UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
OLDE MONMOUTH STOCK
TRANSFER CO., INC.,

                     Plaintiff,

        vs.                                  07 CV 0990 (CSH)

                                      **DECLARATION OF**
                                      **MICHAEL J. TULANEY**
DEPOSITORY TRUST & CLEARING      **IN OPPOSITION TO**
CORPORATION and                            **APPLICATION FOR A**
DEPOSITORY TRUST COMPANY         **TEMPORARY RESTRAINING**
                                        **ORDER**

                     Defendants.
------------------------------------------------------------X

        MICHAEL J. TULANEY, hereby declares pursuant to 28 U.S. C. § 1746 as follows:

        1.     I am a Vice President of The Depository Trust & Clearing Corporation, the parent corporation of The Depository Trust Company ("DTC"). I have been employed by DTC for 28 years and have held my current position since 1999. In this position I am responsible for the Inventory Management of DTC operations, including transfer agent services and FAST balancing

        2.     I submit this affidavit in opposition to plaintiff's application for a temporary restraining order, including a request for mandatory injunctive relief. I am personally familiar with the facts set forth in this declaration.

        3.     Plaintiff Olde Monmouth concedes that it has sought to coerce DTC to approve its application to become a FAST agent by charging DTC exorbitant and discriminatory fees. Despite its agreement to escrow the excessive fees (now totaling approximately $1.1 million) and

1

return the fees if it were to be appointed a FAST agent (*see* accompanying Declaration of Susan Geigel ("Geigel Decl.") ¶ 4), Olde Monmouth has reneged on this agreement and insists upon approval of its application while pocketing its windfall. It further insists that the terms of its approval be inconsistent with DTC's policies and the terms under which all other FAST agents have been approved. DTC, the nation's principal securities depository and a critical element of the national system for the clearance and settlement of securities transactions, has no obligation to succumb to Olde Monmouth's strong-arm tactics. Moreover, according to DTC's records, the number of issues for which Olde Monmouth is identified as the transfer agent has increased during the time this dispute has been ongoing. Its application for a temporary restraining order should be denied.

## BACKGROUND

### DTC

4. DTC is the nation's principal securities depository. It provides various services, particularly the book-entry movement of securities deposited at DTC by its "Participants," the nation's principal brokerage firms and banks. Securities deposited at DTC are registered in the name of DTC's nominee, Cede & Co., and immobilized, as millions of daily securities transactions are settled by the book entry movement of positions in the DTC accounts of its Participants. What would otherwise be an impossible burden of transferring securities certificates representing daily trading volume of billions of shares is thus eliminated. Currently, the value of securities deposited at DTC is well in excess of $30 trillion, reflecting DTC's central role in the securities industry and the nation's economy.[1]

---

[1] According to the SEC, a registered securities depository such as DTC:

> [A]ccepts deposits of securities from broker-dealers, banks and other financial institutions (collectively referred to as "Participants"); credits those securities to the general free accounts of

2

5.  DTC is registered as a clearing agency by the U.S. Securities and Exchange Commission ("SEC") pursuant to 15 U.S.C.§ 78q-1(a)(1)(A). In the words of the SEC, this approval was "an important step in [the SEC's] efforts to facilitate the development of a National Clearance and Settlement System and a significant step in achieving the goals established by Congress." *In re Depository Trust Co.*, SEC Release No. 34-47978, 2003 WL 21288541, 68 Fed. Reg. 35037, 35041 (June 4, 2003) (the "SEC Order") (annexed as Ex. A).

6.  The congressional goal to which the SEC refers is set forth in Section 17A of the Securities Exchange Act of 1934: the prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and safeguarding of securities and funds related to clearance and settlement activities. 15 U.S.C. 78q-1(a)(1)(A). The SEC has thus found that:

> By centralizing and automating securities settlement, by reducing the movement of publicly traded securities in the U.S. markets, and by facilitating the prompt and accurate settlement of securities transactions, DTC serves a critical function in the National Clearance and Settlement System.

