**EXHIBIT A**

the procedures set forth in CBOE Rule 8.95.03 and the procedures set forth in CBOE Rule 2.40(d) concerning recommendations of a market-maker surcharge under that rule. In other respects, a marketing fee oversight committee of the CBOE shall determine administrative procedures for conducting the vote. If a payment accepting firm materially changes its execution status or a DPM transfers its DPM appointment to a separate organization pursuant to CBOE Rule 8.89, any member of the eligible trading crowd may then request that a vote be held to determine whether or not the trading crowd should participate in the marketing fee program by conducting a vote pursuant to the above procedures.

2. Statutory Basis

The CBOE believes that proposed Interpretation .12 to CBOE Rule 8.7 will provide fair and orderly procedures for the administration of the marketing fee program that the CBOE has determined to reinstate, and thus is consistent with and in furtherance of the objectives of Section 6(b)(5) of the Act [11] to promote just and equitable principles of trade and to remove impediments to and perfect the mechanisms of a free and open market.

B. *Self-Regulatory Organization's Statement on Burden on Competition*

The CBOE does not believe that the proposed rule change will impose any burden on competition.

C. *Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants or Others*

The CBOE neither solicited nor received written comments with respect to the proposed rule change.

III. Solicitation of Comments

Interested persons are invited to submit written data, views and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act. Persons making written submissions should file six copies thereof with the Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609. Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for inspection and copying in the Commission's Public Reference Room. Copies of such filing will also be available for inspection and copying at the principal office of the CBOE. All submissions should refer to file number SR–CBOE–2003–20 and should be submitted by July 2, 2003.

IV. Commission's Findings and Order Granting Accelerated Approval of Proposed Rule Change as a Pilot Program

After careful review, the Commission finds that the proposed rule change is consistent with the requirements of section 6(b)(5) of the Act,[12] and the rules and regulations thereunder applicable to a national securities exchange.[13] Specifically, the Commission believes that this proposal, which allows the appropriate trading crowd to determine after a three-month period whether to continue to participate in the Exchange's marketing fee program, promotes member participation in the procedures of the Exchange. Further, the Commission notes that the contemplated voting procedures are substantially similar to the voting procedures contained in CBOE Rules 8.95.03 and 2.40(d), which have previously been reviewed by the Commission.

Finally, the Commission notes that the Exchange is proposing to institute these procedures as a pilot program that will expire one year after Commission approval, or such earlier time as the Commission has approved the procedures on a permanent basis.

Accordingly, the Commission finds good cause, pursuant to section 19(b)(2) of the Act,[14] for approving the proposed rule change prior to the thirtieth day after the date of publication of notice thereof in the Federal Register.

For the Commission, by the Division of Market Regulation, pursuant to delegated authority.[15]

J. Lynn Taylor,
*Assistant Secretary.*
[FR Doc. 03–14643 Filed 6–10–03; 8:45 am]
BILLING CODE 8010-01-P

---

[11] 15 U.S.C. 78f(b)(5).
[12] 15 U.S.C. 78f(b)(5).
[13] In approving this rule, the Commission notes that it has also considered the proposed rule's impact on efficiency, competition, and capital formation. 15 U.S.C. 78c(f).
[14] 15 U.S.C. 78s(b)(2).
[15] 17 CFR 200.30–3(a)(12).

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–47978; File No. SR–DTC–2003–02]

Self-Regulatory Organizations; The Depository Trust Company; Order Granting Approval of a Proposed Rule Change Concerning Requests for Withdrawal of Certificates by Issuers

June 4, 2003.

I. Introduction

On February 3, 2003, The Depository Trust Company filed with the Securities and Exchange Commission ("Commission") and on February 11, 2003, amended proposed rule change SR–DTC–2003–02 pursuant to section 19(b)(1) of the Securities Exchange Act of 1934 ("Act").[1] Notice of the proposal was published in the Federal Register on February 22, 2003.[2] Eighty-nine comment letters were received.[3] For the

---

[1] 15 U.S.C. 78s(b)(1).
[2] Securities Exchange Act Release No. 47365, (February 13, 2003), 68 FR 8535 (February 21, 2003).
[3] Letters from H. Glenn Bagwell, Jr., Esq. (March 6, 2003); Bruce Barrett (March 4, 2003); Bruce M. Barrett (March 19, 2003); Cristy Barrett (March 13, 2003); Jake Barrett (March 13, 2003); Robert D. Becker, Senior Vice President, National City Bank (March 18, 2003); Lester Bianco, Director, Ingalls & Snyder LLC (April 4, 2003); Pete Bowman, Managing Director, First Clearing Corporation (March 18, 2003); Michael R. Brennan, Vice President and Managing Director of Operations, Ameritrade, Inc. (April 28, 2003); Earl D. Bukolt, Managing Director and Chief Operating Officer, Sterne, Agee & Leach, Inc. (April 21, 2003); Leonard W. Burningham, Esq. (March 21, 2003); Leonard W. Burningham, Esq. (March 22, 2003); Leonard W. Burningham, Esq. (March 24, 2003); Neil C. Carfora, Senior Vice President, State Street Corporation (March 11, 2003); Mark Cashion (March 6, 2003); David L. Cermak, Senior Vice President and Director of Operations, RBC; Dain Rauscher (April 21, 2003); Frank M. Ciavarella, Cashiers Division, Prudential Securities Incorporated (April 3, 2003); John Cirrito, Senior Managing Director and Chief Operating Officer, ING Financial Markets LLC (March 17, 2003); Kevin Cundy (March 6, 2003); Richard J. Curran, Director, Credit Suisse First Boston LLC (April 14, 2003); Dennis Dejose (March 8, 2003); Patricia Dowd, Patricia Dowd Inc. (March 5, 2003); Paul A. Ebeling (March 11, 2003); Harry Filowitz, Vice President, Mizuho Trust & Banking Co. (USA) (April 7, 2003); Mary L. Forgy, Chairperson, Bank Depository User Group (March 14, 2003); Mary L. Forgy, Union Planters Trust & Investment Group (March 13, 2003); Susan A. Gessman, Assistant Vice President of Operations, Raymond James and Associates (April 25, 2003); Russell Godwin, President, Medinah Minerals Inc. (March 13, 2003); Jeff Hamel, President, Cashiers' Association of Wall Street, Inc. (March 18, 2003); Edward Hazel, Managing Director, Spear, Leeds & Kellogg (April 9, 2003); James Hendricks (March 8, 2003); Joseph Hoofnagel, Jr. (March 8, 2003); Gordon D. House (March 6, 2003); Tom Ittner, Director, National Financial Services LLC (March 17, 2003); Kent N. Jacobson, President and Chief Executive Officer, James Barclay Alan Inc. (March 7, 2003); Peter Johnston, Managing Director, Goldman, Sachs & Co. (March 24, 2003); Jack
Continued

**35038**  Federal Register / Vol. 68, No. 112 / Wednesday, June 11, 2003 / Notices

reasons discussed below, the Commission is granting approval of the proposed rule change.

