UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X

OLDE MONMOUTH STOCK TRANSFER CO., INC., :

                       Plaintiff,     :

       -- against --               : 07 CV 0990 (CSH)

DEPOSITORY TRUST & CLEARING        :
CORPORATION and DEPOSITORY TRUST
COMPANY,                       :
               Defendants.
                                   :

-------------------------------------------X


**<u>DECLARATION OF JOHN C. TROSTER</u>**


       JOHN C. TROSTER, hereby declares pursuant to 28

U.S.C. § 1746 as follows:

       1.    I am the President of Plaintiff Olde

Monmouth Stock Transfer, Co., Inc. ("Olde Monmouth"), one

of only a small handful of stock transfer agents located in

the State of New Jersey.

       2.    Plaintiff Olde Monmouth is a small, family-

owned company that was founded by my father, John A.

Troster, approximately 16 years ago.  My mother, two

siblings, brother-in-law and I all work with my father at

the company to promote and steward into the next generation

Olde Monmouth's long-term growth and prosperity as a family-owned enterprise. In connection with Olde Monmouth's long-term development plans, it regularly updates all of its operational, security and computer systems to ensure that it remains technologically current and totally up to date in all aspects of the stock transfer industry.

3. Olde Monmouth is in the business of serving as the registrar and stock transfer agent for its clients. Plaintiff's clients are corporations, the shares of which are publicly traded on the national stock exchanges and on the so-called stock trading "bulletin boards." As part of the provision of such services to its clients, Olde Monmouth acts as its clients' transfer agent vis-à-vis Defendant Depository Trust Company; however, no written contract of any kind exists between Olde Monmouth and DTC.

4. Established in 1973, Defendant DTC is the largest central securities depository in the world, with custody of the securities of more than 2.5 million issuers valued at over $28 trillion. According to its official promotional and marketing materials, DTC aims to reduce costs and to enhance clearing and settlement efficiencies by reducing the need for the actual physical transfer of individual stock certificates. Through use of DTC,

2

physical stock certificates are maintained (or "immobilized") in a central location, with changes in the ownership of such securities recorded by "book entry" accounting systems, pursuant to which no stock certificates actually change hands.

5. Defendant DTC provides settlement services for all stock trades made through the National Securities Clearing Corporation ("NSCC"), the largest clearing corporation now in existence, and for other institutional stock trades and transfers. Like DTC, NSCC is also a wholly-owned subsidiary of Defendant DTCC. According to its official promotional and marketing materials, DTC settled securities transactions worth $275.2 trillion in 2004. According to NSCC's official promotional and marketing materials, in 2004 it processed some 5.7 billion transactions, valued at $100.4 trillion.

6. Working and interacting with DTC each business day, Olde Monmouth keeps track of the constantly shifting ownership rolls of its customers' shares of stock. The role Olde Monmouth plays as the intermediary between its clients (*i.e.*, the issuing companies) and DTC is critical to ensuring that accurate records are maintained of the actual day-to-day ownership of its customers' shares of stock as those securities are bought and sold on the

national stock exchanges and through the stock trading bulletin boards.

7. As compensation for its professional services as the stock transfer agent for its clients, Olde Monmouth is paid transaction fees by its clients, as well as by DTC, pursuant to fee schedules that are established by Olde Monmouth. As noted earlier, there is no written contract in place between Plaintiff and DTC governing fees or any other matter. Accordingly, and in keeping with standard custom and practice within the stock transfer industry, Olde Monmouth from time to time revises its fee structure as it determines to be justified by business circumstances and as it deems appropriate to remain competitive in the stock transfer industry.

8. At all times prior to the events complained of in this lawsuit, Olde Monmouth enjoyed a cooperative and mutually beneficial relationship with Defendants; no disputes of any kind arose between them that were not satisfactorily resolved in timely fashion. This period of mutual benefit and cooperation lasted for more than 15 years.

