UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                 :

OLDE MONMOUTH STOCK TRANSFER CO., INC.,    :
    :
                                Plaintiff,    :
    :
            -- against --    :
    :    07 CV 0990 (CSH)
DEPOSITORY TRUST & CLEARING    :
CORPORATION and DEPOSITORY TRUST    :
COMPANY,    :
    :
                           Defendants.    :
    :
---------------------------------------------------------------------X

<u>**PLAINTIFF'S MEMORANDUM OF LAW**</u>
<u>**IN SUPPORT OF ITS**</u>
<u>**MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**</u>

GALLION & SPIELVOGEL
1225 Franklin Avenue
Suite 325
Garden City, New York 11530
516.512.8899

*Attorneys for Plaintiff*
*Olde Monmouth Stock Transfer Co., Inc.*

Dated: February 27, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………... i-iv

PRELIMINARY STATEMENT…......………………………..………………….. 1

FACTUAL BACKGROUND..……………………………………………...…… 6

ARGUMENT: PLAINTIFF'S MOTION FOR A PRELIMINARY
INJUNCTION SHOULD BE GRANTED………………………….………..…… 7

I.  Olde Monmouth Will Suffer Irreparable Injury and Extreme
Damage in the Absence of Injunctive Relief………………………….…... 8

II.  Plaintiff Can Clearly Show That It Is Entitled To A Preliminary
Injunction…………………………………………………………… 10

Defendants Have Monopoly Power In The Relevant Market………………. 10

A.  Plaintiff Is Entitled To A Preliminary Injunction Because It Can
Demonstrate Defendants' Attempted Monopolization……………… 14

B.  Plaintiff Is Entitled To A Preliminary Injunction Under
The "Essential Facility" Antitrust Doctrine…………………………. 16

C.  Plaintiff Is Entitled To A Preliminary Injunction Under The Supreme
Court's Ruling In *Aspen Skiing*……………………………………. 18

III.  Although Presently Moot, Plaintiff Also Is Entitled To A Preliminary
Injunction To Prevent Tortious Interference With Prospective Economic
Advantage Under New Jersey Law…………………………………. 20

CONCLUSION………………………………………………………………. 22

**TABLE OF AUTHORITITES**

## NEW JERSEY STATUES

New Jersey Antitrust Laws § 9-3…………………………………………………………… 7

New Jersey Antitrust Laws § 9-4……………………………………………………… 13-14

## FEDERAL STATUES

Fed. R. Civ. P. 65……………………………………………………………………....... 1

Sherman Antitrust Act § 1 …......……………………………………………………... 7

Sherman Antitrust Act § 2 …......…………………..………………….............. 11-14, 18

## NEW JERSEY CASES

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
116 N.J. 739, 563 A.2d 31 (1989)……………………………………………. 21

*Van Natta Mech. Corp. v. Di Staulo,*
277 N.J. Super. 175,  649 A.2d 399  (1994)…………………………………. 11

## FEDERAL CASES

*A.I.B. Express, Inc. v. Fedex Corp.,*
358 F.Supp.2d 239 (S.D.N.Y. 2004)…………..……………………………… 16, 18

*AIM Int'l Trading, LLC v. Valcucine SpA.,*
188 F.Supp.2d 384 (S.D.N.Y. 2002)…………..…………………………….. 7-9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585, 105 S.Ct. 2847 (1985)…………………………… 11, 13, 16, 18-19

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
603 F.2d 263 (2d Cir.1979)………………………………………………....... 11

*City of Anaheim v. Southern California Edison Co.,*
955 F.2d 1373 (9th Cir. 1992)……………………………………………….. 17

*Eon Labs Mfg., Inc. v. Watson Pharms., Inc.,*
164 F.Supp.2d 350 (S.D.N.Y. 2001)………………………………………… 11

*Ernest Paper Prods., Inc. v. Mobil Chem. Co., Inc.,*

No. CV95-7918 LGB (AJWX), 1997 WL 33483520……………………………………… 4

*Fishman v. Estate of Wirtz,*
807 F.2d 520 (7th Cir. 1986)…………………………………………………….. 4

*Geneva Pharms. Technology Corp. v. Barr Labs., Inc.,*
201 F.Supp.2d 236 (S.D.N.Y. 2002)…………………………..…………… 14, 21

*Givenchy S.A. v. William Stuart Indus.,*
No. 85 CIV 9911, 1986 WL 3358 (S.D.N.Y. 1986)……………………………... 8

*Great W. Directories v. Southwestern Bell Tel.,*
63 F.3d 1378 (5th Cir. 1995)
*modified on other grounds*, 74 F.3d 613 (5th Cir.)
*cert. dismissed*, 518 U.S. 1048 (1996)………………………….………….. 13, 14

*Hecht v. Pro-Football, Inc.,*
570 F.2d 982 (D.C.Cir.1977) (emphasis added),
*cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978)…………… 17

*H.L. Hayden Co. v. Siemens Medical Sys., Inc.,*
879 F.2d 1005 (2d Cir. 1989)…………………………………………………… 14

*Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.,*
190 F.Supp.2d 600 (S.D.N.Y. 2002)…………………………………...……… 15-16

*Interface Group v. Massachusetts Port Auth.,*
816 F.2d 9 (1st Cir. 1987)…………………………………………………….. 17

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,*
596 F.2d 70 (2d Cir. 1979)………………………………………………….… 10

