UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

OLDE MONMOUTH STOCK
TRANSFER CO., INC.,

                Plaintiff,

vs.

DEPOSITORY TRUST & CLEARING
CORPORATION and DEPOSITORY
TRUST COMPANY,

                Defendants.

-------------------------------------------------------------X

07 CV 0990 (CSH)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND IN SUPPORT OF <u>DEFENDANTS' CROSS-MOTION TO DISMISS COMPLAINT</u>

PROSKAUER ROSE LLP
Gregg M. Mashberg (GM-4022)
Karen D. Coombs (KC-3538)
Dolores DiBella (awaiting admission)
1585 Broadway
New York, NY 10036
(212) 969-3000
*Attorneys for Defendants*

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL ALLEGATIONS ..............................................................................................3

    The Roles of DTC and Transfer Agents In the National Securities Industry .....................3

    The Role of a FAST Agent ..............................................................................................6

    The Direct Registration System.......................................................................................7

    The Facts Surrounding OMST's FAST Application and Fee Increases..............................8

    The Allegations of the Present Complaint and Application ...............................................11

ARGUMENT..................................................................................................................13

I. PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF
   SHOULD BE DENIED ...............................................................................................13

    A.    Plaintiff Cannot Meet The High Burden Required To Obtain Affirmative,
        Ultimate, Injunctive Relief On A Preliminary Motion ..........................................13

    B.    Plaintiff's Alleged Harm is Admittedly Purely Speculative, And Neither
        Imminent Nor Irreparable ....................................................................................14

    C.    Plaintiff Is Unlikely to Succeed On The Merits of Its Monopolization
        Claims .................................................................................................................16

        1.    Mere Garden-Variety Business Disputes Cannot Sustain A
            Claim Under Antitrust Laws.................................................................16

        2.    Because DTC Is Not A Competitor In OMST's Relevant
            Market, There Is No Basis For An Antitrust Claim...................................17

        3.    Plaintiff Has Not Alleged Antitrust Injury...............................................23

II. PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED AS A MATTER OF LAW.......24

    A.    Standards Applicable To A Motion to Dismiss......................................................24

    B.    Plaintiff's Claims Under Section 2 Of The Sherman Act And The
        Equivalent New Jersey Statute Fail As A Matter Of Law For The
        Reasons Set Forth Above.....................................................................................26

C.    Plaintiff's Claims Under Section 1 Of The Sherman Act And The
Equivalent New Jersey Statute Also Fail As A Matter Of Law ..............................26

D.    Plaintiff's Supplemental State Law Claim for Tortious Interference
Fails As A Matter of Law .................................................................................28

CONCLUSION.................................................................................................................31

# TABLE OF AUTHORITIES

**CASES**                                                                                                      **PAGES**

*A.I.B. Express, Inc. v. FedEx Corp.,*
  358 F. Supp. 2d 239 (S.D.N.Y. 2004).................................................................18, 21

*Abcor Corp. v. AM Int'l, Inc.,*
  916 F.2d 924 (4th Cir. 1990) ................................................................................17

*Ahmad v. Long Island Univ.,*
  18 F. Supp. 2d 245 (E.D.N.Y. 1998) .....................................................................13

*Alpha Shoe Serv. v. Fleming Cos.,*
  849 F.2d 352 (8th Cir. 1988) ................................................................................18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985).............................................................................................20

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,*
  909 F. Supp. 162 (S.D.N.Y. 1995) ........................................................................18

*Berlent v. Focus Features,*
  2006 U.S. Dist. LEXIS 41095 (S.D.N.Y. June 8, 2006)...........................................13

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993).............................................................................................17

*Brunson Commc'ns, Inc. v. Arbitron, Inc.,*
  239 F. Supp. 2d 550 (E.D. Pa. 2002) ....................................................................27

*Brunswick Corp. v. Riegel Textile Corp.,*
  752 F.2d 261 (7th Cir. 1984) ................................................................................17

*CCBN.Com, Inc. v. Thomson Fin., Inc.,*
  270 F. Supp. 2d 146 (D. Mass. 2003) ....................................................................21

*City Merch., Inc., v. Kings Overseas Corp.,*
  2001 WL 286724 (S.D.N.Y. Mar. 23, 2001) ..........................................................25

*Collagenex Pharms., Inc. v. IVAX Corp.,*
  375 F. Supp. 2d 120 (E.D.N.Y. 2005) ...................................................................16

*Cont'l Orthopedic Appliances v. Health Ins. Plan,*
956 F. Supp. 367 (E.D.N.Y. 1997) ..........................................................................19

*Datapak Assocs. v. Hoynash,*
2004 U.S. Dist. LEXIS 20408 (S.D.N.Y. Oct. 8, 2004) ........................................15

*Doe v. Nat'l Bd. of Podiatric Med. Exam'rs,*
2003 U.S. Dist. LEXIS 10281 (S.D.N.Y. June 19, 2003).......................................14

*Doron Precision Sys. v. FAAC, Inc.,*
423 F. Supp. 2d 173 (S.D.N.Y. 2006)....................................................................25

*Elects. Commc'ns. Corp. v. Toshiba Am. Consumer Prods., Inc.,*
129 F.3d 240 (2d Cir. 1997).....................................................................................25

*Eon Labs Mfg., Inc. v. Watson Pharms, Inc.,*
164 F. Supp. 2d 350 (S.D.N.Y. 2001).....................................................................20

*Fisher v. Berkeley,*
475 U.S. 260 (1986).................................................................................................27

*Floors-N-More, Inc. v. Freight Liquidators,*
142 F. Supp. 2d 496 (S.D.N.Y. 2001).....................................................................24

*Ford Piano Supply Co. v. Steinway & Sons,*
1988 WL 3488 (S.D.N.Y. Jan. 13, 1988) ...............................................................24

*Forest City Daly Hous., Inc. v. Town of N. Hempstead,*
175 F.3d 144 (2d Cir. 1999).....................................................................................13

*G-I Holdings, Inc. v. Baron & Budd,*
179 F. Supp. 2d 233 (S.D.N.Y. 2001).....................................................................29

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,*
201 F. Supp. 2d 236 (S.D.N.Y. 2002).....................................................................29

*George Haug Co. v. Rolls Royce Motor Cars,*
148 F.3d 136 (2d Cir. 1998)...............................................................................23-24

*Gianna Enters. v. Miss World (Jersey,) Ltd.,*
551 F. Supp. 1348 (S.D.N.Y. 1982).......................................................................18

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.,*
879 F.2d 1005 (2d Cir. 1989)...................................................................................20

iv

*Hanson Trust PLC v. ML SCM Acquisition, Inc.*,
  781 F.2d 264 (2d Cir. 1986)..................................................................................13

*Hickerson v. City of New York*,
  146 F.3d 99 (2d Cir. 1998).....................................................................................13

*Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*,
  659 A.2d 904 (N.J. App. Div.), *certif. denied*, 660 A.2d 1197 (N.J. 1995)..............................29

*In re Methyl Tertiary Ether Prod. Liab. Litig.*,
  __ F.3d ___, No. 1:00 1898, MDL 1358 (S.D.N.Y. Jan. 8, 2007) ...........................................25

*Int'l Audiotext Network v. Am. Tel. & Tel. Co.*,
  893 F. Supp. 1207 (S.D.N.Y. 1994), *aff'd*, 62 F.3d 69 (2d Cir. 1995)....................................25

*Interface Group, Inc. v. Massachusetts Port Auth.*,
  816 F.2d 9 (1st Cir. 1987).....................................................................................22

*Intergraph Corp. v. Intel Corp.*,
  195 F.3d 1346 (Fed. Cir. 1999)................................................................................23

*Leeds v. Meltz*,
  85 F.3d 51 (2d Cir. 1996)......................................................................................25

*Line Commc'ns Corp. v. Reppert*,
  265 F. Supp. 2d 353 (S.D.N.Y. 2003)...........................................................................14

*Litho Prestige, Div. of Unimedia Group, Inc. v. News Am. Publ'g, Inc.*,
  652 F. Supp. 804 (S.D.N.Y. 1986) .............................................................................15

