UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

OLDE MONMOUTH STOCK TRANSFER CO., INC., :

                                 Plaintiff,   :

           -- against --             :
                                  07 CV 0990 (CSH)

DEPOSITORY TRUST & CLEARING      :
CORPORATION and DEPOSITORY TRUST
COMPANY,                      :
                       Defendants.

                                 :

----------------------------------------X


**PLAINTIFF'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW
IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>**


 

**GALLION & SPIELVOGEL**
   Edward R. Gallion (EG-5755)
   Steven Spielvogel (SS-2295)
1225 Franklin Avenue
Suite 325
Garden City, New York 11530
516.512.8899

*Attorneys for Plaintiff
Olde Monmouth Stock
Transfer Co., Inc.*


Dated:  March 19, 2007

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT………………………………………………………………………… 1

FACTUAL BACKGROUND…………………………………………………………………………… 4

ARGUMENT:

     Defendants Have Misrepresented Olde Monmouth's
     So-Called "Concessions."……………………………………………………… 13

     When Plaintiff's Allegations Are Viewed in a Light
     Most Favorable to Olde Monmouth, and All Reasonable
     Inferences Are Drawn in Favor of Plaintiff,
     Defendant's Motion to Dismiss Should Be Denied. ………………… 15

     Antitrust Complaints Should Be Dismissed Only Very
     "Sparingly."……………………………………………………………………………… 17

     Plaintiff Has Adequately Defined The Relevant
     Market. ……………………………………………………………………………………… 20

     Plaintiff Has Adequately Alleged Antitrust
     Injury. ……………………………………………………………………………………… 22

     Plaintiff's Tortious Interference Claim Should
     Not be Dismissed. ………………………………………………………………… 23

CONCLUSION……………………………………………………………………………………………… 24

# <u>TABLE OF AUTHORITITES</u>

## FEDERAL STATUTES

Fed. R. Civ. P. 15 ................................................................................... 22

Fed. R. Civ. P. 12(b) ..................................................................... 16, 22

Sherman Antitrust Act § 1 ............................................................ 18

## FEDERAL CASES

*American Express Travel Related Servs. Co. v. Visa U.S.A.,*
     No. 04 Civ. 8967, 2005 WL 1515399
     (S.D.N.Y. June 23, 2005) .................................................... 17

*Atlantic Richfield Co. v. USA Petroleum Co.,*
     495 U.S. 328 (1990) .............................................................. 23

*Bogan v. Hodgkins,*
     166 F.3d 509, 516 (2d Cir.),
     *cert. denied,* 528 U.S. 1019, 120 S. Ct. 526 (1999) ............... 21

*Cool Wind Ventilation Corp. v. Sheet*
     *Metal Workers Int'l Ass'n,*
     139 F.Supp.2d 319 (E.D.N.Y. 2001) .................................... 21

*Conley v. Gibson,*
     355 U.S. 41, 78 S. Ct. 99 (1957) ...................................... 15-16

*Daniel v. American Bd. of Emergency Med.,*
     988 F.Supp. 112 (W.D.N.Y. 1997) ...................................... 17-19

*District 65, UAW v. Harper & Rowe, Publishers, Inc.,*
     576 F. Supp. 1468 (S.D.N.Y. 1983) ................................... 22

*Geroge Haug Co. v. Rolls Royce Motor Cars Inc.,*
     148 F.3d 136 (2d Cir. 1998) ............................................ 17

*Envirosource, Inc. v. Horsehead Res. Dev. Co.,*
     No. 95 Civ. 5106, 1997 WL 525403
     (S.D.N.Y. Aug. 21, 1997) ................................................. 21

*Fengler v. Numismatic Americana, Inc.,*
     832 F.2d 745 (2d Cir. 1987) ............................................ 20

*Foman v. Davis,*
371 U.S. 178, 83 S. Ct. 227 (1963)..................................................... 22

*Freeland v. AT&T Corp.,*
238 F.R.D. 130 (S.D.N.Y. 2006)........................................................ 22

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,*
201 F.Supp.2d 236 (S.D.N.Y. 2002)............................................... 23-24

*Harris v. City of New York,*
186 F.3d 243 (2d Cir. 1999)............................................................. 16

*Hayden Pub. Co. v. Cox Broadcasting Corp.,*
730 F.2d 64 (2d Cir. 1984)........................................................... 20-21

*Hochroth v. William Penn Life Ins. Co.,*
No. 03 CIV 7286, 2003 WL 22990105,
(S.D.N.Y. Dec. 19, 2003)................................................................ 15

*Hosp. Bldg. Co. v. Rex Hosp. Trs.*
[1976-1 TRADE CASES ¶ 60,885], 425 U.S. 738 (1976)...... 18, 20

*In re Natural Gas Commodity Litig.,*
337 F.Supp.2d 498 (S.D.N.Y. 2004)................................................ 16

*Int'l Audiotext Network, Inc. v. American Tel. & Tel. Co.,*
893 F.Supp. 1207 (S.D.N.Y. 1994),
*aff'd*, 62 F.3d 69 (2d Cir. 1995).................................................... 20

*Mathias v. Daily News, L.P.,*
152 F.Supp.2d 465 (S.D.N.Y. 2001)............................................. 22-23

