```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X

OLDE MONMOUTH STOCK TRANSFER CO., INC.,  :

                         Plaintiff,      :

      -- against --                      : 07 CV 0990 (CSH)

DEPOSITORY TRUST & CLEARING              :
CORPORATION and DEPOSITORY TRUST
COMPANY,                                 :

                         Defendants.     :
-----------------------------------------X
```

## DECLARATION OF SUSANNE TRIMBATH, PH.D.

SUSANNE TRIMBATH, PH.D, hereby declares pursuant to 28 U.S.C. § 1746 as follows:

1. I hereby submit this brief in support of Plaintiff's Motion for a Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss.

2. I am the Chief Executive Manager and Chief Economist of STP Advisory Services, LLC, which is located at 2118 Wilshire Boulevard, Suite 596, Santa Monica, California 90403.

3.      I was employed by Defendant Depository Trust Company ("DTC") from August 1987 through August 1993.  DTC is now a wholly-owned subsidiary of Defendant Depository Trust and Clearing Corporation ("DTCC").  My title at DTC was Director of Transfer Agent Services.  I held day-to-day responsibility for maintaining positive relationships between DTC and the corporate trust community ("CTC") in the United States and Canada.  CTC includes transfer agents ("TAs") and registrars, i.e., those companies that maintain the ownership records for public companies.  I also managed a staff of about six (6) employees who maintained the contact databases used to ship securities and mail correspondence to TAs.  As DTC's liaison, I served on transfer agent industry association committees, attended quarterly and annual meetings and conferences, and was a frequent speaker at TA industry events.

4.      Prior to joining DTC, from August 1985 through July 1987 I was employed by the Pacific Clearing Corporation ("PCC") and the Pacific Securities Depository Trust Company ("PSDTC"), now defunct subsidiaries of the Pacific Stock Exchange.  My initial title with PCC was Operations Analyst, and I was responsible for reviewing

2

operations for improvements and defining new business products.  In about September 1986 I was promoted to Vault Manager at PSDTC, and was made responsible for managing the day-to-day operations of the vault, which held securities valued at approximately $49 billion.  I remained in this position until the PSDTC was reorganized, at which point I was hired by DTC in New York.

5.      In addition to my employment experience with DTC and PSDTC, following my tenure at DTC I was a Senior Advisor on a project funded by the United States Government to develop stock trade clearing and settlement and depository operations in Russia in 1993 and 1994.  This work occasioned discussions with DTC senior management subsequent to my tenure at DTC.  In my capacity as Senior Advisor to the Russian project, I created system specifications for stock trade clearing, settlement and depository operations.  These specifications often were reviewed by DTC management prior to implementation in Russia.

6.      In May 2000, I was awarded the degree of Ph.D. in Economics from New York University.

7.      I have thoroughly reviewed the documents submitted by Defendants in connection with the matters presently before the Court, and believe (for the reasons delineated below) that certain assertions contained therein are demonstrably false.

8.      While I was employed by DTC, my industry-liaison role exposed me to a broad range of DTC activities, not only with the CTC, but with bank and broker-dealer participants (each, a "Participant," and collectively, the "Participants") activities.  Many of the same companies that were TAs were also banks (e.g., US Trust, Bank of New York, Chase, Citibank) that maintained Participant accounts at DTC.  The necessity of working with DTC departments and companies on these two complementary sides of the securities business gave me a strategic perspective that was not afforded to most operations managers at DTC.

9.      When I first arrived at DTC in the fall of 1987, the relationship between DTC and the transfer agents (TAs) was quite strained.  The TAs believed that DTC was making unreasonable demands for everything from increased

automation to decreased fees.  In fact, DTC had the power to control prices charged by TAs for their services.  Even in 1987, DTC's holdings of many issuing companies were as much as 75% of all shares outstanding.  Through Defendants' on-going and vigorous efforts at "immobilization" (maintaining physical custody of all stock certificates only at DTC) and "dematerialization" (making shares exist only in the form of electronic files, rather than as physical pieces of paper), DTCC can now claim to be the registered shareholder of 100% of many issuers' stocks and bonds (through its nominee name, Cede & Co).  This makes Defendants the largest registered shareholders of the clients of the TAs (the stock issuers).

