# EXHIBIT A



Thursday,
March 18, 2004

Part III

# Securities and Exchange Commission

17 CFR Part 240
Securities Transactions Settlement;
Proposed Rule

HeinOnline -- 69 Fed. Reg. 12921 2004

**12922**    Federal Register / Vol. 69, No. 53 / Thursday, March 18, 2004 / Proposed Rules

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Part 240**

**[Release No. 33–8398; 34–49405; IC–26384; File No. S7–13–04]**

**RIN 3235–AJ19**

**Securities Transactions Settlement**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Concept release; Request for comment.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is seeking comment on methods to improve the safety and operational efficiency of the U.S. clearance and settlement system and to help the U.S. securities industry achieve straight-through processing. First, the Commission is seeking comment on whether the Commission should adopt a new rule or the self-regulatory organizations should be required to amend their existing rules to require the completion of the confirmation and affirmation process on trade date ("T+0") when a broker-dealer provides delivery-versus-payment or receive-versus-payment privileges to a customer. Second, the Commission is seeking comment on the benefits and costs associated with implementing a settlement cycle for most broker-dealer transactions that is shorter than three days ("T+3"). Third, the Commission is seeking comment on reducing the use of physical securities.

**DATES:** Comments should be submitted on or before June 16, 2004.

**ADDRESSES:** Comments may be submitted electronically or by paper. Electronic comments may be submitted by: (1) Electronic form on the SEC Web site (*http://www.sec.gov*) or (2) e-mail to *rule-comments@sec.gov*. Mail paper comments in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609. All submissions should refer to file number S7–13–04; this file number should be included on the subject line if e-mail is used. To help us process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's Internet Web site (*http://www.sec.gov*). Comments are also available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, NW., Washington, DC 20549. We do not edit personal identifying information from submissions. You should submit only

information that you wish to make available publicly.

**FOR FURTHER INFORMATION CONTACT:** Jerry Carpenter, Assistant Director; Jeffrey Mooney, Senior Special Counsel; Susan Petersen, Special Counsel; Michael Milone, Special Counsel; or Jennifer Lucier, Special Counsel at (202) 942–4187, Office of Trading Practices and Processing, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–1001.

## I. Introduction

In 1975, Congress enacted section 17A of the Securities Exchange Act of 1934 ("Exchange Act"),[1] which directs the Commission to facilitate the establishment of a national clearance and settlement system for securities transactions. In providing the Commission with this authority, the Congress made the following findings:

(1) The prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors.

(2) Inefficient procedures for clearance and settlement impose unnecessary costs on investors and persons facilitating transactions by and acting on behalf of investors.

(3) New data processing and communications techniques create the opportunity for more efficient, effective, and safe procedures for clearance and settlement.

(4) The linking of all clearance and settlement facilities and the development of uniform standards and procedures for clearance and settlement will reduce unnecessary costs and increase the protection of investors and persons facilitating transactions by and acting on behalf of investors.[2]

These findings serve as objectives in the Commission's ongoing efforts to enhance efficiency and reduce risk in the operation of the U.S. clearance and settlement system. As one means of furthering these objectives, the Commission staff supports industry initiatives to improve the operation of

the clearance and settlement system. One such recent industry initiative is to enhance the reliability and efficiency of securities transaction processing by emphasizing straight-through processing ("STP")[3] and to shorten the settlement cycle for securities transactions. The Securities Industry Association ("SIA") has taken the lead in this effort, in cooperation with a number of other trade organizations, market participants, and regulatory bodies representing a cross-section of industry participants domestically and internationally.[4]

The SIA identified ten building blocks as essential to realizing the goal of improving the speed, safety, and efficiency of the trade settlement process:[5]

1. Modify internal processes at broker-dealers, asset managers, and custodians to ensure compliance with compressed settlement deadlines.

2. Identify and comply with accelerated deadlines for submission of trades to the clearing and settlement systems.

3. Amend the National Securities Clearing Corporation's ("NSCC") trade guarantee process so that the guarantee is provided on trade date.

4. Report trades to clearing corporations in locked-in format and revise clearing corporations' output.

5. Rewrite Continuous Net Settlement processes at NSCC to enhance speed and efficiency.

6. Reduce reliance on checks and use alternative means of payment, such as automatic debits allowed by the National Automated Clearing House Association.

7. Immobilize securities shares prior to conducting transactions.

8. Revise the prospectus delivery rules and procedures for initial public offerings.

9. Develop industry matching utilities and linkages for all asset classes.

10. Standardize reference data and move to standardized industry protocols

---

[1] 15 U.S.C. 78q–1. For legislative history concerning Section 17A, *see, e.g.,* Report of Senate Comm. on Housing and Urban Affairs, Securities Acts Amendments of 1975: Report to Accompany S. 249, S. Rep. No. 75, 94th Cong., 1st Sess. 4 (1975); Conference Comm. Report to Accompany S. 249, Joint Explanatory Statement of Comm. of Conference, H.R. Rep. No. 229, 94th Cong., 1st Sess., 102 (1975).

[2] 15 U.S.C. 78q–1(a)(1)(A)–(D).

[3] The Securities Industry Association describes STP "as the seamless integration of systems and processes to automate the trade process from end-to-end—trade execution, confirmation, and settlement—without manual intervention or the re-keying of data." "STP Glossary," prepared by the SIA and available at *http://www.sia.com/stp/other/Glossary_v2.3.xls.*

[4] The SIA created a steering committee and several subcommittees to focus on various aspects of its project. Copies of the committees' white papers and reports are available on the SIA's Web site *www.sia.com/stp/html/industry_reports.html.* The Commission staff participates on the SIA's STP steering and legal and regulatory committees as observers.

[5] "SIA T+1 Business Case Final Report," at 18–21 (August 2000)("SIA Business Case Report"). The report is available online at *http://www.sia.com/t_plus_one_issue/pdf/BusinessCaseFinal.pdf.*

Federal Register / Vol. 69, No. 53 / Thursday, March 18, 2004 / Proposed Rules    **12923**

for broker-dealers, asset managers, and custodians.

Initially, the main emphasis of this industry effort was on shortening the date of trade settlement from the current three business days after trade date ("T+3") to settlement on the next business day after trade date ("T+1"). In July 2002, the SIA shifted the principal focus of the initiative from shortening the settlement cycle to achieving industry-wide STP.[6] In refocusing the project, the SIA stated that the industry needed to focus on more effective STP before it would be in a position to fully evaluate the conversion from T+3 to T+1.[7] The SIA, however, plans to reconsider the need to pursue a reduction in the settlement cycle in 2004.[8]

Reducing risk and increasing efficiency in securities clearance and settlement has also been the focus of recent international initiatives. For the past several years, Commission staff has participated on a Task Force organized by the Committee on Payment and Settlement Systems ("CPSS") of the Group of 10 central banks and the International Organization of Securities Commissions ("IOSCO")[9] that was charged with promoting the implementation of measures that can reduce risks, increase efficiency, and provide safeguards for investors in securities clearance and settlement systems. In November 2001, the CPSS and IOSCO published the Task Force's findings in a report titled, "Recommendations for Securities Settlement Systems" ("CPSS/IOSCO Report").[10] The CPSS/IOSCO Report set forth 19 recommendations that

established minimum standards for the operation of a settlement system.[11]

In November 2002, the Task Force published an assessment methodology for the recommendations.[12] The assessment methodology is primarily intended for use in self-assessments by national authorities to determine whether markets in their jurisdiction have implemented the recommendations contained in the CPSS/IOSCO Report and to develop action plans for implementation where necessary. The Commission and the Board of Governors of the Federal Reserve System have begun assessing the U.S. clearance and settlement system.

On January 30, 2003, the Group of Thirty ("G30") published a report titled, "Global Clearing and Settlement, A Plan of Action" ("2003 G30 Report").[13] The 2003 G30 Report describes best practices for clearing entities operating in the major mature markets with the goal of improving cross-border clearance and settlement. Commission staff participated in the G30's efforts to prepare the report.

The purpose of this release is to build upon these initiatives and continue the exploration of methods to improve the operation of the U.S. clearance and settlement system. People who invest in securities markets want to know that their product will be delivered on time, at the agreed upon terms, and that they will not lose their funds and securities because of insolvency, mismanagement, or operational difficulties. In particular, the focus of this release is on improving the trade confirmation/affirmation process, shortening the settlement cycle, and reducing the use of physical securities. Regulators and financial supervisors globally are also addressing these areas.[14] In light of these domestic

and international efforts, the Commission believes that it is timely to request comment on these issues to help continue the ongoing dialogue concerning the safety, reliability, and efficiency of the U.S. clearance and settlement system.

## II. Trade Confirmation and Affirmation

### A. Confirmation/Affirmation Process

Promptly verifying trade details is essential to identifying discrepancies that can lead to, among other things, settlement failures and errors in recording trades.[15] Currently, the self regulatory organizations' ("SRO") confirmation rules require a broker-dealer to use the facilities of a registered clearing agency, an entity that has received an exemption from clearing agency registration, or a qualified vendor for the confirmation/affirmation of securities transactions when the broker-dealer allows a customer to pay for the trade when the broker-dealer delivers the securities or cash to the customer.[16] This process is generally

---

[6] "SIA Board Endorses Program to Modernize Clearing and Settlement Process for Securities," STP Connections (Securities Industry Association, New York, NY), July 18, 2002, (press release from the SIA Board of Directors endorsing straight-through processing). *See* SIA STP Connections, Issue 1, July 22, 2002, available at *http://www.sia.com/stp/pdf/STP_Newsletter_Issue_1.pdf.*

[7] *Id.* at 2.

[8] *Id.* at 2.

[9] The Committee on Payment and Settlement Systems serves as a forum for the central banks of the G10 countries to monitor and analyze developments in payment and settlement arrangements and to consider related policy issues. The International Organization of Securities Commissions consists of 164 securities market regulators that have agreed to cooperate in order to promote high standards of regulation and to maintain efficient and sound domestic and international securities markets. The Commission is a member of IOSCO.

[10] "Recommendations for Securities Settlement Systems," CPSS/IOSCO Task Force (November 2001). The Commission actively participated in drafting the CPSS/IOSCO Report and supported its publication.

[11] The 19 recommendations are contained in Appendix 1.

[12] "Assessment Methodology for Recommendations for Securities Settlement Systems," CPSS/IOSCO Task Force (November 2002). The Commission actively participated in drafting the CPSS/IOSCO assessment methodology and supported its publication.

[13] The G30, established in 1978, is an independent, non-partisan, not-for-profit organization composed of international financial leaders whose focus is on international economic and financial issues. For additional information about the G30, visit their Web site at *http:// www.group30.org.*

[14] Several regulatory and oversight bodies are addressing confirmation/affirmation processing, the shortening of settlement cycles, and reducing the use of physical securities. Many of the countries involved in the CPSS/IOSCO Report are currently assessing operations in their jurisdictions and have launched efforts to improve securities transaction processing. For example, the Canadian Capital Markets Association, a federally incorporated, not-for-profit organization, has been working with the

Canadian Depository for Securities and provincial regulators to implement straight-through processing and potentially shorten the settlement cycle in Canada to T+1. *See, http://www.ccma-acmc.ca.* Likewise, in September 2003, the Hong Kong Securities and Futures Commission ("HKSFC") published its conclusions, based on comments received on its consultation paper, supporting a certificate-less securities market in Hong Kong. The HKSFC's consultative paper and conclusions are available at *http://www.hksfc.org.hk.* In July 2003, the Governing Council of the European System of Central Banks ("ESCB") and the Committee of European Securities Regulators ("CESR") published for comment a set of standards for clearance and settlement in the European Union that were based on recommendations made in the CPSS/IOSCO Report. The ESCB–CESR paper is available at *http://www.centralbank.ie/gconsult/consult9b.pdf.*

[15] CPSS has defined a fail as "a failure to settle a securities transaction on the contractual settlement date, usually because of technical or temporary difficulties." "A glossary of terms used in payments and settlement systems," at 18, CPSS (March 2003).

