UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
OLDE MONMOUTH STOCK TRANSFER CO.,   :
INC.,   :
  :          07 Civ. 990 (CSH)
           Plaintiff,   :
  :
       -against-   :
_____ :     MEMORANDUM OPINION
DEPOSITORY TRUST & CLEARING   :        AND ORDER
CORPORATION and DEPOSITORY TRUST   :
COMPANY,   :
          Defendants.   :
------------------------------------------------------------- x

HAIGHT, Senior District Judge:

       In this action, plaintiff Olde Monmouth Stock Transfer Co., Inc. ("Olde Monmouth") alleges that defendants Depository Trust & Clearing Corporation ("DTCC") and Depository Trust Company ("DTC") violated federal and state antitrust laws by unreasonably excluding Olde Monmouth from DTC's Fast Automated Securities Transfer ("FAST") Program. Plaintiff also alleges that DTC tortiously interfered with Olde Monmouth's economic relationships with existing and potential future customers by contacting some of plaintiff's clients and undermining Olde Monmouth's business relationships. Furthermore, plaintiff suggests that DTC may have publicized Olde Monmouth's exclusion from the FAST Program to the stock issuing community.

       Plaintiff moved for a preliminary injunction, requesting that this Court affirmatively order DTC immediately to approve Olde Monmouth's application for participation in the FAST Program.[1]

---

[1] Initially, Olde Monmouth also sought a preliminary injunction restraining DTC from its allegedly tortious communications with Olde Monmouth's clients. After defendants agreed not to initiate any further unsolicited communications with clients about Olde Monmouth's fees, plaintiff withdrew this request for preliminary injunctive relief. In consequence, Olde Monmouth's present motion for a preliminary injunction depends entirely upon the viability of its antitrust claims.

Defendants filed a cross-motion to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.,

for failure to state an actionable claim for relief.

## I.  BACKGROUND

**A.      Factual Summary**

Defendant DTC is a clearing agency, registered with the United States Securities and

Exchange Commission ("SEC") under Section 17A of the Securities Exchange Act of 1934, which

provides central securities depository services for the nation's securities industry.[2]  DTC acts as a

depository for trillions of dollars worth of physical securities certificates, which are maintained in

a central location; and it operates an automated, centralized system for book-entry transfers of

securities among its participants, the beneficial owners of securities deposited at DTC.  It describes

itself as a "utility" for the securities industry that facilitates prompt and accurate settlement of

securities transactions, and aims to increase the efficiency of such transactions by reducing the need

for actual physical transfer of individual stock certificates.  DTC charges its participants fees for

services, but operates on a cost basis; revenues in excess of operating costs and reserves are refunded

to participants.  Olde Monmouth asserts that DTC enjoys a monopoly over the entire securities

depository industry, as demonstrated by the fact that DTC is the stock custodian for some 2.5 million

issuers, valued at more than $28 trillion.

Plaintiff Olde Monmouth is a stock transfer agent duly and properly registered with the SEC,

---

[2] Defendant DTC is a wholly-owned subsidiary of defendant DTCC.  Both defendants are incorporated under the laws of the state of New York with their principal place of business located in New York City.

pursuant to Section 17A(c) of the Securities Exchange Act of 1934.[3]  As a transfer agent, Olde Monmouth performs various services for its clients, which are companies that issue publicly-traded shares of stock.  For example, transfer agents issue new stock certificates in withdrawal by transfer transactions when an owner seeks to obtain a physical certificate for his or her shares.  In addition, transfer agents process deposits of physical securities and maintain books and records on the securities issued by their clients.  Olde Monmouth keeps track of the constantly shifting ownership rolls of its clients' stocks and acts as an intermediary between its clients and DTC.  As a stock transfer agent, Olde Monmouth is paid transaction fees by its clients, as well as by DTC.

