UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

OLDE MONMOUTH STOCK
TRANSFER CO., INC.,

                 Plaintiff,

       vs.

DEPOSITORY TRUST & CLEARING
CORPORATION and DEPOSITORY
TRUST COMPANY,

                 Defendants.

-----------------------------------------------------------X

07 CV 0990 (CSH)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

PROSKAUER ROSE LLP
Gregg M. Mashberg (GM-4022)
Michael Lazaroff (ML-0149)
Karen D. Coombs (KC-3538)
Dolores DiBella (DD-9637)
1585 Broadway
New York, NY 10036
(212) 969-3000
*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 2

    The Roles of Each of DTC, its Participants, and Transfer Agents ....................... 3

    The Role of a FAST Agent ...................................................................................... 6

    The Direct Registration System ............................................................................. 6

    The SEC's June 1 Publication of A Proposed Rule for FAST Agent Requirements .......... 7

    The Present Litigation ............................................................................................ 8

        OMST's Original Complaint and the Court's Dismissal of its Antitrust
        Claims ............................................................................................................... 9

        The Allegations of OMST's Proposed Amended Complaint ............................ 10

ARGUMENT ................................................................................................................... 11

I.    LEAVE TO AMEND SHOULD BE DENIED WHERE, AS HERE, SUCH
      AMENDMENT IS FUTILE ................................................................................. 11

II.   PLAINTIFF'S PROPOSED AMENDMENTS ARE FUTILE BECAUSE THEY DO
      NOT CURE THE FATAL DEFECTS IN ITS ORIGINAL COMPLAINT AND DO NOT
      ADEQUATELY PLEAD ANTITRUST VIOLATIONS ...................................... 12

    A.   OMST's Proposed Amended Complaint Does Not Plausibly Allege that
        DTCC and OMST Compete in the Same Relevant Market ................................... 13

    B.   OMST's Proposed Amended Complaint Does Not Adequately Plead A
        Conspiracy ......................................................................................................... 16

    C.   OMST's Proposed Amended Complaint Does Not Adequately Plead A
        Relevant Market .................................................................................................. 18

III.  PLAINTIFF'S ANTITRUST CLAIMS ARE SUBJECT TO IMPLIED IMMUNITY
      BECAUSE THEY ARE THE SUBJECT OF PERVASIVE REGULATION BY THE
      SECURITIES AND EXCHANGE COMMISSION ........................................... 19

IV.     THE PROPOSED AMENDED COMPLAINT IS FUTILE UNDER THE DOCTRINE
        OF PRIMARY JURISDICTION.............................................................................23

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.I.B. Express, Inc. v. FedEx Corp.*,
   358 F. Supp. 2d 239 (S.D.N.Y. 2004)..............................................................13

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*,
   909 F. Supp. 162 (S.D.N.Y. 1995) ...................................................................19

*Baker v. Library of Cong.*,
   260 F. Supp. 2d 59 (D.D.C. 2003) ....................................................................12

*Bell Atlantic Corp. v. Twombly*,
   127 S. Ct. 1955 (May 21, 2007)...................................................2, 12, 16, 17, 18, 19

*Coraggio v. Time Inc. Magazine Co.*,
   1995 WL 242047 (S.D.N.Y. Apr. 26, 1995).................................................. 15-16

*Credit Suisse Securities (USA) LLC v. Billing*,
   127 S. Ct. 2383 (June 18, 2007)...............................................................2, 20, 21, 22

*Danna v. Air France*,
   463 F.2d 407 (2d Cir. 1972).............................................................................25

*De Jesus v. Sears, Roebuck & Co.*,
   87 F.3d 65 (2d Cir. 1996)..................................................................................15

*Discon, Inc. v. NYNEX Corp*,
   93 F.3d 1055 (2d Cir. 1996), *rev'd on other grounds,* 525 U.S. 128 (1998) ....................13

*Ellis v. Tribune Television Co.*,
   443 F.3d 71 (2d Cir. 2006)............................................................................ 23-24

*Flutie Bros. v. Hayes*,
   2006 U.S. Dist. LEXIS 31379 (S.D.N.Y. May 18, 2006)....................................12

*Fort Wayne Telsat v. Entm't & Sports Programming Network*,
   753 F. Supp. 109 (S.D.N.Y. 1990) ...................................................................18

*Fulton Cogeneration Assocs. v. Niagara  Mohawk Power Corp.*,
   84 F.3d 91 (2d Cir. 1996)..................................................................................23

*Gianna Enters. v. Miss World (Jersey) Ltd.*,
    551 F. Supp. 1348 (S.D.N.Y. 1982)..................................................................................19

*Goldblatt v. Englander Commc'ns, LLC*,
    2007 U.S. Dist. LEXIS 4278 (S.D.N.Y. Jan. 18, 2007)................................................. 14-15

*Gordon v. New York Stock Exchange, Inc.*,
    422 U.S. 659 (1975)..................................................................................20, 22, 23

*In re Currency Conversion Fee Antitrust Litig.*,
    265 F. Supp. 2d 385 (S.D.N.Y. 2003)..................................................................................15

*In re Elevator Antitrust Litig.*,
    2006 U.S. Dist. LEXIS 34517 (S.D.N.Y. May 30, 2006)..................................................................................18

*In re Initial Pub. Offering Antitrust Litig.*,
    287 F. Supp. 2d 497 (S.D.N.Y. 2003)..................................................................................22

*Joblove v. Barr Labs, Inc. (In re Tamoxifen Citrate Antitrust Litig.)*,
    466 F.3d 187 (2d Cir. 2006)..................................................................................11

*Kalin v. Xanboo, Inc.*,
    2007 U.S. Dist. LEXIS 3342 (S.D.N.Y. Jan. 12, 2007)..................................................................................14

*Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*,
    464 F.3d 1339 (Fed. Cir. 2006)..................................................................................12

*Kottmyer v. Maas*,
    436 F.3d 684 (6th Cir. 2006) ..................................................................................12

*Mathias v. Daily News, L.P.*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001)..................................................................................18

*Maung Ng We & Massive Atlantic Ltd. v. Merrill Lynch & Co.*,
    2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000)..................................................................................15

*Nat'l Commc'ns Ass'n, v. AT&T*,
    46 F.3d 220 (2d Cir. 1995)..................................................................................24

*Neubauer v. Eva-Health USA, Inc.*,
    158 F.R.D. 281 (S.D.N.Y. 1994) ..................................................................................15

iv

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,
   2004 U.S. Dist. LEXIS 780 (S.D.N.Y. Jan. 22, 2004)................................................15

