# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------X

OLDE MONMOUTH STOCK TRANSFER CO., INC.,

                        Plaintiff,

        -- against --

DEPOSITORY TRUST & CLEARING
CORPORATION; DEPOSITORY TRUST COMPANY;
ABN AMRO HOLDINGS NV; LASALLE BANK N.A.;
LASALLE BANK NATIONAL ASSOCIATION/DRS;
THE BANK OF NEW YORK COMPANY, INC.;
THE BANK OF NEW YORK/DRS; THE BANK OF
NEW YORK - MICHIGAN/DRS; CITIGROUP
INC.; CITIBANK, N.A.; CITIBANK,
N.A./DRS; COMPUTERSHARE LIMITED;
COMPUTERSHARE TRUST COMPANY,N.A.;
EQUISERVE TRUST COMPANY, N.A./DRS;
COMPUTERSHARE INVESTOR SERVICES,
LLC/DRS; COMPUTERSHARE TRUST COMPANY,
INC./DRS; HSBC HOLDINGS PLC; HSBC BANK
USA, N.A.; HSBC BANK USA, N.A./DRS;        07 CV 0990
INVESTORS FINANCIAL SERVICES CORP.;          (CSH)
INVESTORS BANK & TRUST COMPANY/DRS;
JPMORGAN CHASE BANK & CO.; JPMORGAN
CHASE BANK, N.A.; EQUISERVE TRUST
COMPANY, N.A. / J.P. MORGAN SERVICE
CENTER/DRS; MELLON FINANCIAL CORPORATION;
MELLON BANK N.A.; CHASEMELLON SHAREHOLDER
SERVICES, L.L.C./DRS; NATIONAL CITY
BANK CORPORATION; NATIONAL CITY BANK/DRS;
UMB FINANCIAL CORPORATION; UMB BANK,
N.A.; UMB BANK, N.A./DRS; WELLS FARGO &
COMPANY; and WELLS FARGO BANK NATIONAL
ASSOCIATION/DRS;

                        Defendants.

----------------------------------------------X

FIRST AMENDED COMPLAINT

## FIRST AMENDED COMPLAINT

Plaintiff Olde Monmouth Stock Transfer Co., Inc., by and through its undersigned attorneys, hereby submits this First Amended Complaint against Defendants alleging violations of federal antitrust statutes and seeking injunctive relief and monetary compensation for the incalculable damage Olde Monmouth has suffered and will continue to suffer because of Defendants' unconscionable and anticompetitive conduct against Olde Monmouth and other similarly-situated stock transfer agents, which includes, among other causes of action, the improper restraint of trade in violation of applicable federal antitrust statutes.

## THE PARTIES

1.    Plaintiff Olde Monmouth Stock Transfer Co., Inc., ("Olde Monmouth"), is a corporation duly incorporated and authorized to conduct business under the laws of New Jersey, with its principal place of business located in Atlantic Highlands, New Jersey. Since January 9, 1992, Olde Monmouth has been a stock transfer agent duly and properly registered with the United States Securities and

2

Exchange Commission, pursuant to Section 17(A)(C) of the Securities Exchange Act of 1934. As such, Olde Monmouth acts as a transfer agent and registrar for the securities issued by its clients, which are companies the shares of which are publicly traded on the national securities exchanges and on the so-called stock trading "bulletin boards."

2. Defendant Depository Trust & Clearing Company ("DTCC") is a holding company that supports five principal subsidiaries, one of which is its wholly-owned Defendant Depository Trust Company ("DTC"). Both Defendants are incorporated under the laws of the State of New York with their principal places of business located in New York City.

3. Defendant DTC provides central securities depository and related services to members of the securities, banking and other financial industries. Defendant DTC is a limited purpose trust company organized under the laws of the State of New York, a clearing agency registered with the United States Securities and Exchange Commission under Section 17A of the Securities Exchange Act of 1934, a "banking organization" within the meaning of the

3

New York Banking Law, a member of the Federal Reserve System, and a "clearing corporation" within the meaning of the New York Uniform Commercial Code.

4. At all times relevant hereto, Defendant DTCC bears shared responsibility for the unlawful and otherwise improper actions of Defendant DTC as a consequence of DTC's status as a wholly-owned subsidiary of DTCC.

5. As demonstrated by statements that are included among the promotional materials on DTCC's and DTC's official Web site, DTC serves as the stock custodian for some 2.5 million issuers, valued at more than $28 trillion. As such, Defendant DTC enjoys a monopoly over the entire securities depository industry through, among other means, its Direct Registration System ("DRS"). DTC's DRS Program has been imposed upon and/or adopted by virtually every major financial institution and broker/dealer, and therefore DRS participation is or will soon be a listing requirement for all of the major, national and regional stock exchanges in the United States. As a result, all of the 2.5 million issuers that make use of DTCC's and DTC's facilities must be DRS-eligible.

6. Equity ownership shares of Defendants DTCC and DTC are held and owned by financial services institutions that are designated as "Participants" by DTCC

4

and DTC.  Upon information and belief, DTCC's and DTC's equity ownership shares are allocated among their Participants on the basis of the frequency, scope and nature of each Participant's respective DTCC- and DTC-related activities.  DTCC's and DTC's Participants are the equity shareholder/owners of DTCC and, concomitantly, DTC. (A complete list of the Participants that maintain Participant Accounts with DTC, as published by DTCC and DTC as part of their official Web site, as well as Note 1 (entitled "Business and Ownership") and Note 9 (entitled "Shareholders' Equity") to DTCC's Consolidated Financial Statements, dated December 31, 2006, which clearly demonstrate the ownership of DTCC and DTC by their shareholder Participants, are annexed hereto as Exhibit A.)

7.    Defendant ABN Amro Holdings NV ("ABN Amro") is an international major full-service banking and financial services institution incorporated under the laws of The Netherlands, with its principal place of business located in The Netherlands.  According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, ABN Amro's subsidiaries (including but not limited to Defendant LaSalle Bank N.A. (("LaSalle"), and hereinafter referred to as among the "Defendant Participants") are Participants of DTC and

5

maintain DTC Participant Accounts. LaSalle provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary, Defendant LaSalle Bank National Association/DRS ("LaSalle/DRS," and hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

8.    Defendant The Bank of New York Company, Inc. ("BoNY"), is a national major full-service banking and financial services institution incorporated under the laws of the State of New York, with its principal place of business located at One Wall Street, New York, New York 10286. According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, BoNY and its subsidiaries (hereinafter, with BoNY, collectively referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts. Upon information and belief, BoNY provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situation stock transfer agents through its

6

wholly-owned subsidiary companies, The Bank of New York/DRS and The Bank of New York – Michigan/DRS (collectively, "BoNY/DRS," and hereinafter referred to as among the "Defendant DRS Agents"), both of which have been approved by DTC to participate in the DRS Program and are included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

