UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

OLDE MONMOUTH STOCK TRANSFER CO., INC.,

                     **Plaintiff,**

      -- against --

DEPOSITORY TRUST & CLEARING
CORPORATION and DEPOSITORY TRUST
COMPANY,

                     **Defendants.**

                  **07 CV 0990 (CSH)**

------------------------------------------------------------------X

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN
## SUPPORT OF ITS MOTION FOR LEAVE TO AMEND ITS COMPLAINT

**GALLION & SPIELVOGEL**

Edward R. Gallion (EG-5755)
Steven Spielvogel (SS-2295)

1225 Franklin Avenue
Suite 325
Garden City, New York 11530
516.512.8899

*Attorneys for Plaintiff*
*Olde Monmouth Stock Transfer Co., Inc.*

July 30, 2007

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN
## SUPPORT OF ITS MOTION FOR LEAVE TO AMEND ITS COMPLAINT

Plaintiff Olde Monmouth Stock Transfer Co., Inc. ("Olde Monmouth") respectfully submits this Reply Memorandum of Law in support of its motion, pursuant to Federal Rule of Civil Procedure 15, for leave to amend the Complaint in this action.

### PRELIMINARY STATEMENT

Narrowly staking their fortunes, Defendants vest almost the entirety of their opposition to Plaintiff's motion in two recent decisions of the Supreme Court, erroneously arguing that the first, Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955 (2007), provides an additional basis for attacking the sufficiency of the allegations Plaintiff seeks to advance in its Proposed Amended Complaint, and that the second, Credit Suisse Sec. (USA) LLC v. Billing, __ U.S. __, 127 S. Ct. 2383 (2007), somehow *immunizes* Defendants' unlawful and anticompetitive conduct from judicial scrutiny. Thoughtful analysis of these Supreme Court holdings, however, reveals that neither is of actual consequence, relevance or application to Plaintiff's motion, and properly must be limited to their specific facts. Accordingly, Defendants' reliance on these cases is wholly misplaced, their arguments should be rejected, and Plaintiff's motion for leave to amend should be granted.

## ARGUMENT

### Plaintiff's Motion To Amend Its Complaint Should Be Granted.

I.  **Plaintiff Has Met and Fully Satisfied All Applicable Pleading Requirements.**

Defendants mistakenly expend considerable effort in a fruitless attempt forcibly to shoehorn Plaintiff's motion within the framework of the Supreme Court's recent decision in Twombly, a putative class action, which, although filed under the antitrust statutes, otherwise bears no resemblance whatsoever to Olde Monmouth's narrowly tailored claim for specific individual relief.[1] The Twombly plaintiffs presented the Court with nothing more to support their sweeping antitrust claims against the entirety of the American telecommunications industry than undeveloped allegations of parallel conduct by some of the defendants, much if not all of which easily could be attributable to preexisting historical market trends. Perhaps not surprisingly, the Court found such meager pleadings inadequate to permit such a monstrous lawsuit to proceed under the pleading requirements of Rule 12(b)(6), which the Court described as requiring "only enough facts to state a claim to relief that is plausible on its face." Id., 127 S. Ct. at 1974.

Even Defendants acknowledge, as they must, that the Twombly "Court emphasized that it did not require heightened 'fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on is face.'" (Defs' Mem. at 17 (citing Twombly, 127 S. Ct. at 1974).); cf. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683 (1974) (in weighing a motion to dismiss, the district court inquires "not whether a

---

[1]     Twombly presented the Court with an antitrust action on behalf of a putative class consisting of at least 90 percent of the nation's local telephone or high-speed Internet service subscribers during a seven-year period against virtually all of America's largest telecommunications corporations

2

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.")

For a number of reasons, Twombly's plausibility standard provides no support for Defendants' attack on Olde Monmouth's instant motion. First, the putative class plaintiffs in Twombly attempted to support their claims with nothing other than parallel conduct, which typically is viewed with justifiable skepticism in the antitrust context, inasmuch as such conduct is easily attributable to rational market forces. Given the flimsy nature of the conclusory allegations and the paucity of specificity of any kind in Twombly, it would be ill-considered to construe that decision as abrogating in any significant fashion the traditional pleading flexibility afforded to antitrust plaintiffs, which requires that dismissals be granted sparingly, in acknowledgement of the reality that proof of the alleged antitrust conspiracy will always lie primarily within the control of the defendants. See, e.g., Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746-47, 96 S. Ct. 1848 (1976); World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 425 F. Supp. 2d 484, 517 (S.D.N.Y. 2006).[2]