SEC Order, 68 Fed. Reg. at 35041.

---

the depositing Participants; and, pursuant to instructions of the Participants, effects book-entry deliveries of securities (including pledges) among Participants (and participating pledgee banks). *See, e.g., DTC, Participant Operating Procedures*, §§ B and C. The physical securities deposited with a securities depository are held in a fungible bulk, no significant portion of which is identified or identifiable to a particular participant or pledgee; each participant or pledgee having securities of a given issue credited to its account has a pro-rata interest in the physical securities of the issue held in custody by the securities depository in its nominee name. *See generally* § 8-320 of the Uniform Commercial Code. Depositories also may provide facilities for payment by Participants to other Participants in connection with book-entry deliveries of securities.

SEC Rel. No. 19678, 48 Fed. Reg. 17603, 17604, n. 5 (April 25, 1983).

7. As a registered clearing agency, DTC has adopted rules governing its operations. These rules are subject to approval by the SEC pursuant to 15 U.S.C. §78q-1(a)(1)(A)(i). *See* SEC Order at 35041.

8. Pursuant to its SEC-approved rules (Rule 5, Section 1 (attached in relevant part as Ex. B)), DTC has "sole discretion" to determine issues that are "eligible" for DTC's services. It similarly has "sole discretion" to determine whether such security "shall cease" to be eligible. Rule 5, Section 2. In the event that DTC determines that a security is not eligible or no longer eligible for its services, it is obligated to "give notice thereof to all Participants . . . ." Rule 5, Section 3. Such determination is subject a multi-step appeal process. Rule 22. (Ex. B). Pursuant to Rule 6, "[t]he corporation may limit certain securities [sic] to particular issues of Eligible Securities."[2] *Id.*

## TRANSFER AGENTS

9. Typically, issuers employ transfer agents as their agents to maintain the company's stock ledger books containing the names and addresses of the registered owners of its securities and to issue securities certificates registered into the names of new registered owners. Transfer agents may be banks or other entities. Currently there are approximately 1400 transfer agents for the approximately 2.5 million issues that are eligible for DTC's services. Most transfer agents, like clearing agencies, are registered with the SEC. 15 U.S.C. §17q-1 (c).

10. Except as explained below, DTC has no role in selecting transfer agents; they are agents of issuers, not DTC. DTC, however, regularly interfaces with transfer agents. For example, if a Participant that has deposited securities of company ABC at DTC wishes to withdraw all or part of its deposit and obtain a company ABC certificate that is registered in its

---

[2] Rule 6 concerns "Services" and the word "securities" in the quoted language is a typographical error; it should read "services."

name or the name of its customer, it will instruct DTC to perform a "withdrawal by transfer" or "W/T." Upon receiving such an instruction, DTC will deliver to the transfer agent for company ABC an ABC certificate from DTC's vault, registered in the name of Cede & Co., and instruct the agent to cancel such certificate and issue a new ABC certificate registered as instructed by the Participant. If DTC has an ABC certificate in its vault for the exact denomination as requested by the Participant, it is a matter of a simple exchange. If it does not, it will deliver to the agent an ABC certificate for a larger denomination, with instructions to issue two new ABC certificates, one registered as instructed for the amount requested and the other, a "change piece" for the remainder, registered to Cede & Co. W/Ts are a frequent occurrence.

11.     Typically, transfer agents charge DTC fees for performing W/Ts and other services, which are then passed along to the Participants that have requested the action. While the amount varies by transfer agent, the fees being charged by Olde Monmouth are many, many multiples higher than the fees being charged by all other transfer agents performing the same functions. Other services provided by transfer agents for which they charge fees to DTC include, for example, processing rejected securities and replacing lost certificates.

## FAST AGENTS

12.     The exception to the rule that transfer agents are agents for the issuers, not DTC, relates to transfer agents with whom DTC has contracted with to participate in the Fast Automated Securities Transfer Program ("FAST agents"). FAST agents are transfer agents who enter into a contractual relationship with DTC to maintain on their premises, rather than in DTC's vaults, a "balance certificate," registered in the name of Cede & Co., for each issue for which the FAST agent is the transfer agent. Only issues that are designated "FAST issues" are eligible for FAST agent services. FAST agents maintain custody of the Cede & Co. balance

certificate and to adjust the number of Cede & Co. shares it represents on a daily basis based upon transactions instructed by DTC.