II. Description

Recently a number of issuers of securities have independently requested that DTC withdraw from the depository all securities issued by them.[4]

Generally, these issuers have also advised DTC that they will not allow their securities to be reregistered in the name of DTC or its nominee, Cede & Co. The securities of these issuers generally became eligible for DTC services at the request of DTC's participants so that they could utilize DTC's services, including its book-entry transfer system. The securities are held by DTC in its nominee name for the benefit of its participants. DTC has stated that, in its opinion, these issuers have no legal or beneficial interest in the securities they are requesting to be withdrawn from DTC.

DTC's current rules and procedures provide for participants to submit withdrawal requests if they wish to withdraw their securities from DTC.[5] However, DTC's current rules and procedures do not provide for DTC to comply with a withdrawal request from an issuer without also receiving instructions from its participants.

DTC's proposed rule change provides that upon receipt of a withdrawal request from an issuer, DTC will take the following actions: (1) DTC will issue an Important Notice notifying its participants of the receipt of the withdrawal request from the issuer and reminding participants that they can utilize DTC's withdrawal procedures if they wish to withdraw their securities from DTC; and (2) DTC will process withdrawal requests submitted by participants in the ordinary course of business but will not effectuate withdrawals based upon a request from the issuer.

DTC stated in its filing that the application of its procedures is not affected by any purported approval of the request by the shareholders or board of directors of the issuer.[6]

III. Comment Letters

The Commission received 89 comment letters regarding the proposed rule change.[7] Forty-seven commenters submitted fifty-two comment letters opposing the proposed rule change.[8]

Thirty-five commenters submitted thirty-six comment letters supporting the proposed rule change.[9] DTC submitted a letter in response to certain issues raised by comment letters opposing the rule change.

A. Comment Letters Opposing DTC's Proposed Rule Change

A majority of the forty-seven commenters opposed to DTC's filing believe that approval of the proposed rule change would allow DTC to continue to facilitate, either directly or indirectly, short selling in the over-the-counter securities market in violation of DTC's obligation to promote the prompt and accurate clearance and settlement of securities transactions.[10] Seven of these commenters characterized DTC's current settlement process as aiding and abetting illegal short selling or as creating an environment that permits unregistered securities offerings.[11]

At least twenty-six commenters contended that an issuer should have a

---

[4] Kennedy (March 8, 2003); Will Kernen (March 8, 2003); Patrick Kirby, Director, Salomon Smith Barney (March 14, 2003); Donald D. Kittell, Executive Vice President, Securities Industry Association (March 11, 2003); Jeremy D. Kraus, Valesc Medical Specialists (March 4, 2003); Philip Lanz, Managing Director, Bear, Stearns Securities Corp. (April 11, 2003); Arthur Lee, Vice President, Banc of America Securities LLC (March 18, 2003); Joseph M. Liguori, Vice President, JP Morgan Securities, Inc. (April 14, 2003); Erick Lihme (March 8, 2003); Luiz Lima, Director, Americas Regional Service Center, Citibank North America, Inc. (April 22, 2003); Lori Livingston, President and Chief Operating Officer, Transfer Online, Inc. (March 5, 2003); Richard Mangiarelli, President and Chief Operating Officer, Cybertel Communications Corporations (March 5, 2003); John Masse, Executive Director, Morgan Stanley (May 21, 2003); Thomas J. Mazzarisi, Executive Vice President and General Counsel, JAG Media Holdings, Inc. (March 14, 2003); Joseph Meuse (March 5, 2003); Michael Moran, First Vice President, National Investor Services Corp. (March 11, 2003); Lawrence Morillo, Managing Director, Pershing LLC (April 3, 2003); John O'Brien (March 11, 2003); Thomas J. O'Hara, Department Leader, Edward Jones (April 15, 2003); John M. Osmanski (March 4, 2003); David E. Patch (March 4, 2003); Dave Patch (March 6, 2003); D. Patch (March 15, 2003); John L. Petersen, Esq., Petersen & Fefer, on behalf of Blue Industries, Inc. (March 12, 2003); Ernest A. Pittarelli, USB Warburg LLC (April 24, 2003); Robert M. Post (March 8, 2003); James E. Pratt, Esq., on behalf of Composite Holdings, Inc. (March 27, 2003); Joe Raia (March 11, 2003); Richard Reincke, Chief Operating Officer, Aegis Assessments, Inc. (March 3, 2003); Peter Richardson (March 8, 2003); John Rideout (March 12, 2003); Rodney J. Roncaglio (April 29, 2003); Robert S. Rondeau (May 20, 2003); Greg Rotman (March 14, 2003); David Salk (March 6, 2003); Henry F. Schlueter, Esq., Schlueter & Associates, P.C. (March 12, 2003); Robert J. Scott, President and Chief Operating Officer, The Auxer Group, Inc. (March 20, 2003); Joseph J. Selinger, Esq., Tobin, Carberry, O'Malley, Riley & Selinger, P.C. (March 14, 2003); Marshal Shichtman, Esq., Marshal Shichtman & Associates, P.C. (March 11, 2003); Scott Sieck (March 5, 2003); Steven Simonyi-Gindele, President and Chief Executive Officer, ID Superstore (March 17, 2003); Maurisa Sommerfield, Executive Vice President, Charles Schwab & Co., Inc. (April 15, 2003); Michael Sondow (March 4, 2003); Chris Spencer, Chief Executive Officer, Wizzard Software Corporation (March 11, 2003); Roger J. Steffensen (March 8, 2003); SuperVP (March 20, 2003); Kristie Thompson, President, SIA Customer Account Transfer Division (April 4, 2003); Larry E. Thompson, Managing Director and Deputy Chief Counsel, The Depository Trust Company (March 27, 2003); Leon Urbaitel, Chief Operating Officer, StockTransfer.com (March 6, 2003); Brian Urkowitz, Merrill Lynch (April 23, 2003); C. Michael Viviano, BNY Clearing (April 4, 2003); Geoffrey F. Walsh, Chief Operating Officer, Solution Capital (March 7, 2003); and William J. Winter, Senior Vice President, A.G. Edwards & Sons, Inc. (March 14, 2003).