**DTC Announces A Mandatory Program Called DRS (Direct Registration System) To Be Used Only By "FAST" Approved Transfer Agents**

9. Early in 2006, DTC announced the mandatory implementation of a new electronic stock transfer system known as the DRS Program. DTC specifically stated that in order for any transfer agent to be eligible for participation in this new mandatory program, the transfer agent must first be approved for DTC's Fast Automated Securities Program ("FAST"). All newly listed issuers on the national stock exchanges must be part of the DRS Program by January 1, 2007. All existing issuers on the national stock exchanges must be part of the DRS Program no later than January 1, 2008.

10. The objective of the FAST Program is to eliminate the movement of physical securities (immobilization) by allowing stock transfer agents to hold one balance certificate for each issuing company, in lieu of issuing multiple stock certificates. The stated purpose of the FAST Program is to reduce the cost of creating, transporting and storing stock certificates, as well as generally to improve the efficiencies of stock transfers.

11. Widely publicized by DTC as an important cost saving technological advancement in the securities transfer industry, the FAST Program takes the form of a

5

contractual arrangement governing the treatment of stock ownership records between DTC and those members of the stock transfer industry that are approved by DTC to participate in the FAST Program.

12. In several announcements and publications, DTC and other leading organizations in the securities industry, such as the Securities Industry Association, have made clear and emphasized the critical importance of DRS/FAST participation for all members of the securities industry, including stock transfer agents. For example, DTC has stated that it "urges...Underwriters to pick a Transfer Agent that is a FAST Agent because Agents must qualify as FAST in order to become DRS eligible." DTC also has publicized the fact that "DTCC recently sent letters to all Underwriters alerting them to the Rule changes and providing a list of current DRS eligible Transfer Agents." DTC's DRS Program has been imposed upon and/or adopted by virtually every major financial institution and broker/dealer in the securities industry. Moreover, DRS participation is or will soon be a listing requirement for all of the major stock exchanges in the United States. As noted earlier, under the rules and conditions imposed by DTC, no transfer agent can be eligible for DRS

participation unless that agent has been permitted by DTC to participate in DTC's FAST Program.

13. DTC's widespread dissemination of the mandatory nature of its DRS Program throughout the securities, broker/dealer and financial services industries includes, but is not limited to, the publication on the official DTCC/DTC Web site of a list of institutions that already have been approved by DTC as DRS-eligible. It is my understanding that not one small, family-owned stock transfer agency appears among the list of DRS-eligible entities, which is made up entirely of huge full-service financial behemoths and major multinational corporations, such as ChaseMellon, The Bank of New York, Citibank, HSBC Bank, Wells Fargo Bank, and the like; according to Defendants' official list, even The Walt Disney Company has been certified by DTC as DRS-eligible. (A copy of the list of DRS-eligible entities as it appears on the official DTCC/DTC Web site is attached as Exhibit C to the Declaration of Edward R. Gallion, Esq., dated February 7, 2007 ("Gallion Declaration"), which was filed and submitted with the Verified Complaint in this action on February 13, 2007.)

14. In fact, Olde Monmouth recently has begun to receive unsolicited offers from third parties offering

their services as "DRS experts" to assist those businesses not yet approved for DRS participation.  One such solicitation, which arrived at Olde Monmouth's offices by electronic mail, begins:  "I've noticed your business is not yet qualified to offer the Direct Registration System to your clients."  (A copy of this electronic mail solicitation is attached as Exhibit D to the Gallion Declaration.)  The exact extent of the chilling effects on Olde Monmouth's business activities from the widespread dissemination by Defendants of such exclusionary lists of DRS-eligible entities is at this point impossible to ascertain.

15.  Despite Olde Monmouth's repeated and concerted efforts to participate in the FAST Program, however, DTC unreasonably and arbitrarily has refused to allow Olde Monmouth to participate in this important mandatory new program.

**Olde Monmouth's Unsuccessful Efforts to Enroll in FAST**

16.  Realizing the critical importance of the FAST Program to its clients, Olde Monmouth immediately contacted DTC to obtain the requisite application materials as soon as Olde Monmouth learned of the program's mandatory nature in March 2006.  Most of Olde Monmouth's customers

8

are small companies to whom the potential for the cost savings to be realized by the efficiencies inherent in the FAST Program would be of great value.