*National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs. Corp.,*
850 F.2d 904 (2d Cir. 1988)…………………………………………………... 15

*New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.,*
323 F.Supp.2d 559 (S.D.N.Y. 2004)…………………………………..…. 16

*Northeastern Tel. Co. v. American Tel. & Tel. Co.,*
651 F.2d 76 (2d Cir. 1981),
*cert. denied*, 455 U.S. 943, 102 S.Ct. 1438 (1982)………………………..… 15-16

*Spectrum Sports, Inc. v. McQuillan,*
506 U.S. 447, 113 S.Ct. 884 (1993)…………………………….……………... 14-16

*Sutter Home Winery v. Vintage Selections,*
971 F.3d 401 (9th Cir. 1992)……………………………………………….. 4

*Twin Labs., Inc. v. Weider Health & Fitness*,
900 F.2d 566 (2d Cir. 1990)……………………………………….... 16-17

United States v. E.I. du Pont de Nemours & Co.,
351 U.S. 377, 76 S.Ct. 994 (1956)
cert. denied, 444 U.S. 1093 (1980)…………………………………….. 11-12

*United States v. Grinnell Corp.*,
384 U.S. 563, 86 S.Ct. 1698 (1966)……………………………………….. 12

*United States v. Microsoft Corp. ,*
253 F.3d 34 (D.C. Cir.)*,*
*cert. denied,* 534 U.S. 952 (2001),
*aff'd, Massachusetts v. Microsoft Corp.,* 373 F.3d 1199 (D.C. Cir. 2004)……... 12

*Vantico Holdings S.A. v. Apollo Mgmt., LP,*
247 F.Supp.2d 437 (S.D.N.Y. 2003)…………………………………….. 7

*Varallo v. Hammond, Inc.,*
94 F.3d 842 (3d Cir. 1996)…………………………………………… 21

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398, S.Ct. 872 (2004)………………………………………… 16

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
382 U.S. 172, 86 S.Ct. 347 (1965)………………..………………… 11, 16

*Yankees Entertainment & Sports Network, LLC v. Cablevision Systems Corp.,*
224 F.Supp.2d 657 (S.D.N.Y. 2002)………………………………… 15

**SECONDARY SOURCES**

Antitrust Law: An Analysis of Antitrust Principles and Their Application
(Second Edition)…………..…………………………………………… 17-19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
:
OLDE MONMOUTH STOCK TRANSFER CO., INC.,  :
:
Plaintiff,  :
:
-- against --  :
:    07 CV 0990 (CSH)
DEPOSITORY TRUST & CLEARING  :
CORPORATION and DEPOSITORY TRUST  :
COMPANY,  :
:
Defendants.  :
:
-----------------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS
### MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff Olde Monmouth Stock Transfer Co., Inc. ("Olde Monmouth")
respectfully submits this Memorandum of Law in support of its motion, pursuant to Rule
65, Fed. R. Civ. P., for a preliminary injunction.

### PRELIMINARY STATEMENT

Having successfully taken advantage of their undisputed monopoly as the
nation's sole institutional stock depository to impose upon the entire securities industry
their newly developed electronic book-entry stock ownership tracking initiatives (which
are commonly known within the financial services industries as the DRS and FAST
Programs), Defendants Depository Trust & Clearing Company ("DTCC") and Depository
Trust Company ("DTC") have engaged in anticompetitive conduct proscribed by

1

controlling federal and state antitrust statutes to unlawfully exclude Olde Monmouth from participation in the related relevant market for stock transfer agency services for issuing companies that are or wish to be listed on the national stock exchanges.

Olde Monmouth, the archetypal family-owned small business, has enjoyed a mutually beneficial relationship as a stock transfer agent with Defendants for nearly two decades. Plaintiff, despite having updated its computer, security and operational systems to meet every identifiable criterion for FAST participation, has sought enrollment, albeit unsuccessfully, in Defendants' FAST Program (participation in FAST is a direct prerequisite for eligibility in DRS) virtually since the day its requirement was announced and imposed by Defendants upon the stock transfer industry and the national securities industry as a whole.

Widely and exhaustively trumpeted by Defendants as ushering in a new age of enhanced electronic stock transfer efficiencies, Defendants' complete and total imposition of DRS (and through DRS, the FAST Program) is exemplified in countless ways, perhaps no more so than by the fact that DRS-eligibility is now a listing requirement for all of the leading national stock exchanges. Defendants' complete and total control of all administrative and implementation matters relating to DRS and FAST is exemplified by their unfettered license to determine in their sole discretion precisely which stock transfer agents will be permitted to enter the DRS/FAST Programs, thereby effectively abusing their stock depository monopoly position to anoint DTC as the one and only gatekeeper for DRS/FAST entry to the stock transfer market.

Olde Monmouth is acutely aware of the essential importance of DRS/FAST eligibility to its continued viability as a stock transfer agent and as an ongoing participant in the relevant market. In the absence of such DRS/FAST eligibility,

Plaintiff will be permanently relegated at Defendants' hands to the far more restricted and narrowly circumscribed field of stock transfer agency services for the so-called "pink sheet/bulletin board" stock exchanges.

Because of the critical necessity of DRS/FAST to its very future existence, Olde Monmouth undertook immediately all steps necessary to participate. After Defendants' initial inexplicable refusal even to provide Olde Monmouth with the requisite application materials or to respond to countless telephone and written inquiries concerning the status of its application, Defendants subsequently denied Olde Monmouth's entry into the FAST Program without explanation, despite their later acknowledgement that Olde Monmouth has satisfied all of the published required criteria -- and even the *proposed* criteria -- for eligibility.