*Maas v. Cornell Univ.*,
  245 A.D.2d 728 (3d Dep't 1997)............................................................................28, 30

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)........................................................................................22, 23

*Oahu Gas Serv., Inc. v. Pacific Res., Inc.*,
  838 F.2d 360 (9th Cir. 1988) ..................................................................................17

*Patel v. Soriano*,
  848 A.2d 803 (N.J. App. Div.), *certif. denied*, 861 A.2d 845 (2004)......................................16

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
  563 A.2d 31 (N.J. 1989)..................................................................................28, 29, 30

*Singer v. Beach Trading Co., Inc.,*
 876 A.2d 885 (N.J. Super. 2005) ............................................................................................30

*Spectrum Sports, Inc. v. McQuillan,*
 506 U.S. 447 (1993) .................................................................................................................23

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.,*
 190 F. Supp. 2d 577 (S.D.N.Y. 2002) .....................................................................................13

*Tampa Elec. Co. v. Nashville Coal Co.,*
 365 U.S. 320 (1961) .................................................................................................................24

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.,*
 687 F. Supp. 832 (S.D.N.Y. 1988) ..........................................................................................25

*Treppel v. Biovail Corp.,*
 2004 U.S. Dist. LEXIS 20714 .................................................................................................29

*Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,*
 277 F.3d 253 (2d Cir. 2002) .............................................................................................. 15-16

*United Magazine Co. v Murdoch Magazines Distrib., Inc.,*
 146 F. Supp. 2d 385 (S.D.N.Y. 2001) .....................................................................................18

*United States v. Colgate & Co.,*
 250 U.S. 300 (1919) .................................................................................................................23

*United States v. Grinnell Corp.,*
 384 U.S. 563 (1966) .................................................................................................................18

*United States v. Microsoft Corp.,*
 253 F.3d 34 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001) ...................................................19

*Urdinaran v. Aarons,*
 115 F. Supp. 2d 484 (D.N.J. 2000) ..........................................................................................18

*Vantico Holdings S.A. v. Apollo Mgmt.,*
 247 F. Supp. 2d 437 (S.D.N.Y. 2003) .....................................................................................14

*Verizon Comm'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP,*
 540 U.S. 398 (2004) ...............................................................................................18, 20, 21, 23

*Vigoda v. DCA Productions Plus, Inc.,*
 293 A.D.2d 265 (1st Dep't 2002) ............................................................................................30

**STATUTES**

15 U.S.C. § 1 ................................................................................................. 26-27

15 U.S.C. § 2 ................................................................................................. *Passim*

15 U.S.C. § 17q-1(c) ............................................................................................ 5

15 U.S.C. § 78q, et seq. ................................................................................... 3-4, 21

FED. R. CIV. P. 12(b)(6) ................................................................................... 1, 24

N.Y. U.C.C.§ 8-101, *et seq.* ............................................................................... 4, 7

**OTHER AUTHORITIES**

3 P. Areeda & D. Turner, ANTITRUST LAW ¶ 835 (1978) ........................................ 20

68 Fed. Reg. 8535-36 (Feb. 21, 2003) .................................................................. 5

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (Second Ed.) § 772 ....................................................................... 22

SEC Rel. No. 19678, 48 Fed. Reg. 17603, 17604, n. 5 (Apr. 25, 1983) ........................ 4

SEC Rel. No. 34-54289 ....................................................................................... 8

SEC Rel. No. 34-47978, 68 Fed. Reg. 35037(June 4, 2003) ...................................... 4

SEC Rel. 34-37931 (Nov. 7, 1996) ........................................................................ 6

## PRELIMINARY STATEMENT

Defendants The Depository Trust & Clearing Corporation and The Depository Trust Company ("DTC") submit this memorandum of law (1) in opposition to the motion by plaintiff Olde Monmouth Stock Transfer Co., Inc. ("OMST") seeking a mandatory preliminary injunction, constituting the ultimate relief OMST seeks on the merits; and (2) in support of defendants' cross-motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).[1] The gravamen of OMST's ill-conceived litigation is that DTC has not acted to appoint OMST as a FAST agent – an ordinary-course business decision which OMST now attempts to convert into a full-fledged action under state and federal antitrust laws.

OMST has not satisfied its burden for obtaining emergency relief, particularly the heightened burden in order to obtain *mandatory* emergency relief, constituting the very relief requested on the merits of this action; *i.e.,* that DTC "immediately" approve OMST as a FAST agent.

Nor has OMST carried its burden to demonstrate that DTC's determination not to approve its FAST agent application has or could cause it irreparable injury. OMST's complaint alleges, in purely conclusory terms, that it has lost or will lose customers as a result of DTC's decision. Yet its supporting papers do not identify even a single customer OMST has actually lost, instead admittedly relying on pure speculation about what the future might bring. *See*

---

[1] Plaintiff's original application for a temporary restraining order was filed without a supporting memorandum of law. Defendants had filed a memorandum of law in opposition to that application on February 20, 2007. At a hearing before this Court on the same date, the Court set a briefing schedule, both for Plaintiff to fully brief its application for preliminary injunctive relief (and for Defendants to reply), and for Defendants to file a motion to dismiss. Many of Defendants' arguments in support of their motion to dismiss, however, were set forth in their original opposition papers. In order to avoid confusion, this memo will supersede Defendants' original opposition brief (which is, in part, duplicative). The present memo is submitted both in support of Defendants' opposition to Plaintiff's motion for injunctive relief and in support of Defendants' own cross-motion to dismiss.

- 1 -

OMST Mem. at 9. Even if OMST could demonstrate a risk that it might at some unspecified point in the future lose some indeterminate number of customers, such a claim cannot possibly establish either imminent or irreparable harm. To the contrary, such claim is not only far in the future (rather than imminent), but clearly contemplates harm fully compensable by money damages (rather than irreparable). Moreover, any notion that somehow OMST is being run out of business is belied by the fact that the overwhelming number of transfer agents are not FAST agents and relatively few transfer agents have applied to become FAST agents in the last year.

OMST utterly fails to address DTC's showing that in fact OMST's total customer base has *increased* during the relevant time period. Plaintiff thus apparently concedes that it currently acts as the transfer agent for 10% more issuers than it did when it first made its application. As recently early February, OMST added another issuer.[2]

Nor can OMST demonstrate a likelihood of success on the merits of its complaint; to the contrary, its complaint fails to state an actionable claim for relief at all, requiring not only denial of its application for injunctive relief, but, as argued in Point II, *supra*, dismissal of its complaint. In broad strokes:

- Nothing in the antitrust laws or elsewhere requires DTC to appoint OMST to be its agent. DTC may, in its discretion, determine with whom it wishes to contract for these services.

- DTC is not a transfer agent, does not provide transfer agent services, and has not sought SEC registration to act as a transfer agent. Simply put, DTC does not compete with OMST in the alleged relevant market ("the market for stock transfer agent services" (Compl. ¶43)), and OMST's unsupported speculation to the contrary should be dismissed out of hand.

---

[2]    *See* Exhibit Q to the March 8, 2007 Supplemental Declaration of Michael J. Tulaney ("Tulaney Supp. Decl."), submitted with this Memorandum.

- There is not even a hint of antitrust injury.  OMST is one of many hundreds of transfer agents and, in the ten years the FAST program has been available, DTC has appointed 90 transfer agents to be FAST Agents.  Whatever harm allegedly has befallen OMST (and if there is any, it is purely of its own makings), there is no possible harm to competition.

OMST has profoundly overplayed its hand.  Whatever its complaints as to the speed at which DTC considered its application and subsequent request for additional consideration,  it has exhibited terribly flawed judgment in attempting to strong-arm DTC into granting its application by, among other things, increasing its fees 20-fold, and has, in the process, called into question its business integrity.  Its application for emergency injunctive relief should be denied and its complaint dismissed.