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,*
795 F.Supp. 639 (S.D.N.Y. 1992)..................................................... 21

*Mon-Shore Mgmt., Inc. v. Family Media, Inc.,*
No. 83 Civ. 2013, 1984 WL 2867
(S.D.N.Y. Sept. 5, 1984)............................................................... 17

*Nat'l Commc'ns Ass'n v. American Tel. & Tel. Co.,*
808 F.Supp. 1131 (S.D.N.Y. 1992)................................................... 20

*Pepsico, Inc. v. Coca-Cola Co.,*
No. 98 Civ. 3282, 1998 WL 547088
(S.D.N.Y. Aug. 27, 1998)............................................................ 20-21

*Poller v. Columbia Broadcasting Sys., Inc.,*
368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)............... 19-20

*Printing Mart-Morristown v. Sharp Elecs. Corp.,*
116 N.J. 739, 563 A.2d 31 (1989)................................................................ 23

*Resnik v. Swartz,*
303 F.3d 147 (2d Cir. 2002)........................................................................ 16

*Solutia Inc. v. FMC Corp.,*
No. 04 Civ. 2842, 2005 WL 711971 (Mar. 29, 2005)........................ 16

*Varallo v. Hammond, Inc.,*
94 F.3d 842 (3d Cir. 1996)......................................................................... 24

*Visual Scis., Inc. v. Integrated Commc'ns, Inc.,*
660 F.2d 56 (2d Cir. 1981)......................................................................... 20

*Volmar Distribs., Inc. v. New York Post Co., Inc.,*
825 F.Supp. 1153 (S.D.N.Y. 1993)........................................................... 23

*Williams v. City of New York,*
No. 03 Civ. 5342, 2005 WL 901405 (Apr. 19, 2005)........................ 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

OLDE MONMOUTH STOCK TRANSFER CO., INC.,  :

                        Plaintiff,   :

        -- against --                :
                                            07 CV 0990 (CSH)
DEPOSITORY TRUST & CLEARING          :
CORPORATION and DEPOSITORY TRUST
COMPANY,                             :
                        Defendants.
                                     :

----------------------------------------X


**PLAINTIFF'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW
IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Plaintiff Olde Monmouth Stock Transfer Co., Inc.

("Olde Monmouth") respectfully submits this Reply Memorandum of

Law in support of its motion for a preliminary injunction and

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

the Complaint in this action.


**PRELIMINARY STATEMENT**

The ***entirety*** of Defendants' challenge to Plaintiff's

antitrust claims and application for injunctive relief is

premised solely on a single naked factual allegation.  Time and

time again, Defendants relentlessly intone at every opportunity

that Olde Monmouth's antitrust claims must be dismissed (and,

accordingly, its requested injunctive relief denied) because the

1

Defendants do not compete against Olde Monmouth. This assertion is reiterated with such vigor and unflagging frequency as to suggest that Defendants believe that only by incessant repetition can it be imbued with accuracy.

Readily obtainable public documents, however, as well as the facts set forth in the accompanying Declaration of Susanne Trimbath, Ph.D., who is a former senior employee of Defendant DTC, expose the demonstrable falsity of this critical linchpin of Defendants' arguments, without which their attacks against Olde Monmouth's claims lay lifeless: ***Defendants in fact <u>do</u> engage in direct competition with Olde Monmouth.***

Among other unassailable indicia of such direct competition:

- The shareholder/owners of DTCC and DTC (<u>i</u>.<u>e</u>., "Participants," in Defendants' parlance) include the largest and most influential broker/dealers in the United States; these broker/dealer Participants own outright or otherwise control stock transfer agency affiliates that vie with and compete directly against Olde Monmouth to perform stock transfer services for securities issuers. Consequently, Defendants' shareholder/owners provide stock transfer agency services to issuing companies in direct competition with Olde Monmouth.

- Fully one-half of the 36 transfer agents publicly identified as approved for Defendants' DRS Program either are owned outright by, or are subsidiaries of, Defendants' broker/dealer Participant shareholders.

2

- The DRS and FAST Programs that Defendants have imposed on the entire securities industry were originally conceived, developed and proposed to the Securities and Exchange Commission by the Securities Transfer Association ("STA"), the trade group made up of stock transfer agents. Because of concerns raised by some of Defendants' shareholder Participants that adoption of DRS as proposed by the STA would result in the Participants' loss of business and revenue, the Defendants seized control of the original DRS initiative from the STA, successfully appropriated and redirected the entire DRS proposal for Defendants' own purposes and have made use of their monopolistic position of complete authority over DRS for anticompetitive purposes, all of which devolves to the detriment of large segments of the stock transfer industry, securities issuers and consumers in general.

- Over the last 30 years the number of FAST-eligible stock issues has increased by a factor of 2,325 (i.e., from 400 issuers to more than 930,000 issuing companies), while the number of FAST-approved stock transfer agents has increased only by a comparatively paltry factor of nine (from 10 agents to approximately 90). In recent years, the number of small stock transfer agents has decreased at a much higher rate than the rate at which the number of stock transfer agents has decreased overall. Such trends clearly reflect a significant and rapid consolidation of stock transfer services under the control of the large FAST-approved transfer agents that are owned by Defendants.