10.     **Notwithstanding Defendants' frequent claims to the contrary in their brief, Defendants and Plaintiff Olde Monmouth Stock Transfer Co., Inc. ("Olde Monmouth") are indeed competitors.**  As DTC's liaison to the TAs, I served on industry committees, including the "T+3 Direct Registration Subcommittee" (the "Subcommittee") associated with the International Group of Thirty Clearance and Settlement Project, which was known as the "G30."  G30 was formed in the 1990s by top financial industry

representatives from 30 industrialized nations in an effort to improve efficiency in international capital markets by recommending standards for their respective 30 national markets. On the Subcommittee, I worked beside representatives of the Securities Transfer Association ("STA") and the American Society of Corporate Secretaries ("ASCS").

11. The Subcommittee viewed a new Direct Registration System initiative developed by the TAs ("DRS-TA") as offering investors an additional choice of stock ownership in the form of an account statement, in which the shares would be registered in the name of the investor and maintained on the books of the issuer in a book-entry format. After consideration, the G30 decided that the complete elimination of certificates was not necessary at that time, and thus did not endorse DRS-TA.

12. The TA community, nevertheless, continued its work to develop DRS-TA. In 1992, the TA community formed the Investor Registration Option Implementation Committee ("IRO/IC") to make DRS-TA a reality. I served as DTC's representative to IRO/IC. This work eventually led the

Securities and Exchange Commission ("SEC") to solicit comments on the policy implications of, and the regulatory issues raised by, DRS-TA in a release dated December 1, 1994. (Annexed hereto as "Exhibit A" is a true and correct copy of SEC Release No. 34-35038, which contains further details regarding the events leading to the development of DRS-TA.)

13. DRS-TA was based on dividend-reinvestment programs where, at the shareholders option, a company would use dividend payments to purchase additional shares for the shareholder rather than disbursing the dividend as a cash payment to the shareholder. Some issuers extended the concept to the point where an individual investor could open an account with the company that issued the stock (or the company's TA) into which a shareholder could make additional cash contributions that the issuer would then use to purchase additional shares of the company's stock for the shareholder.

14. Shareholders participating in DRS-TA would deal directly with the company that issued the stock (or the company's TA) to buy, sell and transfer shares of stock.

7

The issuers accumulated the stock transactions of all of the shareholders together before executing buy and sell trades so that any transaction fees the issuer paid were divided among a great number of shareholders. Therefore, stock issuers were able to offer DRS-TA services at virtually no cost to shareholders.

15. Before I left DTC in 1993, I proposed and enhanced a service for the direct mailing of certificates by agents to shareholders at the request of financial intermediaries through DTC. I also proposed, developed and tested automated direct withdrawals and deposits at custodians. Both programs are complementary services to DRS-TA, in that these were the refinements necessary to make DRS-TA compatible with DTC services. After I left DTC, I was told by TAs and former co-workers who remained at DTC that the relationship between DTC and the TAs deteriorated almost immediately upon my departure, despite the fact that the department that I headed and developed, Transfer Agent Services, was expanded significantly in the number of staff assigned to the function. I mention this because I believe it places in context the events that follow.

16. Subsequent to the development of DRS-TA, DTC began a program to develop a depository operated book-entry registration system ("DRS-DTC") whereby DTC would come into *direct competition* with the TAs. On October 3, 1996, DTC filed with the SEC a proposed rule change to establish "a new service called the Direct Registration System" ("DRS-DTC"). In SEC Release No. 34-37778 (a true and correct copy of such Release is annexed hereto as "Exhibit B"), which was incorrectly cited in Defendant's Memorandum of Law as the rule where SEC approved DTC's FAST Program, DTC states that DRS-DTC would allow an investor "to transfer its DRS position in the security to a *financial intermediary* in order to sell or pledge the security or to receive a certificate representing the security" (emphasis added). In contrast, DRS-TA would allow an investor to *directly* sell, pledge or transfer the shares.