[16] *See, e.g.,* Securities Exchange Act Release No. 19227 (November 9, 1982), 47 FR 51658 (November 16, 1982) [File No. SR–NYSE–82–1 etc.] (approving SRO confirmation rules). The SRO confirmation rules include: American Stock Exchange ("AMEX") Rule 423(5); Chicago Stock Exchange Article XV, Rule 5; New York Stock Exchange ("NYSE") Rule 387(a)(5); Pacific Stock Exchange Rule 9.12(a)(5); Philadelphia Stock Exchange Rule 274(b); National Association of Securities Dealers ("NASD") Rule 11860(a)(5); and Municipal Rulemaking Board Rule G–15(d)(ii). Trades settled outside of the United States are excluded from the confirmation rules' requirements.

The Commission's order approving the confirmation rules concluded that the confirmation rules were consistent with the establishment of a national system of clearance and settlement, mandated in Section 17A of the Exchange Act, because the trade confirmation service provided by registered clearing agencies provided uniform procedures for the confirmation and affirmation of institutional trades. The Commission also concluded that automated confirmations,

Continued

**12924**    **Federal Register** / Vol. 69, No. 53 / Thursday, March 18, 2004 / Proposed Rules

referred to as providing the customer with receive-versus-payment ("RVP") or delivery-versus-payment ("DVP") privileges. Generally, broker-dealers provide RVP or DVP privileges to institutional customers. The SRO confirmation rules also require the broker-dealer to have obtained an agreement from each customer with RVP/DVP privileges that the customer will affirm each trade promptly upon receipt of the confirmation.[17]

After a broker-dealer executes a trade for a customer who has RVP/DVP privileges, the broker-dealer will provide trade details to the customer. This step is called the "notice of execution" or "NOE." If the customer submitted the order on behalf of other parties (*e.g.*, an investment manager on behalf of several mutual funds), the customer will tell the broker-dealer how to "allocate" the transaction among the underlying entities. The broker-dealer will reply to the customer by sending details of, or "confirming," each allocation. If the broker has correctly allocated the trade, the customer will "affirm" the trade.[18]

In the U.S., the only entity currently offering confirmation/affirmation services is the Global Joint Venture Matching Services—US, LLC (known as "Omgeo").[19] Once a trade has been affirmed, Omgeo submits a deliver order ("DO") to The Depository Trust

Company ("DTC")[20] for book-entry settlement.[21]

Broker-dealers generally confirm trades with their institutional customers on trade date ("T+0") while their institutional customers affirm the large majority of their trades after T+0. For example, in the first half of 2003, of the approximate 700,000 trades that were submitted to Omgeo on an average daily basis the confirmation rate on T+0 was approximately 85.8%, but affirmation rates were approximately 23% on T+0, 85% on T+1, and 88.5% on T+2.[22] Therefore, approximately eleven percent of trades either are not affirmed at all or are not affirmed using Omgeo's confirmation/affirmation process.[23]

*B. Industry Initiative*

1. SIA ITPC White Papers

As part of its effort to improve the clearance and settlement process, the SIA formed the Institutional Transaction Processing Committee ("ITPC") to evaluate the settlement process for institutional trades. The SIA's ITPC published several white papers that describe what it believes are shortcomings in the processing of RVP/DVP transactions and has recommended the use of matching utilities as the way to improve the process.[24] As described in the ITPC 2002 White Paper, current methods of institutional transaction processing involve a series of sequential steps by the broker-dealer and its customer with only one participant reviewing and entering trade data at a time. The result is that the processing swings back and forth between the customer and broker-dealer, and with each pass, one party will provide additional trade data. "The process is reactive in that each participant waits for a trigger before executing the next step in the process."[25] The result is delay and redundant flows of non-essential data.

According to the ITPC, another major cause for delay in institutional

transaction processing is the fact that many industry participants have to manually re-key trade data into several systems. Broker-dealers and their customers tend to have internal systems that lack both automation and common message standards. This lack of synchronized automated data causes errors and discrepancies.

The ITPC 2002 White Paper states that redesigning the institutional transactional settlement model to achieve STP would allow the industry to streamline today's operating process, increase capacity significantly, decrease the number of exception items, and reduce costs over time by eliminating many redundant and manual steps. To address the perceived deficiencies in the existing institutional transaction process, the ITPC envisioned an institutional transaction processing model in which trade data is matched by a matching utility ("MU"). The MU would seamlessly match the data submitted by the broker-dealer and its institutional customer and would submit the matched transaction information to the depository in real time.[26] The ITPC model "treats the trade cycle as a unit from post-execution to settlement rather than a group of loosely related messages and processes" where, "communications between trade participants and the matching utility are assumed to be automated, with virtually simultaneous processes comprising the 'steps' of each phase."[27]

2. Industry Proposals for Rulemaking

One of the principal goals of the SIA's STP initiative is for all transactions to be confirmed and affirmed or matched on T+0.[28] In order to achieve STP, either to accommodate a standard settlement cycle or as a needed improvement to institutional transaction processing, the SIA has suggested two Commission or

---

affirmations, and settlement would increase the quantity and accuracy of trade information regarding customer-side settlement and therefore were consistent with the requirements of Sections 6 and 15A of the Exchange Act to foster the cooperation and coordination of persons engaged in clearing, settling, and processing information with respect to securities transactions. 15 U.S.C. 78f and 78o–3. Finally, the Commission believed that the aggregate benefits of the confirmation rules to broker-dealers, investment managers, and custodian banks outweighed the costs to these parties and did not impose an inappropriate burden on competition. 47 FR 51658.

[17] *E.g.*, NYSE Rule 387(a)(4). The agreement must provide that the customer will affirm the trade by T+2 when the broker-dealer provides the customer RVP privileges and by T+1 when the broker-dealer provides DVP privileges.

[18] The trade confirmation/affirmation process is discussed in detail in the SIA paper, "Institutional Transaction Processing Model," which is available at *http://www.sia.com.*

[19] Generally, an entity that provides a matching service falls within the Exchange Act's definition of a clearing agency and therefore must register as such or obtain an exemption from registration. 15 U.S.C. 78c(a)(23). The Commission has issued an order conditionally exempting Omgeo from clearing agency registration with regard to providing matching and confirmation/affirmation services. Securities Exchange Act Release No. 44188 (April 17, 2001), 66 FR 20494 (April 23, 2001) [File. No. 600–32].

[20] DTC is a clearing agency registered under Section 17A of the Exchange Act.

[21] A DO is an instruction from a participant directing DTC to debit its securities account and to credit the securities account of another DTC participant.

[22] *See generally* Lee Cutrone, Managing Director, Omgeo, remarks at the SIA STP Spring Conference, "The Path to STP," (May 20, 2003) (presentation available online at *http://www.sia.com/stpspring03/pdf/Path_Lee.Cutrone.pdf).*

[23] These exceptional trades generally are settled by the broker-dealer giving DTC a DO through a manual process.

[24] The ITPC published its first white paper in December 1999 with a subsequent version released in February 2001. The final ITPC white paper, "Institutional Transaction Processing Model," was published in May 2002 ("ITPC 2002 White Paper").

[25] ITPC 2002 White Paper at 3.

[26] *See supra* note 19.

[27] ITPC 2002 White Paper at 6.

[28] The SIA formed an Institutional Oversight Committee ("IOC") to oversee the implementation of STP to institutional trade processing. The IOC's goal is that on T+0 all parties to a transaction should have the information required for automated settlement. The IOC believes this implies that:

(1) 100% of trades would be matched or affirmed on trade date. Ultimately, the goal will be to replace the confirm/affirm process with matching;

(2) all communications between participants would be asynchronous (non-sequential) and electronic, including: (a) Notice of executions; (b) allocations; (c) match status/affirmations; (d) settlement instructions;

(3) an industry standard electronic format for message communication would be adopted; and

(4) manual processing should be exception-based. "Institutional Oversight Committee Project Charter," Institutional Oversight Committee (December 16, 2002).

SRO rulemaking alternatives.[29] The first would require broker-dealers to obtain an agreement from their customers at the outset of the relationship or at the time of the trade to participate in and to comply with the operational requirements of interoperable trade-match systems as a condition to settling trades on an RVP/DVP basis. The second would require investment managers to participate in a trade-match system, similar to the way broker-dealers and institutions are required by the SRO confirmation/affirmation rules to participate in a confirmation/affirmation system. Either alternative would result in the completion of the confirmation/affirmation process within minutes of trade execution. They also would provide time to resolve any discrepancies before settlement date, thereby reducing fails.[30]

### C. CPSS/IOSCO and G30 Recommendations

Consistent with the SIA project, the CPSS/IOSCO Report recommended that confirmation and affirmation of institutional investors' trades should occur as soon as possible after trade execution, preferably on T+0, but no later than T+1.[31] The CPSS/IOSCO Report recommended these timeframes because early agreement on trade details will allow early detection of errors and discrepancies in trade data. This should help market participants avoid errors in recording trades, which could result in inaccurate books and records, increased and mismanaged market risk and credit risk, and increased costs. The CPSS/IOSCO Report also stated that STP initiatives should be encouraged.[32] Many practitioners believe that market-wide achievement of STP is essential to maintaining high settlement rates as volumes increase and for achieving timely settlement of cross-border trades.[33]

The 2003 G30 Report endorsed the CPSS/IOSCO recommendations [34] and recommended that trade confirmation be further automated and standardized and that matching utilities be used industry-wide.[35] Specifically, the 2003 G30 Report urged market participants to develop compatible, industry-accepted technical and market-practice standards to automate the confirmation/affirmation process for institutional trades. Like CPSS/IOSCO, the G30 recommended matching institutional transaction data on trade date.[36] The 2003 G30 Report stressed that in order to achieve matching on trade date without introducing risk to the system, current post-trade processing models must be improved.[37]

### D. Discussion

The Commission preliminarily is of the view that the goal of industry-wide trade matching is the best method to improve the confirmation/affirmation process and to achieve STP. Nevertheless, the imposition of a requirement that all broker-dealers and their institutional customers use a matching service raises some significant issues.

For example, mandating the use of a matching service for the confirmation/affirmation process for institutional trades may stifle innovation and competition. While matching is the leading technology today, future developments may provide greater efficiency and improved service. Mandating that the industry use matching may make it virtually impossible for a service provider with a new technology to compete. Requiring all entities to use a matching service also may impose an unnecessary burden on small and medium broker-dealers and asset managers.[38]

The Commission believes that even an investment manager/investment adviser who executes only a small number of trades should be able to affirm its trades with its brokers on T+0. Accordingly,

the Commission seeks comment on how best to have the confirmation/affirmation process completed on T+0 for all institutional trades. The following two approaches, among others, could be considered.

First, the SROs could amend their confirmation rules to prohibit broker-dealers from extending RVP/DVP privileges to any customer unless all trades with that customer are confirmed and affirmed on T+0. Because the SROs currently have virtually identical versions of the confirmation rules, this may be the most straightforward way to reach this goal. The difficulty with this approach is that it would require brokers to take actions to assist in achieving compliance.[39] Broker-dealers may be reluctant to exert pressure on customers that fail to affirm on time because those customers may take their business elsewhere.