Under DTC's FAST Program, some transfer agents can be appointed to act as DTC's agents. The purpose of the program is to eliminate the movement of physical securities by allowing transfer agents to hold one balance certificate for each issuing company—and to adjust the balance on that certificate—rather than issuing multiple stock certificates.  The program is intended to reduce the cost of creating, transporting, and storing stock certificates.  Transfer agents appointed as FAST agents enter into a contractual relationship with DTC governing the treatment of stock ownership records for their FAST stock issues. A transfer agent may become a FAST agent by submitting an application and obtaining approval from DTC.

The present dispute arises out of Olde Monmouth's efforts to become a FAST agent in order to participate in DTC's Direct Registration System ("DRS").  Under DRS, individual investors have the ability to establish a direct book entry position with the issuer, either through the issuer's transfer agent or the investor's broker, without having to hold a physical certificate.  The major stock

---

[3] Olde Monmouth is incorporated under the laws of New Jersey with its principal place of business located in New Jersey.

exchanges in the United States—including the New York Stock Exchange, the American Stock Exchange, and the NASDAQ—have made or will soon make DRS participation a listing requirement for their exchanges.  To be eligible for DRS, the issuing company must have a transfer agent that has been approved for the FAST Program.

Olde Monmouth believes that participation in the FAST Program is of critical importance for retaining its existing clients and attracting new ones.  Accordingly, Olde Monmouth has made vigorous efforts to join the FAST program.  In March 2006, Olde Monmouth began inquiring with DTC about participating in the FAST program.  After obtaining the necessary application materials, Olde Monmouth submitted an application to become a FAST agent on May 19, 2006.  On June 22, 2006, DTC advised Olde Monmouth that it had determined not to use Olde Monmouth's services as a FAST agent, noting that Olde Monmouth had been cited for certain operational deficiencies in SEC reviews.  After this rejection notice, Olde Monmouth made numerous written and telephone inquiries to DTC about its application, and attempted to show that it had cured the deficiencies cited by the SEC and that it was otherwise in complete compliance with all of the FAST Program's requirements, as well as DTC's *proposed*—and not yet enacted—criteria for eligibility.  However, despite these efforts, DTC did not approve Olde Monmouth's application for the FAST Program.

Beginning in July 2006, Olde Monmouth also decided to raise the fees that it charged DTC in an effort to pressure DTC to process and approve Olde Monmouth's FAST application.  Olde Monmouth instituted a series of steep fee increases, such that by October 8, 2006, the charge for a single withdrawal by transfer—originally $35—was now $700.  Olde Monmouth represented that it would revert to the original fee schedule if DTC approved its FAST application.  DTC estimates that, as of the time of the present litigation, it had paid Olde Monmouth approximately $1.1 million

in excessive fees.

After the fee increases, DTC contacted several of Olde Monmouth's clients, complained about the fees Olde Monmouth was charging DTC, intimated that it might stop processing physical transactions for Olde Monmouth's clients,[4] and suggested that the clients should consider using a different stock transfer agent.  Olde Monmouth claims that these communications were malicious attempts to injure Olde Monmouth by disrupting its business relationships.  DTC contends that, in light of the exorbitant transaction fees charged by Olde Monmouth (which were passed on to participants), it was  reasonable for DTC to notify participants of the fee increases and to advise those issuers that DTC was considering "chilling" the issues for companies using Olde Monmouth as their transfer agent.

Finally, Olde Monmouth suggests that DTC has publicized Olde Monmouth's exclusion from the FAST Program to the stock issuing community at large, and thus hindered Olde Monmouth's ability to attract new clients.

**B.    Plaintiff's Claims**

Plaintiff's Verified Complaint asserts seven causes of action: claims for actual and attempted monopolization pursuant to Section 2 of the Sherman Act (plaintiff's First and Second Causes of Action), attempted monopolization pursuant to Section 1 of the Sherman Act (Third Cause of Action), companion claims pursuant to New Jersey antitrust statutes (Fourth, Fifth, and Sixth Causes of Action), and a common law claim for tortious interference with prospective economic advantage (Seventh Cause of Action).  Plaintiff seeks compensatory, punitive, exemplary, and treble damages, as well as injunctive relief requiring DTC to enroll Olde Monmouth in the FAST Program.