*United Magazine Co. v Murdoch Magazines Distribution, Inc.*,
   146 F. Supp. 2d 385 (S.D.N.Y. 2001)......................................................................19

*United States v. National Ass'n of Securities Dealers, Inc.*,
   422 U.S. 694 (1975).............................................................................................20, 22

*Van Buskirk v. N.Y. Times Co.*,
   325 F.3d 87 (2d Cir. 2003)................................................................................. 11-12

*Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*,
   2001 U.S. Dist. LEXIS 18831 (S.D.N.Y. Nov. 19, 2001).....................................18

## STATUTES

15 U.S.C. § 17q-1(c)........................................................................................................5

15 U.S.C. §§ 78q, *et seq*................................................................................................3

15 U.S.C. § 78q-1(a)(1)(D)......................................................................................3, 21

15 U.S.C. § 78q-1(b).......................................................................................................3

15 U.S.C. § 78s(b)(1)...................................................................................................4, 21

N.Y. U.C.C. §§ 8-101, *et seq* .......................................................................................4

FED. R. CIV. P. 12(b)(6) ......................................................................................1, 9, 12

FED. R. CIV. P. 15.........................................................................................................11

## OTHER AUTHORITIES

43 Fed. Reg. 33977 (Aug. 2, 1978).............................................................................21

48 Fed. Reg. 17603 (Apr. 25, 1983) .............................................................................5

48 Fed. Reg. 45167 (Oct. 3, 1983)...............................................................................4

58 Fed. Reg. 13291 (Mar. 10, 1993).............................................................................21

66 Fed. Reg. 43939 (Aug. 21, 2001)...........................................................................21

68 Fed. Reg. 35037 (June 4, 2003) ................................................................4

68 Fed. Reg. 70057 (Dec. 16, 2003) ..........................................................21

71 Fed. Reg. 47262 (Aug. 8, 2006)..............................................................7

71 Fed. Reg. 47276 (Aug. 16, 2006)............................................................7

71 Fed. Reg. 47278 (Aug. 16, 2006)............................................................7

S. Rep. No. 94-75, 1975 U.S.C.C.A.N. 179, 233 .......................................3

SEC Rel. No. 34-37931 (Nov. 9, 1996).....................................................21

SEC Rel. No. 34-41862 (Sept. 10, 1999)...................................................21

SEC Rel. No. 34-54289 (Aug. 8, 2006)........................................................7

SEC Rel. No. 34-55816, 72 Fed. Reg. 30648 (June 1, 2007) ............... *passim*

## PRELIMINARY STATEMENT

Defendants The Depository Trust & Clearing Corporation and The Depository Trust Company (collectively, "DTC") submit this memorandum of law in opposition to the motion by plaintiff Olde Monmouth Stock Transfer Co., Inc. ("OMST") seeking leave to file an amended complaint.[1]  Because OMST's proposed amended complaint ("PAC") has not (and cannot) cure the fatal defects which compelled dismissal of its original action under Fed. R. Civ. P. 12(b)(6) – and because intervening events and Supreme Court case law have shown OMST's claims to be non-justiciable – the motion should be denied on the grounds of futility.

First, the PAC is futile because it fails to cure the deficiencies in the original complaint. As this Court previously recognized, because DTC is not a *competitor* of OMST, its decisions regarding with whom it wishes to do business cannot create antitrust liability.  OMST now seeks to file an equally deficient complaint against not only DTC but *thirty-two* other defendants.  The proposed addition of these numerous financial institutions as defendants is not only a misperceived and futile pressure tactic (reminiscent of OMST's admittedly tactical decision to impose geometric fee increases upon DTC), but the naked and conclusory assertions of agency and conspiracy cannot substitute for the requisite factual allegations of competition still absent from OMST's pleading.  (Point II.A.)

OMST also conclusorily alleges the existence of a contract, combination or conspiracy between DTC and the other proposed defendants, based on nothing more than the allegations that (1) there are significantly fewer transfer agents approved for the Fast Automated Securities Transfer program ("FAST agents") than there are transfer agents generally; and (2) of the

---

[1]    A copy is annexed as Exhibit A to the Declaration of Gregg Mashberg, executed July 16, 2007 ("Mashberg Decl.").

approved FAST agents, some (though not all) are affiliated with some (though not all) of DTC's Participants. OMST asserts that these facts somehow constitute *prima facie* indicia of conspiracy sufficient to sustain a claim under Section 1 of the Sherman Act. Whatever possible doubt before the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) regarding the viability of plaintiff's contrived and conclusory claim, there is now no doubt under the heightened pleading standards that the Section 1 claim should be dismissed. (Point II.B.)

Second, there is an implied immunity from the antitrust laws to the claims at issue here. Last month, the Supreme Court re-affirmed, in *Credit Suisse Securities (USA) LLC v. Billing*, 127 S. Ct. 2383 (2007), that those activities at the heart of the securities industry, and subject to ongoing and comprehensive regulation by the U.S. Securities and Exchange Commission ("SEC"), are impliedly immune from suit under the federal antitrust laws. The claims here fall within that scope and OMST's proposed amendment is futile for that reason as well. (Point III.)

Third, in requesting that the Court order DTC to appoint OMST as a FAST agent, OMST asserts that such appointment is a prerequisite to OMST's ability to provide Direct Registration System ("DRS") services to the issuers who are its customers. New criteria for FAST agent appointment is currently pending in a formal rulemaking proceeding before the SEC, and OMST's proposed amended complaint is therefore futile because it is subject to dismissal under the doctrine of primary jurisdiction. (Point IV.)

## FACTUAL BACKGROUND

As this Court is well aware, this lawsuit arises out of OMST's disappointment over DTC's determination not to utilize OMST as a FAST agent for the transfer of securities. OMST

2

initially filed suit against DTC, the nation's principal securities depository, alleging that DTC had "influence" over the market for transfer agent services, and therefore that its determination of which transfer agents it wished to contract with to act as FAST agents could constitute anticompetitive conduct in the transfer agent market sufficient to support claims under the federal and New Jersey state antitrust laws. In its April 27, 2007 Memorandum Opinion and Order ("Op."), this Court dismissed those claims as a matter of law, finding, among other deficiencies, that no claim could be stated because DTC was not a competitor in the transfer agent market. (Op. at 8.) OMST now seeks to amend its complaint to allege that competitor status may be imputed to DTC, based on allegations that certain of DTC's Participants are affiliated with entities that compete in the transfer agent market (allegations previously rejected by this Court), and further based on allegations that DTC has (in some unspecified fashion) conspired with its Participants to exclude OMST from appointment as a FAST agent.