9.    Defendant Citigroup Inc. ("Citigroup") is a national major full-service banking and financial services institution incorporated under the laws of the State of Delaware, with its principal place of business located at 399 Park Avenue, New York, New York  10043.  According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, Citigroup's subsidiaries (including but not limited to Citibank, N.A., hereinafter collectively referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts.  Upon information and belief, Citigroup provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary entity, Citibank, N.A./DRS ("Citibank/DRS," hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to

7

participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

10. Defendant Computershare Limited ("Computershare") is a leading international financial market services provider incorporated under the laws of Australia, with its principal place of business located in Australia. According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, Computershare's subsidiary, Computershare Trust Company, N.A., ("Computershare Trust," hereinafter referred to as among the "Defendant Participants") is a Participant of DTC and maintains a DTC Participant Account. Upon information and belief, Computershare Trust provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary entities, Equiserve Trust Company, N.A./DRS ("Equiserve/DRS"), Computershare Investor Services, LLC/DRS ("Computershare Investor/DRS"), and Computershare Trust Company, Inc./DRS ("Computershare Trust/DRS") (hereinafter collectively referred to as among the "Defendant DRS Agents"), which have been approved by DTC to participate in

8

its DRS Program and are included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

11.    Defendant HSBC Holdings plc ("HSBC") is an international major full-service banking and financial services institution incorporated under the laws of England and Wales, with its principal place of business located in London.   According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, several HSBC subsidiaries (including but not limited to Defendant HSBC Bank USA, N.A., collectively hereinafter referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts.   Upon information and belief, HSBC provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary entity, HSBC Bank USA, N.A./DRS ("HSBC/DRS," hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

9

12.    Defendant Investors Financial Services Corp. ("Investors Financial") is a banking and financial services institution incorporated under the laws of the State of Delaware, with its principal place of business located at 200 Clarendon Street, Boston, Massachusetts 02116. According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, several of Investors Financial's subsidiaries (hereinafter collectively referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts.  Upon information and belief, Investors Financial provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary entity, Investors Bank & Trust Company/DRS ("Investors Bank/DRS," hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

13.    Defendant JPMorgan Chase Bank & Co. ("JPMorgan") is a national major full-service banking and financial services institution incorporated under the laws of the State of Delaware, with its principal place of

10

business located at 270 Park Avenue, New York, New York 10017. According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, JPMorgan's subsidiaries (including but not limited to JPMorgan Chase Bank, N.A., collectively hereinafter referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts. Upon information and belief, JPMorgan provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary entity, Equiserve Trust Company, N.A. / J.P. Morgan Service Center/DRS ("Equiserve/J.P. Morgan/DRS," hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

14. Defendant Mellon Financial Corporation ("Mellon") is a national major full-service banking and financial services institution incorporated under the laws of the State of Pennsylvania, with its principal place of business located at One Mellon Center, 500 Grant Street, Pittsburgh, Pennsylvania 15258. According to information

11

published as part of DTCC's and DTC's official Web site, and upon information and belief, Mellon's subsidiaries (including but not limited to Defendant Mellon Bank N.A., hereinafter collectively referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts.  Upon information and belief, Mellon provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary company, ChaseMellon Shareholder Services, L.L.C./DRS ("ChaseMellon/DRS," hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

15.   Defendant National City Bank ("National City") is a national major full-service banking and financial services institution incorporated under the laws of the State of Delaware, with its principal place of business located at National City Center, 1900 East Ninth Street, Cleveland, Ohio  44114.  According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, National City and its subsidiaries (collectively, with National City, hereinafter

12

referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts. Upon information and belief, National City provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary entity, National City Bank/DRS ("National City/DRS," hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

16. Defendant UMB Financial Corporation ("UMB") is a major full-service banking and financial services institution incorporated under the laws of the State of Missouri, with its principal place of business located at 1010 Grand Boulevard, Kansas City, Missouri  64106. According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, UMB subsidiaries (including but not limited to UMB Bank, N.A., collectively hereinafter referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts.  Upon information and belief, UMB provides full-service stock transfer agency

13

services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its subsidiary entity, UMB Bank, N.A./DRS ("UMB/DRS," hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

17. Defendant Wells Fargo & Company ("Wells Fargo") is a national major full-service banking and financial services institution incorporated under the laws of the State of Delaware, with its principal place of business located at 420 Montgomery Street, San Francisco, California 94163. According to information published as part of DTCC's and DTC's official Web site, and upon information and belief, Wells Fargo subsidiaries (collectively hereinafter referred to as among the "Defendant Participants") are Participants of DTC and maintain DTC Participant Accounts. Upon information and belief, Wells Fargo provides full-service stock transfer agency services in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents through its wholly-owned subsidiary entity, Wells Fargo Bank National Association/DRS ("Wells Fargo/DRS,"

14

hereinafter referred to as among the "Defendant DRS Agents"), which has been approved by DTC to participate in its DRS Program and is included among the list of DRS-approved transfer agents that appears on DTCC's and DTC's official Web site.

18.   Through the DRS-approved stock transfer facilities identified above as "Defendant DRS Agents" that are owned, operated or otherwise controlled by the Defendant Participants, such Defendant Participants and Defendant DRS Agents are engaged in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents in providing stock transfer agency services to securities-issuing companies whose shares of equity are traded on stock exchanges.   (A copy of the complete list of the 35 entities that have been approved by DTC as DRS-eligible, as it appears on the official DTCC/DTC Web site, is annexed hereto as Exhibit B.)

19.   Because and by virtue of the equity shares of DTCC and DTC that are owned by the Defendant Participants, the stock transfer services provided by the Defendant DRS Agents that are owned, operated or otherwise controlled by the Defendant Participants can be imputed and are attributable to DTCC and DTC and, therefore, DTCC and DTC are engaged in direct competition with Plaintiff Olde

15

Monmouth and all other similarly-situated small independent stock transfer agencies in providing stock transfer agency services to securities-issuing companies whose shares of equity are traded on stock exchanges. Moreover, a number of members of DTCC's Board of Directors are employed by and serve as senior executives of Defendant Participants

20. Defendants have characterized DRS-approved stock transfer agents as "performing important functions on DTC's behalf" and have described each such approved transfer agent as "acting as an agent for DTC in maintaining the Cede & Co. balance certificates and confirming the balance daily" for the shares of the 2.5 million issues that are deposited and traded through use of DTCC's and DTC's facilities. Accordingly, DTCC and DTC are liable for the conduct of such agents, and the stock transfer activities of the DRS-approved stock transfer agents, including the stock transfer agent activities of the Defendant DRS Agents, may be imputed and attributed to DTC and DTCC; therefore, DTCC and DTC are engaged in direct competition with Plaintiff Olde Monmouth and all similarly-situated small independent stock transfer agents in providing stock transfer agency services to securities-issuing companies whose shares of equity are traded on stock exchanges.