In stark contrast to the fatally vague allegations reviewed in Twombly, the unprecedented phenomenon here presented — i.e., the recent vast market consolidation and redirection from potential distribution among some 1,400 stock transfer agents throughout the United States to a mere handful of 35 DRS-approved agents that have been hand-selected by DTC -- cannot reasonably be explained away by historic market trends or as a result of random, uncoordinated activity; rather, it is, as Plaintiff plainly

_____

[2]   Cf. Radovich v. National Football League, 352 U.S. 445, 454, 77 S. Ct. 390 (1957) ("Congress itself has placed the private antitrust litigant in a most favorable position . . . . In the face of such a policy, this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws."); Knuth v. Erie-Crawford Dairy Coop. Ass'n, 395 F.2d 420, 423 (3rd Cir. 1968) ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings.").

3

alleges, the direct result of the deliberately anticompetitive manner in which DTC is administering its DRS/FAST Program.[3]  In these circumstances, Defendants' anticompetitive and outright punitive conduct vis-à-vis Plaintiff can only be attributed to Defendants' deliberate and arbitrary determination to exclude Olde Monmouth from DRS participation.  It simply defies logic to suggest that such a rapid and fundamental reordering of the nation's entire stock transfer agency industry somehow has come about naturally or of its own accord.

Moreover, Olde Monmouth's allegations easily survive scrutiny under Twombly's plausibility standard.  There is nothing implausible whatsoever about the anticompetitive agreement that Olde Monmouth alleges.  Plaintiff respectfully submits that, given, *inter alia*, the swift and massive diversion and concentration of stock transfer agency services within such a small number of transfer agents that are affiliated with Defendants' owners, it is entirely plausible -- *if not probable* -- that Defendants and two or more of the parties that Plaintiff seeks to add as defendants have unlawfully conspired and agreed to divert and capture stock transfer agency services for their own benefit through the manipulative, anticompetitive administration of the DRS/FAST Program, which is wholly within Defendants' unfettered and unsupervised control.  Plaintiff has indeed identified the likely co-conspirators and has adequately described the nature and effect of the alleged conspiracy (e.g., Am. Cmplt. ¶¶ 55, 78, 85, 90), as Defendants demand (Defs' Mem. at 15).

---

[3]  Olde Monmouth observes that while Defendants now assert that 90 stock transfer agents have been certified as DRS-eligible (Defs' Mem. at 6), the identities of these additional agents are unknown.  DTC's official Web site continues to identify only 35 transfer agents as eligible to participate in its DRS/FAST Program, thereby leaving both this Court and the Plaintiff totally in the dark as to the identities of these additional DRS-eligible transfer agents, all of whom, presumably, have only quite recently been approved for participation.  The identification of these additional DRS-eligible transfer agents, the extent of their ownership affiliations with DTC's shareholder/owner Participants and the circumstances surrounding their DRS/FAST acceptance should be disclosed to Plaintiff during the initial phase of discovery.

Defendants also attack Plaintiff's motion by reiterating their prior argument that Plaintiff has inadequately alleged direct competition with Olde Monmouth in the market for stock transfer agency services. Such an argument, however, must fail when considered in the context of Olde Monmouth's amended allegations. Olde Monmouth plainly alleges in its Proposed Amended Complaint that the activities of DTC's affiliated transfer agents are attributable to DTC on the basis, *inter alia*, of *DTC's own* prior statements. (E.g., Am. Cmplt. ¶¶ 19, 20.) As Plaintiff has set forth, DTC variously has described its DRS-approved transfer agents as "performing important functions on DTC's behalf" and as "acting as an agent for DTC in maintaining the Cede & Co. balance certificates and confirming the balance daily." These clear and unambiguous statements appeared in DTC's prior submissions to this Court, presumably reflect Defendants' careful and considered judgment, and, as such, must be evaluated as carrying considerable import and gravity. Defendants' current attempt, as part of their opposition to Plaintiff's instant application, to distance themselves from such prior statements should not be countenanced.[4] Olde Monmouth respectfully submits that it sufficiently has alleged (e.g., Am. Cmplt. ¶¶ 19, 73, 84) that DTC is indeed a direct competitor of Olde Monmouth and other similarly situated stock transfer agents.