13. A transfer agent may become a FAST Agent by submitting an application to DTC, which is reviewed by representatives from DTC's business and legal departments. The review process is stringent because a FAST Agent is responsible for maintaining securities and carrying out activities that are otherwise the legal obligations of DTC, pursuant to DTC's SEC-approved rules and the provisions of Article 8 of the U.C.C. In addition, in appointing FAST agents, DTC must take into account its resulting costs stemming from establishing necessary electronic connectivity, training the agents' personnel and monitoring the agents' performance.

14. During the period 2005-2006, 11 transfer agents submitted applications to become FAST agents. Of these, five were approved and six, including Olde Monmouth, were rejected. In total, there are approximately 90 transfer agents that are approved as FAST agents. There are, by contrast, as noted, well over 1,000 transfer agents with which DTC does business that are not FAST Agents.

15. Upon approval as a FAST agent by DTC, DTC and the FAST agent enter into a "Balance Certificate Agreement," which sets forth the rights and obligations of DTC and the FAST Agent. A form Balance Certificate Agreement is attached as Ex. C. All FAST Agents enter into this form agreement; individual negotiations are not permitted. Among other provisions, the Balance Certificate Agreement provides that it is terminable by either party upon 10 days notice. As discussed below, in demanding that it become a FAST Agent, Olde Monmouth insisted that its designation as a FAST Agent be perpetual and that it be held harmless for anything other than gross negligence.

16.     DTC delegates certain of its responsibilities to FAST agents in order to expedite securities processing for the industry and to reduce the risk of loss by minimizing the physical handling of securities certificates. Thus, returning to the example of the W/T request for company ABC discussed above, if ABC were a FAST issue, DTC would not have had to pull an ABC certificate from its vaults and deliver it to the agent. It simply would have given an instruction to the FAST agent for ABC to issue a new certificate, as instructed by the Participant, and to adjust the balance certificate to reflect the withdrawal of Cede & Co. ABC shares. The savings in time and expense is consistent with the Congressional mandate that clearing agencies such as DTC ensure "prompt and accurate" clearance and settlement of securities transactions.

**DRS**

17.     In the continuing effort to reduce costs, risks and delays associated with the physical delivery securities certificates, in August 2006 the SEC approved rule changes proposed by the New York Stock Exchange ("NYSE"), the NASDAQ Stock Market LLC ("NASDAQ") and the American Stock Exchange ("AMEX") to implement the Direct Registration System ("DRS"). DRS enables individual investors to establish a direct book entry positions with the issuer, either through the issuer's transfer agent or the investors' broker. *See, e.g.,* SEC Rel. No. 34-54289 (Exhibit D) (approving NYSE proposed rule). DRS thus enables investors to have securities registered in their own names (rather than being registered in the name of Cede & Co.) without having to hold a physical certificate.

18.     DRS eligibility is mandatory with respect to all securities newly listed on the NYSE, AMEX and NASDAQ after January 1, 2007. All previously listed securities must become DRS eligible as of January 1, 2008. Notably, however, issues traded on the Pink Sheets

7

or electronic bulletin boards have no such requirement. Olde Monmouth's clientele are overwhelmingly Pink Sheet and bulletin board stocks for which DRS is not mandated.

19. In order for an issue to become DRS eligible it must have a transfer agent that is a DTC DRS Limited Participant. In order for a transfer agent to be a Limited Participant for DRS purposes, it must be a FAST agent.[3]

20. Accordingly, while registration as a FAST agent is a prerequisite to acting as a transfer agent for securities eligible for DRS, registration as a FAST agent is not a requirement to do business as a transfer agent. DTC has not required transfer agents to become FAST agents, nor is disapproval of a FAST application tantamount to putting a transfer agent out of business, as Olde Monmouth has contended. Indeed, most of the many hundreds of transfer agents with which DTC is currently doing business are not FAST agents.