[4 cont.] As explained in further detail by many of the commenters opposing DTC's proposal, the issuers making these requests have alleged that their securities have been the target of manipulative short sellers.

[5] See, e.g., Rules 2, 6, 9(A), and 9(B) of DTC's Rules.

[6] DTC's current procedures and this proposed rule filing do not apply to withdrawal requests submitted by issuers in situations where an issue which should not have been made eligible and deposited at DTC was inadvertently made eligible and deposited (e.g., securities restricted pursuant to Rule 144 or Rule 145 under the Securities Act of 1933). In such situations, DTC will continue its practice of working with the issuer and its participants to exit the security from DTC.

[7] Supra note 3.

[8] Letters from Aegis Assessments, Inc., H. Glenn Bagwell, Bruce Barrett, Bruce M. Barrett, Cristy Barrett, Jake Barrett, Blue Industries, Inc., Leonard W. Burningham (three letters), Composite Holdings, Inc., Kevin Cundy, Cybertel Communications Corporations, Dennis Dejose, Patricia Dowd Inc., Paul A. Ebeling, James Hendricks, Joseph Hoofnagle, Jr., Gordon D. House, ID Superstore, James Barclay Alan Inc., Jack Kennedy, Will Kernen, Erick Lihme, JAG Media Holdings, Inc., Medinah Minerals Inc., Joseph Meuse, John O'Brien, John M. Osmanski, David E. Patch, Dave Patch, David Patch, Robert M. Post, Joseph Raia, Peter Richardson, Rodney J. Roncaglio, Robert S. Rondeau, Greg Rotman, David Salk, Henry F. Schlueter, Robert J. Scott, Joseph J. Selinger, Marshal Shichtman, Scott Sieck, Solution Capital, Michael Sondow, Roger J. Steffenson, StockTransfer.com, SuperVP, Transfer Online, Inc., Valesc Medical Specialists, and Wizzard Software Corporation.

[9] Letters from A.G. Edwards & Sons, Inc., Ameritrade, Inc., Banc of America Securities LLC, Bank Depository User Group, BNY Clearing, Cashiers' Association of Wall Street, Inc., Mark Cashion, Charles Schwab & Co., Inc., Citibank North America, Inc., Credit Suisse First Boston LLC, Edward Jones, First Clearing Corporation, Goldman, Sachs & Co., Ingalls & Snyder LLC, ING Financial Markets LLC, JP Morgan Securities, Inc., Merrill Lynch, Mizuho Trust & Banking Co. (USA), Morgan Stanley, National City Bank, National Financial Services LLC, National Investor Services Corp., Pershing LLC, Prudential Securities Incorporated, Raymond James and Associates, RBC Dain Rauscher, John Rideout, Salomon Smith Barney, Securities Industry Association, Securities Industry Association Customer Account Transfer Division, Spear, Leeds & Kellogg, State Street Corporation, Stearns Securities Corp., Sterne, Agee & Leach, Inc., Union Planters Trust & Investment Group, and USB Warburg LLC.

[10] In addition to alleging that DTC facilitates abusive short selling, some of these commenters took issue with the Commission's regulation of DTC, broker-dealers, and other entities that the commenters believe are responsible for the problems associated with naked short selling.

[11] Several of these commenters characterized the imbalance between the number of shares trading through short selling and the number of shares outstanding as an unregistered securities offering. Others characterized this imbalance as "counterfeiting securities." Letters from H. Glenn Bagwell, Blue Industries, Inc., James Hendricks, ID Superstore, Scott Sieck, Solution Capital, and Michael Sondow.

Federal Register / Vol. 68, No. 112 / Wednesday, June 11, 2003 / Notices    35039

choice as to whether the company's securities are eligible for deposit at DTC,[12] particularly, as some of these commenters argued, when making the securities eligible for deposit at DTC requires the issuer's consent.[13] Most of the twenty-six commenters stated that issuers should have the right to withdraw their securities from DTC in order to protect their shareholders and their share price from the alleged negative consequences of naked short selling by broker-dealers.[14] These commenters believe that by requiring certification and by prohibiting ownership by nominees, including depositories, issuers will better be able to track, address, or preclude naked short selling.[15]

Ten commenters raised a number of concerns regarding the legal basis for the proposal.[16] Seven of the ten commenters stated that DTC's refusal to honor issuers' withdrawal requests or to allow issuers the option of not having securities deposited at DTC conflicts with state law and that state corporation laws, not DTC rules, govern whether a company can restrict securities so that all positions must be certificated or so that just custody-only trading is allowed.[17] Further, they contend that state law determines the conditions that must be met for the proper transfer of securities. One commenter argued that a transfer agent is the agent of the issuer and that unless the issuer has elected to make its securities eligible at DTC, its transfer agent is not subject to DTC rules and regulations or operational arrangements but rather is subject to Commission and NASD rules and regulations.[18] Another of these commenters stated that if transfer agents, which are agents of issuers and as such generally have a duty to follow issuers' instructions including any restrictions imposed by the issuer's by-laws or articles of incorporation, have obligations to both the issuer and to DTC, transfer agents will be effectively "frozen," and the parties will be forced to litigate their disputes.[19]

Four of the seven commenters questioned the need for the filing and in particular questioned DTC's statement that it was only clarifying its existing rules and procedures rather than promulgating a new rule.[20] Some of these commenters said that if this were true, DTC would have either not filed at all or would have filed a rule interpretation pursuant to Section 19(b)(3) of the Act,[21] which would not have required Commission approval. One of the seven commenters observed that while DTC stated that its rules do not provide for issuers' requests to withdraw their securities, DTC did not cite to any rule prohibiting honoring such requests.[22]

Three commenters believe that the manner in which DTC handled this "policy change" was arbitrary, capricious, and detrimental to companies, particularly in light of the fact that DTC has worked with some companies to withdraw their securities but has refused to assist other companies to withdraw their securities.[23] Several commenters also stated they did not understand how at least one company, such as AT&T, could have the right to determine that its stockholders must hold their stock in book-entry form but other issuers do not have the right to determine that their stockholders must hold their stock in certificated form.[24]