17. Participation in the FAST Program is of such critical importance to Olde Monmouth that if it is not permitted to join, it will be unable to retain existing clients or to attract new customers, thereby causing irreparable harm to Olde Monmouth.

18. Over the course of the ensuing few weeks, Olde Monmouth made numerous attempts to learn from DTC the steps that would be required to become a participant in the FAST Program. Despite these many overtures by Olde Monmouth, however, Defendant DTC inexplicably refused to share any additional information about the FAST Program with Olde Monmouth and, in fact, either ignored or rebuffed Olde Monmouth's repeated and numerous attempts to apply for participation in the FAST Program. Despite its best efforts, Olde Monmouth was unable to communicate with any DTC representative about its surprising and inexplicable refusal to allow Olde Monmouth to apply for participation in the FAST Program.

19. Because all of its initial requests to obtain the necessary application materials for participation in DTC's FAST Program were ignored by DTC, in

March 2006 Olde Monmouth began telephoning DTC approximately two times each week in an attempt to secure an application package.  After several weeks of repeated telephone calls to DTC, Olde Monmouth finally obtained the FAST application materials.

20.  Upon receipt, Olde Monmouth immediately completed and returned the FAST Program application forms to DTC on May 19, 2006.

21.  On June 22, 2006, Olde Monmouth was informed by letter from DTC that:  "DTC has determined not to use your services as a FAST agent."  (A copy of the June 22, 2006 letter from DTC is attached as Exhibit E to the Gallion Declaration.)  DTC purported to excuse its unreasonable refusal to permit Olde Monmouth's enrollment in the FAST Program on the basis of several minor deficiencies that in the past had been cited by the Securities and Exchange Commission, despite the fact that, in the case of each such "deficiency," Olde Monmouth had immediately addressed and cured all of the cited conditions to the satisfaction of the Securities and Exchange Commission.

22.  Several days after learning of its rejection by DTC, on July 5, 2006, Olde Monmouth's outside counsel, Mr. Richard Fox, wrote to DTC requesting additional

10

information and clarification concerning its refusal to permit Olde Monmouth's participation in the FAST program. (A copy of Mr. Fox's July 5, 2006 letter is attached as Exhibit F to the Gallion Declaration.) DTC never responded.

23. Realizing that its very existence as an ongoing business enterprise was placed in jeopardy by DTC's unreasonable and arbitrary refusal to address Olde Monmouth's need to participate in the FAST Program, over the next few months Olde Monmouth in good faith undertook a lengthy series of extraordinary steps to convince DTC of its complete and total compliance with all of the FAST program's requirements and to ascertain from DTC the reason for its arbitrary refusal to allow Olde Monmouth's participation -- none of which was successful. Such extraordinary good faith steps included the following:

(a) Olde Monmouth voluntarily implemented greatly enhanced on-site security measures to improve the security of its customers' stock certificates that far exceeded SEC requirements. At the invitation of Olde Monmouth, DTC inspected Olde Monmouth's premises but has never commented on its inspection in any manner.

11

(b)   In addition to correspondence from its attorney, Olde Monmouth continued to place frequent telephone calls to DTC as part of its diligent and conscientious attempts to ascertain whether there might be any plausible justification for DTC's unreasonable and unfair exclusion of Olde Monmouth from the FAST Program.  On September 7, 2006, Isaac Montal, Esq., of DTC's Legal Department, telephoned Olde Monmouth to admonish it against any further inquiries and to promise that it would receive notification of DTC's disposition of its application request a few weeks thereafter.

(c)   In connection with the approval of its enrollment in a separate program initiative sponsored by DTC, the "Paperless Legal Transfer Program," Olde Monmouth sought the assistance of its DTC contact person on that new program to help with its problems in obtaining enrollment in the FAST Program, who promised to look into the matter on behalf of Olde Monmouth.  Olde Monmouth has never received any response to its request.