During the extended period of Defendants' inexplicable stony silence about the status of its application in the face of Olde Monmouth's innumerable entreaties, Plaintiff embarked upon a series of increases in its stock transfer service fees in an as yet still futile attempt to prompt DTC to engage in some sort of substantive dialog about Olde Monmouth's attempts to secure DRS/FAST entry. By Defendants' own calculation, these fees rose to a twenty-fold increase, yet Defendants steadfastly and obstinately refused even to discuss Olde Monmouth's eligibility status in any meaningful way, preferring instead to remit these enhanced fees to Plaintiff (while, presumably, passing these fee hikes directly through to Defendants' broker/dealer members).

Defendants' unreasoned and arbitrary exclusion of Olde Monmouth can only be explained by willful anticompetitive intent, particularly in light of their belated acknowledgement that Olde Monmouth satisfies the eligibility criteria, and the admission of Plaintiff would occasion not even the slightest inconvenience to Defendants. Although

3

Plaintiff has been unable to date to uncover any publicly available data concerning the possibility that Defendants currently provide stock transfer agency services, Plaintiff views Defendants as competitors.[1]  There would appear to be no other plausible explanation for Defendants' irrational determination to deny Olde Monmouth access to DRS/FAST.[2]  The short list of DRS-approved transfer agents is replete with some of the largest stock transfer agencies in the nation, many of whom have corporate directors and members of senior management who also serve on the Board of Directors of Defendant DTCC.

In this regard, many DTCC Board members are employed by companies that either are FAST-approved transfer agents or affiliated with companies that are FAST-approved transfer agents.  For example: (i) DTCC Director Ellen Allemany is the Chief Executive Officer of Global Transaction Services for Citigroup Corporate and Investment Bank.  Citigroup is associated with Computershare Investor Services, which is also approved for the FAST Program; (ii) DTCC Director J. Charles Cardona is the Vice Chairman of The Dreyfus Corporation, which is now owned by Chase Mellon, which in turn owns ChaseMellon Shareholder Services, which also is a FAST Program approved transfer agent; (iii) DTCC Director Art Certosimo is the Executive Vice

---

[1]  *See generally Fishman v. Estate of Wirtz,* 807 F.2d 520, 531 (7th Cir. 1986) ("We know of no rule that states that the parties must be in head-to-head competition in the relevant market (as opposed to head-to-head competition *for* the relevant market) before the antitrust laws will apply."); *Ernest Paper Prods., Inc. v. Mobil Chem. Co., Inc.,* No. CV95-7918 LGB (AJWX), 1997 WL 33483520, at *4 (C.D. Cal. Dec. 2, 1997) ("The Ninth Circuit has defined a 'competitor' for purposes of economic torts as one who 'solicits the same trade [or] customers.'") (*quoting Sutter Home Winery v. Vintage Selections,* 971 F.3d 401, 408 (9th Cir. 1992)).

[2]  Defendants' current explanation for its conduct, i.e., that Plaintiff's increased fees call its suitability for FAST participation into question, rings hollow as nothing more than *ex post facto* pretext. Olde Monmouth did not even consider a transfer fee increase until well after Defendants' intransigence and refusal to discuss the FAST application status had continued for a period of four months.

President of the Bank of New York, which is a FAST-approved transfer agent; and (iv) DTCC Director David Weisbrod is Senior Vice President of Risk Management, Treasury & Securities Services for JP Morgan Chase & Co., which owns ChaseMellon, a FAST-approved transfer agent. It is also worthy of emphasis that Mellon Financial recently announced merger plans with Bank of New York. The three largest stock transfer agents, Computershare Investor Services, ChaseMellon Shareholder Services and Bank of New York, currently provide transfer agent services to approximately 70% of shareholders.

Moreover, it is beyond dispute that, as the sole gatekeeper of DRS/FAST access, no other entity could possibly be better poised to enter the market than DTCC, which could quite easily form yet a sixth wholly owned subsidiary to function in the stock transfer agency market, just as it has established five operating subsidies to date, of which DTC is only one, to exercise veritable monopolies over other discrete aspects of the securities industry.

Under the circumstances, and even on the current state of the record at this preliminary stage of the proceedings, Defendants' impermissible anticompetitive intent to exert unlawful monopoly power over the stock transfer agency market can be determined from the undisputed facts now before the Court. Should the Court determine, however, that it might require additional details concerning Defendants' conduct in connection with Plaintiff's immediate application, Plaintiff respectfully urges the Court's reconsideration of its request, as suggested during the preliminary hearing in this matter on February 20, that Plaintiff be permitted limited discovery on the narrow question of Defendants' monopolistic intent. Such a narrowly circumscribed inquiry of Defendants easily could be undertaken quickly and without disruption to Defendants' day-to-day

business activities, and in all likelihood will produce whatever further information the Court might require to demonstrate Defendants' monopolistic intent.

Defendants' unconscionable anticompetitive conduct in abusing its monopoly position arbitrarily and unreasonably to prohibit Olde Monmouth's DRS/FAST participation violates applicable federal and state antitrust statutes. Olde Monmouth has been left with no alternative other than to seek this Court's intervention to order affirmative injunctive relief requiring Defendants to permit Olde Monmouth's DRS/FAST participation.