## FACTUAL ALLEGATIONS

The facts relevant to DTC's opposition to OMST's application for injunctive relief are set forth in the previously-filed February 17, 2007 Declarations of Michael J. Tulaney ("Tulaney Decl.") and Susan Geigel ("Geigel Decl.") and the documents annexed thereto.  Solely for purposes of its cross-motion to dismiss, DTC accepts as true the well-pleaded factual allegations of the complaint, together with the documents referenced therein, copies of which are annexed to those Declarations.  Briefly, the relevant facts are as follows:

### The Roles of DTC and Transfer Agents In the National Securities Industry

DTC is a clearing agency registered with the U.S. Securities and Exchange Commission ("SEC").  In 1975, Congress amended the Securities Exchange Act of 1934 by adopting Section 17A.  15 U.S.C. §§ 78q, et seq.  Section 17A mandated that the SEC "develop[ . . .] uniform standards and procedures for clearance and settlement [of securities transactions]. . . ."  15 U.S.C. 78q-1(a)(1)(D).  Congress' goal in adopting Section 17A was to ensure the "prompt and

3

accurate" clearance and settlement of securities transactions.    15 U.S.C. § 78q-1(a)(1)(D).  In this regard, the SEC has described DTC as performing a "critical" function in the National Clearance and Settlement System.  SEC Rel. No. 34-47978, 68 Fed. Reg. 35037, at 35041 (June 4, 2003) (hereafter, the "June 4 SEC Order") (describing DTC's functions in the securities industry).

DTC functions as a utility for the nation's securities industry.  It provides the automated centralized depository services that are essential to fulfilling Congress' goals in enacting Section 17A.  DTC  operates an automated, centralized system for book-entry transfers of securities positions among its Participants, who are the beneficial owners of the securities deposited at DTC.  By serving as record holder of trillions of dollars of securities, DTC enables the automated movement of securities positions without the need to transfer paper indicia of ownership.  *See* June 4 SEC Order at 35041 ("[B]y facilitating the prompt and accurate settlement of securities transactions, DTC serves a critical function in the National Clearance and Settlement System") and n.62; *see also* N.Y. U.C.C. § 8-101, *et seq.* (setting forth state law standards for the "indirect holding system" for securities transactions).[3]

---

[3]    In approving DTC's registration as a clearing agency, the SEC explained the functions of a securities depository:

[A]ccepts deposits of securities from broker-dealers, banks and other financial institutions (collectively referred to as "Participants"); credits those securities to the general free accounts of the depositing Participants; and, pursuant to instructions of the Participants, effects book-entry deliveries of securities (including pledges) among Participants (and participating pledgee banks). *See, e.g., DTC, Participant Operating Procedures*, §§ B and C.  The physical securities deposited with a securities depository are held in a fungible bulk, no significant portion of which is identified or identifiable to a particular participant or pledgee; each participant or pledgee having securities of a given issue credited to its account has a pro-rata interest in the physical securities of the issue held in custody by the securities depository in its nominee name. *See* June 4 SEC Order at 35041.  Depositories also may provide facilities for payment by Participants to other Participants in connection with book-entry deliveries of securities.

SEC Rel. No. 19678, 48 Fed. Reg. 17603, 17604, n. 5 (April 25, 1983)

4

DTC charges its Participants fees for its services pursuant to a fee schedule approved by the SEC. As a utility for the securities industry, DTC operates on a cost basis; revenues in excess of operating costs and reserves are refunded to its Participants.

While the vast majority of securities transfers (*e.g.,* purchases and sales of stock) are recorded by book entry, there are occasions where a beneficial owner of securities wishes to obtain the physical shares he or she owns, for example, if an owner wishes to gift a stock certificate. In those instances, the beneficial owner may instruct his or her broker, who in turn may instruct DTC, to perform what is called a Withdrawal by Transfer. *See* 68 Fed. Reg. 8535-36 (February 21, 2003). In those cases, the issuer's stock transfer agent is utilized to issue the new certificate.

Transfer agents engaged in interstate commerce must be registered with the SEC. 15 U.S.C. § 17q-1(c). Currently, there are approximately 1400 transfer agents for the approximately 2.5 million issues eligible for DTC's services. Tulaney Decl. ¶ 9. Their role in the federal securities industry is to perform services (such as Withdrawal by Transfers) for their own clients – the issuers of stock.[4] Thus, for example, "ABC Corp" may be a client of a particular transfer agent, and that agent will perform withdrawal and other necessary transfer agent services in connection with requests made by any beneficial owner of ABC Corp. stock. Accordingly, the market for transfer agents is not regional – if a particular issue is sold nationwide, the transfer agent who services that issue will perform services for all buyers and sellers of that issue, wherever located.

---

[4]    In addition to withdrawals by transfer, transfer agents also, for example, process deposits of physical securities and maintain the books and records for the issuers who are their customers. Tulaney Decl. ¶¶ 9, 11.

Typically, a transfer agent will charge a fee to DTC for performing a Withdrawal by Transfer or other service. Those fees are then passed along by DTC to the Participant that has instructed the action. Tulaney Decl. ¶ 11. As of June 2006, OMST charged DTC $35 for each withdrawal request for one of its issues, an amount within the average fees charged by transfer agents. By October, in its admitted effort to twist DTC's arm into appointing it a FAST agent, the fee was an astronomical $700. *Id.* at ¶ 38; Ex. L.

**The Role of a FAST Agent**

The exception to the rule that transfer agents are agents for the issuers, not DTC, relates to those transfer agents with whom DTC has appointed to act as its agent, and accordingly entered into contractual relationships with, pursuant to DTC's Fast Automated Transfer Securities Program ("FAST agents"). DTC's FAST Program has been in place over ten years, since its approval by the SEC in an SEC Rule published November 7, 1996. SEC Rel. 34-37931 (Nov. 7, 1996).

Transfer agents who have also been appointed as FAST agents enter into a contractual relationship with DTC to maintain on their premises, rather than in DTC's vaults, a "balance certificate," registered in the name of Cede & Co., for each FAST-eligible issue for which the FAST agent is the transfer agent. Tulaney Decl. ¶ 12. (Only issues that are designated "FAST issues" are eligible for FAST agent services.) FAST agents maintain custody of the Cede & Co. balance certificate, adjust the balance on that certificate, and confirm such balance with DTC on a daily basis. *Id.* Thus, a FAST agent has dual responsibilities. As a transfer agent, it acts as an agent for the issuers who are its customers in all respects, and performs the services they request.

As a FAST agent, the transfer agent acts as an agent for DTC in maintaining the Cede & Co. balance certificates and confirming the balance daily.

A transfer agent may become a FAST Agent by submitting an application to DTC, which is reviewed by representatives from DTC's business and legal departments. The review process is stringent because a FAST Agent is responsible for maintaining securities and carrying out activities that are otherwise the legal obligations of DTC, pursuant to DTC's SEC-approved rules and the provisions of Article 8 of the U.C.C. *Id.* ¶ 13. In addition, in appointing FAST agents, DTC must take into account its resulting costs stemming from establishing necessary electronic connectivity, training the agents' personnel and monitoring the agents' performance. *Id.* Upon approval as a FAST agent, the agent enters into a contractual agreement with DTC, a form of which is annexed as Exhibit C to the Tulaney Declaration.

Because FAST agents perform important functions on DTC's behalf, DTC must ensure that FAST agents meet appropriate standards of security and integrity. In total, approximately 90 of the 1400 registered transfer agents are approved as FAST agents. Tulaney Decl. ¶ 14. During the 2005-2006 period, only eleven transfer agents sought to become FAST agents. Of those, five were approved and six rejected, including OMST. *Id.*

### The Direct Registration System

The dispute before this Court arises out of OMST's effort to become a DTC FAST agent in anticipation of the Direct Registration System ("DRS"), which the major stock exchanges have recently adopted (pursuant to SEC approval) as a mandatory requirement for those issues which trade on those exchanges, in order to further improve efficiency in the clearing and settlement of the nation's securities transactions. Under DRS, individual investors have the

ability to establish a direct book entry position with the issuer, either through the issuer's transfer agent or the investors' broker. *See, e.g.,* SEC Rel. No. 34-54289 (approving NYSE proposed rule) (Tulaney Decl., Exh. D). DRS thus enables investors to have securities registered in their own names (rather than being registered in the name of Cede & Co.) without having to hold a physical certificate.