Plaintiff respectfully submits that the facts set forth above, standing alone, are more than sufficient to demonstrate that the Defendants are engaged in direct competition with Olde Monmouth and that, accordingly, each of Defendants' challenges to the Complaint and to Plaintiff's request for injunctive relief must be soundly and completely rejected. To the extent, however, that the Court may deem it necessary to have additional indicia of such direct competition brought before it, Plaintiff respectfully submits that limited discovery is entirely appropriate under the present circumstances and hereby renews its request for permission to conduct such inquiry of Defendants.

**FACTUAL BACKGROUND**

Strikingly absent from Defendants' otherwise tidy exposition of the events underlying this dispute is any mention of the *truly relevant* facts concerning the historical background that resulted in Defendants' imposition of the present DRS/FAST Program on the entire securities industry and any information about Defendants' actual ownership structure.[1] Defendants' monopolistic position of complete and utter control over the nation's predominant securities depository industry -- the position from which Defendants have been able successfully to impose their DRS Program on the securities industry as a whole -- is undisputed for purposes of the pending cross-motions.

---

[1] For a much more detailed discussion of the factual background set forth herein, Plaintiff respectfully directs the Court's attention to the Declaration of Susanne Trimbath, Ph.D., sworn to March 17, 2007 ("Trimbath Decl."), which is submitted herewith.

In preparing for the instant submission to the Court, Plaintiff has turned to Susanne Trimbath, Ph.D., for professional assistance. Dr. Trimbath has held many significant positions within the securities and stock transfer industries over the course of her career, including the position of Director of Transfer Agent Services at Defendant DTC for six years. Her employment history has provided her with a unique vantage point from which to observe the historical development of many of the factual matters here at issue.

Her detailed analyses of these important industry developments, as well as her careful examination of Defendants' submissions in this lawsuit, are fully set forth in her Declaration, to which Plaintiff respectfully refers the Court. Plaintiff steadfastly holds the view that the insightful and illuminating information set forth in Dr. Trimbath's Declaration standing alone provides more than sufficient evidence not only that Defendants are engaged in actual competition with Olde Monmouth, but also that Defendants' motion to dismiss must be rejected in its entirety.

With respect to their ownership structure, Defendants have disclosed in public documents and filings that shares of Defendants' stock are held by entities known as "Participants," all of which are financial services institutions. (The list of Defendants' Participants as published on Defendants' Web site is attached as "Exhibit A" to the Reply Declaration of Edward R. Gallion, Esq., sworn to March 19, 2007 ("Gallion Reply Decl."),

which is submitted herewith.)  The allocation of Defendants'
shares among the Participants appears to be determined on the
basis of the frequency, scope and nature of the Participants'
respective DTCC- and DTC-related activities.  (See Trimbath
Decl. ¶ 18.)  The Participants, therefore, are shareholder/owners
of Defendants DTCC and DTC.

As fully set forth in Plaintiff's prior submissions to
the Court (see Plaintiff's Complaint, filed February 13, 2007;
Plaintiff's Memorandum of Law in Support of Motion for
Preliminary Injunction, filed February 27, 2007), Defendants have
imposed upon the entire securities industry a registration/
transfer regimen known as DRS, which is under the exclusive
control and administration by Defendants.  Compliance with DRS
has been made a requirement for listing on the national
securities exchanges, and will soon be a listing requirement for
most of the regional exchanges in the United States, including
those located in Philadelphia, Chicago and Boston.  (See Trimbath
Decl. ¶ 25.)

Therefore, despite Defendants' disingenuous
suggestions to the contrary, admission to the FAST Program will
be required in all instances to serve as transfer agent even for
those presumably smaller issuers seeking only regional exchange
registration.  Consequently, the universe of listing choices for
non-DRS-compliant issuing companies will continue to shrink
quickly at Defendants' hands and the concomitant opportunities
for non-DRS-compliant transfer agents such as Olde Monmouth to

6

continue in business in any meaningful manner in all likelihood will evaporate in a similarly short period of time.

As a prerequisite to participation in Defendants' DRS Program, transfer agents must be approved by Defendant DTC -- in DTC's sole and unfettered discretion -- as eligible for DTC's FAST Program. While Defendants unreasonably and unlawfully have withheld such approval from Olde Monmouth despite Plaintiff's best efforts and its clear demonstration of full compliance with all published criteria, the publicly available Web site list of the 36 transfer agents that have been approved for the DRS Program discloses that fully one-half of those approved agents are owned by or affiliated with Defendants' Participants. [2] (<u>See</u> Gallion Reply Decl., Exh. B.) Of equal if not greater significance, senior executive representatives of Defendants' most important Participants hold positions on Defendant DTCC's Board of Directors. (<u>See</u> Gallion Reply Decl., Exh. C.)