17. Therefore, DRS-DTC was not a program intended to accommodate the DRS-TA business of the TAs; in fact, as I describe above, that work was completed before I left DTC in 1993. Instead, DRS-DTC was a new service. This is clearly demonstrated in SEC Release No. 34-37778 where

Plaintiff references separate documents to describe the separate services: SEC Release 35038 (December 1, 1994) in footnote 2 to describe DRS-TA; and DTC Important Notice B# 1368-96 (July 15, 1996) in footnote 3 to describe DRS-DTC. Defendant's new product was distinctly advantageous to DTC and its Participants and *specifically intended to compete with the TAs.*

18. There are clear reasons why DTC would take such steps to compete with the TAs through DRS. DTC is tantamount to a cooperative owned by its Participants, with such Participants given the right to purchase voting shares of DTC stock in proportion to the quantity and value of services they use at DTC annually. The voting shares are then used to elect Participants' officers to the Board of Directors of DTC. (Annexed hereto as "Exhibit C" is Note 1 (entitled "Business and Ownership") to DTCC's Consolidated Financial Statements, dated December 31, 2006, which unequivocally demonstrates such Participants' ownership of DTC.)

19. Likewise, as clearly demonstrated in Note 9 (entitled "Shareholders' Equity") to DTCC's Consolidated

Financial Statements, dated December 31, 2006 (a true and correct copy of which is annexed hereto as "Exhibit D"), the Participants also have ownership interests in DTCC with concomitant DTCC voting rights and directorships. Moreover, many DTCC Board members are employed by Participants that either are FAST-approved transfer agents or closely affiliated with companies that are FAST-approved transfer agents.  For example:

- DTCC Director Ellen Allemany is the Chief Executive Officer of Global Transaction Services for Citigroup Corporate and Investment Bank.  Citigroup is associated with Computershare Investor Services, which is a transfer agent approved for the FAST Program.
- DTCC Director J. Charles Cardona is the Vice Chairman of The Dreyfus Corporation, which is now owned by Chase Mellon, which in turn owns ChaseMellon Shareholder Services, which is a FAST Program approved transfer agent.
- DTCC Director Art Certosimo is the Executive Vice President of the Bank of New York, which is a FAST-approved transfer agent.

- DTCC Director David Weisbrod is Senior Vice President of Risk Management, Treasury & Securities Services for JP Morgan Chase & Co., which owns ChaseMellon, a FAST-approved transfer agent.

It is also worthy of emphasis that Mellon Financial recently announced merger plans with Bank of New York.

20. Furthermore, some of the Participants were worried that DRS-TA would take business away from them. They expressed such concerns during the development of DRS-TA. If an investor could buy, sell and transfer shares of stock without a "financial intermediary," then the TAs would be in direct competition with the Participants, who own Defendants DTC and DTCC.

21. In fact, DRS-TA was offered at a significantly lower cost to investors than the buy and sell services of DTC's Participants. Many DRS-TA programs charged no fees to buy shares, only minimal fees to sell shares and no account maintenance fees. (It is important to bear in mind that this was in the 1990s, before online trading pushed many brokerage fees to less than $10 per trade.)

12

Therefore, since the TAs seemed to be competing with the Participants, it only made sense for such Participants, especially those with employees on DTC's Board of Directors, to have DTC compete with the TAs.

22.     Furthermore, in 2006, DTCC filed proposed rule SR-2006-16 with the SEC which is entitled "Proposed Rule Filing to Update the Requirements Pertaining to the FAST and DRS programs of DTC."  (A true and correct copy of DTCC proposed rule SR-2006-16 is annexed hereto as "Exhibit E"). Although eventually withdrawn by DTCC for revision, SR-2006-16 represents a particular burden on smaller transfer agents like Plaintiff Olde Monmouth.