Another option would be for the Commission to adopt a rule that would require broker-dealers to confirm and affirm trades on trade date.[40] We believe that these alternatives would preserve competition and innovation because they do not require the use of a particular service or technology. Further, the Commission rule could complement rather than replace the existing SRO confirmation rules. For example, the SRO confirmation rules could continue to require that the facilities of a clearing agency be used for the book-entry settlement of all depository eligible transactions, while the Commission rule could require that the confirmation and affirmation occur on T+0. In addition, the SRO confirmation rules could continue to provide the procedures for a qualified vendor to provide electronic confirmation and affirmation services.

The Commission seeks comment on the following issues.

1. What are the benefits and costs of same-day trade confirmation/affirmation?

---

[29] Letter from Arthur Thomas, Chairman, T+1 Steering Committee, to Laura S. Unger, Acting Chairman, Commission (February 16, 2001).

[30] In June 2003, the IOC's Business Practices & Matching Implementation Working Group published Institutional Matching User Requirements ("User Requirements"). The User Requirements set forth a method for using a matching utility for post trade processing of institutional trades. The User Requirements also provide guidance on the following areas: (1) Connectivity; (2) process flows; (3) participant profiles; (4) interfaces; (5) new account set-up; (6) exception processing; and (7) variations to the ITPC Model. The task of this working group is to identify and analyze issues related to pre-allocated trades, prime brokerage, correspondent clearing, when-issued trading, and other unresolved institutional trade processing issues. The User Requirements are available on the SIA's Web site at *http://www.sia.com/stp/pdf/MatchingUtilityUserReq.pdf*.

[31] CPSS/IOSCO Report at 9.

[32] *Id.* at 9.

[33] *Id.* at 10.

[34] 2003 G30 Report at 4.

[35] *Id.* at 31.

[36] *Id.*

[37] *Id.* at 80.

[38] As the speaker at one industry conference stated, "It is difficult to argue that an investment manager/investment adviser with only 2–3 block executions per week should be compelled to interface electronically with a MU." John P. Davidson III, Managing Director, Morgan Stanley, remarks at the SIA STP Spring Conference, Institutional Oversight Subcommittee Update (May 19, 2003)(presentation available at *http://www.sia.com/stpspring03/html/presentations.html*).

[39] To facilitate compliance with the SRO confirmation rules, Omgeo (as did its predecessor The Depository Trust Company through the Institutional Delivery and TradeSuite systems) provides the SROs with reports on confirmation and affirmation activity.

[40] For example, under Section 15(c)(6) of the Exchange Act, 15 U.S.C. 78(c)(6), the Commission has the authority to issue rules and regulations with respect to brokers or dealers "necessary or appropriate in the public interest and for the protection of investors or to perfect or remove impediments to a national system for the prompt and accurate clearance and settlement of securities transactions, with respect to the time and method of, and the form and format of documents used in connection with making settlements of and payments for transactions in securities, making transfers and deliveries of securities and closing accounts."

**12926**    Federal Register / Vol. 69, No. 53 / Thursday, March 18, 2004 / Proposed Rules

2. What are the relative burdens of trade date confirmation/affirmation on the different market participants involved?

3. What effect would trade date confirmation/affirmation have on the relationship between a broker-dealer and its customer?

4. Do the benefits of trade date confirmation/affirmation accrue to all participants—brokers, institutional customers, custodians, or matching utilities? Do they accrue to large, medium, and small entities?

5. Does trade date confirmation/affirmation introduce any new risks? If so, can they be quantified?

6. Would the modification of the existing SRO confirmation rules or the adoption of a new Commission rule be feasible approaches to having trades confirmed/affirmed by T+0? Are there alternative rule changes?

7. If rules mandating trade date confirmation/affirmation are adopted, what should be the time frame for implementing them? What factors should the Commission consider in determining the implementation period?

8. Would same-day confirmation/affirmation affect cross-border trading? If so, how would it do so?

9. Should any confirmation/affirmation rule apply to all types of non-exempt securities?

10. Should all participants in institutional trades be required to use a matching service if the Commission were to require confirmation/affirmation on T+0?

11. What, if anything, should the Commission do to facilitate the standardization of reference data and use of standardized industry protocols by broker-dealers, asset managers, and custodians?

## III. Securities Settlement Cycles

### A. Introduction

It is generally accepted that a substantial portion of the risks in a clearance and settlement system is directly related to the length of time it takes for trades to settle. In other words, "time equals risk." [41] In the context of

the Commission's proposal in 1993 to move to T+3, the Federal Reserve Board ("Board") noted that settlement systems for securities and other financial instruments were a potential source of systemic disturbance to financial markets and to the economy.[42] In the Board's view, the key features of an ideal settlement system were the settlement of trades immediately after execution and payment in same-day funds.[43] Similarly, the Federal Reserve Bank of New York stated at that time that shortening the settlement cycle decreased the likelihood for adverse developments to occur between the execution and settlement of each trade, thus lowering the credit and market risks that could arise when settling individual transactions.[44] More recently, the CPSS/IOSCO Report noted that the longer the period from trade execution to settlement, the greater the risk that one of the parties may become insolvent or default on the trade, the larger the number of unsettled trades, and the greater the opportunity for the prices of the securities to move away from the contract prices, thereby increasing the risk that the non-defaulting parties will incur a loss when replacing unsettled contracts.[45]

Arguably, the most significant risk that must be addressed by any clearance and settlement system is systemic risk. Systemic risk is the risk that the inability of one market participant to meet its obligations when due will cause others to fail to meet their obligations.[46] Systemic risk can result from other risks inherent in clearance and settlement systems, such as credit, liquidity and operational risks. A severe problem in one or more of these areas can cause securities firms to fail and increase the likelihood of systemic disruptions in the financial markets. While the Commission believes that the threat of a serious systemic disruption

to the U.S. financial markets from a settlement failure is small because of the risk management controls that are in place, it is nevertheless a serious concern. Thus, it is important that the U.S. securities industry continue to improve its risk management procedures in order to maintain safe and reliable clearance and settlement.

In part as a response to the 1987 Market Break and the 1990 bankruptcy of Drexel Burnham Lambert Group,[47] the Commission adopted Rule 15c6–1, which shortened the settlement time frame for most broker-dealer securities transactions from T+5 to T+3.[48] Rule 15c6–1 was adopted in connection with other measures taken by the securities industry, SROs, and the Commission to improve the operation of the U.S. clearance and settlement system and reduce risk. The other measures included improving the confirmation/affirmation process for institutional trades, expanding cross-margining and guarantee arrangements amongst clearing agencies, and implementing same-day funds settlement. These steps helped facilitate a smooth transition from T+5 to T+3.

The implementation of a T+3 settlement cycle is widely viewed as a success, and the U.S. clearance and settlement system continues to be one of the safest and most reliable in the world.[49] Nevertheless, we believe that we should consider the necessity and appropriateness of mitigating systemic disruptions and facilitate a more efficient clearance and settlement system. Three principal factors underlie our thinking in reviewing options

---

[41] Prompted by the Group of Thirty's 1989 recommendations, in 1991 the Commission requested that U.S. industry participants form a Task Force to evaluate whether and what changes to the clearance and settlement system should be pursued, and to determine a timetable for the implementation of the changes. The Bachmann Task Force, chaired by John Bachmann, presented its findings to the Commission in May 1992. The Task Force concluded that "time equals risk" and that the safety and soundness of the U.S. securities market would be substantially improved by shortening the settlement cycle for corporate securities to T+3 by mid-1994. The Bachmann Task Force on Clearance and Settlement in the U.S.

Securities Markets, Report Submitted to the Chairman of the U.S. Securities and Exchange Commission (May 1992)("Bachmann Report"). *See also* Securities Exchange Act Release No. 31904 (February 23, 1993), 58 FR 11806 (March 1, 1993) [File No. SR–5–93].

[42] Letter from William W. Wiles, Secretary to the Federal Reserve Board, to Jonathan G. Katz, Secretary, Commission (September 1, 1993) (commenting on the proposal to adopt Rule 15c6–1 standardizing the settlement cycle for most securities transactions to three business days after trade date). *Infra* note 48.

[43] *Id.*

[44] Letter from William J. McDonough, President, Federal Reserve Bank of New York, to Jonathan G. Katz, Secretary, Commission (August 27, 1993) (commenting on the proposal to adopt Rule 15c6–1 standardizing the settlement cycle for most securities transactions to three business days after trade date). *Infra* note 48.

[45] CPSS/IOSCO Report at 10.

[46] *Id.* at 41.

[47] For a description of the bankruptcy of the Drexel Lambert Group, *see,* "The Issues Surrounding the Collapse of Drexel Burnham Lambert," Hearings before the United States Congress, Senate Banking, Housing, and Urban Affairs, 101st Congress, 2d Sess. 5 (1990) (testimony of Richard C. Breeden, Chairman, Commission).

[48] 17 CFR 240.15c6–1. Securities Exchange Act Release No. 33023 (October 6, 1993), 58 FR 52891 (October 13, 1993) [File No. S7–5–93] ("Adopting Release"). Rule 15c6–1 became effective on June 7, 1995.

[49] The U.S. clearance and settlement system settles more trades today with a lower failure rate than before Rule 15c6–1's adoption. "In May 1995, before T+3, and with an average daily volume running at 726 million shares in NYSE, Amex and Nasdaq securities, NSCC 'failures to deliver' were an average of 8.43% of all deliveries. In November 1995, after the T+3 conversion, with average daily volume running at 830 million shares in the same securities, NSCC 'failures to deliver' declined to 7.67%." "Speeding up Settlement: The Next Frontier," Arthur Levitt, Chairman, Commission, remarks at the Symposium on Risk Reduction in Payments, Clearance and Settlement Systems (January 26, 1996)(full text available at *http://www.sec.gov/news/speech/speecharchive/1996/spch071.txt*). According to NSCC, for the first seven months of 2003, the average daily failure rate has been 6.80%.

relating to shortening the settlement cycle.

1. Size and growth of the markets: In 1995, the year Rule 15c6–1 became effective, the combined average daily volume on the New York Stock Exchange (NYSE), American Stock Exchange ("AMEX"), and National Association of Securities Dealers Automated Quotation System ("Nasdaq") was 726 million shares. By the end of 2003, the combined average daily volume for the NYSE and Nasdaq was approximately 3.0 billion shares.

2. Tighter linkages: Currently, many financial firms participate in multiple markets in multiple jurisdictions and clearing agencies are increasing their cross-border activities. Therefore, the failure of one system participant could cause a wide circle of participants to fail.