---

[4] A stop on physical processing is known in the industry as "chilling" the issue.

Based on these claims, Olde Monmouth moves for a preliminary injunction which if granted would compel DTC to approve Olde Monmouth's application to the FAST Program.[5]  DTC opposes that motion and cross-moves to dismiss Olde Monmouth's complaint.

## II.  DISCUSSION

### A.    Procedural Analysis

While DTC's cross-motion to dismiss Olde Monmouth's complaint was filed after Olde Monmouth moved for a preliminary injunction, I will consider it first, for the following reasons.

Every federal civil case begins with the filing of a complaint.  When a plaintiff moves for preliminary injunctive relief, it does so on the basis and in aid of its previously filed complaint.  The objective of a plaintiff moving for a preliminary injunction is to obtain relief *pendente lite* with respect to the claims plaintiff pleads in its complaint.

Given these procedural realities, the Court properly considers DTC's motion to dismiss Olde Monmouth's complaint before considering plaintiff's motion for a preliminary injunction.  DTC moves to dismiss the complaint under Rule 12(b)(6) on the ground that it fails to state a claim upon which relief—*any* form of relief—can be granted.  If DTC's motion is well founded, Olde Mountain's complaint falls and its motion for a preliminary injunction necessarily falls with it.

Moreover, in deciding  DTC's motion to dismiss the complaint, the Court looks only to the well-pleaded allegations in the complaint.  Olde Monmouth, in support of its motion for a preliminary injunction, has submitted affidavits and briefs.  Their contents fall outside the four

---

[5] As noted above, Olde Monmouth initially also moved for a preliminary injunction to restrain DTC from further allegedly tortious communications with Olde Monmouth's clients and potential clients, but plaintiff withdrew this request after an agreement was reached between the parties.

6

corners of the complaint and I do not consider them in deciding DTC's motion to dismiss the complaint. *See* the cases cited in Part II.C., *infra*.

**B.      Standard of Review on a Motion to Dismiss**

On a motion to dismiss a complaint under Rule 12(b)(6), the district court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). In reviewing a motion to dismiss, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). But "[w]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

"[T]he complaint must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." *Yurman Design Inc. v. Chaindom Enters., Inc.*, 2000 WL 897141, at *4 (S.D.N.Y. July 5, 2000). Thus, "[a]n antitrust plaintiff cannot create a cause of action by pleading conclusory allegations which merely recite the litany of antitrust." *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 (S.D.N.Y. 2006) (quotations and citation omitted). Rather, the plaintiff's complaint must adequately allege facts establishing the required elements of an antitrust violation. *Id.*

**C.      Plaintiff's Claims Under Section 2 of the Sherman Act**

The Supreme Court has explained that "[t]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power . . . ." *United States v. Grinnell Corp.*,

384 U.S. 563, 570-71 (1966).  To state an attempted monopolization claim, a plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  In the case at bar, Olde Monmouth asserts that "[t]he relevant market in each antitrust claim . . . is the market for stock transfer agent services."  Compl. ¶ 43.

The complaint alleges that DTC "enjoys a monopoly over the entire securities depository industry."  Compl. ¶ 42.  But this industry is distinct from the stock transfer agent industry, in which Olde Monmouth competes, and the complaint fails to allege that DTC actually competes in the relevant market.[6]  *See* Compl. ¶ 42 (alleging that DTC competes in the securities depository market and that it exerts influence on "the very closely related stock transfer agency industry").  Because DTC does not compete in the relevant market—the market for stock transfer agents in which Olde Monmouth competes—plaintiff cannot, as a matter of law, state a claim for monopolization or attempted monopolization of that market by DTC.  The Second Circuit has explained that "it is axiomatic that a firm cannot monopolize a market in which it does not compete" and that there can be no "dangerous probability" of monopolization—a necessary element of an attempted monopoly claim—where the defendants "do not even compete in that [the relevant] market and there is no indication that they ever sought to do so."  *Discon, Inv. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *rev'd on other grounds*, 525 U.S. 128 (1998).