## The Roles of DTC, its Participants, and Transfer Agents

In 1975, Congress amended the Securities Exchange Act of 1934 by adopting Section 17A, 15 U.S.C. §§ 78q, *et seq.*, which mandated that the SEC "develop[ . . .] uniform standards and procedures for clearance and settlement [of securities transactions] . . . ." 15 U.S.C. 78q-1(a)(1)(D). Congress sought to ensure the "prompt and accurate" clearance and settlement of securities transactions, 15 U.S.C. § 78q-1(a)(1)(D), and to empower the SEC to regulate "every facet of the securities handling process . . . clearing agencies, depositories, corporate issuers, and transfer agents," S. Rep. No. 94-75, 1975 U.S.C.C.A.N. 179, 233. Section 17A established standards for registering clearing agencies, 15 U.S.C. § 78q-1(b), and the SEC approved DTC's

3

registration in 1983.  48 Fed. Reg. 45167 (Oct. 3, 1983).  Clearing agency rules are subject to SEC approval.  15 U.S.C. §78s(b)(1).

As a registered clearing agency, DTC functions as a utility for the nation's securities industry.  It operates an automated, centralized system for book-entry movement of securities positions in the DTC accounts of its Participants, who are the beneficial owners of the securities deposited at DTC.  By serving as record holder of well over $30 trillion of securities, DTC enables the automated movement of securities position as a result of millions of daily transactions in the marketplace without the need to transfer paper indicia of ownership.  *See* 68 Fed. Reg. 35037, 35041 (June 4, 2003) (hereafter, the "June 4 SEC Order") (describing DTC's functions in the securities industry) ("[B]y facilitating the prompt and accurate settlement of securities transactions, DTC serves a critical function in the National Clearance and Settlement System") and n.62; *see also* N.Y. U.C.C. §§ 8-101, *et seq.* (setting forth state law standards for the "indirect holding system" for securities transactions).

DTC's Participants are the nation's major banks and brokerage houses.  PAC, Ex. A. The Participants maintain depository accounts at DTC as "securities intermediaries," in accordance with Article 8 of the Uniform Commercial Code.  Thus, although DTC's nominee, Cede & Co., is the registered owner of the securities deposited at DTC, DTC's records reflect the beneficial ownership of its Participants.  DTC must keep records of changes in ownership occasioned by transfer of securities among Participants.  In the same manner, each Participant keeps records of the changes in ownership for those persons and entities for which it is the securities intermediary, to ensure that the changes in beneficial ownership reflected on DTC's books and records are likewise recorded in its own books for the appropriate account.

4

Transfer agents, such as OMST, perform various functions in connection with the issuance of securities by issuers, corporate restructurings and routine deposit and withdrawal of securities into and out of DTC. *See Proposed Rule Change Amending FAST and DRS Limited Participant Requirements for Transfer Agents*, SEC Rel. 34-55816, 72 Fed. Reg. 30648, 30648 (June 1, 2007) (hereafter, "Proposed FAST Rule") (Mashberg Decl., Ex. B).

Although the vast bulk of securities transactions are processed electronically, there are still situations when Participants seek to deposit or withdraw physical certificates. Generally, when securities certificates of a particular issue are deposited at DTC, DTC promptly delivers the certificates to the issuer's transfer agent, who cancels the old certificates and issues new certificates registered in the name of Cede & Co. The transfer agent sends new certificates to DTC, where they are maintained in DTC's vaults in what is known as "fungible bulk." Thereafter, Cede & Co. certificates generally remain immobilized at DTC, as future transactions are recorded by computerized book entry. *See generally* 48 Fed. Reg. 17603, 17604, n.5 (Apr. 25, 1983) (describing the role of a registered securities depository such as DTC). When a Participant seeks to withdraw physical certificates from DTC, it instructs DTC to obtain a new certificate. DTC, in turn, delivers a Cede & Co. certificate to the transfer agent with instructions to issue a new certificate, registered as instructed by the Participant. The transfer agent cancels the Cede & Co. certificate and issues a newly-registered certificate, as instructed. *See* Proposed FAST Rule at 30648.

Transfer agents must be registered with the SEC. 15 U.S.C. § 17q-1(c). Currently, there are approximately 1400 transfer agents for the approximately 2.5 million issues eligible for DTC's depository services. PAC ¶ 51.

**The Role of a FAST Agent**

The process of deposits and withdrawals described above inherently exposes securities to the risk of loss during transit between DTC and the transfer agents, and creates additional monetary expense.  Accordingly, since 1975, DTC has operated the FAST program.  Proposed Fast Rule at 30648 and n.5.  Under the FAST program, FAST agents enter into a contractual relationship with DTC to maintain on their premises, rather than in DTC's vaults, a "balance certificate," registered in the name of Cede & Co., for each FAST-eligible issue for which the FAST agent is the transfer agent.  *Id.* at 30648.  FAST agents maintain custody of the Cede & Co. balance certificate, adjust the balance on that certificate on a daily basis as additional deposits and withdrawals are made, and electronically confirm these changes with DTC.  *Id.* Because the FAST program dispenses with the need to cancel and issue new physical certificates, it reduces costs and risks to the securities industry.  *Id.*

The FAST program includes 930,000 securities issues and approximately 90 transfer agents.  *Id.*, at 30648, n.5.  In addition to its inherent right to choose the agents that participate in the FAST program, DTC has discretion to determine which issues are eligible for the FAST program.  Proposed FAST Rule at 30649, ¶ 3.  In light of anticipated growth of FAST due to DRS adoption, the SEC has recently published for public comment a proposed rule designed to ensure that FAST agents meet proper updated standards of security and integrity.

**The Direct Registration System**

DRS has recently been adopted by the major stock exchanges (pursuant to SEC approval) as a mandatory requirement for those issues that trade on those exchanges, in order to further improve efficiency in the clearing and settlement of the nation's securities transactions.

Proposed FAST Rule at 30648, n.6 (*citing, inter alia,* 71 Fed. Reg. 47278 (Aug. 16, 2006) (New York Stock Exchange), 71 Fed. Reg. 47262 (Aug. 8, 2006) (Amex); 71 Fed. Reg. 47276 (NASDAQ)(Aug. 16, 2006)). Under DRS, individual investors have the ability to establish a direct book entry position with the issuer, either through the issuer's transfer agent or the investor's broker. *See, e.g.,* SEC Rel. No. 34-54289 (approving NYSE proposed rule). DRS thus enables investors to have securities registered in their own names (rather than being registered in the name of Cede & Co.) without having to hold a physical certificate.