16

## JURISDICTION AND VENUE

21.   This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).   Venue over this matter is proper pursuant to 28 U.S.C. § 1391(b).

22.   In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone and electronic communications and the facilities of the national securities markets.

## FACTS

23.   As for the allegations advanced herein, Plaintiff Olde Monmouth makes such allegations based on personal knowledge wherever possible and, as to the remaining allegations herein, upon reasonable information and belief.

24.   Plaintiff Olde Monmouth is a small, family-owned company that was founded by the family patriarch, Mr. John A. Troster, approximately 16 years ago.   Mr. Troster's

17

wife and all of his children work with him at the company to promote and steward into the next generation its long-term growth and prosperity as a family-owned enterprise.

25.    Olde Monmouth is in the business of serving as the registrar and stock transfer agent for its clients. Plaintiff's clients are corporations, the shares of which are publicly traded on the national and regional stock exchanges and on the so-called stock trading bulletin boards.  As part of the provision of such services to its clients, Olde Monmouth acts as its clients' transfer agent vis-à-vis Defendant Depository Trust Company; however, no written contract of any kind exists between Olde Monmouth and DTC.

26.    Established in 1973, Defendant DTC is the largest central securities depository in the world, with custody of the securities of more than 2.5 million issuers valued at over $28 trillion.  According to its official promotional and marketing materials, DTC aims to reduce costs and to enhance clearing and settlement efficiencies by reducing the need for the actual physical transfer of individual stock certificates.  Under DTC's operating procedures, physical stock certificates are maintained (or "immobilized") in a central location, with changes in the

18

ownership of such securities recorded by "book entry" accounting systems, pursuant to which no stock certificates actually change hands.

27. Defendant DTC provides settlement services for all stock trades made through the National Securities Clearing Corporation ("NSCC"), the largest clearing corporation now in existence, and for other institutional stock trades and transfers. Like DTC, NSCC is also a wholly-owned subsidiary of Defendant DTCC. According to its official promotional and marketing materials, DTC settled securities transactions worth $275.2 trillion in 2004. Also according to NSCC's official promotional and marketing materials, in 2004 it processed some 5.7 billion transactions, valued at $100.4 trillion.

28. Working and interacting with DTC each business day, Olde Monmouth keeps track of the constantly shifting ownership rolls of its customers' stock. The role Olde Monmouth plays as the intermediary between its clients (*i.e.*, the issuing companies) and DTC is critical to ensuring that accurate records are maintained of the actual day-to-day ownership of its customers' shares of stock as those securities are bought and sold on the national and regional stock exchanges and through the stock trading bulletin boards.

19

29. As noted above, upon information and belief, the Defendant DRS Agents that are owned, operated or otherwise controlled by Defendant Participants perform similar if not identical stock transfer services, in direct competition with Plaintiff Olde Monmouth and similarly-situated stock transfer agents.

30. As compensation for its professional services as the stock transfer agent for its clients, Olde Monmouth is paid transaction fees by its clients, as well as by DTC, pursuant to fee schedules that are established by Olde Monmouth. As noted earlier, there is no written contract in place between Plaintiff and DTC governing fees or any other matter. Accordingly, and in keeping with standard custom and practice within the stock transfer industry, Olde Monmouth from time to time revises its fee structure as it determines to be justified by business circumstances and as it deems appropriate to remain competitive in the stock transfer industry.

31. At all times prior to the events complained of herein, Olde Monmouth enjoyed a cooperative and mutually beneficial relationship with Defendants; no disputes of any kind arose between them that were not satisfactorily resolved in timely fashion. This period of mutual benefit and cooperation lasted for over 15 years.

20

## DTC Announces A Mandatory Program Called DRS (Direct Registration System) To Be Used Only By "FAST" Approved Transfer Agents

32.   Early in 2006, DTC announced the mandatory imposition and implementation throughout the entire securities industries of a new electronic transfer system known as the DRS Program.   DTC specifically stated that in order for any transfer agent to be eligible for participation in this new mandatory program, the transfer agent must first be approved for DTC's Fast Automated Securities Program ("FAST").

33.   The ostensible purpose of the FAST Program, as described and publicized by Defendants DTCC and DTC, is to eliminate the movement of physical securities (immobilization) by allowing stock transfer agents to hold one balance certificate for each issuing company, in lieu of issuing multiple stock certificates.   The stated purpose of the FAST Program is to reduce the cost of creating, transporting and storing stock certificates and generally to improve the efficiencies of the stock transfer industry.

34.   Widely publicized by DTC as an important cost-saving technological advancement in the securities transfer industry, the FAST Program takes the form of a contractual arrangement governing the treatment of stock

21

ownership records between DTC and those members of the stock transfer industry that are hand-selected and approved by DTC to participate in the FAST Program.

35.    By issuing innumerable announcements, releases and publications, DTCC, DTC and other leading organizations in the securities industry, such as the Securities Industry Association, have made clear and emphasized the critical importance of FAST participation for all members of the securities industry, including stock transfer agents that provide services for the 2.5 million companies whose shares makes use of DTCC's and DTC's facilities.    (Relevant portions of an example of such industry publications, "The Securities Industry Immobilization & Dematerialization Implementation Guide," published by the Securities Industry Association, are annexed hereto as Exhibit C.)    For example, DTC has publicly issued any number of statements "urg[ing] . . . Underwriters to pick a Transfer Agent that is a FAST Agent because Agents must qualify as FAST in order to become DRS eligible."

36.    DTC also has widely publicized the fact that "DTCC recently sent letters to all Underwriters alerting them to the Rule changes and providing a list of current

DRS eligible Transfer Agents." DTC's DRS Program has been imposed upon, adopted or acquiesced to by virtually every major financial institution and broker/dealer.

37. Moreover, DRS participation has been made a listing requirement for all of the major stock exchanges in the United States, including the New York Stock Exchange, the American Stock Exchange and NASDAQ. In addition to the national stock exchanges, a growing number of regional exchanges, such as the Philadelphia, Chicago and Boston trading exchanges, also have imposed DRS-certification as a listing prerequisite. As a consequence of the mandatory nature of the DRS Program, all of the 2.5 million stock issues that make use of DTCC's and DTC's facilities must be DRS-eligible.

38. Given the ongoing and increasingly rapid expansion of DRS-eligibility as a listing requirement to more and more stock exchanges, the critical importance to stock transfer agents of being permitted to participate in the DRS/FAST Program is self-evident. As noted earlier herein, under the rules and conditions imposed by DTC, no transfer agent can be eligible for DRS participation unless that agent has been hand-selected and permitted by DTC to participate in DTC's FAST Program.

23

39. The growing consolidation and concentration of stock transfer services within the small number of DRS-eligible DRS-approved transfer agents have caused widespread consternation among the independent stock transfer agents, such as Olde Monmouth and those that are similarly situated, as evidenced by, for example, a recent front-page article from the Stock Transfer Agency's ("STA") official trade publication.  (A copy of the article from the STA newsletter is annexed hereto as Exhibit D.)