Further in this regard, Plaintiff's proposed amendments would add as party defendants those DRS-approved transfer agents that are owned or otherwise controlled by the shareholder/owner Participants of DTCC and DTC. The fact that such transfer agents do indeed compete directly against Olde Monmouth to provide stock transfer agency services as Plaintiff alleges (see, e.g., Am. Cmplt. ¶ 29) is unassailable,

---

[4]     Apparently also in furtherance of its attempt to divert the Court's attention from the importance of its earlier admissions, Defendants launch into a rather lengthy discussion of corporate veil-piercing principles (Defs' Mem. at 14-16). Because of the fact that Plaintiff at no time has ever advanced such an argument or otherwise articulated any allegations that alter ego machinations play any role whatsoever in the challenged anticompetitive conduct, Olde Monmouth firmly believes that any veil-piercing inquiry would be wholly irrelevant and misguided.

5

and Defendants tellingly make no attempt to argue otherwise.  Accordingly, the proposed amended complaint directly addresses and fully resolves any prior deficiencies with respect to the existence of direct competition with Plaintiff.[5]

In sum, Olde Monmouth respectfully submits that its allegations survive scrutiny under the plausibility standard enunciated by the Supreme Court in Twombly and, similarly, survive Defendants' unsuccessful attacks, particularly in light of the aforementioned considerations attendant to the special difficulties facing plaintiffs when alleging the existence of unlawful agreements under Section 1 of the Sherman Act.[6]

## II.    This Court Has Jurisdiction To Grant The Relief Sought By Plaintiff.

In an astoundingly creative flight of fancy, Defendants arrogantly argue, based *solely* on the Supreme Court's recent decision in Credit Suisse, that this Court is

---

[5]    As was the case with their motion to dismiss, Defendants once again attempt to mislead the Court by manufacturing a wholly irrelevant issue relating to market definition.  (Defs' Mem. at 14-16, 19.)  Plaintiff has provided definitions of the relevant market that are more than sufficiently clear and precise (e.g., Am. Cmplt. ¶¶ 18, 54, 74) to satisfy well-established pleading requirements.  See, e.g., Pepsico, Inc. v. Coca-Cola Co., No. 98 Civ. 3282, 1998 WL 547088, at *6 (S.D.N.Y. Aug. 27, 1998) (market definition should be accepted unless the alleged market makes no economic sense).

In accordance with such controlling precedent, there is no need whatsoever to embark upon pointless examinations of product substitutability, cross-elasticity of demand, entry barriers and the like where, as here, the relevant market may be defined in such a concise and straightforward manner.  As expressly defined in the Amended Complaint, the relevant market, simply put, is the market for the provision of stock transfer agency services on behalf of stock-issuing companies and their shareholders.  (Am. Cmplt. ¶¶ 18, 54, 74.)

[6]    Indeed, it is difficult to fathom the specificity that would satisfy the pleading requirements Defendants here seek to impose.  Presumably, nothing short of the following would suffice: "On November 17, 2005, Mr. Smith of Citibank, Mr. Jones of Wells Fargo, Ms. Brown of Mellon Bank and Ms. White of HSBC met with Messrs. Cohen and Adams of DTCC's legal department at a luncheon meeting at Table 9 of the Four Seasons' Grill Room to finalize an unlawful agreement to manipulate DTC's control over its administration of the DRS Program for the benefit of Defendants' Participant owners in a conversation that was overheard by the staff of the Grill Room and nearby patrons."

As this Court is well aware, such precision is impossibly beyond the scope of any antitrust plaintiff's knowledge at the outset of litigation.  See, e.g., Hosp. Bldg. Co., 425 U.S. at 746-47.

6

without jurisdiction to adjudicate Plaintiff's claims, because the Supreme Court has immunized their unlawful and anticompetitive conduct from judicial scrutiny. Defendants' audacious attacks on the jurisdiction of this Court must be repelled for a host of reasons.

In Credit Suisse, plaintiffs unsuccessfully petitioned the Court to invalidate a wide-ranging and theretofore widely utilized market-making mechanism for the pricing and allocation of initial public offerings, a procedure that the SEC at the time was in the process of reexamining and severely curtailing through the promulgation of a new regulatory scheme in the exercise of its supervisory authority over the securities industry. The Court understandably declined to intervene or interfere with the SEC's ongoing regulatory oversight of the specific widespread practices attacked by the plaintiffs.