## OLDE MONMOUTH'S FAST AGENT APPLICATION

21. With this background, I now address the specific issues raised by Olde Monmouth's application. As demonstrated below, DTC acted appropriately with respect to Olde Monmouth's application, and (although in no way obligated to do so) granted Olde Monmouth numerous opportunities to cure various deficiencies and issues raised by its application and its conduct. Rather than cooperate in resolving these matters in the ordinary course of business and living up to its commitments, Olde Monmouth demanded that DTC approve its application by arbitrary and unilaterally-imposed deadlines. When DTC did not meet these deadlines, Olde Monmouth *by its own admission* (Complaint, ¶¶ 31-32) took retaliatory action by increasing its transfer fees charged to DTC – but not to any other financial institutions – *20-fold* in order to coerce DTC into approving its application. (This fees of $700 per certificate issuance and $200

---

[3]  *See* http://www.dtc.org/dtcpublic/html/lob2/prod6/drsdetail.htm

per certificate cancellation, are many times the average fees charged by the other transfer agents.)

22. DTC has calculated that the retaliatory fee increase has cost DTC (actually its Participants to whom the fees are passed on) approximately $1.1 million above Olde Monmouth's pre-increase fees. This unprecedented and irresponsible action itself raises serious questions regarding Olde Monmouth's suitability to serve as a DTC FAST agent.

23. Olde Monmouth has been a registered transfer agent since 1992. According to DTC's records, Olde Monmouth currently handles transfers for approximately 200 issues, overwhelmingly issues that are traded on the Pink Sheets and electronic bulletin boards. As noted above, neither FAST registration nor DRS participation is required for these issues.

24. Significantly, while claiming that it has been damaged as a result of not having been approved as a FAST agent, the number of issues for which DTC's records show Olde Monmouth is the transfer agent has actually increased since May 2006 when it first submitted its FAST application. At that time, DTC's records showed that it was the transfer agent for approximately 180 issues. And, as recently as last week, DTC was advised that Olde Monmouth had become the transfer agent for an additional company.

25. On or about May 16, 2006, DTC provided Olde Monmouth with the standard application package provided to every transfer agent seeking to become a FAST agent. Olde Monmouth submitted its application to DTC on or about May 23, 2006.

26. DTC reviewed Olde Monmouth's application in its ordinary course. On or about June 6, 2006, at a meeting consisting of representatives from DTC's business and legal departments, certain "red flags" were noted, including several deficiencies in Olde Monmouth's

security and business procedures that had been cited by the SEC in its examinations of Olde Monmouth.

27.     DTC reviewed Olde Monmouth's responses to the deficiencies, together with the entirety of the application, and determined that it was not prepared to approve Olde Monmouth to act as a DTC agent pursuant to the FAST system. By letter dated June 22, 2006, DTC advised Olde Monmouth that it had determined not to approve its application to become a FAST agent. (Exhibit E.)

**Olde Monmouth Demands Reversal of DTC's Decision**

28.     By letter dated July 5, 2006, Olde Monmouth's counsel demanded an appeal of DTC's decision, while acknowledging that his client had no right of appeal. (Exhibit F.) The July 5 letter incorrectly asserted that (1) all issuers were required to join the FAST program, and (2) DTC was the entity that had issued such requirement. As explained above, neither assertion is correct – the bulletin board traded stocks which make up the majority of Olde Monmouth's clientele are not required to participate in FAST, and the requirement that new issues participate in FAST was developed by the major exchanges, not DTC. Nonetheless, Olde Monmouth's counsel relied on these incorrect understandings to conclude that DTC's denial of Olde Monmouth's application was "tantamount to putting them out of business."[4] The letter contained no specific information to support this claim, but merely asserted that DTC's "immediate remedial action [was] required."