Eight commenters took issue with the fact that DTC does not effectively work to protect the interest of the issuer or the issuer's shareholders but rather works in the interest of its participants, the same entities that profit from naked short selling.[25] One of these commenters suggested that this conflict of interest should disqualify DTC from deciding whether an issuer could withdraw its securities.[26]

Finally, eight commenters suggested that the Commission should deny approval of DTC's proposal until the Commission or DTC can investigate and consider appropriate regulation to address naked short selling or until the public is given an opportunity to more fully comment on the proposal.[27] Some of these commenters argued that DTC's current course of action (i.e., filing a proposed rule change) does not sufficiently provide a vehicle for in-depth analysis or meaningful public comment. Several of these commenters suggested that alternatives to DTC such as issuers or transfer agents operating their own book-entry system or a certificated, custody-only system, are available and could be used in lieu of DTC.

B. Comment Letters Supporting DTC's Proposed Rule Change

A majority of the thirty-five commenters supporting DTC's proposed rule change expressed concern that permitting issuers to withdraw their securities from DTC undermines the securities industry's long-term efforts to streamline securities processing, settlement, custodianship in the U.S. market, to achieve straight-through-processing ("STP"), and to ultimately shorten settlement cycles. Twenty-four of these commenters contended that one of the major stumbling blocks to achieving STP involves the difficulties related to processing certificates, which is primarily a manual process.[28] The

---

[12] Letters from Aegis Assessments, Inc., H. Glenn Bagwell, Blue Industries, Inc., Bruce Barrett, Cybertel Communications Corporations, Dennis Dejose, James Hendricks, Gordon D. House, JAG Media Holdings, Inc., James Barclay Alan Inc., Eric Lihme, Medinah Minerals Inc., Joseph Meuse, John O'Brien, John M. Osmanski, David E. Patch, Joseph Raia, Peter Richardson, Henry F. Schlueter, Robert J. Scott, Joseph J. Selinger, Marshall Shichtman, Michael Sondow, Super VP, Transfer Online, Inc., and Valesc Medical Specialists.

[13] Letters from Henry F. Schlueter, Joseph J. Selinger, and Marshal Shichtman.

[14] Letters from Aegis Assessments, Inc., H. Glenn Bagwell, Blue Industries, Inc., Cybertel Communications Corporations, Dennis Dejose, James Hendricks, Gordon D. House, JAG Media Holdings, Inc., James Barclay Alan Inc., Erick Lihme, John O'Brien, John M. Osmanski, David E. Patch, Joseph Raia, Peter Richardson, Henry F. Schlueter, Robert J. Scott, Joseph J. Selinger, Marshall Shichtman, Michael Sondow, Transfer Online, Inc., and Valesc Medical Specialists.

[15] Some commenters refer to allowing the transfer of certificated positions registered only in the name of the final beneficial owner as "custody-only trading."

[16] Letters from H. Glenn Bagwell, Jr., Bruce M. Barrett, JAG Media Holdings, Inc., John M. Osmanski, David E. Patch, Greg Rotman, Henry F. Schlueter, Joseph J. Selinger, Marshal Shichtman, and Solution Capital.

[17] Letters from Bruce M. Barrett, JAG Media Holdings, Inc., David E Patch, Henry F. Schlueter, Joseph J. Selinger, Marshal Shichtman, and Greg Rotman.

[18] Letter from Henry F. Schlueter.

[19] Letter from Marshal Shichtman. The commenter did not explain why he believed the transfer agent has an obligation to DTC.

[20] Letters from H. Glenn Bagwell, Jr., JAG Media Holdings, Inc., John M. Osmanski, and David E. Patch.

[21] Letters from JAG Media Holdings, Inc., John M. Osmanski, and David E. Patch.

[22] Letter from Joseph J. Selinger.

[23] Letters from JAG Media Holdings, Inc., David E. Patch, and Henry F. Schlueter.

[24] Letters from JAG Media Holdings, Inc., David E. Patch, and Solution Capital.

[25] Letters from Cristy Barrett, Jake Barrett, Joseph Meuse, David Patch, Joseph Raia, Joseph J. Selinger, StockTransfer.com, and Wizzard Software Corporation.

[26] Letter from Joseph J. Selinger.

[27] Letters from Aegis Assessments, Inc., Leonard W. Burningham, David E. Patch, David Salk, Joseph J. Selinger, Marshall Shichtman, StockTransfer.com, and Transfer Online, Inc.

[28] Letters from Ameritrade, Inc., Banc of America Securities LLC, Bank Depository User Group, Cashiers' Association of Wall Street, Inc., Mark Cashion, Citibank North America, Inc., Credit Suisse First Boston LLC, Edward Jones, ING Financial Markets LLC, JP Morgan Securities, Inc., Merrill Lynch, Mizuho Trust & Banking Co. (USA), National Financial Services LLC, National Investor Services Corp., Pershing LLC, Prudential Securities Incorporated, RBC Dain Rauscher, Salomon Smith Barney, Stearns Securities Corp., Securities Industry Association, Securities Industry Association Customer Account Transfer Division State Street Corporation, Sterne, Agee & Leach, Inc., USB Warburg LLC, and Union Planters Trust & Investment Group. Several commenters referred to dematerialization or immobilization as a "building

Continued

industry, these commenters believe, has achieved success in significantly reducing risk in the trading markets and in enhancing processing efficiencies within the securities infrastructure supporting book-entry clearance and settlement. In their view, much of the success can be attributed to immobilizing stock certificates and mandating book-entry settlement among financial institutions and their financial intermediaries. Accordingly, many of the commenters claimed that a move to certificated securities is a step backwards in the development of the modern securities processing system and will hinder the industry's efforts to reduce risk, cost, and inefficiencies for all parties involved in securities transactions.[29]

Fourteen commenters specifically raised concerns that an increase in the use of certificates will raise costs and cause significant inconveniences for investors.[30] They believe that increased costs associated with transfers, lost certificates, custody, and trading delays will ultimately be borne by investors. One commenter stated that the withdrawal from DTC might require customer securities to be held in the broker's vault in order to meet the customers' needs and will increase costs associated with transactions, including transfer costs, which are currently ranging from $50.00 to $100.00 per certificate.[31] This commenter claims that these costs are hard to justify to shareholders when the shareholder did not request a certificate.