(d)   Mr. Fox once again wrote to DTC's Legal Department on October 13, 2006, to reiterate Olde Monmouth's express willingness and determination to

cooperate fully with DTC to address and remedy any issues that DTC might have with respect to Olde Monmouth's participation in the FAST program:  "If there are any deficiencies, and they are communicated, my client [Olde Monmouth] will take every step necessary to comply."  Mr. Fox also reiterated Olde Monmouth's request for a face-to-face meeting with DTC representatives to resolve the matter.  (A copy of Mr. Fox's letter of October 13, 2006, is attached as Exhibit G to the Gallion Declaration.)

(e)  Olde Monmouth paid to retain the professional services and assistance of Susanne Trimbath, Ph.D., the CEO of STP Advisors, a firm that provides advisory services to the stock transfer industry.  Because Ms. Trimbath is a former senior-level employee of DTC, Olde Monmouth hoped that by retaining her services, she might be able to provide some insight into DTC's unfair and arbitrary conduct with respect to Olde Monmouth's FAST Program application and open some type of communication or dialog with DTC officials.  Instead of communicating about the status of Olde Monmouth's application, Mr. Montal, of DTC's Legal Department, responded angrily to the very fact of Ms. Trimbath's involvement.  As a

direct consequence of Mr. Montal's angry reaction, Olde Monmouth immediately severed its relationship with Ms. Trimbath in the hope of placating DTC and obviating any further difficulties with Mr. Montal, who appeared to be coordinating DTC's response to Plaintiff's FAST Program application.

(f)  Upon receipt from Mr. Montal of DTC's Proposed Rule Change No. SR 2006-16, Olde Monmouth set out immediately to comply fully with all of the various provisions and requirements of the Proposed Rule.  In less than one month, although the proposed rule change ultimately would be challenged by the securities industry as overly stringent and unduly burdensome, Olde Monmouth had completed the steps necessary to be totally compliant with all of the provisions of the Proposed Rule and provided full documentation to Mr. Montal of its complete compliance with the Proposed Rule on an item-by-item basis.

(g)  Upon being orally informed by DTC's Montal on November 27, 2006, that one of the only two remaining impediments to approval of Olde Monmouth's FAST Program application related to a purported "confiscation" of China Aoxing securities in August 2005, Olde Monmouth immediately provided DTC with

14

clear documentary proof that the so-called "confiscation" was, instead, a *rejection* of the China Aoxing securities that was entirely proper and appropriate under the circumstances. (The second issue raised by Mr. Montal related to Olde Monmouth's fee schedule. That matter is addressed in detail herein, *infra*.)

To highlight Defendants' discriminatory treatment of Olde Monmouth, it is worth observation that behemoth transfer agent Citibank, N.A. was admitted to the FAST Program notwithstanding the fact that its parent company, Citigroup, was involved in a highly publicized Securities and Exchange Commission investigation relating to arrangements between certain Smith Barney mutual funds, an affiliated transfer agent, and an unaffiliated sub-transfer agent. The investigation by the Securities and Exchange Commission ultimately was resolved by Citigroup paying a total of $208.1 million, consisting of $128 million and disgorgement and $80 million in penalties.

(h) Having obtained oral assurances from DTC's Montal to Mr. Fox that Olde Monmouth had met all of the requirements imposed by Proposed Rule Change No. SR 2006-16, Olde Monmouth agreed on December 27, 2006,

15

to establish a lower fee schedule going forward on the condition that Olde Monmouth's FAST program application was approved by January 1, 2007.