As demonstrated below, Olde Monmouth is entitled to the requested injunctive relief. No cognizable justification or explanation of any kind has ever been articulated by Defendants with respect to their unlawful conduct. The requested relief can easily be implemented by Defendants without even the slightest hardship. Accordingly, this Court should grant Olde Monmouth's application and issue a preliminary injunction.

## FACTUAL BACKGROUND

The salient facts, insofar as developed to date and relevant to Plaintiff's instant application, are set forth in the Verified Complaint in this action, filed February 13, 2007, and in the Declaration of John Christopher Troster, the President of Olde Monmouth, sworn to February 27, 2007 ("Troster Decl."), which is submitted herewith. Plaintiff respectfully refers the Court to these documents, which are incorporated herein by reference.

6

## ARGUMENT

### Plaintiff's Motion for a Preliminary Injunction Should Be Granted.

Plaintiff's burdens to support the issuance of a preliminary injunction are well known.[3] To prevail on its motion, Olde Monmouth must establish "'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Vantico Holdings S.A. v. Apollo Mgmt., LP,* 247 F.Supp.2d 437, 451 (S.D.N.Y. 2003) (quoting *AIM Int'l Trading, LLC v. Valcucine SpA.,* 188 F.Supp.2d 384, 387 (S.D.N.Y. 2002) (internal citations omitted).

Because the injunctive relief sought by Olde Monmouth is primarily mandatory in nature,[4] its burden is slightly enhanced: "[I]f a party seeks a mandatory injunction, the party must satisfy a higher standard and the preliminary injunction should be granted 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id.* (quoting *AIM Int'l Trading*, 188 F.Supp.2d at 387).

As demonstrated below, Olde Monmouth can meet even these heightened burdens. The requested injunctive relief should therefore be granted.

---

[3] Plaintiff does not seek injunctive relief at this time for its claims of attempted monopolization under Section 1 of the Sherman Act (Plaintiff's Third Cause of Action) or the corresponding state statute, Section 9-3 of the New Jersey Antitrust laws (Plaintiff's Sixth Cause of Action). These claims require a showing of a conspiracy or other concerted action with another party, which are not yet ripe for adjudication on the state of the record at this preliminary stage of the proceedings.

[4] In addition to Olde Monmouth's request for mandatory injunctive relief in the form of its demand that Defendants approve its pending application for FAST Program eligibility, Plaintiff also asked the Court to enjoin Defendants from any further tortious interference with its customer relationships. In an exchange of correspondence between the parties on February 22 and February 23, Defendants agreed to curtail the activities that Olde Monmouth has challenged as tortious interference.

**IV.** **Olde Monmouth Will Suffer Irreparable Injury and Extreme Damage in the Absence of Injunctive Relief.**

As is the case with any other ongoing business enterprise, Olde Monmouth's continued viability is dependent largely upon its ability to attract and retain new customers. Defendants' anticompetitive refusal to permit Plaintiff's enrollment as a FAST participant threatens Olde Monmouth's very existence because of Defendant's imposition of the sweeping mandate that all issuers wishing to be listed on any of the major stock exchanges are required to participate in Defendants' DRS program, for which FAST eligibility is a prerequisite. Unless and until Olde Monmouth can rightfully claim FAST-eligible status, its ability to attract new issuers and retain existing clients will be severely impaired, if not eliminated entirely.

The threatened termination of business activities or an incalculable loss of goodwill is regularly held to constitute irreparable injury. *See, e.g., AIM Int'l Trading LLC v. Valcucine SpA.,* 188 F.Supp.2d 384, 388 (S.D.N.Y. 2002); *Givenchy S.A. v. William Stuart Indus.,* No. 85 CIV 9911, 1986 WL 3358 (S.D.N.Y. 1986).

Defendants' repeated (and condescendingly belittling) assertion that its denial of DRS/FAST eligibility is of no consequence to Olde Monmouth because a majority of Plaintiff's customers are not registered on the major national stock exchanges misses the point entirely in its rush to be insulting. While it may be true that many of Plaintiff's issuers are smaller enterprises in varying early stages of development, it is safe to assume that all of them hope that their businesses will grow to the point where a listing on one of the national stock exchanges becomes appropriate.

Further, Defendants' arrogant and dismissive characterization of Olde Monmouth's clients -- essentially negating their market significance as "Pink Sheeters" -- neither excuses nor compensates for the incalculable loss of future customers that occurs with increasing frequency as members of the Troster Family are regularly forced to disclose to potential clients that Olde Monmouth has been denied FAST eligibility, thereby invariably resulting in the immediate termination of inquiries from prospective customers. In addition, it is impossible at this juncture to predict with any clarity how many of Olde Monmouth's current clients will sever their business relationship with Plaintiff in the coming weeks and months as the final widespread implementation of Defendants' DRS program and its myriad concomitant requirements makes itself known throughout the entirety of the securities industry. Although DRS/FAST is not a requirement for participation in the "pink sheet/bulletin board" exchanges, many of Olde Monmouth's specifically request that they be able to take advantage of the new program.

Moreover, it simply flies in the fact of common logic and practice to decree unilaterally, as Defendants attempt, that DRS eligibility is of no concern to Olde Monmouth's pool of current clients and potential new customers because of such clients' presumed meager capitalization; it should go without saying that most if not all startup ventures have every intention of expanding their businesses to the point where they, too, can join the "big leagues" and gain registration on a national stock exchange. Why, then, would they knowingly sign on with a stock transfer agent that is precluded from joining them in the ultimate transition to national exchange registration status? Indeed, a startup company's choice of a stock transfer agent that is barred from Defendants' DRS may well have a chilling effect on that new venture's ability to attract critically important

investors, who undoubtedly direct their capital to those enterprises they believe ultimately will thrive.