Under the new SEC-approved rules of the exchanges, the DRS system is mandatory for those issues that have come into existence since January 1, 2007, and are traded on the major exchanges. Issues that were traded on the major exchanges before January 2007 need not adopt DRS until January 1, 2008. Those issues that are not listed on the New York Stock Exchange, American Stock Exchange or the NASDAQ need not adopt DRS. In order for an issue to become DRS eligible it must have a transfer agent that is a FAST agent. Tulaney Decl. ¶ 19. OMST admits that its customer are overwhelmingly pink sheet and over the counter bulleting board stocks, not listed on major exchanges (OMST Mem. at 8, *see* Tulaney Decl. ¶ 23) and therefore, are not obligated to be DRS eligible.

### The Facts Surrounding OMST's FAST Application and Fee Increases

As noted above, Plaintiff OMST is one of six transfer agents whose FAST applications were rejected during the period 2005-2006. According to its Complaint, OMST applied to DTC for registration as a FAST agent in May 2006. Compl. ¶ 27. One month after it submitted its application, DTC advised OMST that it had determined not to use OMST's services as a FAST agent, noting, among other things, that SEC reviews of OMST's operations had found certain deficiencies in those operations. Compl. ¶ 28 and Tulaney Decl., Ex. E.

8

OMST, while recognizing that it did not have a right to appeal this determination, nonetheless sought review of DTC's decision. Compl. ¶ 29, Tulaney Decl., Ex. F. DTC proceeded to re-review OMST's application, including dispatching a 4-person team to review OMST's operations on-site, and providing OMST with a copy of a then-unpublished proposed DTC Rule delineating standards for FAST agent eligibility. *See* Compl. ¶ 30.

OMST, however, was dissatisfied with the speed at which DTC was proceeding, and continued to send letters to various DTC personnel (including DTC's General Counsel) (Compl. ¶ 30(b) and (i)), "place frequent telephone calls to DTC" (Compl. ¶ 30(b)), request that DTC personnel from entirely different departments involve themselves in the ongoing review process (Compl. ¶ 30(c)) and otherwise demand that DTC's personnel immediately focus and act on its application. When those tactics did not cause DTC to put everything else aside and produce the immediate appointment OMST demanded, it adopted a new tactic.

Beginning in July 2006 (less than one month after DTC's initial decision on OMST's application), OMST announced to DTC that it intended to "increase its fees, daily" as a method of compelling DTC to accept it as a FAST agent. Compl. ¶ 31; Tulaney Decl., Ex. G. True to its word, OMST doubled its fees effective July 24, 2006 – then doubled them again less than a week later. Tulaney Decl., Exs. H and I. By October 8, 2006, OMST had increased its fees such that the charge for a single withdrawal by transfer (originally $35) was now *seven hundred dollars*. Tulaney Decl., Ex. J. As OMST frankly concedes, its sole motive for these exorbitant increases was "to prod DTC to discuss and process Olde Monmouth's FAST application." Compl. ¶ 32. Further reflecting its strategy, OMST represented to DTC that it would roll back its fee schedule to their original rates if DTC approved its FAST agent application. Tulaney Decl., Ex. I.

9

DTC estimates that, by the time of the present litigation, it had paid OMST approximately $1.1 million in excessive fees. Tulaney Decl. ¶ 3. Because those fees were passed on to DTC's Participants, DTC, in the ordinary course of its business, notified its Participants of OMST's represented fee increases. Tulaney Decl. ¶ 35 and Ex. J.

In response to these notices, certain of DTC's Participants advised DTC that OMST's fees were directed at DTC only. That is, if a Participant requested services from OMST directly (rather than going through DTC), OMST charged the participants at its original rates. Tulaney Decl. ¶ 36. Upon learning this, DTC became concerned that OMST's conduct was inconsistent with the Congressional goals of ensuring an efficient and uniform system for the transfer, clearance and settlement of securities, in that its pricing structure introduced substantial inefficiencies for the national system's transfer of those securities handled by OMST. *Id.* DTC advised OMST that it viewed this discriminatory treatment (which also reflected poorly on OMST's integrity) with extreme concern. Tulaney Decl., Exh. K. OMST did not provide any substantive response except to alter copies of its earlier notices of fee increases to include a footnote that it "reserve[s] the right to provide discounts," apparently an attempt at a retroactive justification for the discriminatory fees. Tulaney Decl., L (OMST's response) and M (OMST's admission that it had altered documents),

In response to OMST's conduct, DTC began to consider whether it should stop processing the physical transactions for those issuers for whom OMST is the transfer agent. Geigel Decl. ¶ 5. A stop on physical processing is known in the industry as "chilling" the issue. DTC accordingly contacted certain of OMST's customers – the issuers that would be affected by such a chill and advised those issuers that it was considering this action. Compl. ¶¶ 35-36;

10

Geigel Decl. ¶ 6. Although OMST's complaint characterizes this conduct as interference with OMST's business, there is no indication in the complaint that these contacts in any way affected OMST's business relationships[5]

## The Allegations of the Present Complaint and Application

The present action was commenced by Order to Show Cause filed on February 12, 2007. The Verified Complaint asserts seven separate Causes of Action: claims for actual and attempted monopolization pursuant to Section 2 of the Sherman Act (Plaintiff's First and Second Causes of Action), attempted monopolization pursuant to Section 1 of the Sherman Act (Third Cause of Action), companion claims pursuant to the New Jersey antitrust statutes (Fourth, Fifth and Sixth Causes of Action) and a common law claim for tortious interference with OMST's purported prospective advantage (Seventh Cause of Action). OMST seeks compensatory, punitive, exemplary and treble damages, together with preliminary and permanent injunctive relief compelling DTC to appoint OMST as a FAST agent.

OMST contends that it competes in a market for transfer agent services (as well as in a purported market for "New Jersey transfer agent services" with respect to its state claims). No allegations are provided regarding the definition of the relevant market, the substitutability and interchangeability of the products and services it provides, or the portion of Plaintiffs' market share.[6] OMST concedes that DTC is not a competitor in this relevant market (*see* OMST Mem.

---

[5]    OMST does allege that one of its clients, ERF Wireless, advised OMST that it wanted its transfer agent to be a FAST agent. Compl. ¶ 37. Neither OMST's complaint, nor any of its supporting papers for its injunctive relief application, indicate that this has anything to do with the discussion regarding chilling physical transactions or that ERF Wireless has taken any action with respect to its current relationship with OMST.

[6]    Plaintiff also alleges that it provides "Relevant Services" within the relevant market, a term it defines in a circular fashion as "services within that market," Compl. ¶ 44, but does not otherwise explain.

11

at 3-4; Compl. ¶ 42), but nonetheless contends that DTC possesses "influence" over that market, and in its Memorandum of Law further speculates (admittedly without any evidence whatsoever) that DTC might be planning to enter the "relevant market." Mem. at 3-5. OMST then alleges that DTC's rejection of its FAST application somehow impairs OMST's ability to compete in the relevant market. OMST further alleges (Compl. ¶¶ 34-37) that DTC "coerced and/or attempted to coerce" unspecified actual and potential customers into forming a conspiracy for unspecified purposes, presumably, not to do business with Plaintiff, although Plaintiff does not allege that any third party actually entered into any agreement with DTC. As a result of this conclusorily-pleaded conduct, OMST claims its own business has or will suffer damages. However, OMST provides no facts alleging *any harm to competition* in the relevant market (a market, again, in which DTC concededly does not compete).

In its Memorandum of Law, OMST withdraws its application for injunctive relief seeking an order directing DTC to make it a FAST agent, to the extent that application was premised on its Third and Sixth Causes of Action (its claims under Section One of the Sherman Act and companion New Jersey statute), as OMST recognizes that it has failed to allege the essential element of concerted action. OMST Mem. at 7, n.3.[7] OMST further has apparently withdrawn its request for injunctive relief on the Seventh Cause of Action, premised on alleged tortious interference, on the grounds that it has become moot. OMST Mem. at 20-22. Nonetheless, OMST continues to seek a mandatory emergency order requesting that it be named a DTC FAST agent based upon the antitrust claims contained in the First, Second, Fourth and Fifth Causes of

---

[7]     Despite this dispositive concession, it appears that OMST has not withdrawn the claims themselves, but only the request for preliminary injunctive relief; accordingly, DTC addresses these claims in the Motion to Dismiss portion of this Memorandum.