Accordingly, it is quite evident that Defendants' shareholder/owner Participants compete directly against Plaintiff Olde Monmouth to provide stock transfer agent services to

---

[2] Elsewhere, Defendants have publicly stated that "approximately 90" transfer agents have been approved for FAST Program participation (<u>see</u> Trimbath Decl. ¶ 26.), although Plaintiff has been unable to locate any such list of FAST-approved transfer agents even after the exercise of considerable due diligence. Olde Monmouth therefore is of the view that discovery on this critically important issue, among many others, is not only entirely appropriate but necessary, given the great evidentiary weight Defendants have placed on the statistics concerning the percentages relating to the approval and denial rates of applications for FAST eligibility. (<u>See</u>, <u>e.g.</u>, Defs. Mem. at 7.)

It therefore would appear that basic fairness requires that Plaintiff, at a bare minimum, be permitted to discover the identities of those transfer agents that have applied for acceptance into the FAST Program, as well as the ultimate dispositions of their applications at Defendants' unsupervised and unrestrained hands.

securities issuers and that these competitor-Participants bear ultimate responsibility for Defendants' unlawful exclusion of Olde Monmouth from the FAST Program, in clear violation of the federal and state antitrust statutes under which Plaintiff's causes of action are brought.

Additional indications of such direct competition are revealed upon inspection of the historical development of the DRS Program. As explained in greater detail by Dr. Trimbath, the original seminal idea that gave rise to the present DRS Program was developed independently by the Securities Transfer Association; in fact, the STA's proposals, which came to be known within the securities industry as "DRS-TA," were sufficiently developed that the Securities and Exchange Commission was prompted to solicit comments on the policy implications and regulatory issues raised by DRS-TA in a release issued by the Commission dated December 1, 1994. (See Trimbath Decl. ¶ 12 & Exh. A thereto.) Among other innovations envisioned by DRS-TA, this initiative contemplated the complete elimination of physical paper stock certificates in favor of stock ownership records that would be reflected and maintained on the records of the issuer in a book-entry format.

Realizing the potentially ruinous long-term implications for its stock depository facilities and related functions that would be occasioned by acceptance of DRS-TA's proposed total elimination of paper stock certificates, on October 3, 1996, Defendants filed with the SEC their own proposed

8

rule change to create a new service called the Direct Registration Service ("DRS-DTC").[3] (See Trimbath Decl. ¶ 16 & Exh. B thereto.) The critical differences between the competing DRS systems focused on investor autonomy: DRS-TA would have allowed investors to sell, pledge or transfer their shares directly, whereas DRS-DTC requires an investor "to transfer its DRS position in the security to a financial intermediary in order to sell or pledge the security or to receive a certificate representing the security." (Id.)

Thus, upon sensing the possibility that the Securities and Exchange Commission might permit the adoption by the securities industry of DRS-TA as developed by the STA, with its attendant adverse effects on their primary roles as financial intermediaries and depository facilities, Defendants moved swiftly and decisively to wrest developmental control over the DRS initiatives from the STA where they originally were created and nurtured, and instead commandeered the development of the DRS Program to serve the needs of Defendants to the direct benefit of their broker/dealer shareholder Participants and to the direct detriment of the stock transfer agents that are not affiliated with Defendants' Participants. Such turf-protecting actions undertaken by Defendants to counteract and co-opt perceived competitive threats from the stock transfer agents' proposed DRS

---

[3] It bears emphasis that Defendants' initial submissions to the Securities and Exchange Commission on behalf of its DRS-DTC initiative specifically refer to and incorporate the STA's prior DRS proposals, thereby subsuming and redirecting the STA's original creation to meet Defendants' own competitive objectives. (See Trimbath Decl. ¶¶ 16-18.)

program constitute classic textbook illustrations of direct competition.[4]

Yet additional cognizable indications of direct competition between Defendants and unaffiliated stock transfer agents such as Olde Monmouth can be found by examining the irrefutable and unmistakable trend toward complete ownership of all issuers' outstanding shares in the name of Defendants' nominee, Cede & Co.  As noted in Plaintiff's prior submissions, Defendants are now in a position to claim nominal ownership of upwards of fully 75 percent of all outstanding shares of issues listed on the major national stock exchanges, and the three largest stock transfer agents, Computershare Investor Services, ChaseMellon Shareholder Services and the Bank of New York -- each of which not surprisingly is a DRS-approved transfer agent subsidiary of Defendants' most prominent shareholder/owner Participants -- now provide transfer agent services to 70 percent of shareholders.

---

[4]     The true nature and scope of the intent on the part of Defendants' Participants in resolving to commandeer and redirect DRS-TA for their own self-protective purposes are issues of critical importance to Plaintiff's claims, particularly as regards its causes of action under Section 1 of the Sherman Act and the corresponding New Jersey antitrust statute, which sound in illegal conspiracy and/or combination.

Plaintiff respectfully submits that such significant issues are properly susceptible to review only after development on the record through discovery, and Plaintiff therefore is of the view that these claims should not be dismissed and, instead, remain *sub judice* until Plaintiff has been afforded ample opportunity adequately to explore relevant communications between Defendants and their Participants concerning their self-protective intentions with respect to the DRS-TA proposal and any potentially suspect collusive agreements among them concerning related competitive issues.