23.     I first became aware of SR-2006-16 on October 17, 2006 when it was brought to my attention by the STA along with the STA's members' concerns that DTC's proposal was deeply flawed and presented an onerous burden to TAs (especially because of the extraordinary insurance requirements).  I am told that the STA held meetings and discussions with DTC and the SEC in order to secure changes to many of the most onerous provisions of SR-2006-16. The STA argued that the proposed rule exceeded the permissible

13

scope of DTC's authority over TAs.  This is made especially clear by Defendants in their Memorandum of Law when they state that, in addition to appointing FAST agents, Defendants must incur costs associated with "monitoring the agents' performance."  According to the SEC, however:

> There is no SRO that governs transfer agents.  The SEC therefore has promulgated rules and regulations for all registered transfer agents, intended to facilitate the prompt and accurate clearance and settlement of securities transactions and that assure the safeguarding of securities and funds.  The rules include minimum performance standards regarding the issuance of new certificates and related recordkeeping and reporting rules, and the prompt and accurate creation of security holder records and the safeguarding of securities and funds.  The SEC also conducts inspections of transfer agents.

(See www.sec.gov/divisions/marketreg/mrtransfer.shtml, a true and correct copy of which is annexed hereto as "Exhibit F.")

24.    I respectfully submit that DTCC's filing of proposed rule SR-2006-16 with the SEC is part and parcel of a carefully orchestrated plan by DTCC and DTC to force some TAs (especially small TAs such as Olde Monmouth) out of business.  In this regard, in October 2006, at the annual meeting of the STA, a DTCC Managing Director publicly

announced a timeline for the complete elimination of any transfer business that handles physical stock certificates, that is, the elimination of any stock transfer business that was not enrolled in FAST and DRS-DTC. Specifically, as clearly demonstrated in the attached DTCC PowerPoint slide dated, October 20, 2006 (a true and correct copy of such PowerPoint slide is annexed hereto as "Exhibit G"), such Managing Director stated that by 2008, DTC wanted to be the self-proclaimed "Roach Motel" of stock certificates, in that certificates get deposited to DTC but they never come out. The wording on the slide states that "All withdrawals will be done via full DRS," referring to DRS-DTC.

25. On page 8 of Defendants' Memorandum of Law, Defendants *brazenly and falsely* state that "Those issues that are not listed on the New York Stock Exchange, American Stock Exchange or the NASDQQ need not adopt DRS" and therefore need not be FAST approved. In this regard, the SEC not only approved that particular rule change in August 2006, but it also approved an additional and similar rule change for NYSE Arca issues in September 2006. (NYSE Arca, formerly known as the Archipelago Exchange and the

15

Pacific Exchange, is the second securities exchange operated by NYSE Group, Inc.)  Likewise, in January of 2007, Mr. Lawrence Morillo, Managing Director of Pershing LLC and Chairman of the Securities Industry and Financial Markets Association (SIFMA), publicly stated that the Boston, Chicago and Philadelphia stock exchanges filed rule changes with the SEC in October 2006 to adopt DRS and FAST. (A true and correct copy of Mr. Morillo's PowerPoint slides, dated January 11, 2007, are annexed hereto as "Exhibit H".)  Mr. Morillo also stated that the National Stock Exchange (Chicago) would consider such a rule change at their next Board meeting.  **Therefore, there would appear to be no limit to the business that will be denied Olde Monmouth if Plaintiff is denied access to FAST and DRS-DTC.**

26.     On page 3 of Defendants' Memorandum of Law, Defendants erroneously indicate that the FAST Program has only been available for 10 years when, in point of fact, FAST was initiated more than 30 years ago.  According to footnote 3 of SR2006-16:

> DTC introduced the FAST program in 1975 with 400 issues and 10 agents.  Currently, there are over 930,000 issues and approximately 90 agents.

27.     As further evidence of the anti-competitive intent of Defendant, it is worth observing that, in the 30 years since its inception, the number of issues eligible for FAST has increased 2,325 times while the number of agents eligible for FAST has increased by a factor of only 9. Furthermore, the population of small transfer agents is rapidly declining.  According to my analysis of data available from SEC publications, the number of small registered TAs declined 34%, from 470 to 310 just in the 4 years since 2003.  In the same period, the number of all TAs declined only 13%, from about 900 to 785 today.  Clearly, the small businesses in the TA community are suffering more than the larger TAs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of March, 2007.

_____
Susanne Trimbath, Ph.D.
*Chief Executive Manager and Chief Economist*
*STP Advisory Services, LLC*

Sworn to before me this
17th day of March, 2007.

_____
Notary Public