3. Possible wide-scale regional disruption: In the aftermath of the events of September 11, 2001, financial market participants must anticipate significant operational disruptions.[50]

The Commission continues to agree with the underlying conclusions that led to shortening the settlement cycle from T+5 to T+3. First, at any given point during the settlement cycle, fewer unsettled trades would be subject to credit and market risk, and there would be less time between trade execution and settlement for the value of those trades to deteriorate.[51] Second, a shorter settlement cycle would reduce the liquidity risk among derivative and cash markets and reduce financing costs by allowing investors that participate in both markets to obtain the proceeds of securities transactions sooner. Third, shortening the settlement cycle would encourage greater efficiency in clearing and settlement. However, before taking further action, the Commission believes that it is appropriate to seek comment on the benefits and costs of implementing a settlement cycle shorter than T+3 as a potential method of further reducing risk and improving efficiency. In deciding whether or not to shorten the settlement cycle beyond T+3, the Commission must determine

whether benefits of establishing a shorter settlement justify the costs of implementing it. The Commission believes that an evaluation of the current operation of Rule 15c6–1 is an appropriate starting point for such an analysis.[52]

### B. Rule 15c6–1

The Commission adopted Rule 15c6–1 to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities."[53] The rule was adopted in 1993 and became effective in 1995.[54] Rule 15c6–1 provides, "a broker or dealer shall not effect or enter into a contract for the purchase or sale of a security (other than an exempted security, government security, municipal security, commercial paper, bankers' acceptances, or commercial bills) that provides for payment of funds and delivery of securities later than the third business day after the date of the contract unless otherwise expressly agreed to by the parties at the time of the transaction."[55]

The Commission's adoption of Rule 15c6–1 followed the 1989 G30 Report[56] and the Bachmann Report.[57] The 1989 G30 Report recommended that markets around the world shorten settlement cycles to T+3 by 1992 "[i]n order to minimize counterparty risk and exposure with securities transactions, same day settlement is the final goal."[58] The Bachmann Report echoed this view and concluded that a shorter settlement period would reduce market risk to the clearing corporations, their members, and the markets as a whole and proposed T+3 as the standard settlement period.[59]

In the next sections, we discuss specific issues related to the current operation of Rule 15c6–1 and risk

considerations in shortening the settlement cycle beyond T+3.

### C. Current Operation of Rule 15c6–1

1. Coverage

Rule 15c6–1 covers all securities, except for exempted securities (including government securities and municipal securities,[60] commercial paper, bankers' acceptances, or commercial bills).[61] In addition, the rule specifically exempts sales of unlisted partnership interests.[62] The Commission has granted an exemption for securities that do not generally trade in the U.S.[63] The Commission also exempted from Rule 15c6–1 a contract for the purchase or sale of any security issued by an insurance company that is funded by or participates in a separate account, including a variable annuity contract or a variable life insurance contract or any other insurance contract registered as a security under the Securities Act of 1933 ("Securities Act").[64]

2. Offerings

Rule 15c6–1 provides a T+4 settlement cycle in firm commitment underwritings for securities that are priced after 4:30 p.m. Eastern time,[65] which enables market participants to satisfy prospectus delivery requirements of the Securities Act.[66] Subsection

---

[50] On April 7, 2003, the Commission published a joint report with the Board of Governors of the Federal Reserve System and the Office of the Comptroller of the Currency that focused on infrastructure resiliency titled, "Interagency Paper on Sound Practices to Strengthen the Resilience of the U.S. Financial System." Securities Exchange Act Release No. 47638 (April 7, 2003), 68 FR 17809 (April 11, 2003)[File No. S7–32–02].

[51] The longer the time period from trade execution to settlement, the greater the risk that one of the parties may become insolvent or default on the trade ("credit or counter party risk") and the greater the risk the price of the securities may move away from the contract price ("market or replacement cost risk").

[52] As with the move from T+5 to T+3, the appropriate building blocks must be in place. Without these building blocks in place, a move to a shorter settlement cycle could reduce efficiency by producing more failed trades and ultimately increase risk rather than reduce it.

[53] 15 U.S.C. 78q–1(a)(2)(A)(i).

[54] 17 CFR 240.15c6–1. Rule 15c6–1 became effective on June 7, 1995. Prior to 1995, the standard practice for settling securities transactions was five business days after trade date ("T+5").

[55] 17 CFR 240.15c6–1(a).

[56] "Clearance and Settlement Systems in the World's Securities Markets," Group of Thirty (March 1989) ("1989 G30 Report"). Recommendation 7 of the G30's 1989 Report states, "[a] '[r]olling [s]ettlement' system should be adopted by all markets. Final settlement should occur on T+3 by 1992." Copies of the 1989 G30 Report can be requested from the G30 at http://www.group30.org.

[57] See supra note 41.

[58] 1989 G30 Report at 14.

[59] Bachmann Report at 6.

[60] Although not covered by Rule 15c6–1, the Commission approved a proposed rule change by the Municipal Securities Rulemaking Board that required transactions in municipal securities to settle by T+3. Securities Exchange Act Release No. 35427 (February 28, 1995), 60 FR 12798 (March 8, 1995) [File No. SR–MSRB–94–10].

[61] 17 CFR 240.15c6–1(a).

[62] 17 CFR 240.15c6–1(b)(1).

[63] Securities Exchange Act Release No. 35750 (May 22, 1995), 60 FR 27994 (May 26, 1995). Under this exemptive order, all transactions in securities that do not have transfer or delivery facilities in the U.S. are exempt from the scope of Rule 15c6–1. Furthermore, if less than 10% of the annual trading volume in a security that has U.S. transfer or delivery facilities occurs in the U.S., transactions in such security will be exempted from Rule 15c6–1 unless the parties clearly intend T+3 settlement to apply. In addition, a depositary receipt is considered a separate security from the underlying security. Thus, if there are no transfer facilities in the U.S. for a foreign security but there are transfer facilities for a depository receipt based on such foreign security, only the foreign security will be exempt from Rule 15c6–1.

[64] Securities Exchange Act Release No. 35815 (June 6, 1995), 60 FR 30906 (June 12, 1995).

[65] 17 CFR 240.15c6–1(c).

[66] Generally, the current underwriting process requires extensive due diligence between trade date and settlement date. Underwriters must consult with internal and external counsel and auditors, ascertain comfort and opinion letters, meet with senior management in order to complete proper due diligence. Final prospectuses are generally prepared on the night of pricing (trade date), leaving three days to book the deal, allocate trades, confirm share
Continued

**12928**    Federal Register/Vol. 69, No. 53/Thursday, March 18, 2004/Proposed Rules

5(b)(2) of the Securities Act prohibits the sending of securities through interstate commerce "for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 10."[67] Subsection 5(b)(1) of the Securities Act requires that a prospectus used after a registration statement has been filed must meet the disclosure requirements of section 10 of the Securities Act.[68] The term "prospectus" is defined broadly to include any written communication that "offers a security for sale or confirms the sale of any security."[69]

Exchange Act Rule 10b–10 requires that a broker-dealer give or send its customers a written confirmation of a purchase or sale of securities at or before the completion of a transaction.[70] The Securities Act provides that "a communication provided after the effective date of the registration statement * * * shall not be deemed a prospectus if it is proved that prior to or at the same time with such communication a written prospectus meeting the requirements of" Section 10(a) is provided.[71] Because the information contained in a Rule 10b–10 confirmation typically does not satisfy the disclosure requirements of Securities Act Section 10, a prospectus meeting Section 10(a) requirements must be sent or given prior to or at the same time with the confirmation, otherwise the confirmation could be considered a non-conforming prospectus.

The current settlement cycle may be the shortest time frame within which customers may be provided with final prospectuses prior to or simultaneously with delivering the Rule 10b–10 confirmation. If the Commission adopts a shorter settlement cycle, industry representatives have stated that it would be extremely challenging to accurately complete necessary due diligence and satisfy the physical prospectus delivery requirements. Therefore, the SIA has asked the Commission to consider eliminating the requirement that the final prospectus be delivered at the same time as the Rule 10b–10 confirmation.[72] In addition, the SIA has asked the Commission to adopt an electronic access standard as a means to satisfy prospectus delivery.[73] According

to the SIA, an electronic access standard would alleviate time pressures in the current settlement cycle as well as accommodate future amendments to Rule 15c6–1. Furthermore, should the Commission decide to shorten the settlement cycle to T+1, the SIA has asked the Commission to consider a T+3 settlement cycle for firm commitment offerings priced after 4:30 p.m. Eastern time so that industry participants will have sufficient time to complete their due diligence processes.[74] With regard to any such proposals, it must be shown that they are consistent with investors receiving the information and protections to which they are entitled.

### D. Risk Reduction Benefits of Shortening the Settlement Cycle

When the Commission adopted Rule 15c6–1, the Commission believed that shortening the settlement cycle would reduce risks that can lead to systemic disruptions in the financial markets.[75] Accordingly, when considering whether to shorten the settlement cycle further, it would be useful to consider the impact of a shorter settlement cycle on risk.[76]

#### 1. Risks Prior to Settlement[77]

As defined in the CPSS/IOSCO Report, presettlement risk is "[t]he risk that a counterparty to a transaction for completion at a future date will default before final settlement. The resulting exposure is the cost of replacing the original transaction at current market prices and is also known as replacement cost risk."[78]

---

[74] For a more complete discussion, see, "White Paper version 1.1," Syndicate Electronic Storage and Access to Information Committee (June 14, 2000) at http://www.sia.com/stp/pdf/electronic_storage.pdf.

[75] See Securities Exchange Act Release No. 33023, 58 FR at 52894.

[76] See generally CPSS/IOSCO Report at 39–41, Annex 3.

[77] While there are a number of risks that may occur prior to settlement (e.g., market and counterparty risk), for purposes of this release they will be referred to as "presettlement risk." See generally CPSS/IOSCO Report at 39–41, Annex 3.

[78] CPSS/IOSCO Report at 48. "A failure to perform on the part of one party to the transaction will leave the solvent counterparty with the need to replace, at current market prices, the original transaction. When the solvent counterparty replaces the original transaction at current prices, however, it will lose the gains that had occurred on the transaction in the interval between the transaction and default. The unrealized gain, if any, on a transaction is determined by comparing the market price of the security at the time of default with the contract price; the seller of a security is exposed to a replacement cost loss if the market price is below the contract price, while the buyer of the security is exposed to such a loss if the market price is above the contract price. Because future securities price movements are uncertain at the time of the trade, both counterparties face replacement cost risk." CPSS/IOSCO Report at 39. Supra note 51.

Presettlement risk can present substantial danger to the settlement system because it involves the change in the value of securities involved in the defaulting party's transactions. In the event of default of a major participant, it may entail credit losses so large as to create systemic problems.[79] As previously stated, reducing the time period from trade execution to settlement is one of the primary methods of reducing this risk.[80]

Episodes of severe market declines magnify replacement cost risk. At the time of the 1987 Market Break, the U.S. settlement cycle was five days and ten of the thirty stocks making up the Dow Jones Industrial Average ("DJIA") declined 35 percent or more over five days.[81] A default by a buyer of one of these stocks during that period would have exposed the seller to substantial losses. More recently, on Monday, October 27, 1997, the nation's securities markets experienced a tremendous decline when the DJIA fell by 554.26 points. On August 31, 1998, the DJIA experienced a decline of 512.61 points.[82] With sharp price movements, traders may be unwilling or unable to meet margin calls and default on their delivery obligations.

The Commission believes that shortening the settlement cycle could reduce replacement cost risk because the magnitude of replacement cost risk depends on the volatility of the security price and the amount of time that elapses between the trade date and the settlement date.

#### 2. Risks Associated With Settlement

Settlement risk is "[a] general term used to designate the risk that settlement in a transfer system will not take place as expected. This risk may comprise both credit[83] and liquidity risk."[84] Settlement risk is sometimes referred to as principal risk, i.e., the risk of loss of securities delivered or payments made to the defaulting participant prior to the detection of the default.[85] Both the buyer and the seller are exposed to the risk of loss of the full principal value of the securities or funds transferred.

---

[79] Id.

[80] Bachmann Report at 6.

[81] "Clearance and Settlement in U.S. Securities Markets," Federal Reserve Board (March 1992).

[82] "Trading Analysis of October 27 and 28, 1997," report by the Division of Market Regulation, Commission (September 1998).