Plaintiff argues that DTC's "influence" over the transfer agent industry, which it exerts

---

[6] In addition, stock transfer agents must be registered with the SEC pursuant to 15 U.S.C. § 78q-1(c).  Olde Monmouth has not alleged that DTC is registered, or has sought to register, as a transfer agent with the SEC.

from its monopoly position in the closely related securities depository industry, "is precisely the type of market power the antitrust laws were enacted to protect the consuming public [from]." Pl.'s Br. at 12.  But Olde Monmouth offers no legal authority for the proposition that market power under Section 2 of the Sherman Act encompasses "influence" by a non-competitor over the relevant market.  In fact, the Second Circuit rejected a similar theory in the context of the antitrust provisions in Section 5 of the Federal Trade Commission Act in *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920 (2d Cir. 1980).  The petitioner in *Official Airline Guides* published an airline guide that provided detailed information on flight connections and fares.  At the time, the guide was considered the "bible" of the industry, and was the "standard reference for airline ticket officers, travel agents, businesses, and the public generally." *Id.* at 921-22.  The publisher's arbitrary failure to list the connecting flight schedules of commuter airlines (as it did for certified airlines) hindered the commuter airlines' ability to compete with certified airlines. Although the guide injured competition among air carriers, the Court of Appeals emphasized that the defendant, "though possibly a monopolist in the airline schedule publishing industry, admittedly had no anticompetitive motive or intent with respect to the airline industry and is engaged in a different line of commerce from that of the air carriers." *Id.* at 926.  Thus, the court held that the publisher had no duty "not to discriminate unjustifiably between certified air carriers and commuter airlines so as to place the latter at a significant competitive disadvantage." *Id.* at 921.[7]

_____

[7]   In *Official Airline Guides*, the Second Circuit also rejected the FTC's suggestion that "if the only supermarket in town decides to stock Birdseye vegetables but not Green Giant vegetables, the FTC would be able to require it to stock Green Giant vegetables if it were to find Green Giant competitively disadvantaged." *Id.* at 927.  Rather, it concluded that "even a monopolist" had the right to exercise its discretion as to the parties with whom it would deal, so

Thus, plaintiff's legal theories for monopolization and attempted monopolization are fundamentally flawed because the complaint fails to allege that DTC competes in the relevant market. Plaintiff attempts to remedy this defect by raising new factual allegations in its briefing papers. But "[i]t is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs." *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005). *See also Lazaro v. Good Samaritan Hosp.*, 54 F. Supp. 2d 180, 184 (S.D.N.Y. 1999) ("it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss" (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989)); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977) ("a party is not entitled to amend his pleading through statements in his brief").

Even if I were to consider these new factual allegations, they fail to demonstrate a viable monopoly claim against DTC. First, plaintiff suggests that DTC *might* be planning to enter the stock transfer agency market. John Troster, President of Olde Monmouth, states: "Notwithstanding the fact that I have no personal knowledge suggesting that Defendants actively or overtly participate or engage in the stock transfer agency industry, it is abundantly clear that Defendants could at any time, and quite conceivably might be preparing to, participate or so engage." Troster Decl. ¶ 36. This assertion is purely speculative, and does not adequately allege that DTC competes in the relevant market. Second, plaintiff contends that "many DTCC Board members are employed by companies that are transfer agents or affiliated with companies that are

_____

long as it "had no purpose to restrain competition or to enhance or expand [its] monopoly." *Id.* at 927-28.