Under the new SEC-approved rules of the exchanges, the DRS system is mandatory for issues that have become listed on the exchanges since January 1, 2007. Issues that were traded on the major exchanges before January 2007 need not adopt DRS until January 1, 2008. *See id.* In order for an issue to become DRS-eligible it must have a transfer agent that is a FAST agent; however, those issues that are not listed on the major exchanges (the great majority) need not be DRS-eligible, and thus need not have a FAST-approved transfer agent. In previous briefing, OMST admitted that its customers are overwhelmingly Pink Sheet and Over the Counter Bulletin Board stocks, not listed on major exchanges and therefore not obligated to be DRS eligible. (OMST Mem. in Supp. of Prelim. Inj. at 8.)

### The SEC's June 1 Publication of A Proposed Rule for FAST Agent Requirements

On June 1, 2007, the SEC published a proposed DTC rule regarding new standards for becoming a FAST agent, and invited comment from all interested parties. Proposed FAST Rule, 72 Fed. Reg. 30648.[2] The proposed rule noted that the transfer eligibility requirements for the

---

[2]    Defendants previously advised OMST and the Court of the imminent publication of this proposed Rule, and specifically reserved its right to move to dismiss, after such publication, on the grounds of primary jurisdiction. March 9 Mem. at 25-26, n.14.

FAST program needed to be updated to (i) take into account the increased volume and value of securities since the 1975 introduction of FAST; (ii) reflect the current availability of improved technology and safeguards to enhance the requirements of safety in securities transaction; and (iii) require standardized audit reports to certify the processes in place at each FAST agent. Proposed FAST Rule, 72 Fed. Reg. at 30649. In summary, the proposed rule reflected DTC's "reexamin[ation of] the requirements of the FAST program with a view toward ensuring that the assets in the custody of transfer agents, which ultimately belong to DTC's Participants and their customers, are adequately protected." *Id.* Accordingly, the proposed rule sets forth 18 specific criteria that it proposed every FAST applicant be required to meet. *Id.* at 30649-30650. The SEC has invited comments from all interested parties. *Id.* at 30651. It is telling that OMST does not appear to have exercised its right to comment or advised the SEC of the concerns it raises here, despite the fact that the SEC is empowered to reject the proposed rule.

**The Present Litigation**

Plaintiff OMST is one of the transfer agents who (as anticipated by the Proposed FAST Rule) seeks FAST status as a result of the recent exchanges' adoption of DRS requirements. OMST submitted an application for FAST status, which DTC rejected. OMST demanded reconsideration of this decision and when DTC, upon continuing review, did not reverse its previous decision and appoint OMST as a FAST agent quickly enough for OMST's taste, OMST raised the fees it charged (only to DTC) geometrically and, when that did not achieve the desired result, commenced this action.

8

<u>OMST's Original Complaint and the Court's Dismissal of its Antitrust Claims</u>

OMST's original complaint claimed (1) that DTC had a monopoly over the entire securities depository industry, and, through that monopoly, used its power and influence over the allegedly closely-related market for transfer agent services (which OMST defined as the relevant market) (Compl. ¶ 42); (2) attempted monopolization (Compl. ¶ 52); (3) that DTC had attempted to form a conspiracy with actual and potential customer of OMST not to deal with OMST (Compl. ¶ 57); and (4) substantively similar claims under the New Jersey state antitrust laws (Compl. ¶¶ 60-77).[3] OMST sought actual, punitive and treble damages, and preliminary and permanent mandatory injunctions compelling DTC to appoint it as a FAST agent.

DTC moved to dismiss. In opposition, OMST submitted voluminous declarations and exhibits contending that DTC should be considered a competitor of OMST. It argued, *inter alia,* (i) that, allegedly, DTC's Participants own or control transfer agent affiliates that compete against OMST; (ii) that, allegedly, one-half of the total FAST agents approved by DTC were owned by Participants or subsidiaries thereof; and (iii) that the current industry trends indicated a rapid consolidation of stock transfer services. *See* OMST March 19 Mem. in Opp., at 2-3.

On April 23, 2007, this Court denied the request for a preliminary injunction (having previously denied the TRO) and dismissed all of OMST's federal and state antitrust claims pursuant to Fed. R. Civ. P. 12(b)(6). The Court held that, as a matter of law, OMST's monopoly and attempted monopoly claims under Section 2 of the Sherman Act were deficient because DTC was not a competitor in the market for transfer agent services. Op. at 7, 15. The Court further

---

[3]     OMST further asserted that DTC's publication of OMST's alleged exclusion from FAST, and DTC's alleged communications with OMST's customers regarding that fact, constituted tortious interference. That claim (against which DTC served, but had not yet filed a motion for sanctions under Rule 11), has been dropped from OMST's proposed amended complaint.

9

held that OMST's claims alleging conspiracy in violation of Section 1 of the Sherman Act were deficient because there were no allegations of actual agreement.  Op. at 16.

In rendering its decision, the Court rejected OMST's attempt to amend its pleading through the submission of additional documents in its reply brief.  Op. at 10.  Importantly, however, the Court went on to hold: "Even if I were to consider these new factual allegations, they fail to demonstrate a viable monopoly claim against DTC." *Id.*  The Court specifically rejected each allegation, holding that relationships between FAST agents and DTC's Participants were insufficient as a matter of law to impute competitor status to DTC, and that trends in the transfer agent market were irrelevant to whether DTC competes in that market.  *Id.* at 10-11.

The Allegations of OMST's Proposed Amended Complaint

Much of the proposed amended complaint seeks merely to re-allege in a formal pleading the same arguments the Court rejected when submitted in OMST's prior briefing.  Thus, for example, the proposed amended complaint seeks to add as defendants numerous financial institutions that are DTC Participants and certain FAST agents allegedly owned or controlled by those Participants.  PAC ¶¶ 7-17.  OMST alleges that the Defendant FAST agents compete with OMST and that this competitor status may be imputed to DTC because the Participants who allegedly own those FAST agents also hold equity shares in DTC.  *Id.* ¶¶ 18-19, *compare* OMST March 19 Mem. in Opp., at 2-3.  As an alternative basis to impute competitor status to DTC, OMST alleges that DTC is liable for the conduct of FAST agents, and thus somehow DTC should be deemed to be a competitor in the relevant market for transfer agent services – an allegation that not only lacks authority, but which is conceptually inconsistent with the Proposed FAST Rule currently under consideration by the SEC.  *Compare* PAC ¶ 20; Proposed FAST

Rule at 30651 ("DTC will not be liable for the acts or omissions of FAST agents or other third parties . . ."). Finally, OMST alleges the existence of a contract, combination or conspiracy between DTC and one or more of the other Defendants, PAC ¶ 52, although the complaint is devoid of any allegations regarding the scope, nature or terms of the alleged conspiracy.