40.  The critical importance to Plaintiff Olde Monmouth and similarly-situated stock transfer agents of acceptance into DTC's DRS/FAST Program cannot be overstated.

41. On many recent occasions, Olde Monmouth has received in the regular course of its business unsolicited inquiries from issuers in search of a stock transfer agent, who have immediately terminated their inquiries upon learning that DTC has unilaterally excluded Olde Monmouth from participation in the FAST Program.

42.  It also is impossible to estimate the extent to which Defendants DTCC and DTC, Defendant Participants and Defendant DRS Agents have publicized DTC's exclusion of Olde Monmouth and similarly-situated stock transfer agents from the FAST Program to the vast stock-issuing community

at large, including but not limited to the 2.5 million issues that make use of DTCC's and DTC's facilities, and the resulting direct and indirect chilling effects on interstate commerce. It is similarly impossible to estimate the number of new clients that Olde Monmouth and similarly-situated stock transfer agents otherwise would have attracted in the absence of such widespread dissemination of the DRS mandates and Olde Monmouth's arbitrary and improper exclusion from the DRS/FAST Program.

43. In fact, Plaintiff Olde Monmouth recently has begun to receive unsolicited offers from third parties offering their services as "DRS experts" to assist those businesses not yet approved for DRS participation. One such solicitation, which arrived at Olde Monmouth's offices by electronic mail, begins: "I've noticed your business is not yet qualified to offer the Direct Registration System to your clients." (A copy of this electronic mail solicitation is annexed hereto as Exhibit E.)

44. The exact extent of the chilling effects on Plaintiff's business activities, as well as on the business activities of similarly-situated small independent stock transfer agents, from the widespread dissemination by Defendants of such exclusionary lists of DRS-eligible entities is at this point impossible to ascertain.

25

45. DTC's widespread dissemination of the mandatory nature of its DRS Program with respect to the 2.5 million stock issues that make use of DTCC's and DTC's facilities throughout the securities, broker/dealer and financial services industries includes, but is not limited to, the publication on the official DTCC/DTC Web site of a list of the 35 institutions that are approved by DTC as DRS-eligible. Not a single small, independent stock transfer agency appears among the list of DRS-eligible entities, which instead is made up entirely of transfer agents that are owned, operated or otherwise controlled by huge full-service financial behemoths and major multinational corporations.

46. Of the 35 entities selected and certified by DTC as DRS-eligible transfer agents, upon information and belief, eight are captive in-house transfer facilities of certain large corporations that are not otherwise involved in the securities or financial services industries (such as The Walt Disney Company, Sara Lee Corporation and The Procter & Gamble Company) such that they perform such stock transfer services that pertain solely to transactions involving the stock of their respective issuing companies.

26

47. Upon information and belief, the remaining 27 DRS-eligible transfer agents are owned or controlled by major financial institutions. Of these 27 DRS-eligible transfer agents, at least 14 (more than one-half) are owned or otherwise controlled by Defendant Participants. As noted above, these 14 DRS-eligible agents are referred to herein as the "Defendant DRS Agents."

48. Based on publicly available information, it is not possible at this point, absent limited discovery of DTCC and DTC on this issue, to determine how many more of the other 27 DRS-eligible transfer agents also are owned by, affiliated with, or otherwise controlled by any of the other financial institutions that own equity shares of DTC and DTCC as Participants.

49. As stated in its official promotional and marketing materials and as part of its official Web site, DTC serves as the stock custodian of some 2.5 million stock issuers. Because of DTCC's and DTC's mandatory imposition of the DRS Program on the entire securities industry, each of the 2.5 million issues that make use of DTCC's and DTC's facilities are required to be DRS-eligible, which, of course, means that those 2.5 million stock issuers are or

27

will be required to select a stock transfer agent from among the 35 stock transfer agents that have been hand-selected and approved by DTC as DRS-eligible.

50.    Various industry and trade publications currently estimate the number of stock transfer agents now in operation in the United States at between 900 and 1,400.

51.    The imposition of DTC's DRS Program on the securities industry means that the number of stock transfer agents from which the 2.5 million stock-issuing companies whose shares are on deposit with DTCC are now able to choose as their stock transfer agents will drastically diminish in number from between 900 and 1,400 to a mere 35, only 27 of which appear to be financial services institutions.    More than one-half of these 27 transfer agents are owned or controlled by Defendant Participants.

52.    This massive, rapid and deliberate concentration of mandatory DRS-compliant stock transfer services within such a minuscule number of DRS-approved stock transfer agents, at least one-half of which are owned or controlled by Defendant Participants, constitutes *prima facie* indicia of the existence of a contract, combination or conspiracy among Defendants DTCC and DTC and one or more of the Defendant Participants and Defendant DRS Agents, the anticompetitive effects of which have been and continue to

be the redirection and diversion of stock transfer services away from independent stock transfer agencies such as Olde Monmouth to and for the benefit of stock transfer agency facilities that are owned or controlled by Defendant Participants.

53.    Such anticompetitive deliberate concentration of stock transfer services within the hands of the very small number of Defendant DRS Agents, which are owned or controlled by Defendant Participants, constitutes an unreasonable restraint on trade and competition and results in adverse effects on interstate and foreign commerce.    Such adverse effects on interstate and foreign commerce include, but are not limited to:    (i) the exclusion of Olde Monmouth and similarly-situated stock transfer agents from participating in the stock transfer agency market; (ii) the severely diminished number of stock transfer agents from which the 2.5 million issues that make use of DTCC's and DTC's facilities are able to select a stock transfer agent thereby limiting the choice of providers of stock transfer agency services in an anticompetitive manner; and (iii) Defendants' ability to control and raise prices for such services, thereby injuriously affecting the general consuming public as well as stock issuers.

29

54. Accordingly, the stock transfer market, in which stock transfer agents perform myriad tasks, such as maintaining issuers' stock ledger books, processing withdrawals and transfers of stock shares and canceling and issuing stock certificates, has been and continues to be adversely affected by Defendants' concerted anticompetitive and unlawful conduct, only a portion of which is detailed *supra*.

55. The manner in which all or some combination of the Defendants have acted to accomplish such concentration and consolidation of the provision of stock transfer agency services within the stock transfer agency market for their own benefit by deliberately diverting and redirecting stock transfer agency services away from independent stock transfer agencies such as Olde Monmouth through Defendants' manipulation of the mandatory DRS Program constitutes anticompetitive and predatory conduct, the specific intent of which is to facilitate the ultimate monopolization of the market for stock transfer agency services.