Contrary to Defendants' deliberate misconstruction of Plaintiff's claims, they bear no resemblance whatsoever to the issues raised in Credit Suisse. Olde Monmouth has not petitioned this Court to enjoin adoption of the proposed DRS rule, nor has it asked the Court to rewrite the rules, or invalidate or postpone them or otherwise interfere with their adoption in any way.[7] Neither has Olde Monmouth sought this Court's ongoing oversight or supervision of the DRS Program in any manner whatsoever; rather, Olde Monmouth merely is asking the Court to correct Defendants' obvious anticompetitive manipulation of the DRS/FAST Program by permitting Plaintiff's admission thereto. Given Defendants' steadfast refusal to administer the DRS Program

---

[7]    Defendants' focus on Olde Monmouth's failure to file with the SEC an objection to the Proposed Rule provides further evidence of their basic misapprehension as to the nature of Plaintiff's claims. Olde Monmouth has no opposition whatsoever to the content, import or adoption of the rule; indeed, it already has taken all necessary steps to ensure its total compliance therewith.

Instead, Olde Monmouth's concerns derive solely from the unlawful, anticompetitive and unfair manner in which Defendants *administer* the rule to Plaintiff's detrimental exclusion from participation in the DRS/FAST Program. In this regard, Defendants betray their fundamental misunderstanding of the distinction between legally sanctioned rule making authority on one hand, and the non-uniform, arbitrary misapplication of such rules on the other.

evenhandedly and fairly, it is only by enlisting this Court's assistance that the "uniform standards and procedures" envisioned by Section 17A of the Securities Exchange Act can be assured.

Nor can <u>Credit Suisse</u> be read to immunize Defendants' challenged conduct here simply because DTC's rulemaking authority is subject to the SEC's general oversight authority, as Defendants mistakenly and brazenly assert. (Defs' Mem. at 21-23.) Acceptance of Defendants' argument would mean that no lawsuit challenging the administration of the DRS Program could proceed, irrespective of whether or not DTC applied its eligibility criteria unfairly to advance anticompetitive goals, and notwithstanding the fact that there is no SEC administrative remedy, right of appeal or due process available to transfer agents such as Olde Monmouth that wish to be admitted to DTC's FAST Program.

Defendants simply cannot be permitted to have it both ways: DTC cannot claim immunity under the congressional mandate in Section 17A of ensuring efficiency and uniformity, while simultaneously administering the DRS Program in a blatantly non-uniform and anticompetitive manner. Similarly, it simply would defy all logic to accept Defendants' notion that the admission of Olde Monmouth into DRS would somehow "conflict with the regulatory scheme authorized by Congress" in Section 17A (Defs' Mem. at 23). The extremely limited and narrowly tailored relief sought by Plaintiff presents no potential for the type of conflict with a congressionally authorized regulatory scheme that so troubled the <u>Credit Suisse</u> Court.[8] And, of course, Defendants offer the Court no enlightenment as to how such a simple, straightforward act as the approval of Olde Monmouth as DRS-eligible would in any way be inconsistent with the overarching goals of ensuring efficiency and uniformity in our nation's securities markets.

---

[8] In the same vein, Olde Monmouth respectfully submits that Defendant's preposterous suggestion that the Securities and Exchange Commission should be added as a party defendant to this action (Defs' Mem. at n.5) is beneath comment.

8

Finally, Plaintiff observes that the scope and applicability of the savings clause contained in the Securities Exchange Act, which broadly preserves the availability of all antitrust remedies, remains unchanged by the Supreme Court's decision in Credit Suisse; no party invoked the savings clause in the proceedings below and the Court, accordingly, specifically declined to review that issue. Credit Suisse, 127 S. Ct. at 2392. See also id. at 2400 ("A straightforward application of the saving clauses to this case leads to the conclusion that respondents' antitrust suits must proceed. Accordingly, we do not need to reconcile any conflict between the securities laws and antitrust laws.") (Thomas, J., dissenting).

In sum, this Court should rebuff Defendants' fanciful and desperate assaults on this Court's jurisdiction and reject their specious attempt to insulate and immunize their own calculated, anticompetitive conduct from judicial review.

## CONCLUSION

For the foregoing reasons, Plaintiff Olde Monmouth respectfully submits that its motion to amend the Complaint in this action should be granted in all respects.

Dated: July 30, 2007
New York, New York

Respectfully submitted,

_____/ s /_____
By: Edward R. Gallion (EG-5755)
    Steven Spielvogel (SS-2295)

**GALLION & SPIELVOGEL**
1225 Franklin Avenue
Suite 325
Garden City, New York 11530
516.512.8899

*Attorneys for Plaintiff*
*Olde Monmouth Stock Transfer Co., Inc.*

9