---

[4] The July 5 letter further asserted that the deficiencies noted by the SEC should not be considered by DTC because, counsel claimed, those deficiencies did not "bear on and adversely impact the duties of a FAST agent." However, the attachment to that July 5 letter, summarizing the deficiencies and Olde Monmouth's responses, demonstrated that, for example, Olde Monmouth had no procedures at all for checking shareholder names against the U.S. Treasury's Office of Foreign Assets Control List. Olde Monmouth's response was that it was not required to comply with that law; however, DTC is required to comply with that law and thus, transfer agents wishing to act on DTC's behalf must comply. Olde Monmouth's effort to minimize these issues demonstrated its failure to acknowledge the sensitivity of the functions performed by FAST agents on behalf of DTC.

10

29. I am informed that DTC's in-house counsel, Isaac Montal, subsequently spoke by telephone with counsel for Olde Monmouth in response to the July 5th letter, and explained DTC's security and integrity concerns relating to Olde Monmouth.

30. In an attempt to be responsive and consider Olde Monmouth's "appeal," in August, four DTC personnel traveled to Olde Monmouth's offices and conducted a physical inspection. Olde Monmouth, however, was not willing to wait while DTC considered the additional information resulting from that inspection. It continued to demand immediate approval.

**Olde Monmouth Engages in Retaliatory Conduct**

31. By letter dated July 19, 2006, counsel for Olde Monmouth wrote to DTC complaining of DTC's "total lack of interest in resolving the situation" (notwithstanding the substantial time and energy DTC's busy personnel had devoted and continued to devote to this single transfer agent). (Exhibit G.) The July 19 letter announced Olde Monmouth's intent "to increase its fees, daily, until DTC (and especially its Reorganization Section) understand that my client must maintain its viability . . . ."

32. In other words, Olde Monmouth explicitly stated that it intended to charge DTC exorbitant fees for its transfer agent services – as a method of compelling DTC to approve it as its FAST agent.

33. Because Olde Monmouth is the transfer agent for the issues it services, the result of Olde Monmouth's retaliatory price increases was that DTC, and any Participant who sought to transfer physical certificates of an issue handled by Olde Monmouth, would be required to pay Olde Monmouth's grossly excessive fees.

34.     True to its word, effective July 24, 2006, Olde Monmouth *doubled* all of its fees effective that day. (Exhibit H.)[5] Less than a week later, Olde Monmouth, again doubled its fees. (Exhibit I.) That is, in an eight-day period, Olde Monmouth's fees for transfer services had quadrupled. Olde Monmouth's July 30, 2006 cover letter to DTC again admitted that the doubling was "a direct result of DTC's unwillingness and refusal to aid [Olde Monmouth] with a smooth transition to its FAST program." (Exhibit I.) The July 30 letter went on to advise DTC that "in the event that a timely response and assistance to your FAST program is offered, we will consider returning our fees to their current rates."

35.     In accordance with its policies, DTC notified its Participants of the price increases imposed by Olde Monmouth with respect to any issue for which Olde Monmouth was the transfer agent. (*See, e.g.,* documents annexed as Exhibit J.)

**DTC Learns That Olde Monmouth's Pricing Structure Is a Sham**

36.     In response to DTC's notification to its Participants, DTC was contacted by Participants who advised DTC that the new price structure was directed at DTC only. Any Participant who sought directly to use Olde Monmouth's transfer services was charged Olde Monmouth's original rates. Thus, Olde Monmouth's Notices to DTC, which purported to change all transfer fees, were misleading. Aside from the integrity issues – which raise additional concerns for DTC regarding whether it is appropriate to admit Olde Monmouth into the FAST program as its agent – this discriminatory conduct was viewed as inconsistent with DTC's central role in the clearance and settlement system, in that Olde Monmouth was providing an economic incentive not to use the central depository system but, instead, to engage in separate transactions outside the DTC system.

---

[5]     As discussed in paragraph 38, *infra*, this exhibit has been altered by Olde Monmouth from its original version

12

37. On September 26, 2006 DTC wrote to Olde Monmouth advising it that it viewed this discriminatory treatment with concern, and requested that Olde Monmouth promptly provide to DTC its rate sheets and other documentation reflecting the prices charged to DTC and others. (Exhibit K.)