Ten commenters contended that operating outside the DTC environment would undermine the ability of broker-dealers to effectively complete transactions on behalf of their customers.[32] Forced withdrawals of customer positions held in street name would prevent shareholders from fully participating in services provided by their broker, such as margin accounts, automated dividend payments or reinvestments, asset management, proxy services, account transfers, and prompt processing of corporate actions (particularly where old securities need to be exchanged for new securities as required, for example, in mergers and tender offers). Seven of the ten commenters also indicated that such an action would result in an increase in trading delays and trade failures, which would increase risk in the system.[33]

Three commenters believe that the final decision regarding custody and registration should reside with the beneficial owners or their appointed agents and not with the issuers of such securities.[34] These commenters objected to imposing registration restrictions on beneficial owners, because such registration restrictions would be disruptive to market practices, would impose costs on investors, and would cause inefficiencies in the market. Further, nine commenters noted that the direct registration system ("DRS")[35] was specifically designed by the industry to give shareholders an alternative to either holding a certificate or holding in street name registration.[36] Several commenters pointed to AT&T's decision to dematerialize its securities as further support of the industry's initiatives to dematerialize.[37]

Four commenters stated they believe DTC's proposed rule change complies with its obligation under section 17A of the Act to promote the prompt and accurate settlement of securities transactions.[38] In fact, one of these commenters stated that honoring issuers' request to withdraw from DTC was inconsistent with section 17A.[39] One commenter expressed surprise that DTC's filing on this issue was necessary because of the ability of an owner of a negotiable security to register the securities in whatever name it wished has existed for a long time under the Uniform Commercial Code and therefore should not be restricted by the issuer.[40]

With regard to the naked short selling issue, one commenter indicated that the withdrawal of securities from DTC would not have any material or effective impact on the short selling concerns of issuers.[41] Another contended that short selling is vital to ensuring the asset price reflects the underlying fundamentals of the asset and thereby facilitates a more efficient market.[42] This commenter noted that as a result of the additional costs and trade delays associated with certificate-only securities, some brokers are refusing to conduct trades in issues that have been withdrawn from DTC, which has resulted in an illiquid market for those securities.

*C. DTC's Response Letter to Opposing Comment Letters*

DTC emphasizes in its response letter that the proposed rule change does not constitute a departure from DTC's existing rules and procedures approved by the Commission. Those rules, DTC contends, govern requests to make shares eligible and enable participants to withdraw shares on behalf of themselves or their customers from the DTC system through DTC's withdrawal-by-transfer mechanism.[43]

Further, DTC states that issuers do not have continuing ownership rights in shares they have sold into the marketplace and therefore cannot control the disposition of shares already registered in DTC's nominee name by directing that those shares be surrendered to the transfer agent or by restricting their eligibility for book-entry

---

block" to achieving STP or shorter settlement cycles.

[29] Letters from A.G. Edwards & Sons, Inc., Ameritrade, Inc., Banc of America Securities LLC, Bank Depository User Group, BNY Clearing, Cashiers' Association of Wall Street, Inc., Citibank North America, Inc., Edward Jones, Ingalls & Snyder LLC, ING Financial Markets LLC, JP Morgan Securities, Inc., Merrill Lynch, Mizuho Trust & Banking Co. (USA), Morgan Stanley, National City Bank, National Financial Services LLC, National Investor Services Corp., Pershing LLC, Prudential Securities Incorporated, John Rideout, Salomon Smith Barney, Securities Industry Association, Securities Industry Association Customer Account Transfer Division, Spear, Leeds & Kellogg, State Street Corporation, Stearns Securities Corp., Sterne, Agee & Leach, Inc., Union Planters Trust & Investment Group, and USB Warburg LLC.

[30] Letters from Ameritrade, Inc., Mark Cashion, Citibank North America, Inc., First Clearing Corporation, Merrill Lynch, Mizuho Trust & Banking Co. (USA), National Investor Services Corp., Pershing LLC, RBC Dain Rauscher, John Rideout, Salomon Smith Barney, Securities Industry Association Customer Account Transfer Division, Stearns Securities Corp., and Union Planters Trust & Investment Group.

[31] Letter from Raymond James and Associates. According to this comment letter, Raymond James recently initiated a client certificate transfer fee as a disincentive to requesting a certificate. This fee, the commenter claims, has reduced certificate requests by 67% over the past two years.

[32] Letters from Ameritrade, Inc., BNY Clearing, Mark Cashion, First Clearing Corporation, Mizuho Trust & Banking Co. (USA), National City Bank, National Investor Services Corp., RBC Dain Rauscher, John Rideout, and Union Planters Trust & Investment Group.

[33] Letters from Ameritrade, Inc., BNY Clearing, Mizuho Trust & Banking Co. (USA), National City Bank, First Clearing Corporation, RBC Dain Rauscher, and Union Planters Trust & Investment Group.

[34] Letters from First Clearing Corporation, Mizuho Trust & Banking Co. (USA), and John Rideout.

[35] DRS allows a shareholder to hold a book-entry position in his or her own name on the books of the issuer. As a result, shareholders can enjoy the benefits of both holding their securities in a book-entry system and being a "named" shareholder on the issuer's record.

[36] Letters from Banc of America Securities LLC, Edward Jones, Merrill Lynch, Pershing LLC, Prudential Securities Incorporated, RBC Dain Rauscher, Securities Industry Association Customer Account Transfer Division, Stearns Securities Corp., and Sterne, Agee & Leach, Inc.

[37] Letters from Edward Jones, Pershing LLC, RBC Dain Rauscher, and Stearns Securities Corp.

[38] Letters from A.G. Edwards & Sons, Inc., Banc of America Securities LLC, Prudential Securities Incorporated, and Securities Industry Account Customer Account Transfer Division.

[39] Letter from Prudential Securities Incorporated.

[40] Letter from A.G. Edwards & Sons, Inc.

[41] Letter from Citibank North America, Inc.

[42] Letter from John Rideout.

[43] See e.g. Rules 2, 5, and 9 of DTC's Rules.

transfer at DTC.[44] DTC contends that attempts by issuers to control their publicly traded securities are improper and may constitute conversion. DTC states that by purporting to exercise the rights of the shareholders, issuers are interfering with the legal and beneficial rights of DTC and its participants with respect to securities deposited at DTC and with DTC's obligations under section 17A of the Act.