(i) In yet another attempt to establish some type of constructive dialog with DTC about its unreasonable and arbitrary refusal either to allow Olde Monmouth to enroll in the FAST Program or to explain DTC's reasons for its arbitrary exclusion of Olde Monmouth therefrom, I personally prepared and sent additional correspondence to address these issues. My letter, dated January 25, 2007, was directed to Larry Thompson, Esq., the General Counsel of DTC's parent entity, Defendant DTCC, and it clearly recounted in detail the lengthy and tortured history of Olde Monmouth's diligent and conscientious efforts to secure admission to the FAST Program, and DTC's consistently unreasonable and arbitrary refusal to participate in any meaningful communications with Olde Monmouth about the status of its FAST Program application. I also informed DTCC's Thompson of the existence of improper and tortious communications initiated by DTC employees Isaac Montal and John Carvalho to Olde Monmouth's clients, the details of which are elaborated upon herein below. I

16

deliberately directed this communication to the General Counsel of DTC's parent company because of DTC's inexplicable intransigence and because I hoped that Thompson, as Mr. Montal's superior, might be able to facilitate a resolution and prevent further tortious conduct vis-à-vis Olde Monmouth's clients. (A copy of my letter of January 25, 2007, is attached as Exhibit H to the Gallion Declaration.)

24. Olde Monmouth's offer to revert to a prior fee schedule stemmed from the fact that, because DTC had totally ignored and rebuffed all of Olde Monmouth's attempts to obtain clarification of Defendant's unreasonable refusal to permit Olde Monmouth's enrollment in the FAST Program, Olde Monmouth implemented an increase in the fees it charged for its stock transfer services. The first such fee increase became effective in late July 2006 -- ***some four months after Olde Monmouth first began to seek FAST approval.***

25. Olde Monmouth's decision to raise its fees was motivated solely by its desire to prod DTC to discuss and process Olde Monmouth's FAST application and to compensate Olde Monmouth for its loss of business and its inability to attract new clients as a direct result of

DTC's unreasonable rejection of its FAST application.  In addition, on several occasions, Olde Monmouth expressly promised DTC that it would revert to its former fee schedule *immediately* upon its acceptance as a full participant in the FAST Program.

26.  At all times during its relationship with DTC, Olde Monmouth has remained entirely free unilaterally to determine its fee structure inasmuch as, among other things, no written contract has ever been in place between DTC and Olde Monmouth governing fees.

27.  As testament to Defendants' willful anti-competitive and exclusionary behavior -- and I cannot emphasize this enough -- Defendants elected to pay each and every Olde Monmouth fee increase rather than simply admit Olde Monmouth to the FAST Program, notwithstanding the fact that Olde Monmouth had satisfied all of the FAST Program's eligibility criteria.

**DTC'S Tortious Interference With Olde Monmouth's Business**

28.  Defendant DTC's arbitrary and unreasonable exclusion of Olde Monmouth from the implementation of the FAST Program has continued unabated for nearly an entire year -- since the time of Olde Monmouth's initial inquiries to DTC about the program in March 2006.  However, DTC's

18

apparent determination to drive Olde Monmouth out of business eventually (until a recent moratorium was implemented by DTC and DTC by agreement of the parties) began to take on a new dimension:  On more than one occasion, DTC initiated communications with Olde Monmouth's clients with the obvious intent of disrupting and ultimately causing the termination of Olde Monmouth's business relationships with its clients.

29.  As one example of such tortious and anticompetitive interference with Olde Monmouth's business operations, DTC initiated a telephone call to one of Olde Monmouth's clients, PAID, Inc. ("PAID"), on January 17, 2007.  Among the DTC employees who actively participated in this communication with PAID was Mr. Montal, of DTC's Legal Department.  As part of this telephone call, DTC (i) complained to PAID about the fees Olde Monmouth was charging DTC, (ii) brazenly intimated to PAID's representative that DTC might "chill" or otherwise disrupt PAID's stock transfer activities with DTC, and (iii) suggested that it would be advantageous to PAID to consider availing itself of the services of a stock transfer agent other than Olde Monmouth.

30.  Several days thereafter, on January 26, 2007, DTC initiated a similarly threatening telephone call

to another Olde Monmouth client, ERF Wireless Company ("ERF Wireless"), again with the active participation of Mr. Montal of DTC's Legal Department. During this conversation, DTC brazenly intimated to ERF Wireless that DTC might "chill" or otherwise disrupt ERF Wireless' stock transfer activities with DTC and suggested to ERF Wireless that it would be advantageous to ERF Wireless to consider availing itself of the services of a stock transfer agent other than Olde Monmouth.