This ongoing and inestimable injury to Olde Monmouth's goodwill and general business reputation that cripples its ability to grow through the expansion of its customer base undeniably constitutes the type of "extreme or very serious damage [that] will result from a denial of preliminary relief." *AIM Int'l Trading*, 188 F. Supp. 2d at 387.

### V.     **Plaintiff Can Clearly Show That It Is Entitled To A Preliminary Injunction.**

Where, as here, Plaintiff seeks judicial intervention requiring a party to take affirmative action –- in this case, ordering Defendants to approve Olde Monmouth's FAST application -- Plaintiff must clearly show its entitlement to the requested relief.[5] *See, e.g., AIM Int'l Trading,* 188 F.Supp.2d at 387.

As set forth below, Plaintiff can demonstrate its clear entitlement to the requested injunctive relief, even under the demanding and complex requirements of the antitrust causes of action under which Plaintiff has petitioned this Court.

---

[5]     Because Plaintiff can meet this heightened burden, Plaintiff clearly also satisfies the slightly relaxed standards for more common preventive injunctive relief, i.e., "either (1) likelihood of success on the merits or (2) sufficiently serious questions gong to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief," *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979) (per curiam).

To the extent that the Court deems it appropriate to examine a balancing of the parties' respective hardships, however, Olde Monmouth respectfully submits that Defendants are incapable of demonstrating even the most minor of inconveniences should they be ordered to admit Plaintiff to the FAST Program, particularly since Defendants have conceded that Plaintiff already satisfies all of the FAST eligibility criteria. Olde Monmouth, on the other hand, suffers real, yet incalculable, losses of potential new business and damage to its goodwill and business reputation within the securities industry with each passing business day that it is denied access to Defendants' FAST Program.

**Defendants Have Monopoly Power In The Relevant Market.**

A threshold element common to all of Plaintiff's antitrust claims is Defendants' undisputed and unquestionable status as holders of monopoly power over the securities depository industry. Monopoly power is defined as "the power to control prices in the relevant market or to exclude competitors." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n.20, 105 S.Ct. 2847, 2859 n.20 (1985); *see also Eon Labs Mfg., Inc. v. Watson Pharms., Inc.*, 164 F.Supp.2d 350, 359 (S.D.N.Y. 2001). As regards the securities depository field, no one can seriously challenge Defendants' position as the sole participant of any significance whatsoever. With respect to controlling prices in the relevant market, Defendants have demonstrated their continuing ability to do so as recently as February 22, by letter from Defendants' counsel in which DTC **required** Olde Monmouth **to reduce its fees**, stating that it "will no longer accept" Plainitff's fee schedule.

The issue of central importance to Plaintiff's claims derives from the monopolistic stranglehold Defendants exert over the closely related market for stock transfer agency services for the national stock exchanges (with the exception of the so-called "bulletin board"/"pink sheet" issuers' exchanges) in the United States and New Jersey.[6] As is clear from the materials submitted by Plaintiff herewith, Defendants are looking down from their monopoly position as the sole stock depository to dictate the terms upon which stock transfer agents will be permitted –- in Defendants' sole discretion, reasonable, arbitrary or otherwise –- to perform stock transfer services in that

---

[6]     *See generally Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347 (1965) ("[W]ithout a definition of that market, there is no way to measure [a defendant's] ability to lessen or destroy competition."); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 268 (2d Cir.1979) ("[T]he first step in a court's analysis must be a definition of the relevant market.") (*citing United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391-93,76 S.Ct. 994 (1956)), *cert. denied,* 444 U.S. 1093 (1980).

closely and inextricably related and wholly dependent market. Similarly, Defendants have used their monopolistic position to appropriate unto themselves the power, again, in their sole discretion, to make all decisions concerning which stock transfer agents shall be excluded from this second, wholly dependent market.

Such unilateral power to exclude uniformly is held to constitute monopoly power over the relevant market for purposes of the adjudication of antitrust claims, for either actual or attempted monopolization, brought pursuant to Section 2 of the Sherman Act. "The offense of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704 (1966). As discussed *supra*, the first element, monopoly power, is defined as the power to control prices in or to exclude competition from the relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005 (1956). The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market. *See United States v. Microsoft Corp. ,* 253 F.3d 34, 58 (D.C. Cir.)*, cert. denied,* 534 U.S. 952 (2001), *aff'd, Massachusetts v. Microsoft Corp.,* 373 F.3d 1199 (D.C. Cir. 2004). Plaintiff respectfully submits that Defendants' unfettered power unilaterally to determine precisely who shall be excluded from, and who shall be permitted to enter the market, and under what exact conditions such market entry will be allowed, is precisely the type of market power the antitrust laws were enacted to protect the consuming public.