Action. DTC opposes this request relief and, simultaneously, seeks dismissal of the Complaint in its entirety.

## ARGUMENT

## I. PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF SHOULD BE DENIED

### A. Plaintiff Cannot Meet The High Burden Required To Obtain Affirmative, Ultimate, Injunctive Relief On A Preliminary Motion

The granting of preliminary injunctive relief at the outset of a litigation is "one of the most drastic tools in the arsenal of judicial remedies" *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986). This "extraordinary remedy . . . should not be granted as a routine matter." *Ahmad v. Long Island Univ.*, 18 F. Supp. 2d 245, 247 (E.D.N.Y. 1998); *see also, Berlent v. Focus Features*, LLC, 2006 U.S. Dist. LEXIS 41095 (S.D.N.Y. June 8, 2006). Rather, the party seeking such extreme relief must establish both that, (1) absent such relief, it will suffer an irreparable injury; and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping in the moving party's favor. *Hickerson v. City of New York*, 146 F.3d 99, 103 (2d Cir. 1998); *see also Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002) (applying identical standards in denying plaintiffs' application for a temporary restraining order).

As OMST has acknowledged (OMST Mem. at 7), its burden here is even greater. Because it seeks a mandatory injunction ordering DTC to approve its FAST agent application, this Court must apply a heightened standard of review. Mandatory injunctive relief is not proper unless the movant has made a "clear or substantial showing" of likelihood of success. *Forest*

*City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149-150 (2d Cir. 1999) (internal quotation omitted).[8] Moreover, OMST seeks, in this temporary application, to have this Court impose the ultimate relief it seeks on the merits. This too requires OMST to meet a heightened standard of proof. *Forest City Daly Hous.*, 175 F.3d at 150; *Line Commc'ns Corp.*, 265 F. Supp. 2d at 357.

Because, as shown below, OMST can show neither imminent and irreparable harm, nor any likelihood of success on the merits (much less the required "clear and convincing" showing), its ill-considered application should be denied.[9]

### B.    Plaintiff's Alleged Harm is Admittedly Purely Speculative, And Neither Imminent Nor Irreparable

Far from demonstrating that it is in imminent danger of suffering an irreparable injury absent the relief requested, OMST concedes that it cannot specify any negative effects it has suffered or may suffer. OMST Mem. at 9. Rather, OMST submits only conclusory and speculative assertions of possible harm in the future. The allegations of its complaint, that it will

---

[8]    Courts in this District have routinely declined to impose mandatory preliminary injunctive relief. *See, e.g., Line Commc'ns Corp. v. Reppert*, 265 F. Supp. 2d 353, 357 (S.D.N.Y. 2003) (denying application to compel the release of escrowed funds); *Vantico Holdings S.A. v. Apollo Mgmt.*, 247 F. Supp. 2d 437, 451 (S.D.N.Y. 2003) (denying request to enjoin shareholder to vote a particular way; such an injunction alters the status quo and "should be granted only if it satisfies the heightened standard"); *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*, 2003 U.S. Dist. LEXIS 10281, at *5-6, *9 (S.D.N.Y. June 19, 2003) (denying application to compel testing board to release scores; plaintiffs failed to make "a clear showing" of entitlement to relief).

[9]    Because OMST cannot show any likelihood of success on the merits, let alone a clear entitlement, it is unnecessary for this Court to perform a balancing of the hardships. Nonetheless, DTC cannot permit to stand unrebutted OMST's careless assertion that DTC is "incapable of demonstrating even the most minor of inconveniences should [it] be ordered to admit Plaintiff to the FAST Program." OMST Mem. at 10, n.5. First, DTC has discretion to determine with whom it wishes to contract for performing services as its agent. *See* cases cited *infra* at 22. Moreover, as discussed in the Statement of Facts, above, FAST agents are designated to perform functions that are otherwise performed by DTC pursuant to its SEC registration as a clearing agency. Those functions necessarily require FAST agents to maintain secure custody of, and keep accurate records of, the entirety of their issue's outstanding securities. The harm that could be done were DTC to grant this responsibility to an agent without adequate security procedures, record-keeping ability and/or adequate integrity can hardly be overstated.

be "unable to retain existing clients or to attract new customers" Compl. ¶ 24, need not be accepted by this Court, particularly where OMST's Affidavit in support does not identify a single such existing client or new customer. "Conclusory statements of loss represent an insufficient basis for a finding of irreparable harm." *Litho Prestige, Div. of Unimedia Group, Inc. v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 809 (S.D.N.Y. 1986). This is particularly so where, as here, DTC's records show that OMST has actually increased the number of issuers it represents over the time period alleged in its complaint. Tulaney Supp. Decl., Exh. Q. OMST does not dispute this fact (*compare* OMST Mem. at 8-10), which is fatal to its claim of imminent and irreparable injury.

Nor does OMST dispute that the vast majority of its customers are issues which are *not* traded on the national stock exchanges. In asserting that DTC's publication of this fact is "insulting" and "condescendingly belittling," OMST Mem. at 8, OMST fails to recognize its significance here: Because OMST's customers need not be DRS-eligible, there can be no injury to OMST justifying preliminary injunctive relief. This is fatal to OMST's obligation to demonstrate harm that is "neither remote nor speculative, but actual and imminent." *Datapak Assocs. v. Hoynash*, 2004 U.S. Dist. LEXIS 20408, at *5 (S.D.N.Y. Oct. 8, 2004). As DTC noted (and OMST has not disputed), there are many hundreds and hundreds of transfer agents that remain in business who have neither sought to become nor are FAST agents. Tulaney Decl. ¶ 20. Accordingly, OMST's unsupported assertions that its ability to remain in business depends on becoming a FAST agent cannot amount to a tangible demonstration of irreparable injury.

Finally, even if OMST had demonstrated injury, such injury is compensable by money damages and therefore cannot be "irreparable." *Twentieth Century Fox Film Corp. v. Marvel*

15

*Enters., Inc.,* 277 F.3d 253, 258 (2d Cir. 2002) ("when a party can be fully compensated for financial loss by a money judgment, there is simply no compelling reason why the extraordinary equitable remedy of a preliminary injunction should be granted"). OMST's alleged potential future injury would be nothing more than a financial loss—and "financial loss is not of itself sufficient to establish irreparable harm, particularly when the defendants are apparently financially capable of satisfying any judgment . . . ." *Collagenex Pharms., Inc. v. IVAX Corp.,* 375 F. Supp. 2d 120, 139 (E.D.N.Y. 2005) (denying motion for a temporary restraining order and preliminary injunctive relief and noting that plaintiff did not sustain its burden of demonstrating irreparable harm).

### C.    Plaintiff Is Unlikely to Succeed On The Merits of Its Monopolization Claims[10]

OMST's application further fails on the second prong of injunctive relief: OMST cannot establish a likelihood of success on the merits of its claims; indeed; its claims under Section Two of the Sherman Act are inadequate as a matter of law and should be dismissed.[11]

### 1.    Mere Garden-Variety Business Disputes Cannot Sustain A Claim Under Antitrust Laws

As an initial matter, OMST's attempt to craft a Sherman Act violation from DTC's rejection of its application is ill-considered. The antitrust laws were not designed to serve as a remedy for every businesses grievance, and courts have repeatedly warned against the dangers of

---

[10]    The arguments set forth in this section are also applicable to DTC's motion to dismiss.

[11]    DTC will not separately address OMST's companion state law claims under the New Jersey state antitrust statutes. New Jersey courts have recognized that those State statutes "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes . . . to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." *Patel v. Soriano,* 848 A.2d 803, 826 (N.J. App. Div.), *certif. denied,* 861 A.2d 845 (2004) (citations omitted). Accordingly, New Jersey "look[s] to federal jurisprudence to guide our interpretation of the Act," *id.,* and thus, OMST's New Jersey claims should fail for the same reasons the federal claims fail, as set forth in detail below.