Dr. Trimbath has set forth even more detailed statistical information about the alarming rate of consolidation in the hands of the relatively small number of DRS-approved Participant-owned transfer agents and the corresponding decline in the number of unaffiliated stock transfer agents as Defendants' DRS requirements become more and more pervasive throughout the securities industry. (See Trimbath Decl. ¶¶ 24-27.) The pace of such consolidation under Defendants' nominal ownership through Cede & Co., and of course, through Defendants' Participants' stock transfer agent subsidiaries, continues to accelerate and by all accounts will continue to escalate unabated. (Id.)

Indeed, senior executive representatives of DTC include as part of their regular Powerpoint presentations to the securities industry a self-description of Defendants' stock depository as the "Roach Motel," i.e., "the shares go in but they never come out." (See Trimbath Decl. ¶ 24 & Exh. G thereto.)

This exponential increase in Defendants' nominal ownership of publicly traded shares is accompanied by the concomitant escalating concentration of transfer agent services for such issuers in the hands of the few DRS/FAST-approved transfer agents that are specifically hand-selected for inclusion in the program by Defendants. Not surprisingly, virtually all of these specially selected DRS/FAST-approved transfer agents that are involved in the financial services industry are owned by or

11

affiliated with the shareholder/owners of the Defendants' Participants.

Moreover, just as Defendants' have abused their monopolistic position of total control over DRS/FAST to the direct benefit of their shareholder/owner Participants and to the direct detriment of unaffiliated transfer agents such as Olde Monmouth, DTCC and DTC have improperly appropriated unto themselves total **regulatory and supervisory authority** over the transfer agents –- in contravention of the clear and express Congressional mandate that such regulatory and supervisory authority shall be vested exclusively with the United States Securities and Exchange Commission.  (<u>See</u> <u>also</u> Trimbath Decl. ¶ 23.)  As just one example of such overreaching in this regard, Defendants trumpet their self-appointed supervisory role by informing the Court that they must bear the costs associated with "monitoring the [transfer] agents' performance."  (<u>See</u> Defs. Mem. at 7.)[5]

Defendants' sweeping misappropriation of regulatory authority that is reserved exclusively for the Securities and Exchange Commission, as well as the alarming and apparently irreversible consolidation of nominal stock ownership in

---

[5]     Plaintiff notes also that Defendants' frequent invocations of the many laudable goals and public protections embodied in various Congressional mandates to the Securities and Exchange Commission ring somewhat hollow emanating, as they do, from parties who have blatantly violated those mandates by misappropriating unto themselves regulatory authority reserved exclusively for the Commission and who, Plaintiff firmly believes, have abused their unique status vis-à-vis the Commission to engage in and perpetrate unlawful collusive and conspiratorial conduct in contravention of the antitrust laws.

Defendants' hands, have caused widespread and justifiable consternation among the smaller unaffiliated stock transfer agents who justifiably fear for their very survival in the face of Defendants' seemingly unstoppable onslaught, as evidenced by, for example, a recent front-page article from the STA's official trade publication.  (See Gallion Reply Decl., Exh. D.)[6]

In light of the foregoing, Defendants no longer should be heard disingenuously to obfuscate the issues before this Court by continuing to eschew any competitive status vis-à-vis Olde Monmouth and similarly situated small unaffiliated stock transfer agents.  Because such direct competition unquestionably has been demonstrated, each of Defendants' attacks on Plaintiff's claims must fail.  Plaintiff's request for preliminary injunctive relief should be granted and Defendants' motion to dismiss should be rejected in its entirety.

**ARGUMENT**

**Defendants Have Misrepresented Olde Monmouth's So-Called "Concessions."**

Before proceeding to Plaintiff's detailed legal analysis demonstrating its entitlement to injunctive relief as well as an Order denying Defendants' motion to dismiss in all respects, it is imperative that Olde Monmouth, as a threshold matter, correct any number of the frequent misstatements and mischaracterizations that Defendants brazenly label as

---

[6]     Plaintiff previously provided a copy of the STA newsletter article to the Court by letter on February 16, 2007.  An additional copy is hereby submitted as Exhibit D to the Gallion Reply Declaration for the convenience of the Court.

13

"concessions" and proceed carelessly and repeatedly to bandy about. Among Defendants' freewheeling misstatements:

- Olde Monmouth has **_not_** "conceded" that there is no competition between it and Defendants. Indeed, given the lengthy exposition set forth above and the accompanying statements of Dr. Trimbath in this regard, nothing could be farther from the truth and, in fact, Plaintiff has alleged DTC's status as a competitor (see, e.g., Complt. ¶ 47(c)). Consequently, the very heart of each of Defendants' arguments, as well as the corollaries arising therefrom (Defs. Mem. at 16-24), are of no effect and properly should be disregarded by this Court as irrelevant and inapplicable to the facts underlying this action.

- It is by no means "undisputed that DTC's current market share of the market for transfer agent services is zero," as Defendants disingenuously would have this Court believe. (See Defs. Mem. at 20.) Quite to the contrary, Defendants' market share can be properly calculated only by taking into account the ever-increasing market positions held by Defendants' shareholder/owner Participants' transfer agent captives, which, as Plaintiff has demonstrated elsewhere herein, aggregate well in excess of 70 percent.