[83] Credit risk is the risk of loss from default by a participant in a settlement system, typically as a consequence of insolvency. CPSS/IOSCO Report at 39, 48.

[84] Id. at 49.

[85] Id. at 39 and 48.

---

amounts, finalize routing instructions for payment, and prepare for settlement.

[67] 15 U.S.C. 77e(b)(2).
[68] 15 U.S.C. 77e(b)(1).
[69] 15 U.S.C. 77b(a)(10).
[70] 17 CFR 240.10b–10.
[71] 15 U.S.C. 77b(a)(10)(a).
[72] Supra note 29.
[73] Id.

Federal Register/Vol. 69, No. 53/Thursday, March 18, 2004/Proposed Rules   **12929**

In addition, both parties to a securities trade are exposed to liquidity risk on the settlement date. Liquidity risk includes the risk that the seller of a security who does not receive payment when due may have to borrow or liquidate assets to complete other payments. It also includes the risk that the buyer of the security does not receive delivery when due and may have to borrow the security in order to complete its own delivery obligation. The costs associated with liquidity risk depend on the liquidity of the markets in which the affected party must make its adjustments; the more liquid the markets, the less costly the adjustment.[86]

Liquidity problems have the potential to create systemic disruptions. In particular, if liquidity problems arise when securities prices are changing rapidly, failures to meet obligations when due are more likely to elevate concerns about solvency. In the absence of a strong linkage between delivery and payment, the emergence of systemic liquidity problems at such times is especially likely. The fear of losing the full principal value of securities or funds could induce some participants to withhold deliveries and payments, which, in turn, may prevent other participants from meeting their obligations.[87]

As noted above, one reason for shortening the settlement cycle from T+5 to T+3 was that the shorter interval would reduce the liquidity risk in derivative and cash markets and reduce financing costs by allowing investors that participate in both markets to obtain the proceeds of securities transactions sooner. Shortening the settlement cycle to T+1, for example, also would synchronize the settlement of corporate and derivative securities and have liquidity benefits. By reducing the lag between the settlement of derivatives and government securities and the settlement of equity and corporate securities, investors that participate in both markets would be able to reduce their financing costs and obtain the proceeds of their securities transactions on a timelier basis.[88]

### 3. Risks Associated With Operations

The CPSS/IOSCO Report states that "[o]perational risk is the risk that deficiencies in information systems or internal controls, human errors, or management failures will result in unexpected losses. As clearing and settlement systems become increasingly more dependent on information systems, the reliability of these systems is a key element in operational risk. The importance of operational risk lies in its capacity to impede the effectiveness of measures adopted to address other risks in the settlement process and to cause participants to incur unforeseen losses, which, if sizeable, could have systemic risk implications." [89]

Operational deficiencies within a broker-dealer, a clearing corporation, or at an exchange can increase the risk of loss to market participants and investors. These deficiencies can reduce the effectiveness of other measures that the settlement system takes to manage risk. For example, operational problems could impair the system's ability to complete settlement, create liquidity pressures on the market or participants, or hamper the system's ability to monitor and manage credit exposures. Possible operational failures include errors or delays in processing, system outages, insufficient capacity, or fraud by staff.[90]

The events of September 11, 2001, demonstrated how operational risk results from unforeseen events that can directly and severely affect market functions. Generally, financial crises involve both operational and credit issues. In contrast, the events of September 11, 2001, were unusual in that the settlement problems that did occur resulted almost exclusively from operational problems. No firm failed in the immediate aftermath of the terrorist attacks, although some firms were severely affected. If credit problems had arisen, the systemic consequences could have been severe.[91] However, the attacks did highlight the need to examine the risks in the clearance and settlement system, including the need for a resilient clearance and settlement infrastructure.[92]

### E. Costs of Implementing a Shorter Settlement Cycle

#### 1. SIA Business Case Report

In July 2000, the SIA published its T+1 Business Case Final Report ("SIA Business Case Report") that included a cost-benefit analysis for transitioning to T+1. The SIA Business Case Report's major conclusions were the following: (1) The industry could shorten the settlement cycle to T+1 by June 2004; (2) moving to T+1 would cost approximately $8 billion but would save the industry $2.7 billion a year; and (3) moving to T+1 would reduce settlement exposure by 67%.[93]

The SIA estimated that settlement exposure would decrease by $250 billion in a T+1 environment. With fewer open positions at the clearing agencies, the SIA purported that T+1 settlement could reduce participants' clearing fund obligations by one-third. Additionally, operational risk for custodians would also be reduced as the number of pending settlements decreased.[94] The SIA further concluded that firms would benefit from an annual cost savings of approximately $2.7 billion, and would therefore recoup their investment three years after implementing a T+1 settlement cycle.

Since its publication, a number of critics questioned the assumptions and conclusions contained in the SIA's Business Case Report, arguing that it would cost the industry more than $8 billion and the cost recovery would take longer than three years. Critics also argued that the SIA's Business Case Report did not adequately quantify the risk reduction benefits of moving to T+1.[95]

---

[86] *Id.*

[87] *Id.* at 40.

[88] *See* Letter from Sarah A. Miller, Senior Government Relations Counsel, American Bankers Association, to Jonathan G. Katz, Secretary, Commission (June 30, 1993)(commenting on the proposal to adopt Rule 15c6–1).

[89] CPSS/IOSCO Report at 17.

[90] *Id.* at 40.

[91] Despite the widespread loss and destruction from the events of September 11, 2001, the U.S. financial system continued to perform its vital economic functions. "Summary of 'Lessons Learned' from Events of September 11 and Implications for Business Continuity," staffs of the Federal Reserve Board, the New York State Banking Department, the Office of the Comptroller of the Currency, and the Securities and Exhange Commission, discussion document for meeting at the Federal Reserve Bank of New York (February 26, 2002).

Though the equity markets remained closed for four days and most bond trading was suspended for two, the U.S. clearance and settlement system was able to clear and settle trades executed on September 11. Largely by switching to back-up systems, DTC and NSCC continued clearing and settling trades due for settlement on the days following the attacks. As a result, the industry was able to sustain its business and resume trading once the markets reopened on Monday, September 17, 2001. The Depository Trust and Clearing Corporation, Annual Report 2001.

[92] *See supra* note 50.

[93] SIA Business Case Report at 7. Based on 1999 volumes, the SIA estimated decreased settlement exposure by $250 billion in a T+1 environment.

[94] *Id.*

[95] For example, the Investment Counsel Association of America ("ICAA") has expressed disagreement with the findings made in the SIA's Business Case as they pertain to small and mid-sized investment managers. The ICAA stated that the SIA's study contained flaws regarding the number of the investment advisers affected by T+1 and underestimates the costs they will bear. *See* Letters from ICAA to Harvey L. Pitt, Chairman, Commission (October 9, 2001 and January 14, 2002).

Another report examined the impact of T+1 on the dealer community. *See* the Forrester Report, "The Real Benefits of T+1," by Todd Eyler (September 2001). Forrester is an independent research company that "analyzes the future of technology change and its impact on business, Continued

**12930**    Federal Register/Vol. 69, No. 53/Thursday, March 18, 2004/Proposed Rules

## 2. Costs to Cross-Border Trading

Reducing the settlement cycle is neither costless nor without risk. "This is especially true for markets with significant cross-border activity because differences in time zones and national holidays, and the frequent involvement of multiple intermediaries, make timely confirmation more difficult. In most markets, a move to T+1 (perhaps T+2) would require a substantial reconfiguration of the trade settlement process and an upgrade of existing systems. For markets with a significant share of cross-border trades, substantial system improvements may be essential to shortening settlement cycles. Without such investments, a move to a shorter settlement cycle could generate increased settlement fails, with a higher proportion of participants unable to agree and exchange settlement data or to acquire the necessary resources for settlement in the time available. Consequently, replacement cost risk would not be reduced as much as anticipated and operational risk and liquidity risk could increase."[96]

The level of cross-border activity is another significant factor that should be considered when determining whether to reduce the settlement cycle beyond T+3. During the 1990's, non-U.S. investors played an increasing role in the U.S. securities markets. For example, gross activity in U.S. equities by foreign holders totaled $6.0 trillion in 2001.[97] The SIA has projected that T+1 settlement would increase global competitiveness, synchronize settlement with other markets, better equip the U.S. market to handle increasing volumes, and lower transaction costs.[98]

On the other hand, because cross-border transactions in U.S. securities often involve differences in time zones, the use of multiple intermediaries, and the need to convert funds from one currency to another, the ability of a non-U.S. entity to settle trades could become significantly more difficult and expensive if these factors are not addressed adequately. As a result, a settlement cycle shorter than T+3 could make the U.S. securities markets less attractive rather than more attractive to non-U.S. entities.

### F. Request for Comment

The Commission seeks comment on the current operation of Rule 15c6–1

and the costs and benefits of implementing a settlement cycle shorter than T+3. The Commission also seeks comment on alternative means to reduce risks in the system while operating in a T+3 settlement cycle. In order to evaluate fully the costs and benefits associated with shortening the settlement cycle, the Commission requests that commenters' estimates be accompanied by specific empirical data supporting their statements. The Commission seeks comments on the following:

1. Should the securities covered by Rule 15c6–1 be expanded? If so, what securities should be added? Why should these securities be added?

2. Given the increase in cross-border transactions and dually-traded securities over the past eight years, are the conditions set forth in the Commission's exemption order for securities traded outside the United States still appropriate? If not, why not? If the exemption should be modified, how should it be modified?

3. Are the conditions set forth in the Commission's exemption order for variable annuity contracts still appropriate? If not, why not? If the exemption should be modified, how should it be modified?

4. If the Commission were to mandate a settlement cycle shorter than T+3, should the Commission shorten the settlement cycle for firm commitment offerings priced after 4:30 p.m. Eastern time from T+4 to T+3 or T+2?

5. How would a shortened settlement cycle affect processing newly issued securities?

6. What systems and operational changes would be necessary in order to settle newly issued securities in a shortened settlement cycle?

7. How much would it cost to shorten the settlement cycle beyond T+3?

a. Is achieving 100% of confirmation/affirmation or matching on trade date a prerequisite for shortening the settlement cycle beyond T+3?

b. If so, what are the additional costs of shortening the settlement cycle after achieving 100% of confirmation/affirmation or matching on trade date?

8. What parties will bear the costs of moving to a settlement cycle shorter than T+3 (such as broker-dealers, investment managers, custodians, investors, and other market participants)?

9. What are the benefits of shortening the settlement cycle beyond T+3? Are there economic benefits in terms of reduction in credit and liquidity risk associated with shortening the settlement cycle beyond T+3?

10. Who will benefit from shortening the settlement cycle beyond T+3 (such as broker-dealers, investment managers, custodians, investors, and other market participants)?

11. How would shortening the settlement cycle affect efficiency and risk?

a. What are the risks associated with upgrading computer systems and transaction processing procedures to convert existing systems to new systems and the establishment of necessary linkages between other market participants?

b. Would shortening the settlement cycle beyond T+3 encourage market participants to implement additional risk management procedures? What additional operational risks would result from shortening the settlement cycle beyond T+3?

c. Would a shorter settlement cycle encourage market participants to invest in technology and automation that would enhance their operational efficiency? Would such investments improve market efficiency?

d. Are there alternatives to shortening the settlement cycle that would increase efficiency in the clearance and settlement system?

e. Are there alternatives to shortening the settlement cycle that would mitigate risks in the clearance and settlement process?

12. How would shortening the settlement cycle affect the information, benefits, and protections that investors have under present U.S. clearance and settlement arrangements?