10

FAST-approved transfer agents," Troster Decl. ¶ 36, and that some of DTC's participants (the shareholder/owners of DTCC and DTC) "own outright or otherwise control stock transfer agency affiliates that vie with and compete directly against Olde Monmouth to provide stock transfer agent services to securities issuers," Pl.'s Reply Br. at 2. But plaintiff cites no legal authority that could impute competitor status in the relevant market to DTC merely on the basis that some members of its Board of Directors and some of its shareholders are involved in the transfer agent industry.[8] Thus, these allegations fail to show that DTC is a competitor in the relevant market. Third, plaintiff notes an "irrefutable and unmistakable trend toward complete ownership of all issuers' outstanding shares in the name of Defendants' nominee, Cede & Co." and that "the shares go in but they never come out." Pl.'s Reply Br. at 10-11. But DTC's nominal ownership of shares merely facilitates book-entry settlement of security transactions; the participants remain the beneficial owners of the stock. DTC's nominal ownership of shares is not relevant to whether it competes in the transfer agent market. Fourth, plaintiff notes that over the past thirty years the number of FAST-eligible stock issues has increased by a much greater magnitude than the number of FAST-approved stock transfer agents, and that "[i]n recent years, the number of small stock transfer agents has decreased at a much higher rate than the rate at which the number of stock transfer agents has decreased overall." Pl.'s Reply Br. at 3. These trends within the transfer agent market are not relevant to whether DTC actually competes in that market.[9]

---

[8] For example, plaintiff has not attempted to formally pierce the corporate veil of DTC.

[9] Plaintiff's reply papers contain additional allegations based on the historical development of the DRS program. Specifically, Dr. Susanne Trimbath, a former DTC employee now employed as the Chief Executive Manager and Chief Economist of STP Advisory Services, LLC, submits an affidavit on behalf of Olde Monmouth which discusses a proposal presented by the transfer agent industry fifteen years ago that would have expanded their business into the

Because DTC is not a competitor in the relevant market, Olde Monmouth's alternative theories for monopolization—based on monopoly leveraging, the essential facility doctrine, and the Supreme Court's *Aspen Skiing* decision[10]—also fail as a matter of law.

A claim of monopoly leveraging requires that "defendant (1) possessed monopoly power in one market; (2) used that power to create a dangerous probability of monopolizing another market; and (3) caused injury by such anticompetitive conduct." *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 246-47 (S.D.N.Y. 2004) (citing *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)).  As described above, the complaint fails to allege that DTC even competes or seeks to compete in the "another market" of transfer agent services—much less that there is a dangerous probability of DTC monopolizing that market.[11]

_____

market for securities intermediaries (the market for providing direct services to consumers for the purchase and sale of stock), and argues that DTC developed the DRS program to compete with the transfer agents' proposal.  *See* Trimbath Decl.  I do not consider Dr. Trimbath's allegations because they involve completely new facts and legal theories from those asserted in the complaint.  First, the complaint challenges Olde Monmouth's exclusion from the FAST program—not DTC's original development of the DRS program.  (Thus, the relief sought by Olde Monmouth is admission to the FAST program, not the dismantling of DRS.)  Second, the historical background discussed by Dr. Trimbath is not relevant to the current market for transfer agent services.  The proposal advanced by the transfer agent industry fifteen years ago was not adopted.  There is no indication in the complaint that the transfer agent industry presently involves direct services to consumers for purchase and sale of stock, or that Olde Monmouth engages in such services.  *See* Compl. ¶ 13 (describing how plaintiff acts as an intermediary between its clients and DTC and maintains records of the ownership of its customers' shares of stock).  Thus, the historical background presented in plaintiff's reply papers does not speak to whether DTC competes in the relevant market identified in the complaint.