OMST also seeks to re-allege the claims already rejected by this Court regarding the consolidation of the stock transfer agent industry, and the percentages of FAST agents who are affiliated with DTC Participants, *see, e.g.,* PAC ¶¶ 47-54, *compare* March 19 Mem. at 2, this time seeking to characterize those allegations as *prima-facie* evidence of conspiracy. *Id.* ¶ 52.

Finally, the PAC *concedes* that the gravamen of its complaint is the subject of a proposed rule change before the SEC. PAC ¶ 56. Rather than recognize that such publication is fatal to its claims, however, OMST demands that this Court disregard the SEC's ongoing rule-making process, and hold that the *proposed* rule violates the antitrust laws. *Id.* ¶ 58.

OMST again seeks to recover compensatory, punitive and treble damages and mandatory injunctions, both appointing it as a FAST agent and "prohibiting the Defendants from engaging in further activities that would exacerbate or perpetuate the effects of their unlawful anticompetitive conduct." *Id.*, Prayer for Relief, ¶ 2.

## ARGUMENT

### I.    LEAVE TO AMEND SHOULD BE DENIED WHERE, AS HERE, SUCH AMENDMENT IS FUTILE

Federal Rule of Civil Procedure 15 provides that leave to amend "shall be freely given when justice so requires." But the liberality of Rule 15 is not unlimited. Where, as here, the proposed amendment would be futile, denial of leave to amend is proper. *See, e.g., Joblove v. Barr Labs, Inc. (In re Tamoxifen Citrate Antitrust Litig.),* 466 F.3d 187, 220 (2d Cir. 2006); *Van*

11

*Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91-92 (2d Cir. 2003); *Flutie Bros. v. Hayes*, 2006 U.S. Dist. LEXIS 31379, at *29-30 (S.D.N.Y. May 18, 2006). As the *Flutie* court recognized, denial of leave to amend is proper where the proposed amendment could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Id.* at *29 (internal quotation and citations omitted). It is also well-settled that, where an original pleading is legally deficient, and the proposed amendment would not remedy those deficiencies, the amendment is futile. *See, e.g., Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006); *Kottmyer v. Maas*, 436 F.3d 684, 692 (6th Cir. 2006); *Baker v. Library of Cong.*, 260 F. Supp. 2d 59, 68 (D.D.C. 2003). Here, it is clear from the face of OMST's proposed amendment that its complaint remains unsustainable as a matter of law. Accordingly, leave to amend should be denied as futile.[4]

## II.   PLAINTIFF'S PROPOSED AMENDMENTS ARE FUTILE BECAUSE THEY DO NOT CURE THE FATAL DEFECTS IN ITS ORIGINAL COMPLAINT AND DO NOT ADEQUATELY PLEAD ANTITRUST VIOLATIONS

Applying pre-*Twombly* standards, this Court previously found that plaintiff did not adequately allege an antitrust violation because DTC and plaintiff were not competitors and there was no adequate allegation of any conspiracy. Op. at 8-9, 16. This conclusion applied to both the original complaint and the various supplemental information presented by OMST. In its proposed amended complaint, plaintiff has failed to correct these deficiencies, but rather has merely incorporated the previously-rejected supplemental information into its proposed amendment and added bare assertions that, at best, are nothing more than legal conclusions.

---

[4]    DTC does not intend to waive, and specifically reserves, its right to move to dismiss OMST's proposed amended complaint in the event that this Court grants its motion to amend and permits the complaint to be filed.

12

### A.    OMST's Proposed Amended Complaint Does Not Plausibly Allege that DTCC and OMST Compete in the Same Relevant Market

In dismissing the original complaint, this Court held, "[b]ecause DTC does not compete in the relevant market . . . plaintiff cannot, as a matter of law, state a claim for monopolization or attempted monopolization. . ." Op. at 8; *see, e.g., Discon, Inc. v. NYNEX Corp,* 93 F.3d 1055, 1062 (2d Cir. 1996), *rev'd on other grounds,* 525 U.S. 128 (1998) ("it is axiomatic that a firm cannot monopolize a market in which it does not compete"); *A.I.B. Express, Inc. v. FedEx Corp.,* 358 F. Supp. 2d 239, 249 (S.D.N.Y. 2004) (dismissing antitrust claim because plaintiff did not compete in market alleged to be monopolized and thus "the anticompetitive conduct alleged by [plaintiff] is not relevant . . ."). The Court added that this conclusion was true even if the Court considered the "new factual allegations" raised by OMST in its briefing papers. Op. at 10. For example, the Court held OMST had not cited any authority to permit imputing "competitor status in the relevant market . . . merely on the basis that some members of its Board of Directors and some of its shareholders are involved in the transfer agency industry." *Id.* at 11. The Court also noted that there was no attempt to "formally pierce the corporate veil of DTC." *Id.* at 11 n. 8.

In seeking permission to file its amended complaint, OMST provides no legal argument explaining how its proposed amendment resolves the deficiencies in alleging that DTC competes with it in any relevant market nor how DTC has monopoly power in any market in which OMST competes. The PAC continues to identify OMST as "providing stock transfer agency services" or being a "stock transfer agent". PAC ¶¶ 18, 25. It continues to allege that the relevant market is the "market for stock transfer agent services," PAC ¶ 74, and that "DTC enjoys a monopoly over the entire securities depository industry" and not the market for stock transfer agent services, PAC ¶ 5. The PAC does not allege that DTCC or DTC compete directly or have direct

13

monopoly power in the stock transfer agent market. OMST thus utterly fails to correct the pleading deficiencies for which its original complaint was dismissed. *See* Op. at 8.

At best, OMST appears to claim that that DTC can be presumed to compete in the stock transfer agent market either (a) because certain banks own equity in DTC's parent corporation, DTCC, and also own or control certain FAST agents; or (b) because those same FAST agents are actually somehow "agents" of DTC. PAC ¶ 20; Pl. Br., pp. 6-7. Yet this Court has already rejected these arguments: "[P]laintiff cites no legal authority that could impute competitor status in the relevant market to DTC merely on the basis that some members of its Board of Directors and some of its shareholders are involved in the transfer agent industry. Thus, these allegations fail to show that DTC is a competitor in the relevant market." Op. at 11 n.8. This conclusion is also true concerning the proposed amended complaint.