56. Further evidence of Defendants' deliberate and carefully calculated monopolistic and anticompetitive conduct vis-à-vis the stock transfer agency industry by means of its transparent manipulation of the DRS/FAST

30

Program may be found in the recent "Proposed Rule Change Amending FAST and DRS Limited Participant Requirements for Transfer Agents," Release No. 34-55816, which was published in the Federal Register on June 1, 2007 ("DTC's Proposed Rule"). As submitted by Defendant DTC for imposition on the stock transfer agency industry, the DTC's Proposed Rule clearly further demonstrates the monopolistic and anticompetitive intent underlying the DRS/FAST Program and the deleterious effects redounding to the detriment of Olde Monmouth and similarly-situated stock transfer agents arising therefrom.

57. Not surprisingly, the recent publication of the Proposed Rule has caused widespread alarm and consternation among the stock transfer agency industry, the independent members of which understandably fear for their very continued financial viability should DTC's Proposed Rule be adopted. The Securities Transfer Association, Inc. ("STA"), has published an Advisory Memorandum to its membership warning of the many anticompetitive purposes behind and effects of DTC's Proposed Rule and urging its membership to voice its strong opposition to the Proposed Rule and the disastrous financial and anticompetitive implications for independent stock transfer agents, such as Olde Monmouth, that will be occasioned by its ratification.

31

(A copy of the STA's Advisory Memorandum, dated June 6, 2007, is annexed hereto as Exhibit F, pertinent portions of which have been highlighted for the convenience of the Court.)

58.    Among the many anticompetitive and predatory aspects of DTC's Proposed Rule that will result in direct and indirect adverse effects on the ability of Olde Monmouth and similarly-situated independent stock transfer agents to compete and even to remain in business:

(a)    DTC's Proposed Rule imposes on DRS-approved stock transfer agents the responsibilities of acting as a *custodian for DTC*.  Such a custodial relationship between transfer agents and the DTC has never heretofore existed and is inappropriate for any number of reasons.  In particular, custodians within the securities industry are typically full-service financial institutions, banks and trust companies, such as Defendant Participants.  Consequently, by imposing custodial responsibilities on its DRS-approved transfer agents, DTC is transparently favoring its own Participants' Defendant DRS Agents, which are

32

owned or controlled by full-service financial services institutions, in an unlawful anticompetitive manner by defining DRS-eligibility in such a means so as to exclude automatically Olde Monmouth and similarly-situated independent stock transfer agents from participation in the DRS/FAST Program. Requiring FAST agents to act as a custodian for DTC will have little or no effect on transfer agents that are affiliated with full-service financial institutions, such as Defendant DRS Agents, while simultaneously forcing independent non-bank/trust company transfer agents out of business.

(b) DTC's Proposed Rule imposes vastly increased insurance requirements on DRS-approved transfer agents -- enhanced insurance requirements that are wholly unjustified and totally unnecessary based on any historical loss statistical studies. Such massive and unjustified insurance requirements are clearly designed to favor stock transfer agents that are affiliated with full-service financial institutions, such as Defendant DRS Agents, to the exclusion of smaller independent stock

33

transfer agents for whom the cost of obtaining such insurance coverage will be prohibitive, thereby further reducing competition in the stock transfer agency industry and accelerating the consolidation of transfer agency services within the handful of DTC's hand-selected cadre of DRS-approved transfer agents.

(c)   DTC's Proposed Rule imposes additional onerous and financially untenable audit requirements on transfer agents as yet another unreasonable pre-condition to DRS/FAST-eligibility.  At present, the United States Securities and Exchange Commission adequately performs such audits and review functions; DTC's attempted outrageous usurpation of the SEC's rule-making authority in this regard manifests further monopolistic conduct by DTC and the other Defendants at the expense of, and to the anticompetitive detriments of, Olde Monmouth and similarly-situated independent stock transfer agents.

(d)   DTC's Proposed Rule creates a so-called "DRS Ad Hoc Committee" to develop, announce and implement whatever additional DRS

34

Program requirements it desires.  The monopolistic intent and effects of such a "Committee" are manifest, given the facts (i) that DTC itself will appoint and dictate the membership of the Committee in its unfettered discretion and (ii) that the Committee will be free to issue and impose whatever requirements it wants -- anticompetitive or otherwise -- without any independent or outside oversight whatsoever.

(e)  Viewed in the aggregate, DTC's Proposed Rule unilaterally imposes any number of unjustified and otherwise unnecessary significant costs that must be borne by DRS-eligible transfer agents for the sole and exclusive financial benefit of DTC.  While such an arrangement may be unobjectionable to Defendant DRS Agents, inasmuch as such agents are owned or otherwise controlled by the shareholder/owner Participants of DTC (and accordingly the absorption of such costs for the benefit of DTC may be viewed as some type of payments-in-kind), the forced absorption of such new and significant costs by Olde Monmouth and similarly-situated independent stock transfer agents -- costs that transfer agents are

35

expressly prohibited from passing on to DTC under DTC's Proposed Rule -- are carefully designed to be prohibitively costly and ruinous for such independent transfer agents.

59.    The degree to which and the rapidly escalating pace at which the flagrantly unlawful and anticompetitive consolidation and concentration within the stock transfer agency services market have occurred and continue to occur by virtue of Defendants' anticompetitive conduct constitute yet additional evidence of the unlawful monopolization of the market for stock transfer agency services that has taken place and will continue to be ongoing.   (Additional facts and information concerning the anticompetitive consolidation within the stock transfer agency industry, as well as detailed data concerning DTCC's and DTC's anticompetitive conduct and intent during the historical development of the DRS Program, are set forth in the Declaration of Susanne Trimbath, Ph.D., sworn to March 17, 2007, which is annexed hereto as Exhibit G.)

## Olde Monmouth's Unsuccessful Efforts to Enroll in FAST

60.   Realizing the critical importance of the FAST Program to its clients, Olde Monmouth immediately contacted DTC to obtain the requisite application

36

materials.   Most of Olde Monmouth's customers are small companies to whom the potential for the cost savings to be realized by the efficiencies inherent in the FAST Program would be of great value.

61.   Participation in the FAST Program is of such critical importance to Olde Monmouth that if it is not permitted to join, it will be unable to retain existing clients or to attract new customers, thereby causing irreparable harm to Olde Monmouth and other similarly-situated independent stock transfer agents, as well as to the general consuming public and to stock-issuing companies.

62.   Over the course of the ensuing few weeks, Olde Monmouth made numerous attempts to learn from DTC the steps that would be required to become a participant in the FAST Program.   Despite these many overtures by Olde Monmouth, however, Defendant DTC inexplicably refused to share any additional information about the FAST Program with Olde Monmouth and, in fact, either ignored or rebuffed Olde Monmouth's repeated and numerous attempts to apply for participation in the FAST Program.   Despite its best efforts, Olde Monmouth was unable to communicate with any

37

DTC representative about its surprising and inexplicable refusal to allow Olde Monmouth to apply to participate in the FAST Program.