38. Undaunted, Olde Monmouth responded by raising its rates yet again. In a letter dated October 9, 2006 (Exhibit L), it again acknowledged that its "new fee increase is a direct result of your unwillingness to address our issues concerning participation in DTC's FAST/DRS programs." Olde Monmouth did not respond to DTC's inquiry regarding whether its increased rates were being charged solely to DTC, except by altering copies of its previous Notices to "reserve[] the right to provide discounts on certain transactions."[6] Under Olde Monmouth's new rates, the fee for issuing a certificate for a security had gone from $25 per certificate (in June 2006) to *seven hundred dollars* per certificate as of October 9, 2006.

### DTC Continues to Consider Olde Monmouth's "Appeal"

39. Notwithstanding Olde Monmouth's attempts to coerce FAST agent approval from DTC, DTC continued to work in good faith to consider Olde Monmouth's appeal of the denial, and to consider whether Olde Monmouth had demonstrated adequate security, operational safeguards and integrity so as to be trusted to act as DTC's agent with respect to FAST issues.

40. On October 13, 2006, counsel for Olde Monmouth again wrote to DTC, claiming to be "thoroughly confused" by the situation, and by DTC's unresponsiveness. The letter conceded that DTC had taken steps to ascertain the security issues (including an inspection of the Olde Monmouth premises by no fewer than four DTC employees). The letter did not

---

[6] In a letter dated October 18, 2006 (Exhibit M), Olde Monmouth acknowledged that it had altered these documents in response to DTC's September 26 request.

13

acknowledge Olde Monmouth's ongoing efforts to coerce FAST agent approval, which itself raised questions regarding Olde Monmouth's suitability as a FAST agent.

41. I am informed that on October 13, DTC's counsel spoke to Olde Monmouth's counsel to discuss the open issues remaining in DTC's consideration of Olde Monmouth's appeal, and discussed an impending DTC rule change regarding FAST agent approval. I am further informed that during that conversation Olde Monmouth's counsel agreed that the excessive fees, which he said had been escrowed, would be returned once Olde Monmouth became a FAST agent. *See* Geigel Decl., ¶ 4.

42. On November 14, 2006, DTC received another letter from Olde Monmouth, setting forth its position regarding its compliance with the new proposed Rule requirements for FAST agents. (Exhibit N.) Olde Monmouth did not, however, address the fee issue.

43. By letter dated December 27, 2006 (mis-dated as "2007"), Olde Monmouth's Chief Executive Officer, John Christopher Troster, requested that DTC register it as both a FAST agent and a DRS participant, and that it be "guaranteed infinite participation" in those program, except in the case of "gross negligence" (a guarantee which *no* agent or participant is given) and insisted that, contrary to the express terms of the Global Certificate Agreement signed with all FAST agents, that it be excused from liability for anything short of gross negligence. Moreover, Olde Monmouth did not confirm that it would return the excessive fees, instead proposing only that it would roll its fees back to one of the interim increases on a going-forward basis. (Exhibit O.)

44.     DTC has fairly considered Olde Monmouth's application to become a FAST agent. It has done so consistent with DTC's obligations as the nation's principal securities depository and an SEC-registered clearing agency. That the process has taken longer than Olde Monmouth wanted does not remotely justify its strong-arm tactics and refusal to live up to its agreement to refund the grossly excessive and discriminatory fees that it has charged DTC. Its application for emergency relief should be denied.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of February, 2007

_____
Michael J. Tulaney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
OLDE MONMOUTH STOCK
TRANSFER CO., INC.,

                Plaintiff,

vs.    07 CV 0990 (CSH)

**DECLARATION OF SUSAN GEIGEL IN OPPOSITION TO APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

DEPOSITORY TRUST & CLEARING
CORPORATION and
DEPOSITORY TRUST COMPANY

                Defendants.
-----------------------------------------------------------X

      SUSAN GEIGEL, hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

      1.     I am Director, Legal and Regulatory Compliance, of The Depository Trust & Clearing Corporation ("DTCC"), the parent corporation of The Depository Trust Company ("DTC"). I have held this position since 1999. I submit this affidavit in opposition to plaintiff's application for a temporary restraining order ("TRO"). I am personally familiar with the facts set forth in this declaration.