DTC disagreed with the commenters' contention that it had an obligation to take action to resolve the issues associated with naked short selling because those issues arise in the context of trading and not in the book-entry transfer of securities. DTC pointed out that if beneficial owners believe that their interests are best protected by not having their shares subject to book-entry transfer at DTC, then they can instruct their broker-dealer to execute a withdrawal-by-transfer, which will remove the securities from DTC and transfer them to the shareholder in certificated form.

Finally, DTC contested certain commenters' assertion that issuers cause their shares to become eligible at DTC and therefore have the right to withdraw from DTC eligibility. DTC states that most shares are made eligible at the request of participants and not issuers. But regardless of how the shares are made eligible, DTC believes it continues to own and hold the shares for the convenience and at the request of its participants. DTC believes that if it were to exit shares upon demand of an issuer, there is no mechanism to ensure that the shares entrusted to DTC by its participants would be returned to their rightful owners. This, DTC contended, would be inconsistent with its obligations under section 17A.

IV. Discussion

Section 17A(b)(3)(F) of the Act requires that the rules of a clearing agency be designed to promote the prompt and accurate clearance and settlement of securities transactions and to remove impediments to and perfect the mechanism of a national system for the prompt and accurate clearance and settlement of securities transactions.[45] For the reasons described below, the Commission finds that the rule change is consistent with section 17A of the Act.

Pursuant to section 17A of the Act, Congress set forth its finding that the prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and safeguarding of securities and funds related to clearance and settlement activities, is necessary for the protection of investors and those acting on behalf of investors.[46] Inefficient clearance and settlement procedures, Congress found, impose unnecessary costs on investors and those acting on their behalf.[47] Congress vested with the Commission the authority and responsibility to regulate, coordinate, and direct the operations of all persons involved in processing securities transactions toward the goal of establishing a national system for the prompt and accurate clearance and settlement of transactions in securities ("National Clearance and Settlement System") in an effort to increase efficiency and reduce risk.[48] The Commission's approval of DTC's registration as a clearing agency constituted an important step in its efforts to facilitate the development of a National Clearance and Settlement System and a significant step in achieving the goals established by Congress.[49]

As a registered clearing agency, DTC has adopted rules under section 19(b) of the Act to act as a depository that operates a centralized system for the handling of securities certificates through book-entry movements.[50] Generally, those rules, including adoptions, deletions, or changes to DTC's constitution, articles of incorporation, bylaws, rules, or stated policies, practices, and interpretations, must be filed with the Commission and must be approved by the Commission if the Commission finds the rule change consistent with the Act.[51] Furthermore, DTC can only act in accordance with its rules. DTC has adopted rules that permit deposits of securities into DTC by participants [52] and rules that permit withdrawals from DTC by participants and pledgees.[53] However, DTC has not adopted rules that permit issuers to withdraw securities from DTC. Accordingly, a procedure allowing issuers to withdraw securities from DTC would have to be filed and approved by the Commission. DTC has not filed such a rule change.

In accordance with its rules, DTC accepts deposits of securities from its participants (i.e., broker-dealers and banks), credits those securities to the depositing participants' accounts, and effects book-entry movements of those securities.[54] The securities deposited with DTC are registered in DTC's nominee name, Cede & Co. (making DTC's nominee the registered owner of the securities) and are held in fungible bulk. Each participant or pledgee having an interest in securities of a given issue credited to its account has a pro rata interest in the securities of that issue held by DTC. Among other services it provides, DTC provides facilities for payment by participants to other participants in connection with book-entry deliveries of securities, collects and pays dividends and interest to participants for securities, and provides facilities for the settlement of institutional trades. By centralizing and automating securities settlement, by reducing the movement of publicly traded securities in the U.S. markets, and by facilitating the prompt and accurate settlement of securities transactions, DTC serves a critical function in the National Clearance and Settlement System.

DTC's rules also accommodate withdrawal requests from participants or under certain conditions, from pledgees.[55] Securities credited to a participant's or pledgee's account may be withdrawn in certificated form (if the issue is not dematerialized).[56] DTC's rules, both prior to and after the approval of the clarification which is the subject of this rule filing, obligates and allows DTC to take instructions only from its participants.

Some commenters opposing DTC's proposed rule change contend that issuers should have a choice as to whether their securities are made

---

[44] DTC also noted that none of the securities where the issuer is attempting to restrict the transferability of its shares bear any legend, conspicuous or otherwise, noting the restrictions.

[45] 15 U.S.C. 78q–1(b)(3)(F).

[46] 15 U.S.C. 78q–1(a)(1)(A).

[47] 15 U.S.C. 78q–1(a)(1)(B).

[48] 15 U.S.C. 78q–1(a)(1)(A)(i). Congress expressly envisioned the Commission's authority to extend to every facet of the securities handling process involving securities transaction within the United States, including activities by clearing agencies, depositories, corporate issuers, and transfer agents. See S. Rep. No. 75, 94th Cong., 1st Sess. at 55 (1975).

[49] Exchange Act Release No. 20221 (September 23, 1983), 48 FR 45167 (October 3, 1983).

[50] As a registered clearing agency, DTC is a self-regulatory organization and as such, must file with the Commission any proposed rule or rule change pursuant to section 19 of the Act. 15 U.S.C. 78s(b).

[51] Section 3(a)(27) of the Act defines the term "rules of a clearing agency." The Commission's role in the approval of such rules is described in section 17A and section 19(b) of the Act. 15 U.S.C. 78q–1 and 15 U.S.C. 78s.

[52] DTC has informed the Commission that issuers of book-entry-only securities (i.e., some corporate debt and most municipal securities) enter into a contract with DTC whereby the issuer deposits their securities into DTC and DTC then credits the securities to the accounts of participants. See also note 55 infra and accompanying text.

[53] See e.g. Rules 2, 6, and 9 of DTC's Rules.

[54] See e.g. Rule 6 of DTC's Rules. All deposits, whether made by a participant or, in the case of book-entry-only securities, by an issuer must be credited to a participant's account at DTC.

[55] See e.g. Rules 2, 6, and 9 of DTC's Rules.

[56] See e.g. Rule 6 of DTC's Rules, By-Laws and Organization of Certificate.