31. ERF Wireless employee Clareen O'Quinn soon thereafter reported to Olde Monmouth the substance of her conversation with DTC. While Ms. O'Quinn reaffirmed ERF Wireless' satisfaction with its relationship with Olde Monmouth and its general desire to continue to use Olde Monmouth's services, she made clear that ERF Wireless required its stock transfer agent to be able to participate in DTC's electronic transfer programs, such as the FAST initiative, and that her company would be unable to continue to do business with Olde Monmouth unless it was approved for participation in DTC's electronic transfer programs. Ms. O'Quinn also expressly conditioned her company's continued use of Olde Monmouth on its ability to participate in DTC's electronic transfer programs no later than by mid-February 2007.

32. The intentional and malicious communications initiated by Defendant DTC described above have come to Olde Monmouth's attention solely because the customers involved were motivated to share that information with Olde Monmouth. It is impossible to estimate the number of other Olde Monmouth clients and potential future clients that DTC may have contacted in similar fashion who simply have not taken the time to inform Olde Monmouth of DTC's tortious conduct for whatever reason including, but not limited to, the fear of possible retaliation by DTC.

33. On many recent occasions, Olde Monmouth has received in the regular course of its business unsolicited inquiries from issuers in search of a stock transfer agent who have immediately terminated their inquiries upon learning that DTC has unilaterally excluded Olde Monmouth from participation in the FAST Program.

34. It also is impossible to estimate the extent to which DTC and other competitors of Olde Monmouth have publicized DTC's exclusion of Olde Monmouth from the FAST Program to the vast stock issuing community at large and the concomitant direct and indirect chilling effects on interstate and New Jersey commerce, including reducing the number of new clients that Olde Monmouth otherwise would

21

have attracted in the absence of such widespread dissemination.

**DTC and DTCC Are Competitors of Olde Monmouth**

35. Simply stated, Olde Monmouth views Defendants DTC and DTCC as competitors.

36. Notwithstanding the fact that I have no personal knowledge suggesting that Defendants actively or overtly participate or engage in the stock transfer agency industry, it is abundantly clear that Defendants could at any time, and quite conceivably might be preparing to, participate or so engage. I respectfully submit that limited discovery is critical to this issue especially given that -- in addition to Defendants' antagonistic and exclusionary conduct vis-à-vis Olde Monmouth -- Defendants have formed alliances with several major stock transfer agents, all of which are approved for the FAST Program. I respectfully submit that such relationships are highly suspect. In this regard, many DTCC Board members are employed by companies that are transfer agents or affiliated with companies that are FAST-approved transfer agents. For example: (i) DTCC Director Ellen Allemany is the Chief Executive Officer of Global Transaction Services (GTS) for Citigroup Corporate and Investment Bank.

22

Citigroup is associated with Computershare Investor Services, which is also approved for the FAST Program; (ii) DTCC Director J. Charles Cardona is the Vice Chairman of The Dreyfus Corporation, which is now owned by Chase Mellon, which in turn owns ChaseMellon Shareholder Services, which also is a FAST Program approved transfer agent; (iii) DTCC Director Art Certosimo is the Executive Vice President of the Bank of New York, which is a FAST-approved transfer agent; and (iv) DTCC Director David Weisbrod is Senior Vice President of Risk Management, Treasury & Securities Services for JP Morgan Chase & Co., which owns ChaseMellon, a FAST-approved transfer agent.

37. It is also worth highlighting that Mellon Financial recently announced merger plans with Bank of New York. It is my understanding that the largest stock transfer agents, Computershare Investor Services, ChaseMellon Shareholder Services and Bank of New York, currently provide transfer agent services to approximately 70% of shareholders.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ____ day of February, 2007.


_____/s/_____
John C. Troster
*President*
*Olde Monmouth Stock Transfer Co., Inc.*



Sworn to before me this
____ day of February, 2007.



_____
        Notary Public