Moreover, Defendants' willful acquisition or maintenance of its monopolistic power is manifest from the well-known, publicly available facts underlying this action. DTCC and DTC deliberately and unilaterally have imposed a newly developed a regimen of electronic stock transfer enhancements known as the DRS/FAST Program on the stock transfer industry, strict adherence to which is absolutely required for continued participation in that market by transfer agents. The fact that DRS and FAST may be accepted by many of the securities-related industries as occasioning needed efficiencies does nothing to mask the fact that Defendants have unilaterally imposed their programs on the entirety of the relevant market and that Defendants -- and Defendants alone -- have taken it upon themselves to be the sole arbiters, administrators and adjudicators of all things relating to DRS and FAST. As such, Defendants' monopolistic position has nothing to do with "a superior product, business acumen or historic accident"; rather, their position has resulted entirely from Defendants' willful intrusion into the relevant market and their appropriation unto themselves of the role of exclusive gatekeeper for admission into that market. Moreover, this exclusion of Olde Monmouth constitutes a blatant attempt to maintain and exert their monopoly powers to the detriment not only of Plaintiff, but of all similarly situated stock transfer agents, issuers, and the general consuming public, as well.

Because Defendants have willfully acquired and maintained its monopolistic power over the relevant market, Olde Monmouth has demonstrated the existence of an unlawful actual monopoly prohibited under Section 2 of the Sherman Act and Section 9-4 of the New Jersey Antitrust statute, and is therefore entitled to the requested injunctive relief.

Defendants' monopolistic powers of exclusion bring its conduct vis-à-vis Olde Monmouth squarely within the ambit and protections of the antitrust statutes and therefore subject to close scrutiny thereunder:

> The question whether . . . conduct may be properly characterized as exclusionary cannot be answered by simply considering its effect on [the plaintiff-competitor]. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been "attempting to exclude rivals on some basis other than efficiency," it is fair to characterize its behavior as predatory.

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605, 105 S. Ct. 2847 (1985). *See generally Great W. Directories v. Southwestern Bell Tel.*, 63 F.3d 1378, 1385-86 (5th Cir. 1995) ("Exclusionary conduct comprehends behavior that not only tends to impair the opportunities but also does not further competition on the merits or does so in an unnecessarily restrictive way."), *modified on other grounds*, 74 F.3d 613 (5th Cir.), *cert. dismissed*, 518 U.S. 1048 (1996).

**Plaintiff Is Entitled To A Preliminary Injunction Because It Can Demonstrate Defendants' Attempted Monopolization.**

The elements required to demonstrate an unlawful attempt to monopolize may be briefly stated: "(1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed*." H.L. Hayden Co. v. Siemens Medical Sys., Inc.,* 879 F.2d 1005, 1017 (2d Cir. 1989) (internal quotations & citations omitted). *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890 (1993); *Geneva Pharms. Technology Corp. v. Barr Labs., Inc.*, 201 F.Supp.2d 236 (S.D.N.Y. 2002).[7]

---

[7] The elements needed to demonstrate an unlawful attempt to monopolize under the corresponding New Jersey statute, N.J. Stat. Section 9-4, under which Plaintiff's Fifth Cause of Action is brought, are similar to those required under Sherman Act Section 2. *See., e.g., Van Natta Mech. Corp. v. Di Staulo*, 277 N.J. Super. 175, 188, 649 A.2d 399 (1994) ('Four elements need to be proven to establish a violation:

Defendants' exclusionary conduct already has been established as a consequence of their exclusive, unfettered control over the ability of any and all market participants to enter the market through Defendants' total control over the implementation and administration of DRS and FAST. Olde Monmouth respectfully submits that Defendants' intent to monopolize easily may be inferred from their public conduct to date and from their arbitrary and unreasoned exclusion of Olde Monmouth from FAST participation. The iron-fisted manner in which DTCC and DTC have enforced their stranglehold over the DRS and FAST Programs can leave little doubt to any objective observer as to their strong determination to exert continued monopolistic control over the relevant market. Where, as here, proof of the first element of an attempted monopolization claim, anticompetitive conduct, is established, such conduct may be used to infer the specific intent to monopolize, which is the second element of the claim. *See National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs. Corp.*, 850 F.2d 904, 915 (2d Cir. 1988); *see also Northeastern Tel. Co. v. American Tel. & Tel. Co.,* 651 F.2d 76, 85 (2d Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438 (1982).

In the event, however, that the Court wishes to review additional indicia of Defendants' monopolistic intent beyond that already marshaled from the public record by Olde Monmouth and the exclusionary treatment it has received at Defendants' hands, Plaintiff respectfully renews its request, as articulated to the Court during the initial hearing in this case on February 20, that Plaintiff be permitted the opportunity of limited, focused discovery on the question of Defendants' intent. Olde Monmouth believes that such a narrowly circumscribed inquiry, consisting solely of carefully tailored document requests and a handful of depositions easily and quickly will yield whatever further

---

(1) relevant geographic and product market, (2) high probability of success of monopolization, (3) specific intent, and (4) conduct to further an attempt to monopolize. Injury must also be shown.").

15

information the Court might require for a demonstration of Defendants' monopolistic intent. *See generally Spectrum Sports,* 506 U.S. at 455 (attempted monopolization case where Supreme Court stated "intent is necessary . . . to establish the dangerous probability of success that is the object of § 2's prohibition attempts."); *Yankees Entertainment & Sports Network, LLC v. Cablevision Systems Corp.,* 224 F.Supp.2d 657, 666 (S.D.N.Y. 2002) ("[T]he Sherman Act is interpreted to condemn monopoly power only when it is accompanied by the purpose or intent to exercise that power in order to impede or destroy competition.") (internal quotations and citations omitted).