16

using those laws to litigate business tort disputes. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'"); *see also Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 931 (4th Cir. 1990) ("courts should be circumspect in converting ordinary business torts into violations of antitrust laws") (internal quotes omitted); *Oahu Gas Serv., Inc. v. Pacific Res., Inc.*, 838 F.2d 360, 370 (9th Cir. 1988) ("[t]he goal of the antitrust laws, . . . unlike that of business tort or unfair competition laws, is to safeguard general competitive conditions, rather than to protect specific competitors."); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir. 1984) ("[i]f injury to a competitor, caused by wrongful conduct, were enough to bring the antitrust laws into play, the whole state tort law of unfair competition would be absorbed into federal antitrust law."). In flagrant disregard of these cautions, OMST's Complaint attempts to elevate to antitrust status a complaint relating to nothing more than an ordinary business dispute.

> 2.    Because DTC Is Not A Competitor In OMST's Relevant Market, There Is No Basis For An Antitrust Claim

Because – by OMST's own admission – DTC *does not compete* in the relevant market defined in the Complaint, the "market for stock transfer agent services," OMST cannot, as a matter of law, state a claim for monopolization or attempted monopolization of that market. *See* Compl. ¶ 43 (defining relevant market), ¶ 42 (conceding DTC is not in business in the relevant industry).

17

Claims premised on monopolization require that the defendant both possess monopoly power, and maintain or acquire such power through anticompetitive conduct. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *accord Verizon Comm'ns, Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004). Here, the monopoly that OMST alleges DTC possesses is "over the entire securities depository industry." Compl. ¶ 42. But the "securities depository industry" (presumably referring to DTC's functions as a securities depository) is distinct from the stock transfer agent industry, in which OMST competes.[12] Accordingly, because OMST does not compete in the market in which DTC is alleged to have monopoly power, its monopolization claims fail as matter of law. *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 249 (S.D.N.Y. 2004) (dismissing antitrust claim because plaintiff did not compete in market alleged to be monopolized and thus "the anticompetitive conduct alleged by [plaintiff] is not relevant . . ."); *Alpha Shoe Serv. v. Fleming Cos.*, 849 F.2d 352 (8th Cir. 1988)

---

[12]    OMST utterly fails to define its so-called relevant market, except to state that it is made up of the market for transfer agent services. This vague and conclusory allegation is insufficient as a matter of law. In order to allege adequately a relevant market, a plaintiff must define the market's basic elements, such as the substitutability of products or services. Failure to do so can warrant dismissal even at the initial pleading stage. *See, e.g., United Magazine Co. v Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 389 (S.D.N.Y. 2001) (complaint was insufficient, among other things, for failing to define terms used in market definition and to adequately allege interchangeability); *Gianna Enters. v. Miss World (Jersey,) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) (alleged market must relate to the accepted methodology, including "analysis of the interchangeability of use or the cross-elasticity of demand"); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995) (similar). OMST does not even define what "transfer agent services" are alleged to be, and improperly seeks to lump all such services into one market.

Further, OMST asserts, in connection with its state antitrust claims, that there is a separate "relevant market" for transfer agent services in New Jersey. There is (and could be) no allegation that customers look at New Jersey transfer agents as a separate market. *See Urdinaran v. Aarons*, 115 F. Supp. 2d 484, 490 (D.N.J. 2000) ("the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product;" further, any alleged market "must take into account the realities of competition"). Here, OMST does not allege that any (let alone all) of its customers are located in New Jersey, nor that their issues are traded only in New Jersey. By seeking to claim New Jersey as an independent relevant market, and utterly failing to set forth any allegations by which a court could analyze the plausibility of its market definitions, OMST merely emphasizes the implausibility of its claims.

18

(dismissing antitrust complaint where plaintiff and defendant did not compete in the same market); *Cont'l Orthopedic Appliances v. Health Ins. Plan*, 956 F. Supp. 367, 372 (E.D.N.Y. 1997) (same).

Having been alerted to this fundamental defect in its claim by DTC's initial memorandum and during the February hearing before this Court, OMST attempts to cure this flaw. Unable to cite any precedential authority for their novel theory that a non-competitor could somehow be liable for monopolization, OMST is reduced to arguing, alternatively, (1) that DTC's alleged "influence" over the transfer agent industry is the functional equivalent of the market power required to state a claim under Section 2 of the Sherman Act (OMST Mem. at 11-14); (2) that even though it admits that DTC is not a competitor, OMST considers DTC to nonetheless be a competitor because it purportedly *could* enter the market, *might* possibly have the intent to do so, and therefore has a "dangerous probability of success" (OMST Mem. at 14-16 and Troster Aff., ¶¶ 35-36); (3) that DTC's alleged monopoly power in the securities depository market gives rise to a claim of monopoly leveraging (OMST Mem. at 16, n.8); and (4) that DTC could be liable for a Section 2 violation pursuant to the "essential facilities" doctrine (OMST Mem. at 17-20). None of these arguments withstand scrutiny.

First, any alleged "influence" DTC may have over the market for transfer agent services, even if demonstrated, is simply not the equivalent of market power pursuant to Section 2 of the Sherman Act. Notwithstanding OMST's selective quotation from its cited precedents (OMST Mem. at 11-14), each and every one of those precedents dealt with alleged market power by a participant in the market in which plaintiff was engaged. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001), (court recognized that an indicia

19

of monopoly power can be a defendant's "possession of a dominant share of a relevant market"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) (affirming jury verdict of anticompetitive conduct by owner of large ski facility against competitors who owned smaller skiing facilities in the area); *Eon Labs Mfg., Inc. v. Watson Pharms, Inc.*, 164 F. Supp. 2d 350 (S.D.N.Y. 2001) (dismissing antitrust complaint brought by drug manufacturer against competing manufacturer). The concept of "power" in a relevant market by a non-competitor or, as OMST casts its "influence" by a non-competitor, simply has no place in Section 2 jurisprudence.

Second, OMST's purely speculative assertion that DTC might be planning to compete in the stock transfer market in the future – an allegation asserted only in its injunction papers and nowhere to be found in the allegations of the Complaint – cannot, as a matter of law, sustain its Section 2 claims (much less its demand for immediate injunctive relief). This assertion is apparently intended to support a claim for attempted monopoly by DTC. But any such claim requires the plaintiff to demonstrate a "dangerous probability" of success. *Trinko*, 540 U.S. at 415, n.4; *see* OMST Mem. at 14. This element, in turn, is usually assessed by the defendant's *current* market share. *See H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1017 (2d Cir. 1989) (40% market share between two alleged conspirators, in the context of a widely diversified and competitive market, insufficient to demonstrate "dangerous probability of success"); *see also* 3 P. Areeda & D. Turner, ANTITRUST LAW ¶ 835 at 350 (1978) (noting that claims for attempted monopolization should presumptively be rejected where defendant holds market share of 30% or less). Here, it is undisputed that DTC's current market share of the market for transfer agent services is zero. OMST's mere lip service to the phraseology (*see, e.g.,*

20

Compl. ¶ 53) should be rejected. *See CCBN.Com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 157 (D. Mass. 2003) (dismissing attempted monopolization claim at the pleadings stage where plaintiff's allegations regarding defendant's market share were deficient).

Moreover, although nowhere recognized by OMST, any stock transfer agent engaged in interstate commerce must as a matter of federal law be registered with the SEC pursuant to 15 U.S.C. § 78q-1(c). OMST does not (and could not) allege that DTC has sought to register as a transfer agent. OMST's imaginative speculations regarding what could potentially take place at some unspecified future time cannot state a claim under Section 2 of the Sherman Act.[13]

Third, OMST cannot establish any likelihood of success by pressing an (unpled) claim for monopoly leveraging. OMST Mem. at 16, n.8. As recognized by the Supreme Court in *Trinko*, a leveraging claim requires the plaintiff to plead and prove that the defendant had monopoly power in one market, which it was using in an attempt to achieve monopoly power in another market. 540 U.S. at 415, n.4. No such allegations are or could be pled here. There are nothing but purely speculative allegations that DTC is seeking to monopolize the so-called relevant market of transfer agent services – and the complaint demonstrates that it does not compete in that market at all.