- Olde Monmouth has not "withdrawn" its application for injunctive relief under Section 1 of the Sherman Act. Rather, as clearly stated in its prior submissions, Olde Monmouth merely has determined to await further factual development during discovery as to the existence of unlawful

14

conspiracies or collusive combinations, as contemplated by Section 1, in order ultimately to demonstrate its entitlement to injunctive relief thereunder.

- Olde Monmouth has not conceded that it is unable to specify the injury that it has suffered and will continue to suffer as the direct result of Defendants' anticompetitive conduct and, in fact, clearly has alleged such antitrust injury. In light of the unquestionable consolidation that is taking place within the DRS-eligible stock transfer agency industry and Defendants' continuing unreasonable exclusion of Olde Monmouth from participation therein, Plaintiff's current and future injuries are effectively self-evident. Similarly, because Olde Monmouth's exclusion from DRS/FAST undoubtedly has deterred and will continue to deter innumerable prospective customers from doing business with Plaintiff, Olde Monmouth's injuries do not constitute financial loss that is susceptible to quantification.

**When Plaintiff's Allegations Are Viewed in a Light Most Favorable to Olde Monmouth, and All Reasonable Inferences Are Drawn in Favor of Plaintiff, Defendant's Motion to Dismiss Should Be Denied.**

In adjudicating a motion to dismiss, it is well established that a district court must construe the allegations contained in the complaint in a light that is most favorable to the plaintiff and "must deny the motion unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." Hochroth v.

15

<u>William Penn Life Ins. Co.</u>, No. 03 CIV 7286, 2003 WL 22990105, at *1 (S.D.N.Y. Dec. 19, 2003) (citing <u>Conley</u> v. <u>Gibson</u>, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957)); <u>see</u> <u>also</u> <u>In re Natural Gas Commodity Litig.</u>, 337 F.Supp.2d 498, 508 (S.D.N.Y. 2004) ("A court may dismiss a complaint only if '"it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."'") (citing <u>Resnik</u> v. <u>Swartz</u>, 303 F.3d 147, 150-51 (2d Cir. 2002) (quoting <u>Harris</u> v. <u>City of New York</u>, 186 F.3d 243, 247 (2d Cir. 1999))). "[A] court must [also] accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor." <u>Solutia Inc</u>. v. <u>FMC Corp.</u>, No. 04 Civ. 2842, 2005 WL 711971, at *3 (Mar. 29, 2005) (citations omitted); <u>see</u> <u>also</u> <u>Williams</u> v. <u>City of New York</u>, No. 03 Civ. 5342, 2005 WL 901405, at *7 (Apr. 19, 2005) ("In considering a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., the Court construes the complaint liberally, 'accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor[.]'") (citations omitted).[7]

Olde Monmouth respectfully submits that accepting its factual allegations as true, and construing all reasonable inferences in Plaintiff's favor, one may easily and reasonably conclude that Defendants have engaged in, and continue to engage

---

[7]     It bears observation that in <u>Conley</u>, the Supreme Court stated that "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." <u>Conley</u>, 355 U.S. at 48, 78 S. Ct. at 103 (citation omitted).

16

in, willful anticompetitive behavior in bad faith; accordingly, Defendant's motion to dismiss should be denied.

**Antitrust Complaints Should Be Dismissed Only Very "Sparingly."**

Antitrust actions implicate additional unique concerns that caution against precipitous dismissals before the opportunity for adequate discovery has been provided: "In the context of antitrust cases, motions to dismiss 'prior to giving the plaintiff ample opportunity for discovery should be granted [only] very sparingly.'" American Express Travel Related Servs. Co. v. Visa U.S.A., No. 04 Civ. 8967, 2005 WL 1515399 (S.D.N.Y. June 23, 2005) (quoting Geroge Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998) (internal quotations omitted)); Mon-Shore Mgmt., Inc. v. Family Media, Inc., No. 83 Civ. 2013, 1984 WL 2867, at *5 (S.D.N.Y. Sept. 5, 1984) (declining to dismiss antitrust claims; "In considering a defendant's motion to dismiss an antitrust claim, we must keep in mind the Supreme Court's admonition that in antitrust cases 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly[.]'") (quoting Hosp. Bldg. Co. v. Rex Hosp. Trs., [1976-1 TRADE CASES ¶ 60,885], 425 U.S. 738, 746 (1976)).

District courts frequently underscore and uphold the necessity of affording plaintiff an opportunity for discovery to substantiate its antitrust claims. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is

17

entitled to offer evidence to support the claims." <u>Mon-Shore</u> <u>Mgmt., Inc.,</u>1984 WL at *5 (S.D.N.Y. Sept. 5, 1984).  <u>See</u> <u>also</u> <u>Daniel</u> v. <u>American Bd. of Emergency Med.</u>, 988 F.Supp. 112, 122-23 (W.D.N.Y. 1997) ("[B]ecause of the conspiratorial nature of certain antitrust claims, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.") (internal quotation omitted).

Such admonishments counseling against premature dismissal of antitrust allegations are particularly apt under the present circumstances.  Olde Monmouth properly has alleged, *inter alia*, the existence of an unlawful conspiracy involving Defendants that contravenes Section 1 of the Sherman Act and the corresponding New Jersey statute.  The identities of third parties with whom Defendants have entered into such collusive agreements remain undetected to date, although it hardly strains credulity to suspect that Defendants' own shareholder/owner Participants with DRS-approved transfer agency facilities might well have conspired with Defendants improperly to apportion unto themselves an ever increasing share of the market for transfer agency services, especially as the aforementioned market consolidation progresses unabated.