13. How can the safety and soundness of the U.S. clearance and settlement system be increased while ensuring that investors can continue to obtain direct registration of their securities on issuer records in a less-than-three-day settlement environment?

14. What impact would a shortened settlement cycle for U.S. equities and corporate securities have on cross-border trading by non-U.S. entities of these instruments?

## IV. Immobilization and Dematerialization of Securities Certificates

### A. Introduction and Background

Securities have been issued in the U.S. using paper certificates since the eighteenth century.[99] Issuers

---

consumers, and society." For more information, visit their Web site *http://www.forrester.com*.

[96] CPSS/IOSCO Report at 10. *See generally* SIA Business Case Report at 18.

[97] SIA Annual Securities Industry Fact Book 2002 at 74. Available through the SIA.

[98] SIA Business Case Report at 8.

[99] A securities certificate evidences that the owner is registered on the books of the issuer as a shareholder. The shares, as distinct from the certificate, constitute an intangible right to participate in the capital and surplus of the company. Guttman, *Modern Securities Transfers*, Para. 1:5 at 1–15 (Thomson West 2002). Because the certificate is a negotiable instrument under state

traditionally used certificates to register securities ownership in the name of investors. Certificates are used by issuers both as means to evidence and transfer ownership and as a means to identify security owners to issuers, in an effort to develop company loyalty and to know who owns their securities. As trading volumes soared during the last half of the twentieth century, however, processing certificates became increasingly problematic.

The processing of securities certificates has long been identified as an inefficient and risk-laden mechanism by which to hold and transfer ownership. Because securities certificates require manual processing, their use can result in significant delays and expenses in processing securities transactions and can raise risk concerns associated with lost, stolen, and forged certificates.

Congress has recognized the problems and dangers that the movement of certificates presents to the safe and efficient operation of the U.S. clearance and settlement system, and has given the Commission responsibility and authority to address these issues.[100] Indeed, for over thirty years, the Commission and the financial services industry have worked together to reduce the reliance on securities certificates in the U.S. clearance and settlement system. The Commission believes that it is an appropriate time to consider further steps to remove securities certificates from the U.S. trading markets and our clearance and settlement system.

In the late 1960s and early 1970s, the securities industry experienced a "Paperwork Crisis" that nearly brought the industry to a standstill and directly or indirectly caused the failure of large number of broker-dealers.[101] This crisis primarily resulted from increasing trade volume overburdening an inefficient manual clearance and settlement systems. Deliveries to customers of both cash and securities were frequently late, and stock certificates were lost in the "rising tide of paper."[102] In its review of the Paperwork Crisis, Congress found that inefficient clearance and settlement procedures imposed unnecessary costs on investors and those acting on their behalf.[103] In an effort to increase efficiency and reduce risk, Congress amended the Exchange Act to vest the Commission with the authority and responsibility to establish a national system for the prompt and accurate clearance and settlement of transactions in securities ("National Clearance and Settlement System").[104] Recognizing the problems associated with the use of securities certificates, Congress directed the Commission "to end the physical movement of securities certificates in connection with the settlement among brokers and dealers of transactions in securities"[105] and authorized the Commission to establish a system for reporting missing, lost, counterfeit, and stolen securities.[106] Immobilization or dematerialization of securities certificates and consequently book-entry settlement of securities transactions and transfer of ownership have become large components of the operation of the U.S. clearance and settlement system, particularly in light of substantial trading volumes.[107]

Consistent with its Congressional directives, the Commission has long encouraged the use of alternatives to holding securities in certificated form in its effort to improve efficiencies and decrease risks associated with processing securities certificates. The Commission approved DTC's registration as a clearing agency operating as a depository in order to immobilize securities in a registered clearing agency and settle transactions by book-entry movements.[108] Registration of DTC as a clearing agency constituted an important step in achieving increased immobilization of securities in accordance with the goals established by Congress. The Commission also approved rules of the exchanges and the NASD that require their members to use the facilities of a securities depository for the book-entry settlement of all transactions in depository-eligible securities [109] and to require that before any security can be listed for trading it must have been made depository-eligible if possible.[110]

Today, DTC, one of the largest, if not the largest, depository in the world, provides book-entry depository and settlement services for the vast majority of U.S. transactions involving equities, corporate and municipal debt, money market instruments, American Depositary Receipts, and exchange-traded funds between broker-dealers and between broker-dealers and their institutional customers.[111] Many of the issues held at the depository, particularly municipal bonds and derivative securities, are fully dematerialized.

---

commercial laws, it allows the registered owner to deliver the bundle of rights it represents to a third party without first having to change the registration on the books of the issuer. State commercial laws specify rules concerning the transfer of the rights that constitute securities and the establishment of those rights against the issuer and other parties. Official comment to Article 8–101, The American Law Institute and National Conference of Commissioners of Uniform State Laws, Uniform Commercial Code, 1990 Official Text with Comments (West 1991).

The first major issue of publicly traded securities occurred in 1790 when the federal government issued $80 million of bonds to refinance federal and state Revolutionary War debt. In 1792, five securities, two bank stocks and three government bonds, began trading on what was to become the NYSE. For a historical discussion of the development of trading on the exchange, *see* http://www.nyse.com.

[100] 15 U.S.C. 78q–1(a)(2); 15 U.S.C. 78q–1(e).

[101] Securities and Exchange Commission, Study of Unsafe and Unsound Practices of Brokers and Dealers, H.R. Doc. No. 231, 92nd Cong., 1st Sess.

13 (1971). Congress held extensive hearings to investigate the problems and ultimately enacted the Securities Acts Amendments of 1975.

[102] S. Rep. No. 94–75, 94th Cong., 1st Sess. 4 (1975). In addressing the Paperwork Crisis, Congress noted that rather than responding to investor needs and striving for more efficient ways to perform essential functions, securities markets had resisted industry modernization and had been "unable or unwilling to respond promptly and effectively to radically altered economic and technological conditions." *Id.* at 1.

[103] 15 U.S.C. 78q–1(a)(1)(B).

[104] 15 U.S.C. 78q–1(a)(2)(A). Congress expressly envisioned the Commission's authority to extend to every facet of the securities handling process involving securities transactions within the United States, including activities by clearing agencies, depositories, corporate issuers, and transfer agents. *See* S. Rep. No. 75, 94th Cong., 1st Sess. at 55 (1975).

[105] 15 U.S.C. 78q–1(e).

[106] 15 U.S.C. 78q(f)(1).

[107] Immobilization of securities occurs where the underlying certificate is kept in a securities depository (or held in custody for the depository by the issuer's transfer agent) and transfers of ownership are recorded through electronic book-entry movements between the depository's participants' accounts. An issue is partially immobilized (as is the case with most equity securities traded on an exchange or securities association), when the street name positions are immobilized at the securities depository but certificates are still available to investors directly registered on the issuer's books. Dematerialization of securities occurs where there are no paper certificates available, and all transfers of ownership are made through book-entry movements.

[108] Securities Exchange Act Release No. 20221 (September 23, 1983), 48 FR 45167 (October 3, 1983), [File No. 600–1, et. al.].

[109] Securities Exchange Act Release No. 32455 (June 11, 1993), 58 FR 33679 (June 18, 1993), [File Nos. SR–Amex–93–07; SR–BSE–93–08; SR–MSE–93–03; SR–NASD–93–11; SR–NYSE–93–13; SR–PSE–93–04; SR–PHlX–93–09] (order approving rules requiring members, member organizations, and affiliated members of the NYSE, NASD, AMEX, Midwest Stock Exchange, Boston Stock Exchange, Pacific Stock Exchange, and Philadelphia Stock Exchange to use the facilities of a securities depository for the book-entry settlement of all transactions in depository-eligible securities with another financial intermediary).

[110] Securities Exchange Act Release No. 35798 (June 1, 1995), 60 FR 30909 (June 12, 1995), [File Nos. SR–Amex–95–17; SR–BSE–95–09; SR–CHX–95–12; SR–NASD–95–24; SR–NYSE–95–19; SR–PSE–95–14; SR–Phlx–95–34] (order approving rules setting forth depository eligibility requirements for issuers seeking to have their shares listed on national securities exchanges).

[111] In 2002, DTC handled 224.3 million book-entry deliveries valued at nearly $104 trillion. 2002 DTCC Annual Report at 2.

**12932**    Federal Register / Vol. 69, No. 53 / Thursday, March 18, 2004 / Proposed Rules

To reduce the use of securities certificates by individual investors, particularly those of equities and corporate bonds, the Commission and industry representatives have explored various ways to provide for ownership registered in the name of individual investors without reliance on negotiable securities certificates. In 1985, the Division of Market Regulation held "Securities Immobilization Workshops" to discuss the use of central depositories to immobilize securities certificates and the development of book-entry systems where retail investors could register their securities directly with the issuers using issuer or transfer agent operated book-entry systems.[112]

The 1987 Market Break also prompted numerous studies recommending specific reforms to address perceived weaknesses in the clearance and settlement systems.[113] The Bachmann Report, discussed above, made a number of suggestions including eliminating the delivery of "physical certificates" through the use of central depositories, but it did not advocate eliminating the use of the certificate for retail investors.[114] However, the Report argued that while investors should have the right to hold physical certificates, that right should not come at the expense of safety of the markets. The Bachmann Report strongly encouraged the Commission to explore the possibility of requiring retail investors to return their certificates to the system before trading.[115]

In 1990, the Commission held a Roundtable on Clearance and Settlement to discuss the implementation of the recommendations of the Group of Thirty's U.S. Working Committee regarding clearance and settlement.[116]

Participants in the Roundtable noted that the pressure to have securities available for settlement in shorter settlement time frames (at the time the industry was contemplating moving from T+5 to T+3 settlement) would increase the need for immobilizing securities certificates and the use of book-entry transfer at the retail level.[117] The Roundtable participants envisioned a transfer agent operated book-entry registration system that would allow investors to be "directly registered" in electronic form on the books of the issuer. Investors would receive a periodic statement reflecting their ownership interest and would retain the option of selling the securities through brokers by notifying transfer agents to move the securities from the books of the issuers to the books of the brokers. Certificates would also be available upon request.

In 1992, the Securities Transfer Association, the Corporate Transfer Agents Association, the Securities Industry Committee of the American Society of Corporate Secretaries, and DTC formed an ad hoc committee to further develop the concept of direct registration, modeling it after the systems used by transfer agents in their administration of issuers' dividend reinvestment and stock purchase programs. The committee was expanded to include representatives from the SIA and DTC in order to develop both the electronic link by which securities could be transferred between transfer agents and broker-dealers and to develop operational guidelines.

In 1994, the Commission issued a concept release seeking public comment on the policy implications and the regulatory issues raised by the use of direct registration.[118] A vast majority of commenters supported the concept, but many also expressed continued support

for shareholders' abilities to obtain securities certificates if so desired.[119]

The culmination of these efforts is the establishment of the Direct Registration System ("DRS"), which is operated by DTC.[120] DRS allows an investor to establish either through the issuer's transfer agent or through the investor's broker-dealer a book-entry position on the books of the issuer, and to electronically transfer her position between the transfer agent and the broker-dealer. DRS, therefore, allows an investor to have securities registered in her name without having a certificate issued to her and the ability to electronically transfer her securities to her broker-dealer in order to effect a transaction without the risk and delays associated with the use of certificates. In 1996, the NYSE modified its listing criteria to permit listed companies to issue securities in book entry form provided that the issue is included in DRS.[121] Similarly, the NASD modified its rule to require that if an issuer establishes a direct registration program, it must participate in an electronic link with a securities depository in order to facilitate the electronic transfer of the issue.[122] On July 30, 2002, the Commission approved a rule change proposed by the NYSE to amend NYSE Section 501.01 of the NYSE Listed

---

[112] "Progress and Prospects: Depository Immobilization of Securities and Use of Book-Entry Systems," Staff Report, Division of Market Regulation, Commission (June 14, 1985).