[10] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

[11] Troster's speculation that DTC might enter the relevant market is completely insufficient to show a "dangerous probability" of monopolization.  That factor is usually assessed by the defendant's current market share—not by the possibility that the defendant might enter the market.  *See, e.g., H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1017 (2d Cir. 1989) (40% market share between two alleged conspirators, in the context of a widely diversified

*Cf. A.I.B. Express*, 358 F. Supp. 2d at 250-51 (refusing to dismiss monopoly leveraging claim where AIB sufficiently alleged dangerous probability that FedEx would monopolize "facilitation market," in which both FedEx and AIB competed).

The elements of an essential facility claim under Section 2 of the Sherman Act are: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 568 (S.D.N.Y. 2004) (quoting *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 569 (2d Cir. 1990)). Here, Olde Monmouth alleges that DTC controls stock depository mechanisms that are "essential" to the stock transfer industry, and that DTC has been denying Olde Monmouth access to the FAST Program. But the essential facility doctrine is intended to prevent a *competitor* from obtaining an unfair advantage in a market by denying to its actual or potential *competitors* access to a facility essential for use of that market. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2d ed. 2002) § 772 ("the primary use of the so-called essential facility doctrine has been in cases where a monopolist refuses to share some important input with actual or potential competitors"). The doctrine is inapplicable here because DTC is not a competitor of Olde Monmouth in the transfer agent industry. *See Interface Group, Inc. v. Massachusetts Port. Auth.*, 816 F.2d 9, 12 (1st Cir. 1987) ("The [essential facility] doctrine aims

---

and competitive market, insufficient to demonstrate "dangerous probability of success"). *Cf. A.I.B. Express*, 358 F. Supp. 2d at 251 (allegation in complaint that defendant "will simply take over" the other market sufficient to withstand motion to dismiss plaintiff's claim based on monopoly leveraging). Olde Monmouth's complaint nowhere alleges that DTC has plans to enter the other market of transfer agency services, let alone that it will "take over" that market.

to prevent a firm with monopoly power from extending that power from one stage of production into another and from one market to another . . . .  But it is difficult to see how denying a facility to one who, like [plaintiff], is not an actual or potential competitor [of the defendant] could enhance or reinforce the monopolist's market power.") (dismissing essential facility claim brought by charter airline operator against Port Authority for denying access to a particular airport terminal).  Put another way, DTC's denial of Olde Monmouth's FAST application does not enhance or reinforce DTC's monopoly power in the securities depository industry—because Olde Monmouth does not compete in that market.

Finally, plaintiff contends that under the Supreme Court's decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), a willingness to forgo short-term profits in favor of achieving a long-term anticompetitive result and a refusal to continue a profitable prior course of dealing reveal anticompetitive conduct.  In *Aspen Skiing*, the Supreme Court found actionable an improper "refusal to deal" where the defendant ski resort operator suddenly departed from a long-standing profitable arrangement with its competitor pursuant to which they had joined together to sell multi-area ski lift tickets that gave customers the flexibility to patronize any of the area's ski resort facilities at a discounted price.  But this decision does nothing to diminish the fundamental requirement that DTC compete in the relevant market against Olde Monmouth.  And although plaintiff claims that there are "striking similarities between the underlying factual predicate" in *Aspen Skiing* and the case at bar, Pl.'s Br. at 19, the cases are plainly distinguishable—because the parties in *Aspen Skiing* were competitors in the same market for ski resort operations.

In sum, the gravamen of plaintiff's complaint is that DTC unfairly and unreasonably

14

denied Olde Monmouth's application to the FAST Program.  Although plaintiff strains to connect this allegation to legal theories of monopolization, these theories are fundamentally flawed because DTC does not compete with Olde Monmouth in the relevant market for transfer agent services.  Thus, plaintiff's claims under Section 2 of the Sherman Act and the equivalent New Jersey antitrust statute (plaintiff's First, Second, Fourth, and Fifth Causes of Action) fail as a matter of law and must be dismissed.[12]  Allegations that DTC has been arbitrary and capricious in excluding Olde Monmouth from the FAST Program are properly addressed to the SEC, which oversees DTC's activities as a registered clearing agency.