Plaintiff provides only cursory allegations (if any) to support the notion that the activities of any of the shareholders of DTC's parent corporation could somehow impute competitor status to DTC. OMST still does not and cannot adequately plead that there is any basis for piercing the corporate veil of DTC (assuming that is how the imputation of competition is to work). Under New York law, a presumption of separateness applies to corporations and in order to pierce the corporate veil a plaintiff must allege both (1) complete dominion and control by the owner over the corporation (here, by Participants over DTCC); and (2) that such dominion and control was exercised to commit a fraud or wrong injuring the party seeking to pierce the veil. *Kalin v. Xanboo, Inc.*, 2007 U.S. Dist. LEXIS 3342, at *28-31 (S.D.N.Y. Jan. 12, 2007); *see also, e.g., Goldblatt v. Englander Commc'ns, LLC*, 2007 U.S. Dist. LEXIS 4278, at *16-17 (S.D.N.Y. Jan.

14

18, 2007); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, 2004 U.S. Dist. LEXIS 780, at *18 (S.D.N.Y. Jan. 22, 2004). There are no such allegations here.

Moreover, OMST would be required to pierce the veil in at least 3 ways: (1) from DTC to DTCC; (2) from DTCC to its various Participants and (3) from each Participant to the FAST agent allegedly affiliated with it. All of these allegations would need to be specific. *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003) ("purely conclusory allegations [of dominion and control] cannot suffice to state a claim based on veil-piercing or alter ego liability, even under the liberal notice pleading standard"); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (conclusory allegations of veil piercing unsupported by factual assertions fail even the liberal standards of Rule 12(b)(6)). Even if OMST could successfully plead a claim to pierce the corporate veil, its claim would not be against DTC, but rather against those who allegedly used DTC as *their* alter ego.

Nor can OMST establish competitor status via its suggestion that there is some type of agency relationship between DTC and approved stock transfer agents. OMST's conclusory allegation – unsupported by facts – is hardly sufficient to meet its heavy burden to impute any FAST agent's conduct to DTC in order to deem DTC a competitor in the transfer agent market. *See generally Maung Ng We v. Merrill Lynch & Co.*, 2000 WL 1159835, at *5 (S.D.N.Y. Aug. 15, 2000) (plaintiffs' conclusory statements that entities were "agents" did not sufficiently allege an agency relationship); *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 285 (S.D.N.Y. 1994) (bare allegation of control was not sufficient): *Coraggio v. Time Inc. Magazine Co.*, 1995 WL 242047, at *3 (S.D.N.Y. Apr. 26, 1995) (allegation that parent "controls" subsidiary

insufficient to survive a motion to dismiss because it was nothing more than a conclusory and unsupported allegation).

Moreover, even assuming *arguendo* that FAST agents are "agents" of DTC with respect to their maintenance of the issuers' balance certificates, *see* PAC ¶ 20, this cannot, as a matter of law, justify treating DTC as a competitor in the alleged relevant market, *i.e.,* the market for transfer agent services. PAC ¶ 74. To the contrary, transfer agents perform routine deposit, withdrawal and corporate restructuring functions as agents for the *issuer*, not for DTC. There are no allegations (nor can there be) that DTC "controls" transfer agents in the performance of any of their activities on behalf of issuers. The fact that transfer agents function as agents of the issuers is explicitly conceded in the Advisory Memorandum of the Securities Transfer Association submitted by OMST. PAC , Ex. F at pg. 2 ("[t]ransfer agents serve as an agent for the issuer"); *see also* PAC, Ex. D at 2 ("Transfer agents, therefore, are regulated and audited by the SEC and are required by issuers to provide audit reports regarding the status of their operations. Issuers are ultimately responsible for the actions of their agents."). Similarly, transfer agents are not acting on DTC's behalf when they compete to acquire issuer customers. Accordingly, OMST cannot impute the transfer agent's services in the relevant market to DTC, and cannot allege that DTC is a competitor.

## B.    OMST's Proposed Amended Complaint Does Not Adequately Plead A Conspiracy

The proposed Section 1 claim is similarly futile because OMST does not plausibly state a conspiracy as required by *Twombly*. This Court dismissed OMST's original Section 1 claims because OMST did not even allege an actual agreement. Op. at 16. In the proposed amended complaint, OMST has simply added a conclusory, non-specific claim of some type of conspiracy

16

purportedly inferred from ambiguous facts. PAC ¶ 52. Such allegations are insufficient to state a claim under Section 1 of the Sherman Act.

In *Twombly,* the plaintiffs alleged that the defendants entered into "agreements" to "refrain from competing against one another," which plaintiffs claimed could be inferred from (a) defendants' common failure to pursue purportedly lucrative business activities; (b) statements by a CEO of one of the defendants; and (c) alleged parallel conduct by the defendants. The Court held that these allegations, amounting to "an allegation of parallel conduct and a bare assertion of conspiracy" were insufficient to survive a motion to dismiss. *Twombly,* 127 S. Ct. at 1966. The Court emphasized that it did not require heightened "fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

Like the *Twombly* plaintiff, OMST has failed to allege sufficient facts to state a plausible claim. The PAC merely conclusorily alleges that there is a "conspiratorial agreement" between DTC and "one or more of the Defendant Participants and/or Defendant DRS Agents." PAC ¶ 90. OMST does not allege who agreed to do what or when. The proposed amendment gives no indication of how many defendants purportedly entered such an agreement or even the general contents of any such agreement. OMST's only basis for alleging agreement is that a "massive, rapid and deliberate concentration of mandatory DRS-compliant stock transfer services within such a miniscule number of DRS-approved stock transfer agents . . . . constitutes *prima facie* indicia of the existence of a contract, combination or conspiracy among Defendants DTCC and DTC and one or more of the defendant Participants and Defendant DRS Agents." *Id.* ¶ 52. But, like the parallel conduct in *Twombly*, allegations regarding the current concentration of FAST agents, without more, do not provide facts sufficient to allege a plausible conspiracy. Moreover,