63.    Because all of its initial requests to obtain the necessary application materials for participation in DTC's FAST Program were ignored by DTC, in March 2006 Plaintiff began telephoning DTC approximately two times each week in an attempt to secure an application package.    After several weeks of repeated telephone calls to DTC, Olde Monmouth finally obtained the FAST application materials.

64.    Upon its receipt, Olde Monmouth immediately completed and returned the FAST Program application form to DTC on May 19, 2006.

65.    On June 22, 2006, Olde Monmouth was informed by letter from DTC that:   "DTC has determined not to use your services as a FAST agent."   (A copy of the June 22, 2006 letter from DTC is annexed hereto as Exhibit H.)   DTC purported to excuse its unreasonable refusal to permit Olde Monmouth's enrollment in the FAST Program on the basis of several minor deficiencies that in the past had been cited by the Securities and Exchange Commission, despite the fact that, in the case of each such "deficiency," Olde Monmouth

38

had immediately addressed and cured each of the cited conditions to the satisfaction of the Securities and Exchange Commission.

66.    Several days after learning of its rejection by DTC, on July 5, 2006, Olde Monmouth's outside counsel, Mr. Richard Fox, wrote to DTC requesting additional information and clarification concerning its refusal to permit Olde Monmouth's participation in the FAST program. (A copy of Mr. Fox's July 5, 2006 letter is annexed hereto as Exhibit I.)   DTC never responded.

67.    Realizing that its very existence as an ongoing business enterprise was placed in jeopardy by DTC's unreasonable and arbitrary refusal to address Olde Monmouth's need to participate in the FAST Program, over the next few months Plaintiff in good faith undertook a lengthy series of extraordinary steps to convince DTC of its complete and total compliance with all of the FAST program's requirements and to ascertain from DTC the reason for its arbitrary refusal to allow Olde Monmouth's participation -- none of which was successful.   Such extraordinary good faith steps included the following:

(a)    Plaintiff voluntarily implemented greatly enhanced on-site security measures to improve the security of its customers' stock certificates that far

39

exceeded SEC requirements.  At the invitation of Olde Monmouth, DTC inspected Plaintiff's premises but has never commented on its inspection in any manner.

(b)  In addition to correspondence from its attorney, Olde Monmouth continued to place frequent telephone calls to DTC as part of its diligent and conscientious attempts to ascertain whether there might be any plausible justification for DTC's unreasonable and unfair exclusion of Olde Monmouth from the FAST Program.  On September 7, 2006, Isaac Montal, Esq., of DTC's Legal Department, telephoned Olde Monmouth to admonish it against any further inquiries and to promise that it would receive notification of DTC's disposition of its application request a few weeks thereafter.

(c)  In connection with the approval of its enrollment in a separate program initiative sponsored by DTC, the "Paperless Legal Transfer Program," Olde Monmouth sought the assistance of its DTC contact person on that new program to help with its problems in obtaining enrollment in the FAST Program, who promised to look into the matter on behalf of Olde Monmouth.  Olde Monmouth has never received any response to its request.

40

(d)   Mr. Fox once again wrote to DTC's Legal Department on October 13, 2006, to reiterate Olde Monmouth's express willingness and determination to cooperate fully with DTC to address and remedy any issues that DTC might have with respect to Olde Monmouth's participation in the FAST program:  "If there are any deficiencies, and they are communicated, my client [Olde Monmouth] will take every step necessary to comply."  Mr. Fox also reiterated Olde Monmouth's request for a face-to-face meeting with DTC representatives to resolve the matter.  (A copy of Mr. Fox's letter of October 13, 2006, is annexed hereto as Exhibit J.)

(e)   Olde Monmouth paid to retain the professional services and assistance of Susanne Trimbath, Ph.D., the CEO of STP Advisors, a firm that provides advisory services to the stock transfer industry.  Because Ms. Trimbath is a former senior-level employee of DTC, Olde Monmouth hoped that by retaining her services, she might be able to provide some insight into DTC's unfair and arbitrary conduct with respect to Plaintiff's FAST Program application and open some type of communication or dialog with DTC officials.  Instead of communicating about the status

41

of Olde Monmouth's application, Mr. Montal, of DTC's Legal Department, responded angrily to the very fact of Ms. Trimbath's involvement.  As a direct consequence of Mr. Montal's angry reaction, Olde Monmouth immediately severed its relationship with Ms. Trimbath in the hope of placating DTC and obviating any further difficulties with Mr. Montal, who appeared to be coordinating DTC's response to Plaintiff's FAST Program application.

(f)  Upon receipt from Mr. Montal of DTC's Proposed Rule Change No. SR 2006-16, Olde Monmouth set out immediately to comply fully with all of the various provisions of the Proposed Rule.  In less than one month, although the proposed rule change ultimately would be challenged by the securities industry as overly stringent and unduly burdensome, Plaintiff had completed the steps necessary to be totally compliant with all of the provisions of the Proposed Rule and provided full documentation to Mr. Montal of Plaintiff's complete compliance with the Proposed Rule on an item-by-item basis.

(g)  Upon being orally informed by DTC's Montal on November 27, 2006, that one of the only two remaining impediments to approval of Olde Monmouth's

42

FAST Program application related to a purported "confiscation" of China Aoxing securities in August 2005, Plaintiff immediately provided DTC with clear documentary proof that the so-called "confiscation" was, instead, a *rejection* of the China Aoxing securities that was entirely proper and appropriate under the circumstances.  (The second issue raised by Mr. Montal related to Olde Monmouth's fee schedule. That matter is addressed in detail herein, *infra.*)

(h)   Having obtained oral assurances from DTC's Montal to Mr. Fox that Olde Monmouth had met all of the requirements imposed by Proposed Rule Change No. SR 2006-16, Plaintiff agreed on December 27, 2006, to establish a lower fee schedule going forward on the condition that Olde Monmouth's FAST program application was approved by January 1, 2007.

(i)   In yet another attempt to establish some type of constructive dialog with DTC about its unreasonable and arbitrary refusal either to allow Olde Monmouth to enroll in the FAST Program or to explain DTC's reasons for its arbitrary exclusion of Plaintiff therefrom, Olde Monmouth's President, Mr. John C. Troster, prepared and sent additional correspondence to address these issues.  Mr. Troster's

43

letter, dated January 25, 2007, was directed to Larry Thompson, Esq., the General Counsel of DTC's parent entity, Defendant DTCC, and it clearly recounted in detail the lengthy and tortured history of Olde Monmouth's diligent and conscientious efforts to secure admission to the FAST Program, and DTC's consistently unreasonable and arbitrary refusal to participate in any meaningful communications with Olde Monmouth about the status of its FAST Program application.  Mr. Troster also informed DTCC's Thompson of the existence of improper and tortious communications initiated by DTC employees Isaac Montal and John Carvalho to Olde Monmouth's clients, the details of which are elaborated upon herein below. Mr. Troster deliberately directed this communication to the General Counsel of DTC's parent company because of DTC's inexplicable intransigence and because Mr. Troster hoped that Thompson, as Mr. Montal's superior, might be able to facilitate a resolution and prevent further tortious conduct vis-à-vis Olde Monmouth's clients.  (A copy of Mr. Troster's letter of January 25, 2007, is annexed hereto as Exhibit K.)