      2.     On October 13, 2006, DTC contacted Olde Monmouth's counsel, Richard Fox, by telephone to discuss the open issues remaining in DTC's consideration of Olde Monmouth's appeal of the denial of its application to become a FAST Agent. The call was made from the office of Isaac Montal, DTCC's Deputy General Counsel. The call was made on the speakerphone and I was present in Mr. Montal's office throughout the call. Mr. Montal advised Mr. Fox that DTC was in the process of submitting a rule filing to the SEC that would detail specific requirements that any FAST agent would have to meet. Although that Rule had not yet been published as final, and therefore did not necessarily apply to current FAST applications,

1

once it was final, all FAST agents (including any FAST agents previously approved) would be required to demonstrate compliance with the standards set forth in that rule. In order to aid DTC in reviewing Olde Monmouth's assertions of adequate security and procedures, DTC offered to provide Olde Monmouth with a draft of that proposed Rule, so that Olde Monmouth could advise DTC as to whether it believed that it met the standards set forth in that Rule. Olde Monmouth agreed to do so, and DTC provided Olde Monmouth with a copy of the Proposed Rule on October 19, 2006 (Exhibit P).

3. Mr. Montal also advised Mr. Fox that Olde Monmouth's retaliatory pricing needed to be resolved. Mr. Montal stated that Olde Monmouth's actions were wholly improper and reflected poorly on Olde Monmouth's judgment and integrity – fundamental considerations in determining whether a transfer agent should be granted permission to act on behalf of DTC.[1]

4. Mr. Fox acknowledged these concerns and said that the excess fees charged to DTC had been escrowed by Olde Monmouth. He stated that should Olde Monmouth be approved as a FAST agent, it would immediately refund those escrowed fees to DTC and would reduce its going forward fees to the pre-increase level. Although DTC had no obligation to approve Olde Monmouth as a FAST agent, Mr. Montal agreed to this conditional offer.

5. When, in the wake of Olde Monmouth's December 27, 2006 letter, DTC realized that Olde Monmouth was not going to refund the excessive fees and was imposing unilateral conditions on its becoming a FAST agent, it was apparent that on a going forward basis Olde Monmouth's fee structure created a disincentive for brokers and their customers to use DTC's depository services and electronic book-entry transfer system for the securities for which Olde

---

[1] DTC also discussed with Olde Monmouth on that telephone call the issue of certain apparently confiscated securities from China Aoxing, an issue that was resolved. However, this issue was not discussed as part of the FAST application issue, but was merely a separate issue as to which DTC needed clarification from Olde Monmouth.

2

Monmouth was the transfer agent. DTC deemed this to be inconsistent with its SEC mandate to provide efficient depository services.

6.   As the registered owner of the securities deposited by Participants, it was appropriate for DTC to notify issuers that their agent, Olde Monmouth, was imposing exorbitant costs on the process of processing physical transactions in their certificates and that as a result DTC was considering whether to stop processing such physical transactions. I am aware that DTC communicated by telephone with two issuers for which Olde Monmouth was the transfer agent, one of which was Paid, Inc. (for which call I was present). To my knowledge, no one from DTC threatened any issuer, as alleged in Old Monmouth's complaint; DTC merely explained that the cost of processing issues for which the Olde Monmouth was the transfer agent was prohibitive and that DTC was considering not processing physical transactions, consistent with its role as an SEC-registered clearing agency. While, consistent with DTC's Rule 5, DTC could have determined that such issues were no longer eligible for DTC's services, DTC considered the much less onerous option of not processing physical transactions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16TH day of February, 2007

*Susan Geigel* (signature)

3