35042    Federal Register / Vol. 68, No. 112 / Wednesday, June 11, 2003 / Notices

eligible for deposit at DTC.[57] In this way, these commenters argue, issuers would be better able to protect their shareholders from the negative effects naked short selling has on their securities' share price.[58] Securities deposited at DTC are registered in the name of Cede & Co. and are held beneficially for DTC participants, who in turn may hold the securities beneficially for their customers.[59] Since DTC participants and their customers, not issuers, have ownership interest in the securities, DTC participants and their customers have the authority to determine whether to deposit securities with DTC or not. Participants deposit certificates with DTC in order to avail themselves of the efficiencies and safeguards provided by DTC. It would not be consistent with DTC rules to allow issuers to withdraw securities which they have not deposited at DTC or have no ownership interest.

Furthermore, the issues surrounding naked short selling are not germane to the manner in which DTC operates as a depository registered as a clearing agency. Decisions to engage in such transactions are made by parties other than DTC. DTC does not allow its participants to establish short positions resulting from their failure to deliver securities at settlement. While the Commission appreciates commenters' concerns about manipulative activity, those concerns must be addressed by other means.[60]

Several commenters claim that DTC is acting arbitrarily by permitting some issuers to withdraw their securities while prohibiting others from withdrawing their securities because DTC did accommodate a few earlier requests from issuers in the belief that they were unusual circumstances. However, DTC only withdrew these securities based upon instructions made by participants pursuant to DTC's rules and procedures. DTC bore the substantial expense resulting from coordinating the communications and actions among DTC participants, the transfer agent, and the issuer in order to accommodate each issuer's request. When it became clear to DTC that many more issuers intended to attempt to withdraw their securities from DTC, it decided that it would no longer bear the substantial additional cost and expense of time in accommodating such requests. In none of the situations where DTC assisted an issuer in having its securities withdrawn did DTC act on an issuer's instructions. DTC facilitated the issuer by having DTC participants issue instructions to withdraw the securities.

With regard to commenters' contention that state law permits companies to adopt certain restrictions on publicly traded securities, this filing does not address the validity of such restrictions since the securities that are the subject of this filing are securities which are registered in the name of (i.e., legally owned) Cede & Co. prior to the imposition of any restrictions. The securities of issuers, such as the ones that recently attempted to withdraw their securities from DTC, were issued without restrictions or notice of an adverse claim, and no restrictions were imposed on or claims made against the securities when DTC participants deposited the securities at DTC or when the transfer agent registered them in the name of Cede & Co.

While not a direct subject of this rule filing, we note that actions by some issuers of publicly traded securities to require transfer only by certificate[61] and to restrict ownership of the securities by a depository or financial intermediary could result many of the inefficiencies and risks sought to be avoided when Congress promulgated section 17A of the Act.[62] We also note in this connection that section 17A(e) directs the Commission to use its authority "to end the physical movement of the securities certificate in connection with settlement among brokers and dealers of securities transactions by means of the mails or other means or instrumentalities of interstate commerce."[63] Consistent with this directive, the Commission has encouraged the use of alternatives to holding securities in certificated form in an effort to improve efficiencies and decrease risks associated with processing securities certificates. Among other things, the Commission has approved the rule filings of self-regulatory organizations that require their members to use the facilities of a securities depository for the book-entry settlement of all transactions in depository-eligible securities[64] and require that, before any security can be listed for trading, it must have been made depository eligible if possible.[65] More recently the Commission has approved the implementation and expansion of DRS.[66]

---

[57] Some commenters argued that because some issuers sign an Operating Agreement or Letter of Representation with DTC in order to make their shares eligible at DTC, they should retain the right to withdraw their securities. DTC has informed the Commission that as a general rule only those issuers who issue in "book-entry-only" form (i.e., certain debt and municipal securities where no certificate is available) sign an Operating Agreement with DTC. Furthermore, DTC's Underwriting Service Guide, which describes DTC's eligibility requirements and deposit process, makes clear that generally only issuers of book-entry-only securities must execute a Letter of Representation to make the securities eligible for deposit. Since most equity securities make certificates available, participants make most deposits of securities into DTC.

[58] A short sale is generally a sale of a security that the seller does not own or as effectuated by the delivery of borrowed securities within the required settlement timeframe. Although the Commission notes that a "naked short sale" is not a defined term, it generally refers to where a seller sells a security without owning or borrowing the security and does not deliver when delivery is due.

[59] DTC participants holding securities on behalf of a customer are generally obligated to act pursuant to their customers' instructions.

[60] See Rhino Advisors, Inc. and Thomas Badian: Lit. Rel. No. 18003 (February 27, 2003); See also SEC v. Rhino Advisors, Inc. and Thomas Badian, Civ. Action No. 03 civ 1310 (RO) (Southern District of New York).

[61] One commenter questioned how AT&T could choose to dematerialize but other issuers cannot choose to issue in certificated form only. AT&T is incorporated in the State of New York and trading on the New York Stock Exchange ("NYSE"). New York law permits companies to issue in book-entry-only and NYSE rules permit listed companies to not offer certificates provided the issuer is participating in DRS pursuant to NYSE rules. However, prior to AT&T dematerializing, the vast majority of AT&T's stock was immobilized at DTC in order to facilitate book-entry transfers at DTC. Only individuals holding certificates were practically effected by AT&T's decision to dematerialize.

[62] We note that in the late 1960s and early 1970s, the securities industry experienced a "Paperwork Crisis" that nearly brought the industry to a standstill and directly or indirectly caused the failure of large number of broker-dealers. This crisis primarily resulted from increasing trade volume coupled with inefficient, duplicative, and extensively manual clearance and settlement systems particularly with securities certificates, poor records, and insufficient controls over funds and securities. Securities and Exchange Commission, Study of Unsafe and Unsound Practices of Brokers and Dealers, H.R. Doc. No. 231, 92nd Cong., 1st Sess. 13 (1971). Congress held extensive hearings to investigate the problems and ultimately enacted the Securities Acts Amendments of 1975. Securities Acts Amendments of 1975: Hearings on S. 3412, S. 3297, S. 2551 Before the Subcomm. On Securities of the Senate Comm. on Banking, Housing and Urban Affairs, 92nd Cong., 2nd Sess. (1972).

[63] 15 U.S.C. 78q–1(e). See also supra note 46 and accompanying text.