The final required element, a showing of a "dangerous probability of achieving monopoly power," is evaluated by examining the Defendants' "'ability to lessen or destroy competition' in the relevant market." *Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.,* 190 F.Supp.2d 600, 614 (S.D.N.Y. 2002) (quoting *Spectrum Sports,* 506 U.S. at 456); *see also Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347 (1965). Where Plaintiff's demonstration of anticompetitive conduct is combined with monopolistic intent and a showing of Defendants' monopoly power, these factors may coalesce to prove a dangerous probability of monopolistic success. *See Intellective, Inc.*, 190 F.Supp.2d at 614; *see also Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 85 (2d Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438 (1982).[8]

---

[8] Plaintiff also respectfully submits that it is entitled to a preliminary injunction under the antitrust doctrine known as "leveraging." Courts have found anticompetitive conduct in violation of the antitrust statutes where, as is the case presented by Plaintiff's instant application, a defendant abuses its monopoly position in one market by "leveraging" that position improperly to cause anticompetitive injury in a related market. A claim of monopoly leveraging requires that "defendant (1) possessed monopoly power in one market; (2) used that power to create a dangerous probability of monopolizing another market; and (3) caused injury by such anticompetitive conduct." *A.I.B. Express, Inc. v. Fedex Corp.*, 358 F.Supp.2d 239, 246-47 (S.D.N.Y. 2004).

<u>**Plaintiff Is Entitled To A Preliminary Injunction Under The "Essential Facility"
Antitrust Doctrine.**</u>

The elements of an essential facility claim under Section 2 of the Sherman

Act are: "'(1) control of the essential facility by a monopolist; (2) a competitor's inability

practically or reasonably to duplicate the essential facility; (3) the denial of the use of the

facility to a competitor; and (4) the feasibility of providing the facility.'" *New York*

*Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F.Supp.2d 559, 568 (S.D.N.Y.

2004) (quoting *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 569 (2d Cir.

1990)).  According to two prominent antitrust commentators:

> It should be clear that the essential facility doctrine concerns vertical
> integration—in particular, the duty of a vertically integrated monopolist to
> share some input in a vertically related market, which we call market #1,
> with someone operating in an upstream or downstream market, which we
> shall call #2.  If the facility is truly 'essential,' then the #1 monopoly
> facility also establishes a #2 monopoly.  For example, the plaintiff might
> claim that a municipal sports stadium (market #1) is the essential facility
> the plaintiff needs in order to run a profession basketball franchise
> (market #2).  Or a surgeon might claim that a hospital (market #1) is an
> essential facility that the plaintiff needs to engage in his surgical practice
> (market #2).  Once again, if the hospital really is 'essential,' then refusal to
> share the #1 hospital monopoly creates the #2 surgical monopoly.

*Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust*

*Principles and Their Application* § 771a (Second Edition) (footnotes omitted).

Olde Monmouth respectfully suggests that, even on the state of the record

presented by the current procedural posture, the mere recitation of the required elements

of the essential facility doctrine is sufficient to establish Plaintiff's entitlement to

injunctive relief thereunder.

First, there can be no doubt that Defendants exercise complete and total

domination over the stock depository mechanisms, which are unquestionably essential to

the securities industry nationwide, if not globally.  There is absolutely no possibility --

practical, reasonable or otherwise -- that Olde Monmouth or any other entity might even

contemplate the duplication of Defendants' essential stock depository facilities and

without access to it will undoubtedly be irreparably harmed.[9]  No doubt exists as to

Defendants' denial to Olde Monmouth of the use of its facilities, nor can anyone be heard

to argue that Defendants can easily and immediately admit Olde Monmouth to the FAST

Program without occasioning even the slightest inconvenience to DTCC or DTC.

In fact, it would be difficult to fashion a fact pattern that more easily falls

within the definition of actionable anticompetitive conduct proscribed by the essential

facility doctrine.

Therefore, Olde Monmouth is entitled to preliminary injunctive relief

directing DTCC and DTC to accept its application for FAST Program eligibility.

## Plaintiff Is Entitled To A Preliminary Injunction Under The Supreme Court's Ruling In *Aspen Skiing*.

A plaintiff may demonstrate its entitlement to relief by showing that the

defendant unilaterally terminated a voluntary course of dealing that suggested a

willingness to forgo short-term profits in favor of achieving a long-term anticompetitive

result and that the defendant's refusal to continue its prior course of dealing with the

---

[9]  "A company [that] has monopoly power over an essential facility may not refuse to make the facility available to others where there is no legitimate business reason for the refusal."  City of *Anaheim v. Southern California Edison Co.,* 955 F.2d 1373, 1379 (9th Cir. 1992); *see generally Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d at 568 ("a plaintiff must demonstrate that . . . 'denial of its use inflicts a *severe handicap* on potential [or current] market entrants .'") (quoting *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 992 (D.C.Cir.1977) (emphasis added), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978)).

*See  also Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 772 (Second Edition): ("[T]he primary use of the so-called essential facility doctrine has been in cases where a monopolist refuses to share some important input with actual or potential competitors."); *Interface Group v. Massachusetts Port Auth.,* 816 F.2d 9, 12 (1st Cir. 1987) ("[I]t is difficult to see how denying a facility to one who, like Interface, is not an actual or potential competitor could enhance or reinforce the monopolist's market power."); *Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 774d (2006 Supplement) ("[T]he essential facility doctrine presupposes the existence of one or more rivals who are or could be competing in the market but for denial of the essential facility.").

plaintiff, even if properly compensated, revealed anticompetitive conduct. *See A.I.B. Express*, 358 F.Supp.2d at 250. The Supreme Court has found anticompetitive conduct and antitrust violations in at least one factual situation of remarkable similarity to the anticompetitive situation confronting Olde Monmouth.