Finally, OMST's arguments pursuant to the "essential facility" doctrine likewise fail as a matter of law because DTC is not a competitor in the relevant market. This doctrine is intended to prevent a *competitor* from obtaining an unfair advantage in a market by denying to its actual

---

[13]  Because OMST cannot, as a matter of law, demonstrate that non-competitor DTC has a dangerous probability of monopolizing the stock transfer market – an essential element of its attempted monopolization claim – this Court may disregard its assertions regarding the other elements of such a claim (DTC's purported anticompetitive conduct, and specific intent). *A.I.B. Express*, 358 F. Supp. 2d at 249 (defendant's alleged anticompetitive conduct not relevant where plaintiff and defendant were not competitors).

or potential *competitors* access to a facility essential for use of that market. *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (Second Ed.) § 772. Here, OMST apparently contends that the stock depository facilities operated by DTC are "essential" to the stock transfer industry. Leaving aside the uncontroverted fact that the vast majority of stock transfer agents are not FAST agents, DTC is not a competitor, and thus is not denying use of its facility to competitors.

In *Interface Group, Inc. v. Massachusetts Port Auth.*, 816 F.2d 9 (1st Cir. 1987), a case cited by OMST, the First Circuit in fact rejected precisely the theory OMST urges here, and dismissed an "essential facilities" claim against a non-competitor. Plaintiff, the operator of a charter airline, alleged that the Port Authority had committed a Section 2 violation under the "essential facilities" doctrine because it denied it access to a particular terminal. The court disagreed and held:

> This view of the essential facilities doctrine, however, considerably overstates its scope. The doctrine aims to prevent a firm with monopoly power from extending that power 'from one stage of production into another and from one market into another' . . . . *But it is difficult to see how denying a facility to one who, like [plaintiff], is not an actual or potential competitor could enhance or reinforce the monopolist's market power.*

*Id.* at 12 (citations omitted, emphasis added). OMST's own cited precedent reveals the patent insufficiency of its theory.

At bottom, DTC's alleged "anticompetitive conduct" is nothing more or less than DTC's ordinary-course business decision not to appoint OMST as its agent. But even if DTC were a monopolist in a relevant market, as a matter of law, it has no general duty under the antitrust laws to deal with potential suppliers. *See, e.g., Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S.

752, 761 (1984) (a business generally has the right to deal, or not deal, with whom it likes, provided it does so independently); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1359 (Fed. Cir. 1999) (rejecting refusal to deal theory premised on defendant's withdrawal of plaintiff's special benefits as a customer of defendant) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), among other cases); *see also Trinko*, 540 U.S. at 408 (the Sherman Act does not restrict the right of an alleged monopolist "freely to exercise . . . independent discretion as to parties with whom he will deal."). DTC is free to determine the entities whom it wishes to appoint as FAST agents, to undertake certain services that would otherwise be performed by DTC under the strict regulatory supervision of the SEC. DTC cannot, under the guise of the antitrust laws, be compelled to delegate those duties and responsibilities to all comers, regardless of whether it believes those comers can meet the standards to which DTC itself is subject.

3.   Plaintiff Has Not Alleged Antitrust Injury

OMST has also failed to demonstrate any likelihood of success on the merits for the independent reason that its Complaint and application do not, and could not, allege the requisite antitrust injury. Although this issue was raised by DTC in its initial briefing (*see* DTC Feb. 20 Mem. at 12-14), OMST's papers fail even to address the issue.

As DTC previously demonstrated, an antitrust plaintiff must demonstrate harm to competition itself, not merely harm to the alleged monopolist's competitors. *Trinko,* 540 U.S. at 407 ("[t]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("[t]he law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself"); *George Haug Co. v.*

23

*Rolls Royce Motor Cars*, 148 F.3d 136, 139 (2d Cir. 1998) (plaintiff must demonstrate at the threshold that defendants' acts had an actual adverse effect on competition as a whole). Thus, as a "threshold matter," OMST is required to allege a "substantial foreclosure of competition in an area of effective competition, that is, in a relevant market." *Ford Piano Supply Co. v. Steinway & Sons*, 1988 WL 3488, at *1 (S.D.N.Y. Jan. 13, 1988); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (competition foreclosed must "constitute a substantial share of the relevant market"). The Complaint contains no such allegations.

OMST has not alleged any foreclosure of competition in its alleged relevant market of transfer agent services, much less a "substantial foreclosure." Indeed, because there are hundreds of transfer agents in the relevant market defined by OMST, it would be absurd to suggest that OMST's inability to act as a FAST agent could in any way affect competition in that alleged relevant market. Even if OMST could show that its own business was being impaired, the sheer number of transfer agents that provide equivalent services clearly show that there could be no harm to competition even were OMST to be driven entirely out of the market. For this reason, as well, OMST cannot state a claim under the Sherman Act. *See, e.g., Floors-N-More, Inc. v. Freight Liquidators*, 142 F. Supp. 2d 496, 501-02 (S.D.N.Y. 2001) (claim dismissed because, among other things, allegation that defendants cut off plaintiff retailer's supply through threats and other unfair conduct did not sufficiently allege an adverse effect on competition).

## II.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED AS A MATTER OF LAW

### A.    Standards Applicable to A Motion To Dismiss

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), it is axiomatic that "the Court must accept the pleader's allegations of facts as true together with such reasonable

24

inferences as may be drawn in [the pleader's] favor." *E.g., Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 893 F. Supp. 1207, 1211 (S.D.N.Y. 1994), *aff'd*, 62 F.3d 69 (2d Cir. 1995). Despite this liberal pleading standard, "bald assertions and conclusions of law will not suffice" (*Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996)), and conclusory statements cannot "substitute for minimally sufficient factual allegations." *Elects. Commc'ns. Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (affirming dismissal of claims under Sherman Act §§ 1 and 2).

Moreover, "it is not... proper to assume that the [plaintiff] can prove facts that it has not alleged . . . ." *Id.* (internal quote omitted). In addition to well-pleaded factual allegations, "the pleading must set forth enough information to suggest that relief would be based on some recognized legal theory." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 836 (S.D.N.Y. 1988) (dismissing claims under Sherman Act §§ 1 and 2); *see also City Merch., Inc., v. Kings Overseas Corp.*, 2001 WL 286724, at *1 (S.D.N.Y. Mar. 23, 2001).

Thus, "[a]n antitrust plaintiff cannot create a cause of action by pleading conclusory allegations which merely recite the litany of antitrust." *Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 (S.D.N.Y. 2006) (internal quote omitted). Rather, a court must determine whether the factual allegations demonstrate the necessary elements of, for example, a relevant market, power in that market, anticompetitive conduct and harm to competition. Here, OMST has failed to do so, and the complaint should be dismissed.[14]

---

[14]    Moreover, as noted above, DTC has submitted a proposed Rule to the SEC that will set forth the standards for review and approval of FAST agent applications. The SEC will publish the proposed Rule for notice and comment in the near future. Thus, to the extent that OMST's complaint is directed at those standards, and any alleged advantage enjoyed by larger transfer agents, it should be directed to the SEC as part of that notice and comment procedure. Similarly, any allegations that DTC has been arbitrary or capricious in determining not to appoint OMST a FAST agent (see Compl. ¶ 22), are also properly addressed to the

**B.     Plaintiff's Claims Under Section 2 Of The Sherman Act And The Equivalent New Jersey Statute Fail As A Matter Of Law For The Reasons Set Forth Above**

DTC incorporates by reference the arguments set forth in Section I.C., above.  None of these arguments (but for the discrete issue of the total number of transfer agents demonstrating the lack of antitrust injury here) rely on factual matters outside the complaint and the documents incorporated by reference therein.  Accordingly, the fatal flaws in OMST's First, Second, Fourth and Fifth Claims for Relief discussed in Section I.C. require not only denial of Plaintiff's application for preliminary injunctive relief, but outright dismissal of those claims.