As demonstrated elsewhere in Plaintiff's submissions to the Court, the three largest stock transfer agents, each of which is a DRS-approved transfer agent subsidiary of Defendants' most prominent shareholder/owner Participants, now provide transfer agent services to 70 percent of shareholders.  Given

18

this rather remarkable market concentration in the hands of just three of Defendants' shareholder/owners, discussions of such improper collusive arrangements between Defendants and their Participants seem nearly probable.

Defendants' numerous transparent attempts to deny its domination of the market are simply belied in their entirety by the actual facts.  Among many other clear indicia of Defendants' tight control of the market:  (1) Defendants alone enjoy the unfettered and unsupervised authority to define, determine and grant eligibility; (2) Defendants have complete control over market access; and (3) Defendants indeed possess the authority to set prices for transfer agency services within the market, as clearly evidenced by, for example, the recent letter Plaintiff received from Defendants' counsel in which DTC **demanded** that Olde Monmouth **immediately reduce its fees**, baldly announcing to Plaintiff that it "will no longer accept" Plaintiff's fee schedule.[8]

Surely, dismissal of Plaintiff's claims would be improvident before Olde Monmouth has been permitted to take discovery on such a crucial yet limited issue. See Daniel, 988 F.Supp. at 122 ("This [motion to dismiss] standard is even more stringent when evaluating anti-trust claims, where the proof often is in the hands of the alleged conspirators, and dismissals prior to giving the plaintiff ample opportunity for merit-based discovery should be granted sparingly.") (citing Hosp. Bldg. Co.

---

[8]    A copy of this letter, dated February 22, 2007, from Defendants' attorneys is submitted as Exhibit E to the Gallion Reply Declaration.

19

v. <u>Rex Hosp. Trs.</u>, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338) (1976) (citing <u>Poller</u> v. <u>Columbia Broadcasting Sys., Inc.</u>, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)); <u>cf</u>. <u>Fengler</u> v. <u>Numismatic Americana, Inc.</u>, 832 F.2d 745, 747 (2d Cir. 1987) ("On a motion for preliminary injunction, where 'essential facts are in dispute, there must be a hearing . . . .'") ((quoting <u>Visual Scis., Inc.</u> v. <u>Integrated Commc'ns, Inc.</u>, 660 F.2d 56, 58 (2d Cir. 1981)).  In a similar vein, Plaintiff's allegations with respect to its remaining antitrust claims are pleaded with sufficient precision to warrant discovery.  Defendants' motion for dismissal should be rejected.

**<u>Plaintiff Has Adequately Defined The Relevant Market.</u>**

The Second Circuit has emphasized that market definition is almost invariably a fact-driven inquiry.  <u>See</u>, <u>e.g.</u>, <u>Hayden Pub. Co.</u> v. <u>Cox Broadcasting Corp.</u>, 730 F.2d 64 (2d Cir. 1984); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Int'l Audiotext Network, Inc.</u> v. <u>American Tel. & Tel. Co.</u>, 893 F.Supp. 1207, 1214 (S.D.N.Y. 1994) (Market definition is a question of fact to be determined only "after a factual inquiry into the commercial realities faced by consumers." (internal quotations omitted)), <u>aff'd</u>, 62 F.3d 69 (2d Cir. 1995).  Accordingly, motions to dismiss for failure to allege adequate market definition are to be granted only in cases where "the alleged market makes 'no economic sense under any set of facts.'"  <u>Pepsico, Inc.</u> v. <u>Coca-Cola Co.</u>, No. 98 Civ. 3282, 1998 WL 547088, at *6 (S.D.N.Y. Aug. 27, 1998) (quoting <u>Nat'l Commc'ns Ass'n</u> v. <u>American Tel. & Tel. Co.</u>, 808 F.Supp. 1131,

20

1134 (S.D.N.Y. 1992)).  Despite DTCC's and DTC's assertions to the contrary, Olde Monmouth is not required to include among its pleadings any extensive analyses of "reasonable interchangeability" or "cross-elasticity of demand."  See Pepsico, 1998 WL 547088, at *5; Envirosource, Inc. v. Horsehead Res. Dev. Co., No. 95 Civ. 5106, 1997 WL 525403, at *3  (S.D.N.Y. Aug. 21, 1997) ("Extensive analyses of reasonable interchangeability and cross elasticity of demand, however, are not required at the pleading stage."); see also Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc., 795 F.Supp. 639, 647 (S.D.N.Y. 1992).