[113] See e.g., Division of Market Regulations, The October 1987 Market Break (February 1988); Working Group on Financial Markets, Interim Report to the President of the United States (May 1988).

[114] Supra note 41.

[115] Some industry representatives continue to recommend the Commission adopt regulations that would permit the sale of securities only when the securities have been "returned to the system" (i.e., when certificates either are in the possession of the broker-dealer or are accessible to the broker-dealer through a direct registration system or through a custodian or other financial intermediary). See e.g., "Defining 'Return to the System Prior to Entering Sale,' " Physical Certificates Subcommittee, STP Steering Committee, SIA (November 2002).

[116] Concerned with the international financial system following the 1987 market break, the 1989 G30 Report offered recommendations for reducing risk and improving efficiency in the world's clearance and settlement systems for corporate

securities. 1989 G30 Report, supra note 56. For more information on these recommendations, see Securities Exchange Act Release No. 33023 (October 6, 1993), 58 FR 52891 (October 13, 1993). Subsequently, the U.S. Working Committee was formed to study the existing U.S. clearance and settlement systems and to recommend appropriate changes based upon the Group of Thirty's recommendations. Based upon its review, the U.S. Working Committee issued its report, "Implementing the Group of Thirty Recommendations in the United States," U.S. Working Committee, Group of Thirty (November 1990).

[117] Providing Alternatives to Certificates For the Retail Investor, Group of Thirty, U.S. Working Committee, Clearance and Settlement Project (August 1991).

[118] Securities Exchange Act Release No. 35038 (December 1, 1994), 59 FR 63652 (December 8, 1994) [File No. SR–34–94] ("Concept Release").

[119] Referring in the Concept Release to the then recently adopted Rule 15c6–1, the Commission stated that "faster trade settlements should not require investors to forego the benefits of direct registration," and noted that "Rule 15c6–1 does not require customers to leave funds, securities, or both subject to the broker-dealers' possession or control."

[120] With such a system in place, investors would have three choices as to how to hold their securities: (1) In street name at their broker-dealer; (2) in certificated form; or 3) in electronic form on the books of the issuer. This transfer agent operated book-entry system eventually was realized in the current DRS. For more information on alternatives to holding securities certificates, see http://www.sec.gov/investor/pubs/holdsec. For a description of DRS and the DRS facilities administered by DTC, see Securities Exchange Act Release Nos: 37931 (November 7, 1996), 61 FR 58600 (November 15, 1996), [File No. SR–DTC–96–15] (order granting approval to establish DRS); 41862 (September 10, 1999), 64 FR 51162 (September 21, 1999), [File No. SR–DTC–99–16] (order approving implementation of the Profile Modification System); 42704 (April 19, 2000), 65 FR 24242 (April 25, 2000), [File No. SR–00–04] (order approving changes to the Profile Modification System); 43586 (November 17, 2000), 65 FR 70745 November 27, 2000), [File No. SR–00–09] (order approving the Profile Surety Program in DRS); 44696 (August 14, 2001), 66 FR 43939 (August 21, 2001), [File No. SR–DTC–2001–07] (order approving movement of DRS issues into the Profile Modification System and the establishment of the "S" position as the default in DRS).

[121] Securities Exchange Act Release No. 37937 (November 8, 1996), 61 FR 58728 (November 18, 1996), [File No. SR–NYSE–96–29].

[122] Securities Exchange Act Release No. 39369 (November 26, 1997), 62 FR 64034 (December 3, 1997), [File No. SR–97–51].

Company Manual to allow a listed company to issue securities in a dematerialized or completely immobilized form and therefore not send stock certificates to record holders, provided the company's stock is issued pursuant to a dividend reinvestment program, stock purchase plan, or is included in DRS.[123]

Use of DRS has expanded substantially since its inception in 1996, but continues to remain limited relative to the total number of issuers. As of November 2003, approximately 600 issuers and 17 transfer agents participate in DRS with over 37 million shareholders holding their securities in DRS.[124] Issuers, transfer agents, and broker-dealers continue to meet in order to explore expanding the use of DRS to non-equity products and integrate new technologies that would make the system more effective and efficient.

### B. CPSS/IOSCO and G30 Recommendations

Many in the international community view the elimination of securities certificates as a critical component in the overall plan to make markets more efficient and to minimize risk in the world's clearance and settlement system. Recommendation 6 of the CPSS/IOSCO Report states: "Securities should be immobilized or dematerialized and transferred by book entry in CSDs (central securities depositories) to the greatest extent possible."[125] The CPSS/IOSCO Report states that maintaining custody of securities in a central securities depository (such as DTC) will significantly reduce costs associated with securities settlement and custody through economies of scale and will increase efficiency through increased automation. The CPSS/IOSCO Report notes that immobilization or dematerialization of securities also reduces or eliminates certain risks, such as the destruction or theft of certificates. The CPSS/IOSCO Report recognizes that it may not be necessary to achieve complete immobilization to realize the benefits of central securities depositories as long as the most active market participants immobilize their holdings. In practice, retail investors may not be prepared to give up their certificates. Less active investors who choose to hold certificates could continue to do so; however, they should bear the associated costs.[126]

Recommendation 1 of the 2003 G30 Report endorses complete dematerialization through the comprehensive use of central securities depositories for all records of ownership although the report recognizes immobilization as an acceptable step towards dematerialization if it can be achieved more quickly and efficiently than dematerialization.[127] The 2003 G30 report maintains that dematerialization should be considered best practice in order to achieve fast and efficient clearing, settlement, and asset servicing and to prevent forgery, theft, or other misappropriation.

### C. The Continuing Risks and Costs of Certificates in the U.S. Trading Markets

Virtually all mutual fund securities, government securities, options, and municipal bonds in the U.S. are dematerialized and most of the equity and corporate bonds in the U.S. market are either immobilized or dematerialized. While the U.S. markets have made great strides in achieving immobilization and dematerialization for institutional and broker-to-broker transactions, many industry representatives believe that the small percentage of securities held in certificated form impose unnecessary risk and expense to the industry and to investors. In addition, the SIA identified the elimination of securities certificates in the U.S. marketplace as a necessary "building block" to achieve shorter settlement timeframes.[128] More recently, the SIA has requested that the Commission consider specific regulatory initiatives to achieve this goal.[129] The SIA contends that despite the fact that only a small portion of securities positions remains certificated and that requests for certificates are declining, the risks and costs associated with processing the remaining certificates in the marketplace are substantial and avoidable. These costs

are ultimately passed along to investors generally, rather than only those holding their securities in certificated form.

The most common risk is that associated with lost or stolen certificates. Between 1996 and 2000, the SIA estimated that an average of 1.7 million certificates were reported lost or stolen each year.[130] In 2001, that figure increased to approximately 2.5 million certificates. Industry experts expect the number of certificates reported lost or stolen to continue to rise.[131] The events of September 11, 2001, further underscored the risks associated with certificates. Tens of thousands of certificates that were being processed or were in vaults at broker-dealers and banks located in and around the World Trade Center at the time of the attack were either destroyed, lost, or were not accessible when offices located around the site were destroyed or were inaccessible for some period of time. Settlement activity for immobilized or dematerialized securities continued at DTC without significant delay or problems but DTC had to suspend certificate processing for four days until it could regain full access to its facilities.

The SIA also raised concerns about the significant and unnecessary costs associated with processing securities certificates. The SIA estimates that annual direct and indirect cost of handling certificates in the U.S. market exceeds $234,000,000.[132] Direct costs include those associated with processing and supporting certificates at the broker-dealers or custodial banks, including expenses for shipping, medallion guarantees, custody, and conducting inventory for securities held in the firm's vault. According to the SIA, firms also face an opportunity cost in processing the certificates as these resources that must be devoted to this operation could be used toward other risk reducing initiatives or technological and service upgrades.

When a broker-dealer receives certificates to sell, often both the registered representative in the front office and staff in the operations area in the back office at the broker-dealer examine the certificate for negotiability. Among others, broker-dealers must make inquiries pursuant to the

---

[123] Securities Exchange Act Release No. 46282 (July 30, 2002), 67 FR 50972 (August 6, 2002), [File No. SR–NYSE–2001–33].

[124] *See supra* note 120 for more information on alternative methods of holding securities.

[125] CPSS/IOSCO Report at 13.

[126] *Id.*

---

[127] 2003 G30 Report at 67. Recommendation 1 states, "Infrastructure providers and relevant public authorities should work with issuers and securities industry participants to eliminate the issuance, use, transfer and retention of paper securities certificates without delay * * *" G30 believes that the use of paper, unautomated communication and manual recording in securities processing is time-consuming, expensive and prone to clerical error.

[128] SIA Business Case Report, *supra* note 5. The securities industry has long supported the elimination of certificates. "The Securities Markets—A Report with Recommendations," NYSE (August 5, 1971).

[129] Letter to Robert L.D. Colby, Deputy Director, Division of Market Regulation, Commission, from Donald Kittell, Executive Vice President, SIA (August 20, 2003); letter to Annette Nazareth, Director, Division of Market Regulation, Commission, from Donald Kittell, Executive Vice President, SIA (March 24, 2003) ("Nazareth Letter").

---

[130] *Id.*

[131] *E.g.,* AT&T conducted a reverse split in November 2002 that required shareholders to remit their certificates in exchange for a book-entry position in DRS. AT&T estimated that approximately 30% of its 2.7 million certificates outstanding at the time of the corporate action would be reported lost by shareholders.

[132] Nazareth Letter, *supra* note 129.

**12934**    Federal Register / Vol. 69, No. 53 / Thursday, March 18, 2004 / Proposed Rules

Commission's Lost and Stolen Securities Program ("LSSP").[133] Brokers are charged for each inquiry. If the broker-dealer believes that the certificate is negotiable and does not receive a negative LSSP report, the certificate is forwarded to DTC for deposit into the broker-dealer's account at DTC. DTC then credits the broker-dealer's account and forwards the certificate to the transfer agent for reregistration into DTC's nominee name. If the transfer agent determines the certificate is not transferable, the transfer agent returns the certificate to DTC. DTC reverses the deposit credit to the broker-dealer's account and returns the certificate to the broker-dealer, usually many days after the trade has settled and sale proceeds have been paid or credited to the customer's account. The rejection of a security after settlement date exposes the customer to the costs and risks that she may have to purchase replacement securities and exposes the broker-dealer to the costs and risks associated with collecting should the customer be unable to obtain replacement securities.

Another potential cost to investors is the cost of replacing a lost certificate. An investor who had lost her certificate, or whose certificate was stolen, generally must obtain a surety bond to protect the transfer agent from the risk that the lost or stolen certificate will reappear before the transfer agent will issue a replacement certificate. Pursuant to industry guidelines, most transfer agents charge investors two per cent of the current market value of the securities for such a surety bond.

There are also many indirect costs associated with certificates. DTC costs include direct and indirect personnel and technology costs related to processing certificates.[134]

Transfer agent costs include personnel, facilities, and technology needed to process, custody, store, insure, and inventory unissued and cancelled certificates. All costs, both direct and indirect, the SIA notes, are ultimately borne by investors.