**D.      Plaintiff's Claims Under Section 1 of the Sherman Act**

Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies that unreasonably restrain trade in the relevant market.  *See* 15 U.S.C. § 2; *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006).

Plaintiff's Third Cause of Action alleges "attempted monopolization" in violation of Section 1 of the Sherman Act.  But Section 1 does not address "attempt" claims.  *Compare* 15 U.S.C. § 1 (prohibiting contracts, combinations, or conspiracies in restraint of trade) *with* 15 U.S.C. § 2 (prohibiting monopolization or *attempted* monopolization).  Plaintiff must allege an actual agreement to restrain trade, and it has not done so.

Plaintiff claims that "DTC coerced and/or attempted to coerce such third parties [actual

---

[12] New Jersey courts have recognized that the New Jersey state antitrust statutes "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes" and that New Jersey "look[s] to federal jurisprudence to guide our interpretation of the [New Jersey Antitrust] Act."  *Patel v. Soriano*, 848 A.2d 803, 826 (N.J. App. Div. 2004) (citations omitted).  Thus, Olde Monmouth's New Jersey monopolization claims fail for the same reasons the federal claims fail.

and potential customers of Olde Monmouth] into forming a combination, contract, or conspiracy with DTC for the purpose of furthering DTC's anticompetitive scheme to restrain trade in the relevant market."  Compl. ¶ 57.  But the apparent factual bases in the complaint for this claim are allegations that DTC contacted several of Olde Monmouth's clients, complained about the fees Olde Monmouth was charging DTC, intimated that it might stop processing physical transactions for Olde Monmouth's clients, and suggested that the clients should consider using a different stock transfer agent.  Compl. ¶¶ 34-38.  Nothing in these allegations indicates that any third party actually agreed to form a combination, contract, or conspiracy with DTC.  Absent an actual agreement, plaintiff's Section 1 claim must fail.  *See Fisher v. Berkeley*, 475 U.S. 260, 266 (1986) ("there can be no liability under § 1 [of the Sherman Act] in the absence of agreement" between separate entities).[13]                                   Thus, plaintiff's  claims for "attempted monopolization" under Section 1 of the Sherman Act and the equivalent New Jersey antitrust statute (plaintiff's Third and Sixth Causes of Action) fail as a matter of law and must be dismissed.[14]

### E.        Plaintiff's Claim for Tortious Interference

-------------------

[13] In its reply brief, plaintiff suggests that "it hardly strains credulity to suspect that Defendants' own shareholder/owner Participants with DRS-approved transfer agency facilities might well have conspired with Defendants improperly to apportion unto themselves an ever increasing share of the market for transfer agency services . . . ."  Pl.'s Reply Br. at 18.  I do not consider this speculated conspiracy—between DTC and major transfer agents—because it is completely different from the conspiracy theory alleged in the complaint—between DTC and Olde Monmouth's clients.  And as explained above, "the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."  *Lazaro v. Good Samaritan Hosp.*, 54 F. Supp. 2d 180, 184 (S.D.N.Y. 1999) (citation omitted).

[14] As described *supra* n.12, the New Jersey antitrust statutes are construed in accordance with the comparable federal antitrust statutes.  Thus, Olde Monmouth's New Jersey claim fails for the same reason the federal claim under Section 1 fails.

Under New Jersey law, a claim for tortious interference with prospective economic advantage requires: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Varallo v. Hammond, Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989)).

Olde Monmouth alleges that DTC tortiously interfered with Olde Monmouth's economic relationships with existing and potential future customers in two ways.  First, plaintiff alleges that DTC contacted several of Olde Monmouth's clients, complained about the fees Olde Monmouth was charging DTC, intimated that it might "chill" the issues for Olde Monmouth's clients, and suggested that the clients should consider using a different stock transfer agent. Second, Olde Monmouth suggests that DTC has publicized Olde Monmouth's exclusion from the FAST Program to clients and the stock issuing community, and thus hindered Olde Monmouth's ability to attract new clients.  Defendants argue that these allegations are deficient because they do not sufficiently allege "malice" or that actual damages were caused by DTC's communications.