17

the Proposed FAST Rule supports a reasonable inference that the current "concentration" is expected to change in the near future. *See* 72 Fed. Reg. at 30648. The allegations of an agreement or conspiracy in the proposed amended complaint therefore are simply insufficient to state a claim and would have been insufficient even under the Second Circuit standard that existed before *Twombly. See, e.g., In re Elevator Antitrust Litig.*, 2006 U.S. Dist. LEXIS 34517, at *28-29 (S.D.N.Y. May 30, 2006) (dismissing Section 1 claim because alleged anticompetitive actions were equally likely to stem from individual competitive conduct by each of the purported co-conspirators, and thus could not support an inference of conspiracy); *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 483-84 (S.D.N.Y. 2001) (laundry list of allegedly anticompetitive actions, without information regarding the identities of co-conspirators or the nature and objectives of the conspiracy insufficient as a matter of law to withstand dismissal); *Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*, 2001 U.S. Dist. LEXIS 18831, at *42 (S.D.N.Y. Nov. 19, 2001) (claim which did not allege when and where agreement was made, by whom, and why, and the terms of such alleged agreement, was without merit and would be dismissed ); *Fort Wayne Telsat v. Entm't & Sports Programming Network*, 753 F. Supp. 109, 115 (S.D.N.Y. 1990) (complaint must identify co-conspirators and describe nature and effect of alleged conspiracy).

### C.    OMST's Proposed Amended Complaint Does Not Adequately Plead A Relevant Market

Plaintiffs allege that the relevant market is "the market for stock transfer agent services, including but not limited to the maintenance of issuers' stock ledgers and the processing of withdrawals and transfer of shares by canceling and issuing new stock certificates." PAC ¶ 74. Elsewhere OMST discusses purported competition for "full-service stock transfer agency services" (*e.g.*, PAC ¶¶ 7, 8) and for "stock transfer agency services to securities-issuing

18

companies whose shares of equity are traded on stock exchanges." PAC ¶¶ 18, 19.  OMST does

not define what services are included in this proposed market.  It does not provide any basis for

grouping all stock transfer agent services in a single market, or provide allegations regarding

substitutability, or allege any other facts to justify its conclusory legal allegation that there is

such a market.  Such vague and conclusory allegations are insufficient as a matter of law.  It was

clear even before *Twombly* that in order to allege a relevant market adequately, a plaintiff must

define the market's basic elements, such as the substitutability of products or services.  *See, e.g.,*

*United Magazine Co. v Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 389

(S.D.N.Y. 2001) (complaint was insufficient, among other things, for failing to define terms used

in market definition and to allege adequately interchangeability); *Gianna Enters. v. Miss World*

*(Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) (alleged market must relate to the

accepted methodology, including "analysis of the interchangeability of use or the cross-elasticity

of demand"); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172

(S.D.N.Y. 1995) (similar).  It is certainly clear now that OMST's market allegations are

insufficient as a matter of law.

III.  **PLAINTIFF'S ANTITRUST CLAIMS ARE SUBJECT TO IMPLIED IMMUNITY BECAUSE THEY ARE THE SUBJECT OF PERVASIVE REGULATION BY THE SECURITIES AND EXCHANGE COMMISSION**

This Court would need to dismiss even an adequately-pled complaint because the activity

at issue here is subject to implied immunity from the antitrust laws.  The basis of OMST's charge

is a claim that there is something anticompetitive about the way in which DTC has approved and

intends to continue approving FAST transfer agents.  OMST therefore seeks to have this Court

both determine what (if anything) in DTC's approval process could be anticompetitive and then

19

craft a permanent injunction to interfere with and regulate that process.  PAC, Prayer for Relief ¶ 2.  But DTC's process for appointing FAST transfer agents is an integral part of its SEC-mandated and regulated role as a securities depository, and its responsibility to safeguard the securities and funds in its control.  Proposed FAST Rule, 72 Fed. Reg. at 30651.  DTC and its clearance and settlement functions (including through DRS and via FAST agents) is critical to the efficient functioning of the securities industry.  As such, the DTC activities that OMST asks this Court to enjoin as "anticompetitive" are immune from application of the antitrust laws.  This conclusion was recently re-affirmed by the Supreme Court, which held that certain underwriting practices during the course of an initial public offering (IPO) of shares were impliedly immune from the antitrust laws because of the nature of the SEC regulation of that aspect of the securities industry.  *Credit Suisse Sec. (USA) LLC v. Billing*, 127 S. Ct. 2383 (2007).

In *Credit Suisse*, the Court held that, following its earlier decisions in *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659 (1975) and *United States v. National Ass'n of Securities Dealers, Inc. (NASD),* 422 U.S. 694 (1975), there are four critical factors in determining whether or not the securities laws preclude application of the antitrust laws:

> (1) the existence of regulatory authority under the securities law to supervise the activities in question;
> (2) evidence that the responsible regulatory entities exercise that authority; and
> (3) a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct . . . .
> (4)  . . . the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law seeks to regulate.

*Credit Suisse, 127* S. Ct. at 2392.

As in *Credit Suisse,* there is no question here that the SEC has exercised and continues to exercise regulatory authority over DTC, its depository, clearance and settlement activities, and

the functioning of DRS and FAST as an integral part of those activities. The SEC was empowered to regulate, coordinate, and direct the operations of all persons involved in processing securities transactions. As noted above (*supra*, pp. 4-5), the SEC has sweeping and comprehensive regulatory authority over all aspects of clearing agencies in general and over the securities handling process. The SEC must approve any DTC rule before it can be effective, and DTC can act only pursuant to those SEC-approved rules. *See* 15 U.S.C. § 78s(b)(1).

DRS and the FAST program were created pursuant to SEC authority and have been the subject of numerous SEC rule changes and proceedings over their 30 year history, most recently, the Proposed FAST Rule. *See, e.g.,* 43 Fed. Reg. 33977 (Aug. 2, 1978) (describing proposed rule change to enable non-New York based transfer agents to provide FAST services); 58 Fed. Reg. 13291 (Mar. 10, 1993) (approving proposed rule change clarifying the methods for FAST agents to effect changes in balance certificates); SEC Rel. No. 34-37931 (Nov. 9, 1996) (approving rule change establishing procedures for DRS); SEC Rel. No. 34-41862 (Sept. 10, 1999) (approving rule change modifying certain DRS procedures); 66 Fed. Reg. 43939 (Aug. 21, 2001) (approving rule change relating to movement of DRS issues; 68 Fed. Reg. 70057 (Dec. 16, 2003) (approving rule change eliminating certain criteria for DRS transactions).

It is also clear here that the need to regulate DTC's depository, clearance and settlement activities, and to ensure the safeguarding of the securities and funds for which DTC is responsible, is central to the "proper functioning of well regulated capital markets." *See Credit Suisse,* 127 S. Ct. at 2392. In enacting the governing regulatory scheme of Section 17A, Congress expressly intended to "develop[] . . . *uniform standards and procedures* for clearance and settlement [of securities transactions] . . ." 15 U.S.C. 78q-1(a)(1)(D) (emphasis added). In

21

furtherance of this explicit goal, the SEC has developed a comprehensive, uniform federal regulatory scheme intended to regulate, coordinate, and direct the operations of all persons involved in the processing of securities transactions. *See In re Initial Pub. Offering Antitrust Litig.*, 287 F. Supp. 2d 497, 511 (S.D.N.Y. 2003) (conduct regulated by the SEC more likely to be immune from state regulation because of the broad scope of the SEC's regulation and sweeping grant of authority granted by Congress).

Thus, as in *Credit Suisse,* there is no question that the first condition (legal regulatory authority), the second condition (exercise of that authority), and the fourth condition ("heartland" securities activity) that were present in *Gordon* and *NASD* are satisfied in this case as well. *Credit Suisse,* 127 S. Ct. at 2393. The question here, as in *Credit Suisse,* is whether there is "a conflict that rises to the level of incompatibility." *Id.* This case provides an even stronger risk of conflict than that found impermissible in *Credit Suisse.* There, the Court construed the challenged conduct as conduct that had already been *prohibited* by the SEC. Nonetheless, the Court held that implied immunity was appropriate, given that such challenges would require private litigants and courts to engage in "the fine securities-related lines separating the permissible from the impermissible." Citing the "need for securities-related expertise . . . ; the overlapping evidence from which reasonable but contradictory inferences may be drawn; and the risk of inconsistent court results," the Court determined that even the already-prohibited conduct could not be challenged by private antitrust litigants. *Id.* at 2395.

Here, the conflict is much more direct. OMST seeks to challenge as allegedly anticompetitive conduct that is either permitted by the SEC or that is likely to be permitted by the SEC through a formal rule-making process. OMST's proposed amended complaint seeks to

22

have this Court enjoin DTC's proposed approval process (among other conduct) -- the very conduct that the SEC is in the process of specifically approving. PAC, Claim for Relief ¶ 2. Thus, this Court need not consider those other factors (which would also require immunity here) because the challenge here is to the type of activity regulated by the SEC that is central to the functioning of the securities industry and that is approved or likely to be approved. *See Gordon*, 422 U.S. at 688-89 (securities law precludes antitrust challenge to the fixing of commissions regardless of whether SEC changed its rules permitting the practice). As the Court explained in *Gordon*, "[g]iven the expertise of the SEC, the confidence the Congress has placed in the agency, and the active roles the SEC and the Congress have taken, permitting courts throughout the country to conduct their own antitrust proceedings would conflict with the regulatory scheme authorized by Congress rather than supplement that scheme." *Gordon*, 422 U.S. at 689-690. OMST's antitrust claims therefore are precluded by the securities laws and should be dismissed.

## IV.    THE PROPOSED AMENDED COMPLAINT IS FUTILE UNDER THE DOCTRINE OF PRIMARY JURISDICTION

Even if the Court determines that there is no implied immunity here, it should nonetheless dismiss the action because the issues raised by the proposed amended complaint falls within the expertise of an administrative agency and this Court's review raises a substantial danger of inconsistent rulings. The doctrine of primary jurisdiction provides an allocation of initial decision-making responsibility between courts and administrative agencies, in order to ensure that they "do not work at cross-purposes." *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996); *see also Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006). The *Ellis* court identified four factors to be considered in determining when the primary jurisdiction applies: (1) whether the question at issue involves

technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *Id.* at 82-83, *citing Nat'l Commc'ns Ass'n, v. AT&T*, 46 F.3d 220, 222 (2d Cir. 1995). All of these factors weigh in favor of this Court declining jurisdiction over the PAC.

As to the first two factors, the standards appropriate for appointment of FAST agents, and the effect of imposing such standards, are matters uniquely within the expertise of the SEC. Clearance and settlement of securities transactions – a critical function in the nation's securities industry – is a highly specialized industry that has been closely regulated by the SEC since Congress' adoption of Section 17A in 1975. The SEC, after a period of notice and comment, is best-suited to identify technical and policy considerations in connection with any standards or regulations that would affect those clearance and settlement mechanisms – including the appointment of FAST agents to handle some portion of those transactions. Significantly, as noted above, OMST has apparently chosen not to have availed itself of the opportunity to provide comments to the SEC on proposed rules governing the FAST program.

The third factor, the danger of inconsistent rulings, is acute in this case. In the Proposed FAST Rule, the SEC has specifically invited comments regarding any effect on competition from the proposed rule change. Proposed FAST Rule, 72 Fed. Reg. at 30651. Yet OMST's proposed amended complaint asks this Court to determine whether the Proposed FAST Rule is anticompetitive, and to permanently enjoin such conduct. PAC, ¶ 58 and Prayer for Relief ¶ 2. Thus, there could well be an impermissible conflict between an SEC rule directing DTC to act in a particular way, and a Court ruling forbidding DTC from taking the same act. This is precisely

24

the sort of disruptive conflict the primary jurisdiction doctrine is designed to avoid. *See, e.g., Danna v. Air France*, 463 F.2d 407, 412 (2d Cir. 1972). Finally, the fourth factor, whether a prior application has been made, also weighs in favor of deferring to the agency. Although this factor is generally applied in cases where there has been or is pending an agency adjudication, the reason for the doctrine applies with at least equal force where, as here, there is a pending rulemaking proceeding before the agency. The Proposed FAST Rule addresses precisely the issues OMST seeks to raise in its proposed amended complaint concerning the criteria for FAST agents, and this Court should exercise its discretion under the primary jurisdiction doctrine to permit the SEC, in the first instance, to address the legitimacy of those proposed criteria.[5]

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court deny OMST's motion for leave to amend its complaint on the grounds of futility.

Dated: July 16, 2007

PROSKAUER ROSE LLP

By: _____/s/_____
    Gregg M. Mashberg (GM-4022)
    Michael Lazaroff (ML-0149)
    Karen D. Coombs (KC-3538)
    Dolores DiBella (DD-9637)

    1585 Broadway
    New York, NY 10036
    (212) 969-3000
    *Attorneys for Defendants*

---

[5] At some point, the relief requested by OMST would likely require that it join the SEC as a defendant.