68. Plaintiff's offer to revert to a prior fee schedule for its charges stemmed from the fact that, because DTC had totally ignored and rebuffed all of Olde Monmouth's attempts to obtain clarification of Defendant's unreasonable refusal to permit Olde Monmouth's enrollment in the FAST Program, Olde Monmouth implemented an increase in the fees it charged for its stock transfer services. The first such fee increase became effective in late July 2006.

69. Plaintiff's decision to raise its fees was motivated solely by its desire to prod DTC to discuss and process Olde Monmouth's FAST application and to compensate it for its loss of business and its inability to attract new clients as a direct result of DTC's unreasonable rejection of its FAST application. In addition, on several occasions, Olde Monmouth expressly promised DTC that it would revert to its former fee schedule upon its acceptance as a full participant in the FAST Program.

70. At all times during its relationship with DTC, Olde Monmouth has remained entirely free unilaterally to determine its fee structure inasmuch as, among other things, no written contract has ever been in place between DTC and Olde Monmouth governing fees.

45

71. As the result of an exchange of correspondence between DTC and Plaintiff on February 22, 2007, Olde Monmouth agreed to revert to its previous fee schedule in consideration of DTC's agreement to cease and desist from any further communications with Olde Monmouth's customers of a nature that Plaintiff believed to constitute tortious interference.

## AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION

### FEDERAL ANTITRUST
### (VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT -- ACTUAL MONOPOLIZATION)

A. NATURE OF TRADE AND COMMERCE

72. Plaintiff hereby incorporates all of the allegations set forth herein above by reference as if set forth in full at this point.

73. As demonstrated *supra*, Defendants are competitors of Olde Monmouth and similarly-situated stock transfer agents for the provision of stock transfer agency services, and Defendant DTC enjoys a monopoly over the entire securities depository industry through, among other means, its Direct Registration System ("DRS"), which has

46

been imposed upon and/or adopted by virtually every major financial institution and broker/dealer. Participation in DTC's DRS Program is a mandatory listing requirement for all of the 2.5 million stock issues that make use of DTCC's and DTC's facilities, as well as for listing on all of the major national and regional stock exchanges in the United States. The DRS Program provides the mechanism pursuant to which Defendants are able to exert, and do exert, direct and indirect anticompetitive power on the stock transfer agency industry by, among other means, Defendants' unlawful and arbitrary exclusion of certain stock transfer agents from eligibility for DTC's FAST Program, participation in which is an essential prerequisite for participation in DTC's DRS Program.

74. The relevant market in each antitrust claim alleged herein below is the market for stock transfer agent services, including but not limited to the maintenance of issuers' stock ledgers and the processing of withdrawals and transfer of shares by canceling and issuing new stock certificates. The relevant geographic market in each antitrust claim alleged herein below includes, but is not limited to, the United States.

47

75. For all the reasons set forth above in Plaintiff's allegations concerning the background of the relevant industry and for other reasons, there is a distinct market for the provision of stock transfer agency services in the United States. Herein below Plaintiff will refer to that market as the "Relevant Market" and the stock transfer agency services provided within that market will be referred to as the "Relevant Services."

76. Since at least 2005 and continuing through the date hereof (the "Relevant Time"), Defendants' misconduct has threatened, and continues to threaten, to drive Olde Monmouth and other similarly-situated stock transfer agents out of business.

77. During the Relevant Time, Defendants have adversely affected and continue to adversely affect the market for Relevant Services in the Relevant Market, directly and substantially adversely affecting interstate commerce in violation of Sections 1 and 2 of the Sherman Act.

B. MISCONDUCT

78. During the Relevant Time, and continuing through the present day, Defendants have intentionally engaged in an ongoing course of conduct with the purpose

48

and effect of impairing Olde Monmouth's and other similarly excluded stock transfer agents' ability to compete in the Relevant Market and to be able to engage in the performance of the Relevant Services. This course of conduct has been and continues to be designed to allow, and has the effect of allowing, Defendants to maintain and expand their monopoly power within the Relevant Market. This course of conduct includes, but is not limited to, the following:

a.  DTC has continued to require FAST registration in order to be permitted to provide the Relevant Services within the Relevant Market.

b.  During the Relevant Time, as part and parcel of Defendants' conspiratorial agreement to restrain trade, Defendants unlawfully and in an anticompetitive manner have forced and continue to force the massive consolidation and concentration of the provision of stock transfer agency services in the hands of an extremely small number of DRS-eligible stock transfer agents, many of which are Defendants.

c.  During the Relevant Time, as part and parcel of the conspiratorial agreement among the Defendants to restrain trade, DTC has intentionally and maliciously attempted to

49

persuade Olde Monmouth's existing customers and potential future customers not to do business with Olde Monmouth, and has threatened retaliation if they use, or continue to use, Olde Monmouth's services.

d.    As part and parcel of its conspiratorial agreement among the Defendants to restrain trade, DTC has threatened not to allow Olde Monmouth to perform services for its current and potential customers.  Some customers have explicitly stated that they do not understand why DTC is coercing them to abandon Olde Monmouth. In doing so, the Defendant Participants, Defendant DRS Agents and DTC have acted for the purpose of foreclosing Olde Monmouth's access to the Relevant Market and crippling its ability to compete with Defendants to the detriment of Olde Monmouth and interstate commerce.

e.    During the Relevant Time, as part and parcel of its conspiratorial agreement among the Defendants to restrain trade, DTC has engaged in an ongoing course of conduct to disparage Olde Monmouth's services to actual and potential customer in order to cause such third parties not

50

to do business with Olde Monmouth for the purpose of foreclosing its access to the Relevant Market and ability to compete in the Relevant Market to the detriment of Old Monmouth and interstate commerce.

## C.    EFFECTS OF MISCONDUCT

79.    Defendants' conduct, as alleged above, has produced, expanded and maintained monopoly power (including the power to control prices and to exclude competitors) for the benefit of Defendants in the Relevant Market such that Defendants have amassed a dominant market share in the Relevant Market.   Defendants have deliberately and purposefully sought to secure such monopoly power so that they may, *inter alia*, unilaterally exclude companies, including Olde Monmouth and similarly-situated stock transfer agents, and to raise prices at will, all in violation of Section 2 of the Sherman Act (15 U.S.C. Section 2).

80.    The course of action alleged herein was intended to and has had the following specific injurious effects:

51

a. The consuming public will be denied the benefits of free and open competition in the Relevant Market;

b. Stock-issuing companies, including the 2.5 million issues that make use of DTCC's and DTC's facilities, are being denied and will continue to be denied freedom of choice as a consequence of the unlawful and anticompetitive concentration and consolidation of DRS-approved stock transfer agency services within the hands of a small number of DRS-approved stock transfer agents, many of which are the Defendants.

c. Competing companies engaged in the marketing and selling of Relevant Services will be crippled in their ability to compete in the Relevant Market, with the probable effect that consumer choice will be limited and prices will be increased, all to the detriment of the consuming public;

d. Plaintiff and others similarly situated have been and will continue to be foreclosed from the opportunity to compete in the Relevant Market; and

e.  DTC and the other Defendants, including Defendant DRS Agents, will maintain and expand their monopoly power in the Relevant Market with the power to exclude competition and raise prices.

## D.  ANTICOMPETITIVE HARM

81.  By reason of the foregoing, Olde Monmouth, similarly-situated stock transfer agents, stock-issuing companies and the general public have suffered anticompetitive injury, i.e., injury resulting directly from a reduction in the vigor of the competitive process in the Relevant Market.  This anticompetitive injury consists of, among other things, Olde Monmouth and similarly-situated stock transfer agents being foreclosed from the opportunity to compete in the Relevant Market, and the revenue and profits that would have been realized as part of that competitive process.

82.  Moreover, but for the illegal conduct described herein, the value of Plaintiff's  enterprise and the enterprises owned by similarly-situated stock transfer agents as ongoing business concerns would have continued to increase, whereas the current value of such stock transfer agents' enterprises has been and will continue to be greatly reduced relative to what it would have been in the

absence of such illegal conduct. Plaintiff does not now know the precise amount of its damages proximately caused by the conduct described herein, which are thus subject to proof at trial or other appropriate proceeding. Under Section 4 of the Clayton Act, Plaintiff is entitled to treble the actual amount of all such damages and to an award of reasonable attorneys' fees and costs.

## AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION

### FEDERAL ANTITRUST
### (VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT -- ATTEMPTED MONOPOLIZATION)

83. Olde Monmouth hereby incorporates all of the allegations set forth herein above by reference as if set forth at this point in full.

84. As demonstrated *supra*, Defendants are competitors of Olde Monmouth and have a dominant market share in the Relevant Market.

85. Defendants' misconduct threatens to drive Olde Monmouth and similarly situated stock transfer agents out of business. Defendants undertook this deliberate pattern of anticompetitive conduct with the specific intent

54

to achieve monopoly power (with power to control prices and exclude competitors) within the Relevant Market.

86.    The plan and course of action alleged herein poses a dangerous probability of inflicting the following specific injurious effects:

a.    The consuming public will be denied the benefits of free and open competition for Relevant Services in the Relevant Market;

b.    Stock-issuing companies, including the 2.5 million issues that make use of DTCC's and DTC's facilities, are being denied and will continue to be denied freedom of choice as a consequence of the unlawful and anticompetitive concentration and consolidation of DRS-approved stock transfer agency services within the hands of a small number of DRS-approved stock transfer agents, many of which are Defendants.

c.    Competing companies engaged in the performance of Relevant Services will have their ability to compete crippled, with the probable effect that consumer choice will be limited and prices will be increased, all to the detriment of the consuming public and to the significant benefit of Defendants;

55

d.    Plaintiff and others similarly situated have been and will continue to be foreclosed from the opportunity to compete in the Relevant Market; and

e.    There is a dangerous probability that Defendants will expand and obtain their monopolistic power  in the Relevant Market with the power to exclude competition and raise prices.

87.    Plaintiff does not now know the precise amount of its damages proximately caused by the conduct described herein, which are thus subject to proof at trial or other appropriate proceeding.  Under Section 4 of the Clayton Act, Plaintiff is entitled to treble the actual amount of all such damages and to an award of reasonable attorneys' fees and costs.

## AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION

### FEDERAL ANTITRUST
### (VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT --
### RESTRAINT OF TRADE)

88.    Olde Monmouth hereby incorporates all of the allegations set forth herein above by reference as if set forth at this point in full.

56

89.    As demonstrated *supra*, Defendants are competitors of Olde Monmouth, have a dominant market share in the Relevant Market, and during the Relevant Time, DTCC, DTC, Defendant Participants and Defendant DRS Agents had monopoly power in the Relevant Market sufficient to control prices and constrain consumer choice in that market.

90.    In undertaking the conduct alleged above DTCC and/or DTC entered in a conspiratorial agreement with one or more of the Defendant Participants and/or Defendant DRS Agents to exclude competition in the Relevant Market.

91.    The anticompetitive scheme had the actual adverse effect of unreasonably restraining trade in the Relevant Market in the following respects:

a.    The consuming public was denied the benefits of free and open competition in the performance of Relevant Services in the Relevant Market;

b.    Stock-issuing companies, including the 2.5 million issues that make use of DTCC's and DTC's facilities, were denied and will continue to be denied freedom of choice as a consequence of the unlawful and anticompetitive concentration and consolidation of DRS-approved stock transfer agency services within the hands

57

of a small number of DRS-approved stock transfer agents, many of which are the Defendants.

c.    Competing companies engaged in the marketing and selling of such services throughout the United States had their ability to compete crippled, with the consequence that consumer choice was limited, all to the detriment of the consuming public; and

d.    Plaintiff and others similarly situated have been and will continue to be foreclosed from the opportunity to compete in the Relevant Market.

92.    Plaintiff does not now know the precise amount of its damages proximately caused by the conduct described herein, which are thus subject to proof at trial or other appropriate proceeding.  Under Section 4 of the Clayton Act, Plaintiff is entitled to treble the actual amount of all such damages and to an award of reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

By reason of all of the foregoing, Plaintiff hereby prays that this Court adjudge and decree:

1.  That judgment be entered against Defendants for the amount of damages suffered by Plaintiff, as proven at trial or other appropriate proceeding, and for punitive and exemplary damages, as well as treble damages;

2.  That a permanent injunction be granted, prohibiting the Defendants from engaging in further activities that would exacerbate or perpetuate the effects of their unlawful anticompetitive conduct;

3. Granting injunctive relief requiring Defendant DTC to enroll Olde Monmouth in its FAST and DRS Programs under the same terms and conditions as apply to other stock transfer agents that have been approved as DRS/FAST-eligible; and

4.  For such other and further relief as the Court deems just and proper to be awarded.

## DEMAND FOR JURY TRIAL

Plaintiff Olde Monmouth hereby demands trial by jury.

Dated:    June 25, 2007
          New York, New York

Respectfully submitted,

____/ s /_____
By:  Edward R. Gallion (EG-5755)
     Steven Spielvogel (SS-2295)

**GALLION & SPIELVOGEL**
1225 Franklin Avenue
Suite 325
Garden City, New York 11530
516.512.8899

*Attorneys for Plaintiff*
*Olde Monmouth Stock Transfer Co.*

60