[64] Securities Exchange Act Release No. 32455 (June 11, 1993), 58 FR 33679 (June 18, 1993) (order approving rules requiring members, member organizations, and affiliated members of the New York Stock Exchange, National Association of Securities Dealers, American Stock Exchange, Midwest Stock Exchange, Boston Stock Exchange, Pacific Stock Exchange, and Philadelphia Stock Exchange to use the facilities of a securities depository for the book-entry settlement of all transactions in depository-eligible securities with another financial intermediary).

[65] Securities Exchange Act Release No. 35798 (June 1, 1995), 60 FR 30909 (June 12, 1995) (order approving rules setting forth depository eligibility requirements for issuers seeking to have their shares listed on the exchange).

[66] DRS provides an investor with the ability to register her securities in her own name on the issuer's records and to efficiently transfer by book-entry movements her securities positions to her broker. Using DRS, an investor can register a position directly with the issuer and can electronically move the position to a broker of choice for disposition within the current settlement


The use of certificates can result in significant delays and expenses in processing securities transactions and can raise safety concerns associated with lost, stolen, and forged certificates. The concerns associated with lost certificates was dramatically demonstrated during the September 11, 2001, tragedy when tens of thousand of certificates maintained in broker-dealers' vaults either were destroyed or were unavailable for transfer.

Accordingly, for the reasons stated above the Commission finds that the rule change, which clarifies that DTC's rules only permit it to honor its participants' requests to withdraw securities, is consistent with section 17A of the Act.

### V. Conclusion

On the basis of the foregoing, the Commission finds that the proposed rule change is consistent with the requirements of the Act and in particular with the requirements of section 17A(b)(3)(F) of the Act and the rules and regulations thereunder. *It is therefore ordered,* pursuant to section 19(b)(2) of the Act, that the proposed rule change (File No. SR–DTC–2003–02) be and hereby is approved.

For the Commission by the Division of Market Regulation, pursuant to delegated authority.[67]

J. Lynn Taylor,
*Assistant Secretary.*
[FR Doc. 03–14642 Filed 6–10–03; 8:45 am]
BILLING CODE 8010-01-P

---

### SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–47982; File No. SR–NASD–2003–80]

**Self-Regulatory Organizations; Notice of Filing and Immediate Effectiveness of Proposed Rule Change by National Association of Securities Dealers, Inc. to Codify the Policy of the Nasdaq Market Operations Review Committee With Respect to Review Panels**

June 4, 2003.

Pursuant to section 19(b)(1) of the Securities Exchange Act of 1934, ("Act")[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on May 6, 2003, the National Association of Securities Dealers, Inc. ("NASD"), through its subsidiary, The Nasdaq Stock Market, Inc. ("Nasdaq"),

---

timeframes as well as within any future shortened settlement cycle.
[67] 17 CFR 200.30–3(a)(12).
[1] 15 U.S.C. 78s(b)(1).
[2] 17 CFR 240.19b–4.

submitted to the Securities and Exchange Commission ("Commission") the proposed rule change as described in Items I, II and III below, which Items have been prepared by Nasdaq. On June 2, 2003, Nasdaq filed Amendment No. 1 to the proposed rule change.[3] The Commission is publishing this notice to solicit comments on the proposed rule change, as amended, from interested persons.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

Nasdaq proposes to codify the policy of the Nasdaq Market Operations Review Committee with respect to the use of review panels. Below is the text of the proposed rule change. New text is in *italics*.

\* \* \* \* \*

**4612. Primary Nasdaq Market Maker Standards**

(a)–(h) No change.
*Cross Reference—IM–11890–2, Review by Panels of the MORC*

\* \* \* \* \*

**4619. Withdrawal of Quotations and Passive Market Making**

(a)–(e) No change.
*Cross Reference—IM–11890–2, Review by Panels of the MORC*

\* \* \* \* \*

**4620. Voluntary Termination of Registration**

(a)–(d) No change.
*Cross Reference—IM–11890–2, Review by Panels of the MORC*

\* \* \* \* \*

**4710. Participant Obligations in NNMS**

(a)–(e) No change.
*Cross Reference—IM–11890–2, Review by Panels of the MORC*

\* \* \* \* \*

**11890. Clearly Erroneous Transactions**

(a)–(d) No change.

**IM–11890–1. Refusal to Abide by Rulings of a Nasdaq Officer or the MORC**

It shall be considered conduct inconsistent with just and equitable principles of trade for any member to

---

[3] *See* letter from John M. Yetter, Assistant General Counsel, Nasdaq, to Katherine England, Assistant Director, Division of Market Regulation, Commission, dated May 30, 2003 ("Amendment No. 1"). In Amendment No. 1, Nasdaq added cross-references to proposed new IM–11890–2 to the text of related rules. For purposes of calculating the 60-day abrogation period, the Commission considers the proposed rule change to have been filed on June 2, 2003, when Amendment No. 1 was filed.

refuse to take any action that is necessary to effectuate a final decision of a Nasdaq officer or the MORC under Rule 11890.

**IM–11890–2. Review by Panels of the MORC**

*For purposes of Rule 11890 and other NASD rules that permit review of Nasdaq decisions by the MORC, a decision of the MORC may be rendered by a panel of three or more members of the MORC, provided that no more than 50 percent of the members of any panel are directly engaged in market making activity or employed by a member firm whose revenues from market making activity exceed ten percent of its total revenues.*

\* \* \* \* \*

### II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, Nasdaq included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. Nasdaq has prepared summaries, set forth in sections A, B and C below, of the most significant aspects of such statements.

#### A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

1. Purpose

The purpose of this rule filing is to codify the existing practice of the Market Operations Review Committee (the "MORC") with respect to convening panels of its members to undertake reviews of Nasdaq decisions that are subject to review by the MORC. The MORC is a standing committee selected by the Nasdaq Board of Directors. Under the Plan of Allocation and Delegation of Functions by NASD to Subsidiaries (the "Delegation Plan"), however, no more than 50 percent of the MORC's members may be directly engaged in market making activity or employed by a member firm whose revenues from market making activity exceed ten percent of its total revenues. At this time, five members of the MORC are market maker representatives under the standard established by the Delegation Plan, while the remaining nine members of the MORC are not. Currently, the MORC's primary function is to review Nasdaq's decisions to nullify or modify clearly erroneous