The Supreme Court's decision in *Aspen Skiing* is instructive with respect to Olde Monmouth's instant application because of the striking similarities between the underlying factual predicate that the Supreme Court found to violate Section 2 of the Sherman Act and Defendants' anticompetitive conduct toward Olde Monmouth. The Supreme Court found actionable an improper "refusal to deal" where the defendant ski resort operator suddenly departed from a long-standing profitable arrangement with its competitor pursuant to which they had joined together to sell multi-area ski lift tickets that gave customers the flexibility to patronize any of the area's ski resort facilities at a discounted price. *See Aspen Skiing*, 472 U.S. at 611.

Judge Scheindlin has analyzed the current state of antitrust "refusal to deal" jurisprudence:

> In *Verizon*, the Supreme Court calls attention to two aspects of the defendant's conduct in *Aspen Skiing* that supported a finding of liability in that case. First, "[t]he unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." Second, "the defendant's unwillingness to renew the [previous course of dealing] even if compensated at retail price revealed a distinctly anticompetitive bent."

*A.I.B. Express,* 358 F.Supp.2d at 250-51 (footnote omitted). *See also Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 773 (2006 Supplement) ("What *Aspen* required, according to *Trinko* [*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398,

124 S.Ct. 872 (2004)], was a sacrifice of short-run profits in order to injure or ruin a rival.").

Similarly, Olde Monmouth is entitled to injunctive relief on its refusal to deal claim. Even on the quite limited record before the Court, it is apparent that DTCC and DTC unilaterally refused to continue its prior course of dealing with Olde Monmouth by initially totally ignoring and then ultimately rejecting Plaintiff's application for acceptance into the FAST Program, despite Defendants' acknowledgement that Olde Monmouth meets all of the published eligibility criteria for FAST acceptance.

The record herein also establishes that the deliberate anticompetitive conduct suffered by Olde Monmouth at the hands of DTCC and DTC far exceeds the severity of that found sufficient to establish antitrust liability by the Supreme Court. Here, Defendants not only were willing to forgo the ongoing economic benefits they otherwise would have received from continuing their stock agency relationship with Olde Monmouth, they willingly paid sharply escalating transaction fees to Plaintiff in order to exclude it from the FAST Program. By Defendants' own calculation, these transaction fees eventually increased to reach the point where they amounted to twenty times their normal level; yet Defendants nonetheless preferred to remit such increased fees rather than undertake the simple action of approving Olde Monmouth's FAST Program application –- a step that would have resulted in no cost whatsoever to Defendants.

**Although Presently Moot, Plaintiff Also Is Entitled To A Preliminary Injunction To Prevent Tortious Interference With Prospective Economic Advantage Under New Jersey Law.**

As noted previously, through an exchange of correspondence between the parties on February 22 and February 23, Defendants have agreed not to initiate any further unsolicited communications with Plaintiff's clients of the nature attacked by Olde

Monmouth as constituting tortious interference with prospective economic advantage (Plaintiff's Seventh Cause of Action). Olde Monmouth is willing to take Defendants at their word and forgo the immediate opportunity to pursue its injunctive remedies, while reserving its right to renew its application should Defendants renounce their representations and recommence their tortious communications with Olde Monmouth's client base.

In that event, it is important to note that Defendants' attack on Olde Monmouth's claim of entitlement to injunctive relief under this cause of action (Def. Mem. At 17-18) is fundamentally flawed because of its misapprehension of controlling state law authority.

Defendants erroneously assert that a plaintiff must allege that the conduct complained of is motivated *solely* by malice or accomplished by unlawful means (Def. Mem. at 17). This is an inaccurate statement of the requirements of a common law claim for tortious interference with prospective economic advantage under New Jersey law. In contrast to the common law of New York, New Jersey contains no such narrow requirement.

The required elements under New Jersey law are simply stated as follows: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 201 F.Supp.2d 236, 289 (S.D.N.Y. 2002) (construing New Jersey law) (citing *Varallo v. Hammond, Inc.,* 94 F.3d 842, 848 (3d Cir. 1996)); *see Printing Mart-Morristown v. Sharp Elecs. Corp.,* 116 N.J. 739, 563 A.2d 31, 37 (1989). A simple correct recitation of the required elements demonstrates that Defendants' attempt to

engraft New York's more stringent pleading requirements onto the common law of New Jersey is as misleading as it is inappropriate.

Should Defendants resume their tortious communications with Olde Monmouth's client base, Olde Monmouth will be entitled to an order enjoining such conduct.

## CONCLUSION

For the foregoing reasons, Plaintiff Olde Monmouth is entitled to the issuance of a preliminary injunction requiring Defendants to approve Plaintiff's application for participation in the FAST Program.

Dated:  February 27, 2007

<div style="margin-left: 40%;">

Respectfully submitted,

_____/ s /_____
By: Edward R. Gallion (EG-5755)
    Steven Spielvogel (SS-2295)
    Joshua B. Subin (JS-3483)
GALLION & SPIELVOGEL
1225 Franklin Avenue
Suite 325
Garden City, New York 11530
516.512.8899

*Attorneys for Plaintiff*
*Olde Monmouth Stock Transfer Co., Inc.*

</div>