**C.     Plaintiff's Claims Under Section 1 Of The Sherman Act And The Equivalent New Jersey Statute Also Fail As A Matter Of Law**

OMST's Third Cause of Action is styled as a claim for "attempted monopolization" pursuant to Section 1 of the Sherman Act.  Compl. at p. 31.[15]  This claim is nonsensical – Section 1 does not address monopolization claims, and does not recognize "attempt" claims for combinations in restraint of trade.  *Compare* 15 U.S.C. § 1 (prohibiting only the actual making of a combination or conspiracy in restraint of trade) *with* 15 U.S.C. § 2 (prohibiting monopolization *or* attempted monopolization).  Rather, a claim under Section 1 requires the plaintiff to plead and prove the existence of a combination, contract or conspiracy to unreasonably restrain trade in the relevant market.  OMST has failed to do so, and, accordingly, has withdrawn its application for

---

SEC, which oversees DTC's activities as a registered clearing agency.  To the extent that any portion of Plaintiff's complaint survives the present motion, DTC reserves its right to move to dismiss the remaining portions after SEC publication on the grounds of primary jurisdiction.  *See, e.g., In re Methyl Tertiary Ether Prod. Liab. Litig.*, ___ F.3d ___, No. 1:00 1898, MDL 1358 (S.D.N.Y. Jan. 8, 2007) (describing doctrine of primary jurisdiction, which grants courts discretion to stay or dismiss a claim out of deference to federal agency with expertise in resolving issues material to the litigation).

[15]     Similarly, Plaintiff's Sixth Cause of Action alleges "attempted monopolization" under the New Jersey statutory equivalent of Section 1 of the Sherman Act.  Compl. at p. 40.

26

preliminary injunctive relief as to this claim. The claim should be dismissed at the pleadings stage for the same reason.

The Complaint alleges that DTC "coerced and/or attempted to coerce . . . third parties into forming a combination, contract or conspiracy with DTC." Compl. ¶ 57. Leaving aside that OMST has utterly failed to allege the nature or purpose of this alleged combination, contract or conspiracy in more than the most conclusory terms, OMST's own allegations show that there was no agreement between DTC and any third party. The Cause of Action itself does not identify the alleged third parties, or DTC's alleged coercion. Presumably, OMST means to refer to the customer communications set forth in paragraphs 34 through 40 of its Complaint. However, nothing in any of those paragraphs indicates any agreement by any third party to any alleged proposal, coercion or other alleged conduct by DTC.

At most, OMST's allegations are that DTC attempted to convince customers to enter into an agreement to OMST's detriment. DTC, of course, vigorously disputes that it did so, but even if those allegations were accepted as true they do not, as a matter of law, state a Section 1 claim. It is well-settled law that absent an actual agreement, no claim will lie. "[T]here can be no liability under § 1 in the absence of agreement." *Fisher v. Berkeley*, 475 U.S. 260, 266 (1986) (recognizing that the Court has always limited the reach of section 1 to concerted efforts by more than one entity); *see also, e.g., Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 559 (E.D. Pa. 2002) ("The very essence of a Section 1 claim is the existence of an agreement.") (citations and internal quotations omitted). Because OMST has failed to allege any actual agreement to restrain trade, OMST cannot succeed on its Third Cause of Action.

27

**D.    Plaintiff's Supplemental State Law Claim for Tortious Interference Fails As A Matter of Law**

Finally, OMST's Seventh Cause of Action, which alleges tortious interference with prospective advantage based on (1) DTC's alleged statements to issuers currently using OMST that DTC might be compelled to "chill" the issue and (2) vague and conclusory allegations of "disparagement," in DTC's purported publication of the fact that OMST was not a FAST agent (*see* Compl. ¶¶ 35-40, 80) also fails as a matter of law.

DTC demonstrated that, under either New York or New Jersey law,[16] a claim for tortious interference requires a plaintiff to plead specifically (and prove) both that (1) defendant's conduct was motivated *solely* by malice or effectuated by unlawful means, and (2) but for defendant's interference, the plaintiff would have consummated a contract. *Maas v. Cornell Univ.*, 245 A.D.2d 728, 731 (3d Dep't 1997) (affirming dismissal of complaint at preanswer stage); *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989) (a claim for tortious interference requires a reasonable expectation of prospective advantage but for defendant's interference, and a showing that the interference was intentional and without justification or excuse) (collecting cases).

OMST does not contend that it has alleged adequately this first essential element of the tort; *i.e.*, that DTC was motivated solely by malice, or accomplished its objective by unlawful means. Rather, it argues that these "stringent pleading requirements" are only applicable under New York law, and not that of New Jersey. OMST is wrong. As at least two cases in this District have recognized, the laws of New York and New Jersey with respect to this tort are

---

[16]    The complaint itself does not specify the state common law under which it is brought. DTC does not concede that New Jersey law is applicable here.

"nearly indistinguishable." *Treppel v. Biovail Corp.*, 2004 U.S. Dist. LEXIS 20714, at * 25 (S.D.N.Y. Oct. 15, 2004) (New Jersey employs "substantially the same elements" as New York in tortious interference cases). *See also G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 250 (S.D.N.Y. 2001) (finding no material difference between New Jersey and New York law on tortious interference).

New Jersey courts require that a plaintiff alleging tortious interference with prospective advantage allege "harm inflicted intentionally and without justification or excuse." *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 933-34 (N.J. App. Div.), *certif. denied*, 660 A.2d 1197 (N.J. 1995) (citations omitted); *Printing Mart*, 563 A.2d at 39-40; *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 289 (S.D.N.Y. 2002) (cited in OMST Mem. at 21). Thus, as with New York law's reference to disinterested malevolence, if a defendant's conduct is motivated by a legitimate consideration or business justification, the cause of action fails. In *Ideal Dairy Farms*, for example, the court rejected a claim for tortious interference with prospective economic advantage notwithstanding evidence demonstrating "fierce rivalry and rank animosity" on the part of defendant toward the plaintiff-competitor, and a showing that the defendant had specifically targeted its competitor's customers. 659 A.2d at 933. The court noted that, "although the record shows that there was ill-will, there was also a valid business justification supporting [defendant's] conduct." *Id.*

Because under either New York or New Jersey law, OMST must allege that DTC's actions were without valid business justification (*i.e.,* the product solely of malevolence), and because OMST admittedly has failed to do so, its claim for tortious interference fails as a matter of law. Nor has OMST alleged the tort's essential element of "wrongful means." This term

29

requires conduct rising to the level of fraud, dishonesty or illegality. *Printing Mart*, 563 A.2d at 39-40.

Finally, OMST's Complaint is entirely devoid of the required allegation under the second prong of this tort, *i.e.*, that but for the alleged interference, OMST would have entered into a specifically-identified business relationship. *See, e.g., Singer v. Beach Trading Co., Inc.*, 876 A.2d 885, 895 (N.J. Super. 2005) (affirming judgment against plaintiff on claim for tortious interference; plaintiff was required to prove, among other things, that there was a reasonable probability she would have obtained the expected economic benefit absent defendant's interference); *Vigoda v. DCA Productions Plus, Inc.*, 293 A.D.2d 265, 266-67 (1st Dep't 2002) (dismissing complaint for tortious interference as a matter of law for failure to plead that plaintiff would have entered into an economic relationship but for defendant's wrongful conduct); *Maas v. Cornell Univ.*, 245 A.D.2d 728, 731 (3d Dep't 1997) (affirming dismissal of complaint at preanswer stage). OMST's Memorandum makes no response to this fatal flaw, which also requires dismissal of this claim. The Seventh Cause of Action should be dismissed.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court (1) deny OMST's motion for preliminary injunctive relief and (2) dismiss OMST's complaint for failure to state a claim on which relief can be granted.

Dated: March 9, 2007

PROSKAUER ROSE LLP

By: _____
Gregg M. Mashberg (GM-4022)
Karen D. Coombs (KC-3538)
Dolores DiBella (awaiting admission)

1585 Broadway
New York, NY 10036
(212) 969-3000
*Attorneys for Defendants*

31