Although Defendants expend a considerable amount of energy in their attempt to muddy this otherwise straightforward issue, Plaintiff has not alleged the existence of a particularly complex or nebulous relevant market that is difficult to define. Rather, the Complaint contains allegations that more than adequately describe the easily comprehensible and well-defined market for the services of stock transfer agents.  Simply put, such services are provided to the issuers of securities by stock transfer agents.  The relevant market alleged herein is appropriately described and withstands scrutiny because, as alleged by Olde Monmouth, it is a market in which "there is reasonable interchangeability in use between a [service] and substitutes."  See Bogan v. Hodgkins, 166 F.3d 509, 516 (2d Cir.), cert. denied, 528 U.S. 1019, 120 S. Ct. 526 (1999); Hayden Publ., 730 F.2d at 70-71; Cool Wind Ventilation Corp. v. Sheet

21

<u>Metal Workers Int'l Ass'n</u>, 139 F.Supp.2d 319, 326 (E.D.N.Y. 2001). Because the economic and commercial realities are such that the relevant market is susceptible to straightforward description and Plaintiff adequately has alleged the existence and description of that market, Defendants' Rule 12(b)(6) motion on market definition grounds should be denied.[9]

**<u>Plaintiff Has Adequately Alleged Antitrust Injury.</u>**

Allegations regarding Olde Monmouth's injury and the injuries suffered by issuing companies and the consuming public at large by Defendants' anticompetitive conduct are pleaded with sufficient clarity (<u>see</u>, <u>e.g</u>., Cmplt. ¶¶ 49-50) and are precisely of the nature the antitrust laws are designed to prevent. <u>See</u> <u>Freeland</u> v. <u>AT&T Corp.</u>, 238 F.R.D. 130 (S.D.N.Y. 2006); <u>Mathias</u> v. <u>Daily News, L.P.</u>, 152 F.Supp.2d 465 (S.D.N.Y. 2001). The scope of choice available to consumers of transfer agency services has been and will continue to be improperly restricted by the unlawful restrictions Defendants have placed on small unaffiliated stock transfer agents' ability to vend their services.

---

[9] However, to the limited extent that the Court might be inclined to grant Defendants' dismissal motion even in part, Plaintiff would seek leave to make an application under Rule 15 of the Federal Rules of Civil Procedure, which permits amendment of a complaint at any stage of the litigation and requires that such leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The United States Supreme Court has held that Rule 15's "mandate is to be heeded" and leave to amend freely given. <u>Foman</u> v. <u>Davis</u>, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1963). "Leave to file an amended complaint is therefore granted freely absent bad faith, undue delay or prejudice to the opposing party." <u>District 65, UAW</u> v. <u>Harper & Rowe, Publishers, Inc.</u>, 576 F. Supp. 1468, 1474 (S.D.N.Y. 1983) (citation omitted).

Moreover, as evidenced by, among other things, the statement of concerns about Defendants' activities contained in the STA Newsletter, the injury of which Olde Monmouth complains is not limited to Plaintiff itself, but rather is shared by all similarly situated unaffiliated transfer agents.  In similar fashion, Olde Monmouth can show antitrust injury under these circumstances because its loss is occasioned by Defendants' acts that reduce consumer choice.  See Volmar Distribs., Inc. v. New York Post Co., Inc., 825 F.Supp. 1153, 1160 (S.D.N.Y. 1993).  Accordingly, it would appear to be beyond dispute that Plaintiff has more than adequately alleged that Defendants' conduct has directly resulted in competition-reducing effects.  See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990); see also Mathias v. Daily News, L.P., 152 F.Supp.2d 465 (S.D.N.Y. 2001).  Defendants' motion to dismiss for failure to allege antitrust injury should be firmly rejected.

**Plaintiff's Tortious Interference Claim Should Not Be Dismissed.**

Olde Monmouth need say little to negate Defendants' misguided argument that Plaintiff's New Jersey law claim for tortious interference should be dismissed.  As pointed out in Plaintiff's prior submissions, Defendants' fundamental misapprehension of the required elements for this claim under New Jersey law is fatal to Defendants' challenge.  Although DTCC and DTC obviously would prefer that it were otherwise, there is no requirement that Plaintiff allege that Defendants' improper conduct was motivated *solely* by malice.  See, e.g., Printing

23

Mart-Morristown v. <u>Sharp Elecs. Corp.</u>, 116 N.J. 739, 563 A.2d 31, 37 (1989); <u>Geneva Pharms. Tech. Corp.</u> v. <u>Barr Labs., Inc.</u>, 201 F.Supp.2d 236, 239 (S.D.N.Y. 2002) (applying New Jersey law) (citing <u>Varallo</u> v. <u>Hammond, Inc.</u>, 94 F.3d 842, 848 (3d Cir. 1996)). Because Defendants' request for dismissal of Plaintiff's tortious interference claim is based entirely on this basic misinterpretation of the relevant and controlling New Jersey common law precedents, Defendants' motion should be denied.

<u>**CONCLUSION**</u>

For the foregoing reasons, (i) Plaintiff Olde Monmouth is entitled to the issuance of a preliminary injunction requiring Defendants to approve Plaintiff's application for participation in the FAST Program and (ii) Defendants' motion to dismiss the complaint in this action should be denied in all respects.

Dated: March 19, 2007

Respectfully submitted,

____/ s /_____
By: Edward R. Gallion (EG-5755)
    Steven Spielvogel (SS-2295)

**GALLION & SPIELVOGEL**
1225 Franklin Avenue
Suite 325
Garden City, New York 11530
516.512.8899

*Attorneys for Plaintiff*
*Olde Monmouth Stock Transfer Co., Inc.*