The SIA maintains that investors would realize many benefits from dematerializing securities issues, including decreased opportunity for fraud, earlier access to issuer proceeds, timelier receipt of corporate action entitlements, transparent audit trail of ownership, consolidated record keeping, and increased ease in estate liquidations.[135] While some investors may remain attached to securities certificates, the SIA's research shows that those 55 years of age and younger are receptive to dematerialization.[136]

The SIA believes that given technological advances, the increasing acceptance of book-entry positions as the standard for evidencing ownership and the availability of DRS, a concerted effort should be made to immobilize or dematerialize the remaining equity and corporate bond securities. Specifically, the SIA has requested that the Commission consider regulatory action that would either directly or indirectly require new issues of publicly traded companies to be issued only in book-entry form and to be eligible for DRS.[137] To address the matter of companies whose securities are already in the public market, the SIA advocates requiring all companies listed on an exchange or Nasdaq to have their existing shares be made eligible for DRS and to issue any new securities only in book-entry form.

Finally, the SIA urged the Commission to adopt regulations that would gradually eliminate the ability of investors to obtain certificates from their broker-dealers and to eliminate the ability of broker-dealers to obtain a certificate through DTC. Under such a regulatory scheme, investors who wanted certificates (if an issuer were still issuing certificates) would have to directly contact the issuer's transfer agent.

*D. Discussion and Request for Comment*

As discussed above, the Commission has long advocated a reduction in the use of certificates in the trading environment by immobilizing or dematerializing securities. These efforts are consistent with Congress's directive to end the physical movement of securities in connection with settlement among brokers and dealers. The use of certificates increases the costs and risks of clearing and settling securities for all parties processing the securities, including those involved in the National Clearance and Settlement System. Most of these costs and risks are ultimately borne by investors.

While the Commission endorses the concepts of immobilization or dematerialization, the Commission recognizes that they raise significant issues. The ability to hold securities certificates to evidence ownership in a corporation has a long tradition. There are perceived advantages, as well as disadvantages, to holding securities in the form of physical certificates instead of street-name registration.[138] DRS now provides a viable alternative to street name holding for some investors who do not want to hold securities at a broker-dealer, but only for those investors who have an issuer and transfer agent that offer DRS services.

Although the Commission believes investors should have the ability to register securities in their own names, the Commission also believes it is time to explore ways to further reduce certificates in the trading environment. There is significant risk, inefficiency, and cost related to the use of securities certificates. The possibility exists that investors' attachment to the certificate may be based more on sentiment than real need. Today, non-negotiable records of ownership (*e.g.*, account statements) evidence ownership of not only most securities issued in the U.S.

---

[133] The Commission requires, among others, every national securities exchange, registered securities association, broker, dealer, transfer agent, registered clearing agency, and many banks to report to the Commission's LSSP designee, the Securities Information Center ("SIC") the discovery of missing, lost, counterfeit, or stolen securities certificates. SIC operates a centralized database that records lost and stolen securities. 15 U.S.C. 78q(f)(1)(A) and 17 CFR 240.17f-1. These entities also must inquire of the database as to whether certificates they receive have been reported to the LSSP. 15 U.S.C. 78q(f)(1)(B).

[134] At the end of 1999, DTC sent an average of 11,460 certificates to investors each day. By the end of 2002, that number had decreased to an average of 5,454 certificates issued per day.

[135] Nazareth Letter, *supra* note 129.

[136] In an attempt to better understand retail investors who want their securities in certificated form, the SIA conducted a survey to profile customers who had requested a certificate over a six-month period. Approximately 76% of investors who responded were over 55 years of age. Nearly all respondents had been investing for over ten years but had made very few transactions per month. Just over one-half of the respondents own a personal computer and use the Internet. Even though 62% thought is was "very important" to retain the option of requesting a physical certificate, 50% of these investors indicated they would continue investing if certificates were not available. SIA Business Case Report, supra note 5.

[137] Nazareth Letter, *supra* note 129.

[138] *See* Holding Your Securities—Get the Facts, *http://www.sec.gov/investor/pubs/holdsec http:// www.sec.gov/investor/pubs/holdsec* (as examples of advantages, noting that with certificates the issuer knows how to reach the investor and will send annual and other reports, dividends, proxies, and other communications directly to the investor and that the investor may find it easier to pledge securities as collateral for a loan if they are held in the form of physical certificates; as examples of disadvantages, noting that when investors want to sell stock, they will have to send their certificates to their brokers or the companies' transfer agent to execute the sales, which may make it harder to sell quickly, that if investors lose their certificates, they may be charged a fee for replacements, and that if the investors move, they will have to contact the companies with their change of address in order not to miss any important mailings); Providing Alternatives to Certificates For the Retail Investor, Group of Thirty, U.S. Working Committee, Clearance and Settlement Project (August 1991), at 9, 25–26 (discussing various "needs" and "concerns or problems" expressed on behalf of investors regarding certificates, including that with certificates the investor can sell securities through the broker-dealer of his or her choice, without having to transfer a brokerage account).

but also other financial assets, such as money in bank accounts.

Therefore, we seek comment on the following:

1. Should securities be completely immobilized or dematerialized in the U.S.? If so, which would better serve the market—complete immobilization or dematerialization? Why?

2. What are the costs and benefits of complete immobilization or dematerialization?

3. Are there operational, legal, or regulatory impediments to immobilization or dematerialization?

4. What advantages might certificates have over securities held in book-entry-only form (*i.e.*, proof of ownership in the event of a loss of electronic records of ownership)? What regulatory initiatives should be considered to address these advantages if the markets were to move away from certificates?

5. Should the existence of a viable, widely available direct registration system that preserves the benefits of holding securities in the form of physical certificates be a prerequisite to complete immobilization or dematerialization?

6. What should be done to increase the availability and use of DRS or to otherwise improve DRS? For example, should the Commission adopt operational or processing rules specifically for processing book-entry transactions (*i.e.*, DRS and dividend reinvestment and stock purchase plans), including, but not limited to, timeframes for processing these transactions?

7. What are the back office costs at broker-dealers to process securities certificates? What are the costs at transfer agents to process securities certificates? How do these costs compare to the costs of processing book-entry securities?

8. What should be done to encourage more companies to issue their securities in a completely immobilized or dematerialized format? Should publicly traded companies be required to do so?

9. What can broker-dealers do to facilitate complete immobilization or dematerialization on both the retail and institutional customer levels? Are registered representatives sufficiently educated about DRS and do they communicate to investors available options to holding a certificate?

10. What can transfer agents do to facilitate complete immobilization or dematerialization on both the issuer and investor level?

11. What incentives or disincentives can be employed to discourage shareholders from requesting certificates? Will investors be less

inclined to request a certificate if they were required to pay more to obtain, transfer, and trade certificated securities than book-entry securities? Should investors who choose to hold certificates bear a greater amount of the overall costs associated with producing and processing those certificates?

12. Are any rules or regulations needed to enhance the safety of book-entry systems operated by transfer agents or broker-dealers?

13. What can be done to engender public confidence in certificate-less systems?

## V. Solicitation of Additional Comments

In addition to the areas for comment identified above, we are interested in any other issues that commenters may wish to address relating to trade confirmation, settlement cycles and physical securities. Please be as specific as possible in your discussion and analysis of any additional issues.

By the Commission.

Dated: March 11, 2004.

**Lynn Taylor,**

*Assistant Secretary.*

## Appendix 1

### CPSS–IOSCO Task Force

*Recommendations for Securities Settlement Systems*

Legal Risk

1. Legal Framework

Securities settlement systems should have a well-founded, clear, and transparent legal basis in the relevant jurisdictions.

Presettlement Risk

2. Trade Confirmation

Confirmation of trades between direct market participants should occur as soon as possible after trade execution, but no later than trade date (T+0). Where confirmation of trades by indirect market participants (such as institutional investors) is required, it should occur as soon as possible after trade execution, preferably on T+0, but no later than T+1.

3. Settlement Cycles

Rolling settlement should be adopted in all securities markets. Final settlement should occur no later than T+3. The benefits and costs of a settlement cycle shorter than T+3 should be assessed.

4. Central Counterparties

The benefits and costs of a central counterparty should be assessed. Where such a mechanism is introduced, the central counterparty should rigorously control the risks it assumes.

5. Securities Lending

Securities lending and borrowing (or repurchase agreements and other economically equivalent transactions) should be encouraged as a method for expediting the

settlement of securities transactions. Barriers that inhibit the practice of lending securities for this purpose should be removed.

Settlement Risk

6. Central Securities Depositories (CSDs)

Securities should be immobilised or dematerialised and transferred by book-entry in CSDs to the greatest extent possible.

7. Delivery Versus Payment (DVP)

Securities settlement systems should eliminate principal risk by linking securities transfers to funds transfers in a way that achieves delivery-versus-payment.

8. Timing of Settlement Finality

Final settlement on a DVP basis should occur no later than the end of the settlement day. Intraday or real-time finality should be provided where necessary to reduce risks.

9. CSD Risk Controls to Address Participant Defaults

Deferred net settlement systems should institute risk controls that, at a minimum, ensure timely settlement in the event the participant with the largest payment obligation is unable to settle. In any system in which a CSD extends credit or arranges securities loans to facilitate settlement, best practice is for the resulting credit exposures to be fully collateralised.

10. Cash Settlement Assets

Assets used to settle the cash leg of securities transactions between CSD members should carry little or no credit or liquidity risk. If central bank money is not used, steps must be taken to protect CSD members from potential losses and liquidity pressures arising from the failure of a settlement bank.

Operational Risk

11. Operational Reliability

Sources of operational risk arising in the clearing and settlement process should be identified and minimised through the development of appropriate systems, controls, and procedures. Systems should be reliable and secure, and have adequate, scaleable capacity. Contingency plans and backup facilities should be established to allow for timely recovery of operations and completion of the settlement process.

Custody Risk

12. Protection of Customers' Securities

Entities holding securities in custody should employ accounting practices and safekeeping procedures that fully protect customers' securities. It is essential that customers' securities be protected against the claims of a custodian's creditors.

Other Issues

13. Governance

Governance arrangements for CSDs and central counterparties should be designed to fulfill public interest requirements and to promote the objectives of owners and users.

14. Access

CSDs and central counterparties should have objective and publicly disclosed criteria for participation that permit fair and open access.

**12936**          Federal Register / Vol. 69, No. 53 / Thursday, March 18, 2004 / Proposed Rules

### 15. Efficiency

While maintaining safe and secure operations, securities settlement systems should be cost effective in meeting the requirements of users.

### 16. Communication Procedures and Standards

Securities settlement systems should use or accommodate the relevant international communication procedures and standards in order to facilitate efficient settlement of cross-border transactions.

### 17. Transparency

CSDs and central counterparties should provide market participants with sufficient information so that they can accurately identify and evaluate the risks and costs associated with using the CSD or central counterparty services.

### 18. Regulation and Oversight

Securities settlement systems should be subject to regulation and oversight. The responsibilities and objectives of the securities regulator and the central bank with respect to SSSs should be clearly defined, and their roles and major policies should be publicly disclosed. They should have the ability and the resources to perform their responsibilities, including assessing and promoting implementation of these recommendations. They should cooperate with each other and with other relevant authorities.

### 19. Risks in Cross-Border Links

CSDs that establish links to settle cross-border trades should design and operate such links to reduce effectively the risks associated with cross-border settlements.

[FR Doc. 04–5981 Filed 3–17–04; 8:45 am]
**BILLING CODE 8010–01–P**