The New Jersey Supreme Court has explained: "Malice is not used here in its literal sense to mean 'ill will;' rather, it means that harm was inflicted intentionally and without justification or excuse." *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001); *see also Printing Mart,* 563 A.2d at 37 (defining "malice" in this context as "the intentional doing of a wrongful act without justification or excuse").  Plaintiff's complaint acknowledges that Olde Monmouth implemented fee increases on DTC, Compl. ¶ 31, but alleges that DTC's

17

communications with plaintiff's customers were undertaken "solely to injure Olde Monmouth," Compl. ¶ 82.  Construing the complaint liberally and accepting its factual allegations as true for the purposes of a motion to dismiss, I conclude that Olde Monmouth has sufficiently alleged that DTC acted with malice when it contacted Olde Monmouth's clients and allegedly pressured them to use a different transfer agent.[15]  However, to the extent that plaintiff's tortious interference claim is based on DTC's general publication of lists of institutions that have been approved as DRS-eligible, plaintiff has not adequately alleged malice.  There are plain business justifications for the general publication of such lists, and plaintiff cannot plausibly contend that these publications were made solely to injure Olde Monmouth.

DTC argues that plaintiff has failed to allege any specific business relationships that were terminated as a result of defendants' communications.  And it is true that plaintiff's specific allegations of DTC's communications with Olde Monmouth's customers—PAID, Inc. and ERF Wireless Company—do not allege that either of those customers actually terminated their relationships with plaintiff as a result of DTC's communications.  Compl. ¶¶ 34-37.  However, the complaint later asserts that: "As a proximate result of the conduct alleged herein [DTC's allegedly tortious communications with plaintiff's actual and potential customers], these actual and potential customers terminated or are contemplating the termination of their prospective economic relationships with Olde Monmouth and did not do further business with Olde

---

[15] Defendants' submissions assert that Olde Monmouth instituted exorbitant fee increases—such that the charge for a single withdrawal by transfer increased from $35 to $700—and that DTC's communications with Olde Monmouth's customers were entirely reasonable under these circumstances.  Defs.' Opp'n Br. at 9-10.  Although plaintiff does not appear to dispute the magnitude of the fee increases, I do not presently address the justifications asserted by DTC because a motion to dismiss deals only with the sufficiency of the complaint.

Monmouth." Compl. ¶ 81.  The mere contemplation of terminating a business relationship would not suffice to show actual damages, but actual termination would.  Once again construing the complaint liberally and accepting its factual allegations as true for the purposes of a motion to dismiss, I conclude that Olde Monmouth has sufficiently alleged that DTC's communications caused actual damages.  Therefore I deny defendants' motion to dismiss plaintiff's Seventh Cause of Action.

Whether plaintiff can prove all the elements of a tortious interference claim is, of course, a different question, which will no doubt be explored in discovery.

**F.      Plaintiff's Motion for a Preliminary Injunction**

As noted *supra*, plaintiff's present motion for a preliminary injunction depends entirely upon

its antitrust claims.  Since those claims will be dismissed, it necessarily follows that plaintiff's

motion for a preliminary injunction must be denied.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiff's First through Sixth

Causes of Action in the complaint under Federal Rule of Civil Procedure 12(b)(6) is granted.

Plaintiff's motion for a preliminary injunction is denied.

Defendants' motion to dismiss plaintiff's Seventh Cause of Action is denied.  With respect

to that cause of action only, counsel for the parties are directed to meet and draft a proposed

discovery plan pursuant to Rule 26(f).  Counsel are further directed to file that plan with the Court

not later than May 23, 2007.

The foregoing is SO ORDERED.

Dated: New York, New York
       April 23, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE